## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EYAL YAKOBY and JORDAN DAVIS, | Civil Action No. |
| Plaintiffs, | **COMPLAINT** |
| v. | Jury Trial Demanded |
| UNIVERSITY OF PENNSYLVANIA, | |
| Defendant. | |

Plaintiffs Eyal Yakoby and Jordan Davis, for their complaint against defendant University of Pennsylvania ("Penn"), allege as follows:

### PRELIMINARY STATEMENT

1.  Penn, the historic 300-year-old Ivy League university, has transformed itself into an incubation lab for virulent anti-Jewish hatred, harassment, and discrimination.  Once welcoming to Jewish students, Penn now subjects them to a pervasively hostile educational environment.  Among other things, Penn enforces its own rules of conduct selectively to avoid protecting Jewish students from hatred and harassment, hires rabidly antisemitic professors who call for anti-Jewish violence and spread terrorist propaganda, and ignores Jewish students' pleas for protection.  In doing so, Penn has placed plaintiffs and other Jewish and Israeli students at severe emotional and physical risk.

2.  This lawsuit seeks to hold Penn accountable under Title VI of the Civil Rights Act of 1964 for the damages it has caused plaintiffs and for its failure to remedy the hostile environment on its campus.  The harassment and discrimination on campus and in the classroom are relentless and intolerable.  Plaintiffs and their Jewish peers are routinely subjected to vile and threatening antisemitic slurs and chants such as "Intifada Revolution," "from the River to the Sea," "Fuck the Jews," "the Jews deserve everything that is happening to them," "you are a dirty

Jew, don't look at us," "keep walking you dirty little Jew," "get out of here kikes!" and "go back to where you came from."  Plaintiffs and other Jewish students must traverse classrooms, dormitories, and buildings vandalized with antisemitic graffiti.  Subjected to intense anti-Jewish vitriol, these students have been deprived of the ability and opportunity to fully and meaningfully participate in Penn's educational and other programs.

3.      Antisemitism has been a growing institutional problem on Penn's campus and other university campuses for many years, increasing by over forty percent in 2022 alone, and the abuse and intimidation have steadily intensified.  A recent study found that nearly seventy-three percent of  Jewish college students have seen or been the victim of antisemitism since the start of the fall 2023 semester.  Among the most perilous and unwelcoming campuses in the country for Jewish students, Penn is now under federal investigation for anti-Jewish discrimination.  In announcing the investigation, the U.S. Assistant Secretary of Education for Civil Rights stated that "the Department of Education, like the nation, see[s] the fear students and school communities experience as hate proliferates in schools[.]"

4.      Penn for years has been acutely aware of that fear, but it has chosen to not only ignore but exacerbate it.  Plaintiffs and others have explicitly and repeatedly warned Penn administrators that the hostile environment they had created endangers Jewish students.  For example, over the weekend of September 22-24, 2023, Penn proudly hosted an anti-Jewish hate-fest, euphemistically dubbed the "Palestine Writes Literature Festival," that calls to mind the infamous August 2017 Unite the Right hate rally in Charlottesville, Virginia.  Like Charlottesville, the Penn anti-Jewish festival invited some of the world's most virulent antisemites, including people who have asserted that "most Jews [are] evil" and that Jews are "European colonizers."  But where the disgraceful Virginia rally was organized by neo-Nazi

white supremacists, the disgraceful Penn festival was sponsored by the university and its professors.  When one plaintiff warned Penn administrators in the days before the event that he and other Jewish students were "terrified," he was encouraged to attend the hate-fest—as the Director of Penn's Middle East Center put it, the festival "will prove to be an enriching or perhaps even liberating experience to anyone."

5.      Incredibly, Penn's administration did not just ignore students' pleas to distance itself from the festival and antisemitic speakers invited to attend but also thumbed its nose at the pleas of Penn's own trustees and alumni.  In an open letter, more than 2,000 Penn alumni, affiliates, and trustees expressed "deep concerns" about the hate-festival, urging Penn to do "all within its power to distance itself from the event's antisemitic speakers, make clear that such antisemitism is wholly at odds with the university's values, and take proactive steps to ensure that Jewish students, faculty, and staff are safe and welcome at Penn."  Penn, led by President M. Elizabeth Magill, rejected pleas to distance itself from the festival, and instead, Board of Trustees Chairman Scott Bok, the Chairman and Chief Executive Officer of investment bank Greenhill, pressured objecting trustees to step down.  As one trustee stated upon resigning in disgust, Penn "failed us through an embrace of antisemitism, a failure to stand for justice, and complete negligence in the defense of its own students' well-being. . . ."

6.      The antisemitic speakers at the festival lived up to their reputations, inveighing against "Jewish supremacism" and the "messianic mindset" of "religious Jews" who are willing to "put up with anything to take over more land."  After Hamas's horrific mass slaughter, rape, and kidnapping of more than 1,200 Israeli civilians on October 7, 2023, one of the invited speakers at the Palestine Writes Literature Festival stooped to the previously unimaginable low of joking about an Israeli baby Hamas had burned in an oven, asking "with or without baking

powder?"  Similar stomach-turning anti-Jewish conduct, by students and faculty alike, are commonplace at Penn.

7.      The October 7 massacre turbocharged antisemitism at Penn.  Emboldened by years of Penn's tolerance and enabling of antisemitism, and deliberate indifference to Jewish students' complaints, Penn students and faculty openly support and extol Hamas's atrocities. Even though such hate speech and conduct violate Penn's conduct codes, Penn has refused to mete out any discipline, sitting idly by as the anti-Jewish harassment escalated.  Penn's motto is "Leges sine Moribus vanae," *i.e.*, "Laws without morals are useless"—the same can be said for conduct codes without enforcement.  Penn's refusal to enforce its own codes of conduct against antisemitism predictably ensured that the October 7 terrorist attack would make anti-Jewish abuse even more pervasive on campus.

8.      Indeed, only two days before this filing, on December 3, 2023, an antisemitic student mob rampaged across Penn's campus chanting for the destruction of Israel and its citizens, vandalizing multiple Penn buildings, including those surrounding a plaintiff's dormitory, by scrawling the words "intifada," "blood thirsty," and "shame" on the walls.  After terrorizing plaintiffs and other Penn students, the mob headed to Center City to attack a restaurant, Goldie, solely because it is owned by an Israeli Jew.  In contrast to Penn, which permitted the mob to assemble, deface buildings, and scream genocidal chants on campus, Pennsylvania Governor Joshua Shapiro, and several Pennsylvania members of Congress, immediately condemned the event as a "blatant act of antisemitism."  As of this filing, Penn has said nothing.

9.      The hostile environment for Jews on campus has been heightened by the recent drastic decrease in the number of Jewish students at Penn, leaving those Jewish students who do

enroll even more isolated and unsafe against, and further emboldening, their antisemitic attackers and abusers.

10.     Evidencing its discriminatory double standard, Penn, in contrast to its tolerance and enabling of those expressing and spreading antisemitism, including students and faculty supporting Hamas and harassing Jewish students, aggressively enforces its codes to address bias against other minorities and readily disciplines students and faculty members who harass other groups or espouse viewpoints Penn selectively deems inappropriate.  It is inconceivable that Penn would allow any group other than Jews to be targeted for abuse or allow students and professors to call for the annihilation of any country.  When it comes to the protection of Penn's Jewish students, the rules do not apply.

11.     Penn's conduct in enabling systemic antisemitism on its campus constitutes an egregious violation of Title VI of the Civil Rights Act of 1964.  Penn must now be compelled through injunctive relief to implement institutional, effective, far-reaching, and concrete remedial measures, including, among other things: (i) disciplinary measures, including termination, against deans, administrators, professors, and other employees responsible for antisemitic abuse, whether because they engaged in it or permitted it; (ii) disciplinary measures, including suspension or expulsion, against students who engage in such conduct; and (iii) declining and returning any donations, whether from foreign countries or elsewhere, implicitly or explicitly conditioned on the hiring or promotion of antisemitic professors or the inclusion of antisemitic coursework or curricula.  Penn must also pay damages, including tuition refunds, to plaintiffs—who have been robbed of their college experience—to compensate them for the hostility they have been forced to endure because of Penn's unlawful conduct.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and § 1343

over the claims arising under Title VI of the Civil Rights Act of 1964 ("Title VI") (42 U.S.C. §

2000d *et seq.*).  This Court has supplemental jurisdiction over plaintiffs' related state law claims

under 28 U.S.C. § 1367(a) because those claims arise out of the same case or controversy as

plaintiffs' federal claim.

13.    This Court has personal jurisdiction over Penn because it is based and operates in

Philadelphia, Pennsylvania.

14.    Venue in this District is proper under 28 U.S.C. § 1391 because it is the judicial

district in which a substantial part of the events or omissions giving rise to plaintiffs' claims

occurred and where Penn is located.

## PARTIES

15.    Plaintiff Eyal Yakoby is a dual American-Israeli citizen, and a Jewish student at

Penn, which he has attended since August 2021.  He is a senior studying Political Science and

Modern Middle East Studies in the College of Arts and Sciences.

16.    Plaintiff Jordan Davis is a Jewish student at Penn, which she has attended since

August 2023.  She is a freshman in the College of Arts and Sciences.

17.    The University of Pennsylvania is a private university, also known as the Trustees

of the University of Pennsylvania, which is organized under the laws of Pennsylvania and

located in Philadelphia, Pennsylvania.  At all times relevant to this complaint, Penn was and

continues to be a recipient of federal funding, making it subject to Title VI.  As of June 30, 2023,

Penn's endowment fund stood at $21 billion.

## FACTS

**A.      Federal, State, and Local Laws Protect Against Antisemitism**

18.      Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, prohibits discrimination on the basis of race, color, or national origin in any program or activity that receives federal funding or other federal financial assistance.  Title VI protects all students, including Jewish students, in federally funded programs or activities.

19.      Since at least September 2004, it has been the policy of the Office of Civil Rights ("OCR") of the U.S. Department of Education ("DOE"), the agency responsible for enforcing Title VI, to investigate claims related to antisemitism.  In an October 26, 2010 letter to federally funded schools, OCR confirmed that such schools must address antisemitic harassment under Title VI.  According to OCR's letter, such harassment violates Title VI when it creates a "hostile environment" in which "the conduct is sufficiently severe, pervasive, or persistent so as to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by a school" or when the harassment is "encouraged, tolerated, not adequately addressed, or ignored by school employees."

20.      In its letter, OCR made clear that schools must take "immediate and appropriate action to investigate or otherwise determine what occurred" when responding to harassment claims, and, when such investigations reveal that discriminatory harassment occurred, schools "must take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring."

21.      Both the Trump and Biden Administrations have since confirmed the urgent necessity under Title VI to combat antisemitism.  In December 2019, President Trump issued Executive Order 13899 on Combating Anti-Semitism (the "Executive Order"), directing the

executive branch to enforce Title VI against discrimination "rooted in anti-Semitism as vigorously as against all other forms of discrimination prohibited by Title VI," and in doing so, to consider the definition of antisemitism promulgated by the International Holocaust Remembrance Alliance ("IHRA"), an intergovernmental organization comprising over thirty-five countries.

22.     Under the IHRA definition, the following are "contemporary examples of antisemitism":

- "Calling for, aiding, or justifying the killing or harming of Jews in the name of a radical ideology or an extremist view of religion";

- "Making mendacious, dehumanizing, demonizing, or stereotypical allegations about Jews as such or the power of Jews as collective—such as, especially but not exclusively, the myth about a world Jewish conspiracy or of Jews controlling the media, economy, government, or other societal institutions";

- "Accusing Jews as a people of being responsible for real or imagined wrongdoing committed by a single Jewish person or group, or even for acts committed by non-Jews";

- "Denying the fact, scope, mechanisms (e.g. gas chambers) or intentionality of the genocide of the Jewish people at the hands of National Socialist Germany and its supporters and accomplices during World War II (the Holocaust)";

- "Accusing the Jews as a people, or Israel as a state, of inventing or exaggerating the Holocaust";

- "Accusing Jewish citizens of being more loyal to Israel, or to the alleged priorities of Jews worldwide, than to the interests of their own nations";

- "Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor";

- "Applying double standards by requiring of [Israel] a behavior not expected or demanded of any other democratic nation";

- "Using the symbols and images associated with classic antisemitism (e.g., claims of Jews killing Jesus or blood libel) to characterize Israel or Israelis";

- "Drawing comparisons of contemporary Israeli policy to that of the Nazis";

- "Holding Jews collectively responsible for actions of the state of Israel"; and

- "Criminal acts are antisemitic when the targets of attacks, whether they are people or property – such as buildings, schools, places of worship and cemeteries – are selected because they are, or are perceived to be, Jewish or linked to Jews[.]"

23.     As the IHRA definition clarifies, and as the Trump and Biden administrations have explicitly recognized, the state of Israel is a central, critical, and inextricable element of Jewish identity.  As the historical birthplace of the Jewish people, the land of Israel is at the core of Jewish identity, ancestral tradition, religion, and culture.

24.     Zionism is the movement for the reestablishment, development, and protection of the Jewish nation in the land of Israel and arises from the Jewish people's ethnic and historic roots in the land of Israel and the right of the Jewish people, like any other people, to self-determination.

25.     Anti-Zionism, therefore, is inherently and necessarily discriminatory and antisemitic—whether expressed in terms of, for example, denying the Jewish people's right to self-determination or the right of the State of Israel to exist; applying double standards applicable to no other country or people in assessing the State of Israel's legitimacy and conduct; denying that the State of Israel has the right to self-defense, like any other country, against terrorism, invasion, or the murder, rape, and kidnapping of its citizens; accusing Israel of being inherently racist or comparable to the Nazis; or invoking classic antisemitic canards against Israel and its people.  "When people criticize Zionists," Dr. Martin Luther King, Jr. explained, "they mean Jews.  You're talking anti-Semitism."

26.     The unleashing of widespread anti-Israel hate that has gripped college campuses such as Penn since October 7 has confirmed that anti-Zionism is rarely anything more than thinly-veiled antisemitism.  At anti-Israel rallies and events across the country, visibly Jewish

students—expressing no outward support of Israel—have been maligned as "murderers," "colonizers," and, most tellingly, "Zionists."

27.     As a dual Israeli-American citizen, Zionism is an especially crucial component of Yakoby's Jewish identity.  Yakoby's grandfather emigrated to Israel after the second world war ended with the dream of escaping persecution and living freely.  When he got to Israel, he met Yakoby's grandmother, who was living in Israel before the country was officially founded in 1948.  Yakoby's father was born in Israel and was a member in Israel's National Defense Forces. Yakoby's mother was born in America but emigrated to Israel in her adult life.  Yakoby still has plenty of family and friends in Israel, including his brother, and visits the country regularly.

28.     Zionism is also a fundamental part of  Davis's Jewish identity.  Davis grew up in Wyoming and was the only Jewish student in her high school.  She spent last summer living and traveling in Israel, and has family and friends throughout the country.

29.     On January 4, 2023, DOE, citing the "rise in anti-Semitic incidents," released a fact sheet entitled "Protecting Students from Discrimination Based on Shared Ancestry or Ethnic Characteristics," which notes that Title VI's protections extends to "students who experience discrimination, including harassment, based on their shared ancestry or ethnic characteristics or citizenship or residency in a country with a dominant religion or distinct religious identity."

30.     On May 25, 2023, President Biden released The U.S. National Strategy to Counter Antisemitism, which his administration described as the "most ambitious and comprehensive U.S. government-led effort to fight antisemitism in American history," and DOE launched its Antisemitism Awareness Campaign.  As part of that campaign, OCR released a letter reminding schools of their legal obligations under Title VI to provide all students, including Jewish students, a school environment free from discrimination and to take immediate

and appropriate action to respond to harassment that creates a hostile environment.  On September 28, 2023, as part of President Biden's National Strategy to Counter Antisemitism, eight federal agencies confirmed again that Title VI prohibits antisemitic forms of discrimination in federally funded programs and activities.

31.     Harakat al-Muqawama al-Islamiya, also known as Hamas, is a terrorist group committed to armed resistance, against and the complete destruction of, Israel and its Jewish inhabitants, the creation of an Islamic Palestinian state in Israel's place, and the annihilation of all Jews around the world.  In October 1997, the U.S. State Department designated Hamas as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act. Hamas's 1988 charter states, "The Day of Judgment will not come about until Muslims fight Jews and kill them."  Since 2007, Hamas has been the de facto governing body in the Gaza Strip.

32.     Hamas leaders are clear about their agenda: kill all Jews.  In December 2008, for example, Hamas spokesperson Fawzi Barhoum called for suicide attacks and warned that "Hamas will continue the resistance until the last drop of blood."  A month later, in January 2009, Hamas leader Mahmoud al-Zahar promised that Hamas would "lay the foundation for a tomorrow without Zionists."  Ten years on, Hamas's message and purpose was still the same; in 2019, a senior Hamas terrorist, Fathi Hamad, encouraged Palestinians across the globe to kill Jews, stating, "our brothers outside are preparing, trying to prepare, warming up. . . . Seven million Palestinians outside, enough warming up, you have Jews with you in every place. *You should attack every Jew possible in all the world and kill them.*"

33.     In keeping with its mission statement, since its inception, Hamas has carried out countless indiscriminate, terror attacks on Israeli civilians, including bombings, rocket attacks, shootings, and stabbings.  Notably, terrorists have engaged in two intifadas against Jews in

Israel—mostly but not exclusively by suicide bombs, many of which consisted of nails dipped in rat poison—who were riding on buses, and visiting restaurants and clubs. During the Second Intifada, from approximately around September 2000 through February 2005, Hamas terrorists proudly claimed responsibility for over fifty suicide bombings, including: the August 9, 2001 bombing of a pizzeria in Jerusalem, which killed seven children; the December 2, 2001 double-suicide bombing in the crowded Ben Yehuda pedestrian mall in Jerusalem, which killed eleven; and the March 27, 2002 suicide bombing in the Park Hotel in Netanya, which targeted families gathering to celebrate the Passover Seder, and killed thirty. Over the next twenty years Hamas has killed countless more through similar suicide bombings, public bus attacks, booby traps, shootings, and other acts of terror.

34.     In the wake of Hamas's October 7 terrorist attack against Israel (discussed in more detail below), which, as President Biden observed, contributed to an "alarming" rise in antisemitism at schools and on college campuses, OCR announced that it was expediting its processing of discrimination complaints involving antisemitism. At least seven bills have been introduced in both houses of Congress condemning support for Hamas, Hezbollah, and other terrorist organizations at American universities which has created a hostile educational environment for Jewish students, faculty, and staff. On October 18, 2023, the U.S. Senate passed a resolution condemning "antisemitic student activities," and on November 2, 2023, the U.S. House passed a resolution condemning support for Hamas, Hezbollah, and other terrorist organizations at American universities.

35.     On November 7, 2023, OCR released a letter "remind[ing] colleges, universities, and schools that receive federal financial assistance of their legal responsibility under Title VI . . . to provide all students a school environment free from discrimination based on race, color, or

12

national origin, including shared ancestry or ethnic characteristics."  The letter states: "It is your legal obligation under Title VI to address prohibited discrimination against students and others on your campus—including those who are perceived to be Jewish [or Israeli] . . . in the ways described in this letter."  Given the rise in antisemitism on campus,  DOE also announced plans to hold technical assistance webinars to ensure that students facing discrimination on campus have the information they need to file a formal complaint with OCR.

36.     Less than two weeks after these announcements, on November 16, 2023, OCR announced the opening of investigations into Penn and six other schools across the country, for alleged violations of Title VI.  According to  OCR, the investigations coincided with "the Biden-Harris Administration's continued efforts to take aggressive action to address the alarming nationwide rise in reports of antisemitism . . . since the October 7 Israel-Hamas" war.  As noted by U.S. Secretary of Education Miguel Cardona in announcing the investigations, "Hate has no place in our schools, period.  When students are targeted because they are—or are perceived to be—Jewish . . . or any other ethnicity or shared ancestry, schools must act to ensure safe and inclusive educational environments where everyone is free to learn[.]"  Assistant Secretary of Education for Civil Rights Catherine E. Lhamon echoed those concerns, stating that "the Department of Education, like the nation, see[s] the fear students and school communities experience as hate proliferates in schools[.]"

**B.     Penn Fails to Enforce Its Own Policies to Protect Jewish Students**

37.     Penn has issued at least seven policies designed and intended to protect students from discrimination, harassment, and intimidation: (i) Code of Student Conduct; (ii) Guidelines on Open Expression; (iii) Nondiscrimination Statement; (iv) Charter of the Student Disciplinary

System; (v) Principles of Responsible Conduct; (vi) Penn's Equal Opportunity and Affirmative Action Policy; and (vii) Faculty Handbook.

38.     Among other things, Penn asserts that its procedures, policies, and handbooks provide "guidance for *fair and consistent treatment of everyone* within the Penn community." Penn repeatedly assures and represents to students that it is "strongly committed to providing respectful work and learning environments for all members of its community," and that its policies prohibiting discrimination, harassment, and intimidation of the type plaintiffs have experienced are "intended to reinforce that commitment."

39.     Penn's assertions, assurances, and representations have proven false.  As alleged in detail herein, Jewish and Israeli students are routinely targeted for antisemitic discrimination, harassment, and intimidation, without consequence, by their peers and professors.  Even though every instance of antisemitic behavior alleged herein is prohibited by one or more of Penn's policies, Penn has done nothing to enforce these policies to remedy or prevent that behavior, and certainly nothing approaching the manner in which Penn has enforced them with respect to misconduct not involving antisemitism.  Penn selectively enforces its own rules, deeming Jewish students unworthy of the protections it readily affords non-Jewish students victimized by discrimination, harassment, and intimidation.

### i.    Code of Student Conduct

40.     In the Code of Student Conduct (the "Code"), Penn asserts that it is a "community in which intellectual growth, learning from others, mutual tolerance, and respect for freedom of thought and expression are principles of paramount importance," and becoming a Penn student entails "an obligation" to promote Penn's welfare by assuming certain "rights and responsibilities."  Under the Code, students, faculty, staff, and those otherwise affiliated with

Penn, are each "responsible for his or her own actions and [are] expected to respect the rights of others."

41.     The Code expressly "affords every student certain rights"—known as the "Rights of Student Citizenship"—that Penn claims "are essential to the University's educational mission and its character as a community," including:

- "The right to have access to and participate in the academic and non-academic opportunities afforded by the University, subject to applicable standards or requirements.";

- "The right to be free from discrimination on the basis of race, color, gender, sexual orientation, religion, national or ethnic origin, age, disability, or status as a disabled or Vietnam Era veteran."; and

- "The right to fair University judicial process in the determination of accountability for conduct."

42.     The Code also provides that students are "expected to exhibit responsible behavior regardless of time or place," and that failure to do so "may result in disciplinary action by the University."  According to the Code, responsible behavior is a "standard of conduct which reflects higher expectations than may be prevalent outside the University community," and includes the following obligations:

- "To respect the health and safety of others. This precludes acts or threats of physical violence against another person (including sexual violence) and disorderly conduct. This also precludes the possession of dangerous articles (such as firearms, explosive materials, etc.) on University property or at University events without University authorization.";

- "To respect the right of fellow students to participate in University organizations and in relationships with other students without fear, threat, or act of hazing.";

- "To refrain from conduct towards other students that infringes upon the Rights of Student Citizenship. The University condemns hate speech, epithets, and racial, ethnic, sexual and religious slurs.  However, the content of student speech or expression is not by itself a basis for disciplinary action. Student speech may be subject to discipline when it violates applicable laws or University regulations or policies.";

- "To refrain from stealing, damaging, defacing, or misusing the property or facilities of the University or of others. This also precludes the disruption of University computing services or interference with the rights of others to use computer resources.";

- "To comply with policies and regulations of the University and its departments (*e.g.*, the University's Guidelines on Open Expression, Anti-Hazing Regulations, Drug and Alcohol Policies, Sexual Harassment Policy, etc.)."; and

- "To comply with federal, state, and local laws."

43.     Penn has a history of selectively enforcing the Code to exclude Jewish students from the Code's protections.

### ii.     Guidelines on Open Expression

44.     The Guidelines on Open Expression (the "Guidelines") govern Penn's purported dedication to "freedom of thought, inquiry, speech, and lawful assembly."  According to the Guidelines, Penn "affirms the right of members of the University community to assemble and demonstrate peaceably in University locations within the limits of the[]Guidelines and undertakes to ensure that such rights shall not be infringed."  Under the Guidelines, Penn also supposedly supports "the right of others to pursue their normal activities within the University and to be protected from physical injury or property damage."  The Guidelines apply to all demonstrations in a University location, which includes: (i) Penn's campus; (ii) any location owned, leased, or used by Penn; and (iii) areas immediately adjacent to Penn.

45.     The Guidelines state that every member of the Penn community is expected to know and follow the Guidelines, and individuals whose conduct violates the Guidelines may be held accountable, including by referral to the Office of Student Conduct to determine disciplinary proceedings.  Individuals or groups violate the Guidelines if:

- "They interfere unreasonably with the activities of other persons. The time of day, size, noise level, and general tenor of a meeting, event or demonstration are factors that may be considered in determining whether conduct is reasonable";

- "They cause injury to persons or property or threaten to cause such injury";

- "They hold meetings, events or demonstrations under circumstances where health or safety is endangered"; or

- "They knowingly interfere with unimpeded movement in a University location."

46. As part of the Guidelines, Penn established the Committee on Open Expression—a standing committee of the University Council (a forum made up of faculty, administration, staff, and students that recommends general policies and advises the administration of the university). The Committee on Open Expression is tasked with: (i) "participating in the resolution of conflicts that may arise from incidents or disturbances implicating the[] Guidelines"; (ii) "mediating among the parties to prevent conflicts and violations of the[] Guidelines"; (iii) "interpreting the[] Guidelines"; (iv) "advising administrative officers when appropriate"; and (v) "recommending policies and procedures for the improvement of all levels of communication." Additionally, Penn's Vice Provost for University Life is charged with protecting and maintaining the right of open expression under the Guidelines, and may "instruct anyone whose behavior is violating or threatens to violate the[] Guidelines to modify or terminate such behavior."

### iii.    Nondiscrimination Statement

47. Penn's Nondiscrimination Statement states that Penn "values diversity and seeks talented students, faculty and staff with diverse backgrounds, experiences, and perspectives," and that Penn does not discriminate on the bases of several characteristics, including "race . . . religion . . . national or ethnic origin . . . or any other legally protected class status in the administration of its admissions, financial aid, educational or athletic programs, or other University-administered programs or in its employment practices."

17

### iv.    Principles of Responsible Conduct

48.    According to Penn's Principles of Responsible Conduct, Penn's mission "is to offer a world class education to [its] students, train future leaders of our country, expand and advance research and knowledge, [and] serve [the Penn] community and society both at home and abroad[.]"  In pursuit of this mission, Penn states that "all members of the University community need to understand and uphold both legal requirements and the highest of ethical standards."  Penn has enumerated ten Principles of Responsible Conduct (the "Principles") "to distill [its handbooks, manuals, web-sites, and other materials] for easy review and access" and "articulate the basic expectations that should guide each [member of the Penn community] in [their] work at Penn," including the following:

- **Principle One** - **Ethical and Responsible Conduct**: "Penn's faculty, administration and staff should conduct themselves ethically, with the highest integrity, in compliance with all applicable laws, regulations, and University policies, in all aspects of their work . . . . Their conduct should always reflect their positions of trust and loyalty with respect to the University, the Health System, and members of these communities.";

- **Principle Two - Respect for Others in the Workplace**: "Penn is an institution that values academic freedom, diversity and respect for one another.  Penn is committed to the principle of nondiscrimination and does not tolerate conduct that constitutes harassment on any basis, including sexual, racial, ethnic, religious, or gender.";

- **Principle Six - Environmental Health and Safety**: "Penn is committed to the protection of the health and safety of the University community and the creation of a safe working environment.  To accomplish this end, Penn provides training in health and safety regulation and policy and Penn faculty, administration, and staff are expected to comply with sound practices and legal requirements."; and

- **Principle Ten - Responsible Reporting of Suspected Violations and Institutional Response**: "Penn faculty, administration and staff are expected to report suspected material violations of University and Health System policies, as well as violations of applicable laws and regulations[.]"

49.     Penn's faculty, administration, and staff have consistently failed to apply these principles to combat antisemitism and protect Penn's Jewish and Israeli students, including plaintiffs.

### v.     Faculty Handbook

50.     Penn's Faculty Handbook provides that all "teacher[s] should remember that the public may judge the profession and the institution by their utterances" and that "teacher[s] should at all times show respect for the opinions of others, and should indicate when they are not speaking for the institution."  The Faculty Handbook incorporates: (i) Penn's Charter of the Student Disciplinary System; (ii) Guidelines on Open Expression; (iii) Equal Opportunity and Affirmative Action Policy; and (iv) Confiscation of Publications.

### vi.     Equal Opportunity and Affirmative Action Policy

51.     Penn's Office of Affirmative Action and Equal Opportunity Programs, in collaboration with its Division of Human Resources and the Office of the Provost, oversees the implementation and administration of the Equal Opportunity and Affirmative Action Policy (the "Policy"), which includes Penn's nondiscrimination policies and programs.

52.     According to the Policy, "diversity is prized at Penn as a central component of its mission and helps create an educational and working environment that best supports the University's commitment to excellence in teaching, research, and scholarship."  Under the Policy, Penn proclaims that it maintains a "substantive institutional commitment to diversity along dimensions of race . . . [and] ethnicity," and "prohibits unlawful discrimination based on race, color, sex, sexual orientation, gender identity, religion, creed, national or ethnic origin, citizenship status, age, disability, veteran status, or any other legally protected class."  Penn further "recognizes the right of members of the [Penn] community to raise questions and pursue complaints of discrimination and adheres to a strict policy that prohibits retaliation for doing so."

### vii.     Penn's Charter of the Student Disciplinary System

53.     Penn's Charter of the Student Disciplinary System (the "Disciplinary System") "sets forth the procedures under which alleged violations of the Code of Student Conduct . . . and other policies, rules, and regulations are resolved," and establishes "the responsibility of all students at the University of Pennsylvania to exhibit responsible behavior regardless of time or place."  This responsibility includes but is not limited to "the obligation to comply with all provisions of the Code of Student Conduct; with all other policies and regulations of the University, its Schools, and its Departments; and with local, state, and federal laws."

54.     The stated purpose of the Disciplinary System is to "further the educational mission of the University of Pennsylvania by providing a fair and effective mechanism for investigating and resolving disputes involving students and alleged violations by students of the University's rules, regulations, and policies."

55.     Where a violation is found, the Disciplinary System provides for sanctions, including but not limited to: warning, reprimand, fine, restitution, disciplinary probation, withdrawal of privileges, suspension, indefinite suspension, or expulsion.

### C.     Penn's History of Antisemitism and Civil Rights Violations

### i.     Reported Incidents of Antisemitism from 2015 through 2023

56.     Antisemitism at Penn is hardly a new phenomenon; to the contrary, it has permeated campus life for years prior to Hamas's October 7 attack.  For nearly a decade, there has been a steady increase in antisemitic incidents at Penn.  And despite repeated assurances by Penn that it would take meaningful steps to address and remedy antisemitism on campus, Penn has offered only hollow platitudes while doing little to nothing to rectify the problem.  Instead, rather than discipline the perpetrators, Penn opted to forsake the victims, permitting them to be

targeted for abuse and harassment, and to decrease its Jewish student population through targeted admission filtering.

57.     In March 2015, for example, eight student groups—including the Penn Arab Student Society, Penn for Immigrant Rights, Penn Students for Justice in Palestine, Students Organizing for Unity and Liberation, Penn Amnesty International, Penn Non-Cis, and the Student Labor Action Project—announced "Penn Divest from Displacement," a proposal that the University divest from corporations profiting from "displacement" around the world.  While this proposal purported to address the problem of "displacement" globally, most of the movement's identified companies were targeted only because of their connection to Israel.

58.     In October 2015, Professor John L. Jackson, then Dean of Penn's School of Social Policy and Practice and the current Provost at Penn, co-authored a report for the American Anthropological Association ("AAA") recommending a boycott of Israel, alone among all of the world's countries, that led to an AAA resolution being introduced to AAA's membership to boycott Israeli academic institutions.  As the Anti-Defamation League ("ADL") described it, the resolution was an "effort to delegitimize and demonize Israeli academia" and a "bigoted and ham-handed attempt to indict any academic simply on the basis of their nationality."

59.     On February 10, 2016, *The Daily Pennsylvanian*, Penn's student-run newspaper, ran an article not only accusing Israel of "institutionalized racism and apartheid," but vilifying the Penn Jewish community as well, claiming that for many Jewish students, "the presentation of facts regarding oppression and state-sponsored violence can be hard to swallow."  The article accused the Jewish community of rejecting "dialogue, 'substantive facts' and a non-propagandized setting" in favor of only "homogenous" conversation.

21

60.     Several months later, in April 2016, various student groups, including Penn's chapter of Students for Justice in Palestine ("SJP")—an anti-Zionist student group then formally recognized by Penn and a chapter of the national Students for Justice in Palestine—organized events for its first annual "Israeli Apartheid Week."  Israeli Apartheid Week is an annual program organized by anti-Israel activists in cities across the globe, focused on support for the Boycott, Divestment, Sanctions movement ("BDS") and vociferous slander of Israel as a "racist," "apartheid" state.  For instance, as part of the 2016 Israeli Apartheid Week programming, SJP erected an "Apartheid Wall," meant to evoke the Israeli-West Bank barrier, built by Israel in the wake of suicide bombings and other attacks originating within the West Bank during the Second Intifada.  SJP's "Apartheid Wall" accused Israel of segregation and violations of international law.

61.     Another SJP-organized Israeli Apartheid Week event included a screening, in Penn's Williams Hall, of "The Occupation of the American Mind."  The film, narrated by Roger Waters, features antisemitic themes and tropes, accusing "the Israel lobby" of "shap[ing] American perceptions of the Israeli-Palestinian conflict" and facilitating "media coverage . . . slanted heavily in favor of Israeli interests."  Additionally, several of the film's speakers justify terrorism against Israelis as legitimate "resistance," demonize Israel, falsely accuse the Israeli government of "terror[ism]," "murderous attacks," and "acting like a monster," and call Israeli soldiers' actions "inhumane" and "brutal."  Comments on the film's online page bear evidence of the explicit Jew-hatred the film intended to incite, including: "The Jews have controlled the mass media for over 100 years now . . . Many are finding out about the Jewish control of the media, their ownership of the Federal Reserve, their murder of 60 million Christians under Communism, the phony Holocaust, the Jewish domination of the slave trade, etc."  The following year, in

22

March 2017, SJP again screened the antisemitic film in Penn's Huntsman Hall, home to the Wharton Business School, advertising it as a "documentary" about "Israel's public relations wars in the United States."

62.     In April 2017, Penn's SJP held its second annual Israeli Apartheid Week. Lauding the event, SJP's president emphasized that "[w]e make it very clear that we're anti-Zionism, which is the political ideology of an ethnocentric . . . State of Israel[.]"  To that end, SJP held several antisemitic events, including "Solidarity in the Face of Apartheid," which accused both Israel and the U.S. of apartheid, and "Christians in Palestine," which falsely charged that Palestinian Christians are "victims of the Israeli Occupation" and "victims being forced to flee from their historical homeland."

63.     Less than a week later, on April 24, flyers with swastikas and phrases like "join your local Nazis" were posted around campus.  As complaints poured in, Penn administrators refused to require the removal of the flyers, and instead normalized and greenlighted antisemites' use of swastikas to advance their bigotry.  As a Penn spokesperson put it, "[t]he content of student speech or expression is not by itself a basis for disciplinary action" and, referring to provisions of the Code, stated that "[n]o posters shall be prohibited or restricted solely on the basis of their content, except when they may violate other applicable laws or regulations."

64.     Of course, flyers containing a swastika—the Nazi symbol associated with the Nazi extermination of six million Jews—violated any number of Penn policies, including but not limited to the Code, the Guidelines, and the Nondiscrimination Statement, all of which Penn refused to enforce.  Penn's inaction concerning swastika flyers could not be more different from its zealous enforcement of conduct codes when the alleged offender was Jewish or when an incident victimized a non-Jewish minority group.  For instance, as explained further below, a few

months after Penn refused to remove the swastikas, a Jewish professor was barred from teaching after making comments critical of racial preference policies in universities.

65.    Emboldened by a Penn administration that permitted swastika flyers to be displayed on campus, in August 2017, SJP participated in creating and distributing "The Penn Disorientation Guide."  Although it is described as "a resource for people fighting against injustice," the Disorientation Guide's only substantive mention of Jews, other than the anti-Zionist group Jewish Voice for Peace, is to label them racists and oppressors and claim that Israel is actually "Israeli occupied Palestine."

66.    On September 26, 2017, Penn Law Palestine Solidarity ("PLPS"), in conjunction with SJP and National Lawyers Guild ("NLG"), a progressive bar association with a well-documented history of anti-Zionism, hosted yet another screening of the "The Occupation of the American Mind" on Penn's campus.

67.    PLPS and NLG followed up a month later, on October 23, 2017, by issuing an open letter to Penn Law students who had organized a trip to Israel.  The letter accused the students of "whitewash[ing] and perpetuat[ing] Israel's decades-long oppression and dispossession of Palestinians" and "being complicit in the systematic exclusion and institutional racism perpetrated by the Israeli state."  The letter concluded by calling for the boycott of Israel.

68.    In April 2018, SJP held its third annual Israeli Apartheid Week, "seeking to raise awareness of Israel's apartheid system of oppression over the Palestinian people and to build support for the [BDS] movement."

69.    On April 7, 2018, as part of Israeli Apartheid Week, SJP hosted "Politics of Place: A Panel Discussion" with George Ciccariello-Maher and Marc Lamont Hill.  At the time, Ciccariello-Maher was well-known for radical and incendiary speech, having tweeted, for

example, "All I want for Christmas is white genocide," and "Some guy in first class gave up his seat for a uniformed soldier.  People are thanking him.  I'm trying not to vomit or yell about Mosul."  In December 2017, Ciccariello-Maher left his job at Drexel University after he was put on leave due to his hateful comments.

70.     Similarly, Marc Lamont Hill is a self-described "social justice activist" who is radically anti-Israel.  In 2014, for example, Hill visited Israel and videoed himself claiming, "We came here to Palestine to stand in love and revolutionary struggle with our brothers and sisters; We come to a land that has been stolen by greed and destroyed by hate[.]"  Hill, however, was not in Palestine—he was in Nazareth, well within Israel's sovereign borders.  Hill is also known to speak out in reverence and support of other antisemites, such as Louis Farrakhan (who called Hitler "a very great man" and Judaism a "dirty religion"), and terrorists such as Ali Jiddah (who was convicted of planting bombs  in downtown Jerusalem) whom Hill hailed as a "true revolutionary and a beautiful spirit."  In September 2018, Hill lost his job at CNN when he called for the eradication of Jews in Israel at a speech given in front of the United Nations, claiming that "what justice requires . . . . . .is a free Palestine from the River to the Sea."

71.     During the April 7 "Politics of Place: A Panel Discussion,"  which was hosted at Penn's Irvine Auditorium, Ciccariello-Maher and Hill touted the BDS movement, as "essential," "so powerful" and a "global response to free Palestine."  Hill defended the concept of discriminating against Israeli academics by, for example, banning them from academic conferences.  Hill also stated to the Penn audience that one of the "dominant Zionist narratives" was that "indigenous people didn't deserve the land" and that purchasing products from Israeli companies "supports [the] occupation."  Leveraging classic antisemitic tropes of Jewish influence in politics and  media, Hill concluded by claiming that the "Democratic Party being

bought and sold" by Jewish-funded lobbyists was the reason for what he claimed was the American left's "silence" regarding Israel and Palestine.

72.     Shortly after Israeli Apartheid Week, on April 13, 2018, a member of SJP authored a guest column in *The Daily Pennsylvanian* titled, "Israeli apartheid: real, brutal and deadly."  The column baselessly accused Israel of "inhumane acts such as murder, forcible transfer, imprisonment, or persecution of an identifiable group on racial, national, ethnic, cultural, religious, or other grounds, 'committed in the context of an institutionalized regime of systematic oppression and domination.'"

73.     On May 5, 2018, the Philadelphia Coalition for Boycott, Divestment and Sanctions against Israel—a Philadelphia-based group focused on the boycott of Israel—was permitted to hold its "A Teach-In on Cultural Boycott" event in Penn's Houston Hall.  The event was organized as part of the "Philly don't orchestrate Apartheid" campaign to pressure the Philadelphia Orchestra into canceling its planned Israel performances.  Speakers at the event repeatedly demonized Israel through centuries-old antisemitic canards and conspiracies asserting that Jews control the media and politics.  Speaker Lawrence Davidson, for example, claimed that "Israel through its Lobby power, through its Zionist network, has influence beyond its own domain.  And it uses that influence to systematically corrupt the politicians and practices of [the U.S.] . . . it's clear that they are creating a clear and present danger to our society, to our laws [and] to our culture."  Davidson also attacked Judaism itself as having become "an adjunct of racist political ideology . . . tied to an apartheid regime."  Another speaker, Hannah Mermelstein, denied the Jewish people's right to self-determination, calling for the "right of return" and claiming that "[w]e can't normalize Israel as a country."

74.     On April 1, 2019,  a group of Penn Law students published a letter on Penn Law's website that demonized Israel and its supporters, claiming "[i] t is the influence of pro-Israel lobbying groups like AIPAC and bogus charges of anti-Semitism that are in reality hindering our ability to have a balanced discussion about Israel[.]"  It also accused Israel of "pinkwashing," arguing that "Israel's portrayal of itself as a haven for LGBTQ people in the Middle East represents a cynical and deliberate use of gay rights to distract from and normalize the Israeli occupation and settler colonialism[.]"  Israel is the most tolerant of Middle East countries towards the LGBTQ community, and Tel Aviv is known as one of the most LGBTQ-friendly cities in the world.  To twist this fact into a narrative of "occupation and settler colonialism" is antisemitic.

75.     On January 15, 2020, Penn's Center for Africana Studies and Annenberg School for Communication co-sponsored an event commemorating Dr. Martin Luther King, Jr.  Dr. King, the father of the American civil rights movement, was also a strong supporter of Israel and Zionism.  Famously, on March 25, 1968, ten days before his assassination, Dr. King addressed a convention of American rabbis, telling them: "Peace for Israel means security, and we must stand with all our might to protect its right to exist, its territorial integrity.  I see Israel . . . as one of the great outposts of democracy in the world."  But although the event was supposed to honor Dr. King's legacy of social justice, one speaker, Gina Dent, falsely accused Israel of "us[ing] . . . the prison" for political reasons, and stated that in Israel, "Palestinians are always labeled violent and then incarcerated just for their existence."  Dent further advocated for Palestinian violence against Israel, telling the crowd that she would "support people who are labeled violent when they are struggling for freedom."

76.     Later that year, on July 23, 2020, a Penn student posted the following on the

Brandeis Center-affiliated Instagram account "jewishoncampus," on which students can post

their antisemitic experiences:

> During my [Master's in Social Work] program, I was given a
> 'privilege quiz' by my professor who taught a mandatory course on
> racism.  The quiz listed several categories based on identity (e.g.
> religion, race, ethnicity).  In each category, the quiz then listed
> possible identities (e.g. Judaism, Christianity, Islam, etc.).  Next to
> each of these possible identities, the quiz assigned a positive or
> negative value.  The higher the value, the more we would need to
> 'check our privilege,' according to our professor.  Under the religion
> category, Judaism was ranked as the most privileged identity, with
> 25 points assigned. Christianity was ranked as the second most
> privileged category, with only 5 points assigned.  When I voiced my
> concerns to the classroom, I was met with laughter and eyerolls.

77.     Weeks later, on September 22, 2020, another harassed Penn student posted to

"jewishoncampus": "On the first day of [German] class, my professor noticed my yarmulke and

advised me, only me, that I should 'be on my best behavior.'  I sat in class for a few more days,

only to be met with more uncomfortable remarks: 'something tells me you never liked gefilte

fish.'"  The repeated mockery forced the student to drop the class.

78.     On May 10, 2021, Hamas and the Palestinian Islamic Jihad (another U.S.

designated foreign terror organization) attacked Israel with a barrage of rockets and missiles,

launching over 4,300 rockets and missiles towards Israeli population centers over an eleven-day

period.  In response to Israel defending itself, on May 19, 2021, Penn's Center and Program in

Gender, Sexuality and Women's Studies signed a statement asserting that Israel was engaging in

"ethnic cleansing" and "ethnonationalist violence" against the Palestinian people.  The statement

also rejected any "'both sides' rhetoric that erases the military, economic, media, and global

power that Israel has over Palestine."  Finally, the statement encouraged the erasure of Israel,

calling for the "end of Israel's military occupation of Palestine" and the Palestinian "right of return."

79.     The next day, as if to one-up the antisemitism of the Gender, Sexuality and Women's Studies group, Penn Against the Occupation ("PAO"), a new anti-Israel student group, called on Penn to divest from Israeli companies, and terminate contracts with companies that "enable" Israel.  PAO asserted that Israel, which has "genocidal, racist foundations," was engaged in "ongoing ethnic cleansing" and "an ongoing project of settler colonialism that depends on the marginalization and incremental destruction of Palestinian life."  The statement was signed by twenty-nine groups and over three hundred members of the Penn community, including professors Ania Loomba, Suvir Kaul, Chi-ming Yang, David Kazanjian, Meta Mazaj, and Toorjo Ghose.

80.     These assertions, like the other anti-Israel assertions alleged herein, are not only false, but they are based on double standards never applied to non-Jewish countries by their advocates, who ignore and are virtually never heard to protest actual racism, genocide, or ethnic cleansing in non-Jewish countries.

81.     In December 2021, Penn Law Students for Justice in Palestine ("PLSJP")—a then newly reactivated Penn Law organization dedicated to the "Palestinian liberation movement"— accused participants in Penn Law's trip to Israel of "whitewash[ing] and perpetuat[ing] Israel's decades-long oppression and dispossession of Palestinians."  PLSJP's letter questioned whether it was possible to travel to Israel without ignoring the experience of Palestinians "while an apartheid regime continues to hold power and inflict violence" and falsely accused the Israeli military of "frequently target[ing] health care workers."

82.     On March 31, 2022, the Middle East Center at Penn's School of Arts and Sciences hosted a talk titled "Governance" with Noura Erakat, an assistant professor at Rutgers University, known for her unabashed antisemitic teachings.  Erakat frequently compares Zionists to Nazis, claiming that Zionism is an ideology of "Jewish superiority" which is "fundamentally rooted in the belief that Jews are God's chosen people."  On October 7, 2023, Erakat supported Hamas's horrific attack on Israel, stating on social media: "Any shock in response to this . . . attack reflects an expectation that those Palestinians die quietly and a complicity in their strangulation."

83.     At her March 2022 "Governance" talk, Erakat invoked antisemitic tropes and conspiracy theories to accuse Israel of maintaining a "policy of ethnic cleansing" and "settler colonialism" which "marks all Palestinians for removal regardless of juridical or geographic demarcation."  Erakat asserted, echoing classic antisemitic tropes, that Israel entered into the Abraham Accords—historic peace treaties between Israel and a number of Arab countries—to "suppress democracy, in order to fulfill and expand . . . capitalist interests at the expense of all peoples, not merely the Palestinians. . . .."

84.     On May 4, 2022, Penn's Middle East Center hosted another speaker, Devin Atallah, an assistant professor at the University of Massachusetts, who baselessly demonized Israel.  Atallah accused Israel of being inherently racist and engaging in an "uncompromising practice and ideology" he called "unchilding," by which Israel wages "violence against Palestinian childhood."

85.     In August 2022, student groups released a 2022 version of the Penn Disorientation Guide, which reflected the same anti-Jewish sentiments as its predecessors.  PAO's contribution to the guide falsely claimed that "Israel is a settler colonial state that uses

apartheid to further its ethnic cleansing agenda." PAO also listed the ways in which Penn allegedly "supports the occupation," including by cooperating with companies "complicit" in Israel's supposed violations of international law. PAO went on to demonize Penn Hillel's Birthright Israel program, claiming that, "[b]y supporting Penn Hillel's Birthright Israel, the University turns a blind eye to the crimes of Israeli occupation and erasure of Palestinian identity. . . . Birthright Israel advances a Zionist mission, disregarding Palestinian history and the reality of Israeli occupation."

86.     On October 24, 2022, PAO posted on Instagram a statement of solidarity with climate demonstrators who were arrested at a Penn protest. In its statement, PAO drew absurd comparisons between the arrests and Israel's policies: "The practice of arresting peaceful protesters is a staple of policing in both the United States and in Israeli-occupied Palestine. . . . We urge Penn not only to divest from all fossil fuel companies but to divest from companies that profit from Israeli apartheid, many of which are one and the same. We recognize that policies of forced displacement, from Palestine to the UC townhomes in Philadelphia, are all modern-day practices of settler colonialism."

87.     On November 9, 2022, PAO screened the propaganda film "Gaza Fights for Freedom" at Penn's Van Pelt Library. The film is narrated by known antisemite Abby Martin, who said in 2013 that Israel uses "Hitler's methods" to maintain a "Jewish majority," and demonizes Israel and its citizens while defending and justifying Hamas. In the film, Martin glorifies the First and Second Intifada, equating the values and actions of Hamas to those of "progressive Jewish organizations worldwide." The film also provides a platform to Mahmoud Al-Zahar, a Hamas co-founder, who in the film claims "We are not playing terrorism or violence . . . we run effective self-defense by all means including using guns." There is no doubt that

Penn would not permit the on-campus screening of such a propaganda film targeting any minority group other than Jews—and supporting a recognized terrorist organization responsible for murdering any group other than Jews.

88.      In March 2023, PAO held its annual Israel Apartheid Week.  On March 23, PAO hosted an event featuring speakers Noura Erakat and Mohammed El-Kurd.  Pointing to El-Kurd's vicious blood libels—including that Israel "harvest[s] Palestinian organs," has an "unquenchable thirst for Palestinian blood," and that "[t]here is no difference between a Zionist and a Nazi"—several Jewish groups asked Penn to condemn the event and El-Kurd's appearance on campus.  Penn remained silent.

89.      Unsurprisingly, at the event, El-Kurd and Erakat delivered antisemitic diatribes calling for anti-Jewish violence.  Yakoby, who attended the event, sat stunned as the speakers compared Israel to the Nazis, claimed Zionism "is apartheid" and "has committed crimes against humanity," and called the ADL the "Apartheid Defense League."  The speakers also encouraged violence against Israel, saying that Palestinians had the "legal right," and that it was part of their "humanity," to engage in "violent resistance" against Israel.  During Erakat's speech, she stared at the noticeably Jewish students wearing yarmulkes who sat in the back of the lecture room.  Although these students were sitting quietly and doing nothing to disturb Erakat's lecture, she repeatedly encouraged them to challenge her, saying, "I'm ready for you and will destroy you."  It is of course inconceivable that Penn would have permitted such an event had the speakers targeted any non-Jewish minority group for abuse and harassment.

90.      Further evidencing and underscoring the antisemitism and double standards motivating their activities, most of the antisemitic Penn students and faculty members are never heard to condemn, let alone rally against, countries which, unlike Israel, can be fairly accused of

crimes—including, for example, such Arab and Muslim countries as Syria and Yemen, which have killed hundreds of thousands of Arab civilians, including tens of thousands of Palestinians, and Pakistan, which is now expelling almost two million Afghan Muslims.

**D.      Penn's Deliberate Indifference to the Antisemitism on Campus Nurtures a Hostile Environment for Jewish Students**

91.     As a result of Penn's actions and inactions described above, including permitting antisemitic events, speakers, screenings, flyers, and messages, and repeatedly failing and refusing to enforce its own policies or take disciplinary measures against students and professors who violate those policies, Penn has made it clear that it will permit, tolerate, and condone antisemitic activity.  Such deliberate indifference and discriminatory application of Penn's policies cultivated an environment in which antisemitic activity, and the risk to Jewish students, would necessarily increase following Hamas's October 7 massacre.

**i.      Penn Supports and Endorses an Antisemitic Hate Fest Dubbed the Palestine Writes Literature Festival**

92.     Setting the stage for the wave of antisemitism that would be devastating for plaintiffs and Penn's Jewish students a few weeks later, from September 22 through 24, 2023— the eve of Yom Kippur, one of the holiest Jewish days—Penn hosted the Palestine Writes Literature Festival ("Palestine Writes").  The guest speakers included some of the world's leading antisemitic activists who have relentlessly promoted violence against Jews.  Despite the pleas of several students, including  Yakoby, to condemn and rebrand the event, Penn not only permitted it but defended it.

93.     Palestine Writes was first announced on or about August 23, 2023.  The event was sponsored by Penn's Wolf Humanities Center and the Department of Cinema and Media Studies, the Penn School of Arts and Sciences Middle East Center, the Penn School of Arts and Sciences

Near Eastern Languages and Civilizations Center, the Sachs Program for Arts Innovation, and

the Kelly Writers House.  Together with false claims denying historical Jewish ties to the state of

Israel, the event's website touted its featured speakers—a veritable who's who of leading Jew-

haters—twenty-five of whom have been identified by the ADL as antisemitic, including:

- **Susan Abulhawa**, the Executive Director of Palestine Writes.  Abhulhawa has repeatedly compared Israel unfavorably to Nazi Germany (*e.g.*, "Calling Israel a Nazi state doesn't quite capture the depths of their malevolence") and boasts that she "takes comfort in knowing" that the Jewish state will one day be "wiped off the map."  After the October 7 attacks, Abulhawa celebrated the carnage, writing that "Palestinian fighters finally broke free . . . in a spectacular moment" and that the "brave Palestinian fighters overtook Israeli colonies built on their ancestral villages, seeing their stolen lands for the first time in their lives" and "inspired not only the whole of Palestine but the oppressed masses worldwide, to imagine what freedom looks like; what resistance is possible; and what life is attainable.";

- **Marc Lamont Hill**, the former CNN commentator who had espoused antisemitic hate at a Penn event in 2018.  In the years since, Hill has continued to support Palestinian violence against Israel.  For instance, in November 2022, Hill praised a terrorist that planted a bomb in a Jerusalem movie theater, referring to her as a "legend" and "beloved daughter of Jerusalem.";

- **Roger Waters**, who narrated the film "The Occupation of the American Mind" and whom the U.S. Department of State has identified as having "a long track record of issuing antisemitic tropes to denigrate Jewish people."  Waters has compared Israel to Nazi Germany, falsely stated that Israel subscribes to the idea that "the Jewish people are somehow superior to everybody else on the planet but particularly the Arabs," and called on vintage antisemitic tropes in theorizing that early Zionists were "a bunch of Europeans back in the middle of the 19th century deciding that they were going to take over this piece of land, and kick out anybody that lived there and take it over for themselves and their own little cabal.";

- **Salman Abu Sitta**, a Palestinian academic who has long dehumanized Jews and Israel, frequently claiming that "Israeli savagery knows no bounds" and "[t]he Zionist god of this Israel has an insatiable lust for blood.  Its altar must be anointed by the blood of innocent Palestinians."  Abu Sitta claimed in a video that Jews were hated in Europe because they played a role in the destruction of the economy in some countries.  He also asserts that Israel is worse than Nazi Germany: "Let nobody throw Auschwitz at me. It was a terrible crime committed during a world war.  To reward a wartime crime with what is in effect an extended, far-reaching, and ongoing crime is obscene.  Those wartime victims should have been as courageous as the Palestinians.  They should have fought back against the aggressor, even against the odds, as we do.  They should not have fled and, like cowards, attack innocent people in a faraway land who have done them no harm.";

- **Bill Mullen**, a professor and faculty advisor for SJP at Purdue University, who has advocated for known antisemites like professor Steven Salaita, who cheered the 2014 kidnapping of three Israeli high school students with the tweet, "I wish all the fucking West Bank settlers would go missing."  Mullen has proposed that "the solution" for eliminating bias against professors like Salaita was "de-zionize" American college campuses.;

- **David Palumbo-Liu**, a Stanford professor, who openly flaunts his hatred of Israel, suggesting, for example, that "If Israel is not the most hated nation in the world, there is something deeply wrong with the world.";

- **Refaat Alareer**, a professor at the Islamic University of Gaza, who claims that "most Jews [are] evil."  (While invited, Alareer was removed from the speaker line up on or about September 14, 2023.);

- **Randa Abdel-Fattah**, an Australian writer who has stated that "Israel is a demonic, sick project, and I can't wait for the day we commemorate its end," and "Israel is an abomination . . . [and] its core identity [is] a racist, Jewish supremacist, settler-colonial regime of hell";

- **Aya Ghanameh**, an activist associated with the Rhode Island School of Design's chapter of SJP, who often calls for and defends violence against Jews in Israel, tweeting: "yeah i support violent resistance and what about it? liberation by any and all means necessary . . ." and "'israeli civilians' don't exist. militant settler armed society who r all drafted = everyone is a soldier. even if they're not officially in the army, they are a militia as a society."  Following a terror attack in January 2023 that killed seven Jewish civilians at a synagogue in Jerusalem, Ghanameh tweeted "resistance is justified when people are occupied."; and

- **Wisam Rafeedie**, a lecturer at Bethlehem University – Palestine, who in June 2023 praised the 1972 Lod Airport Massacre, at which 26 civilians were violently gunned down in Israel, including American citizens, and 80 others were injured.

94.  The program also previewed pre-festival events such as a screening of the Jordanian film "Farha," which took place on September 19.  "Farha," a modern-day blood libel, claims to be "inspired by true events" that took place during what many Palestinians refer to as the "Nakba," or "catastrophe," that was the founding of Israel in the wake of the 1948 war.  Despite claiming to be based on truth, and despite an epilogue which refers to the protagonist as having "made it to Syria, where she shared her story, keeping it alive for generations to come," the director, Darin Sallam, has admitted that the film's narrative is almost complete fiction.  While a

Palestinian girl known to Sallam was supposedly locked in a room during the war, as is portrayed in the film, nearly everything else—including atrocities committed by what appeared to be Israeli soldiers—is fabricated.

95.    Another featured event was a panel celebrating the literature of Ghassan Kanafani. Kanafani was a spokesperson for the Popular Front for the Liberation of Palestine, a radical terrorist group which claimed responsibility for the Lod Airport massacre.  Prior to the attack, Kanafani had been photographed together with the gunmen.  The panel was led in part by Louis Allday, who has written that Kanafani was his "hero" who taught that "armed struggle[ ]for the Palestinians . . . was legitimate and necessary."

96.    Palestine Writes was not only sponsored with Penn funds and promoted by Penn academic departments, but was also prominently featured on class syllabi.  For instance, Elementary Arabic I and Intermediate Arabic III made it mandatory for all students to attend the event, explaining that "activities in class will be structured around the events" of Palestine Writes.

97.    Almost immediately after students arrived on campus for the academic year on or about August 28, 2023, students from nine Penn Jewish organizations met to discuss Palestine Writes and the risks it posed for Jewish students.  The groups sent a letter on September 1 to President Magill, Provost Dr. John L. Jackson, Jr., Dean of the School of Arts and Sciences, Steven J. Fluharty, Vice Provost for University Life, Karu Kozuma, and four other administrators, expressing concern and dismay over Palestine Writes.  The letter requested, among other things, that Penn issue a statement condemning known articulations of antisemitism by some of the speakers and take "proactive steps" to create open spaces for respectful dialogue

36

and a "positive learning environment."  The letter also requested a prompt meeting with the administration, which was scheduled for September 11.

98.     The September 11 meeting took place at 9:00 a.m. at Bishop White Room, located on the second floor of Penn's Houston Hall, and included a small group of Jewish Penn students; Mr. Kozuma, Vice Provost for University Life; Jeffrey Kalhberg, Associate Dean in the School of Arts and Sciences; Heather J. Sharkey, Professor and Chair of the Department of Near Eastern Languages and Civilizations; and Rev. Charles (Chaz) Howard, Vice President of Social Equity and Community and University Chaplain.  At the meeting, students expressed concern for their safety, Penn's sponsorship of antisemitic speakers, and class syllabi requiring attendance at the event.  The administrators did not provide any concrete steps that they would implement to address, ameliorate, or mitigate the mounting and expected risk of harm the event would inflict on Jewish students.

99.     The next day, on September 12, President Magill, Provost Jackson, and Dean Fluharty published a brief statement on Palestine Writes, noting that "many have raised deep concerns about several speakers who have a documented and troubling history of engaging in antisemitism by speaking and acting in ways that denigrate Jewish people."  Notably missing from the statement was any suggestion that Penn would de-fund the festival or remove its branding from the festival's advertisements.

100.    In the wake of Penn's refusal to condemn an anti-Jewish hate fest featuring leading antisemites, the next day, September 13, a swastika was spray painted at Meyerson Hall, in the Weitzman School of Design.

101.    Yakoby, who had been following the administration's response to the concerns Jewish students had raised over Palestine Writes, was distressed upon receiving President

Magill's September 12 statement.  In response, on September 19, Yakoby sent a letter, signed by over two hundred students, to various Penn administrators responding to President Magill's September 12 statement regarding Palestine Writes.  The letter stated, *inter alia*, that "regardless of whether [Palestine Writes] is 'affiliated' with UPenn or 'co-sponsored' by its departments, the perception is that UPenn agrees with and endorses the content of these programs – including the antisemitism of the speakers – and in so doing, it creates a hostile environment for all Jewish students, regardless of their course of study."  The letter emphasized how Jewish students were "terrified" that Penn was giving a platform to antisemitic speakers who were invited precisely to spew anti-Jewish hatred on Penn's campus.  The letter called out various speakers for their antisemitic rhetoric and planned roles in Palestine Writes.  The letter concluded by noting that hosting these speakers violated Penn's community standards, including: (i) Penn's Nondiscrimination Statement; (ii) Code of Student Conduct; and (iii) Guidelines on Open Expression.  The letter also requested that the administration take swift and immediate action to protect the integrity of a safe learning environment for Penn students.

102.    Despite being sent to more than twelve administrators—including President Magill, Provost Dr. John L. Jackson, Jr., the School of Arts and Sciences Dean's Office, Professor Paul D. Sniegowski, Professor Huda Fakhreddine, Heather J. Sharkey, Professor Josef W. Wegner, Professor Ian Fleishman, Professor Rahul Maukerjee, Meta Mazaj, Undergraduate Chair of Cinema and Media Studies, Professor Bekir Harun Küçük, and John H. Ghavinian, Executive Director of Middle East Center—Yakoby did not receive a response to his letter for several days.

103.    After days of the administration's inaction (except for President Magill's ineffective statement), one of the Jewish student attendees at the September 11 meeting

requested a meeting with Kathleen Shields, Vice President for Public Safety, to discuss the safety of the Jewish community at Penn, particularly given the upcoming Jewish holidays and the dangerously hostile atmosphere engendered by Palestine Writes.  The meeting took place on September 19.  The Jewish student reported that Shields was condescending and did not take his concerns seriously.  Yet again, the administration took no action to address the student's safety concerns or take any steps to enforce its own rules of conduct.

104.    Davis, who had just arrived on Penn's campus for her first semester of freshman year, was also deeply disturbed by the Jew-hating guest speakers invited to appear at Palestine Writes.  She authored an op-ed, published in *the Algemeiner*, expressing her dismay over many of the speakers, including Roger Waters, whose only apparent connection to Palestine Writes is his hatred of Jews.  Davis remarked that "when antisemites are given a platform on campus, antisemitism follows," and that Palestine Writes was no different.  "For the first time, I'm questioning whether I should wear my Star of David necklace to class.  Should I be scared when I go to the Hillel?  Should I stay quiet about my support for Israel?  Do I have to fear that . . . I [] will be attacked?"  Davis concluded her opinion piece with a plea to the administration, stating "[t]he livelihood of a group of students is at risk, and it is the duty of the university to prevent harm from reaching the lives of these students."

105.    Outside organizations and experts also began to raise alarms over Palestine Writes.  On September 20, for example, the American Jewish Committee ("AJC") called on Penn to, among other things, unequivocally denounce the known antisemitic speakers and prohibit the use of any Penn branding that was being used to endorse or support the event.

106.    Then, on September 21, at 6:55 a.m., an individual broke into Penn's Hillel ahead of a morning prayer service.  The individual knocked over several pieces of furniture and

shouted antisemitic obscenities about Jewish people, including yelling "Fuck the Jews" and "[the Jews] killed JC [Jesus Christ]."

107.    Later that day, at 5:11 p.m.,  Yakoby, having received no response to his September 19 letter, sent a follow up email to the same group of administrators, including President Magill:

> Hi All,
>
> I wanted to follow up after my letter which was sent more than three days ago.  I have not had any response from any Department Chairs.  This is the voice of over 200 Penn Students who feel that your departments are failing them and paving the way to discrimination, harassment, and violence such as what we witnessed at Hillel today.  Your silence is deafening when 200+ students tell you, the faculty, that we are "terrified."  I hope this does not reflect your compassion as educators or your commitment to the work you do.
>
> Allow me to quote some of the words of an upcoming speaker: "If a zionist breathes near me today I will destroy you."
>
> We do not want to be destroyed, we want to be educated.
>
> Thank you for your time.

108.    Professor Harun Küçük, the Director of the Middle East Center, replied to Yakoby's original September 19 email a few hours later.  Rather than validate the ongoing fear felt by Jewish students in the wake of the Hillel incident and in anticipation of Palestine Writes, Professor Küçük instead suggested that  Yakoby and the over two hundred students who signed the letter need not worry about Palestine Writes because the remarks made by the Hillel perpetrator were "more in line with Christian nationalism."  Ignoring the antisemitic incidents that had already occurred on campus early in the semester, and that the festival's speakers included some of the world's leading antisemites, Professor Küçük went on to explain that Palestine Writes is "not even symbolically violent, except that it portrays physical violence that is taking place in the region."  Instead of offering solutions to protect fearful students, Professor

Küçük did the opposite: He encouraged Yakoby and the other signatories of the letter to attend Palestine Writes (a portion of which was on Yom Kippur), claiming it "will prove to be an enriching or perhaps even liberating experience to anyone."

109.    On the same day, Ian Fleishman, Chair of the Cinema and Media Studies department, also responded to Yakoby's email. Professor Fleishman explained that when his department agreed to cosponsor Palestine Writes, it was "without any knowledge of particular participants and should in no way be taken as an endorsement of these individuals or the views they espouse." The Cinema and Media Studies department, however, continued to list itself as a sponsor of the event following Professor Fleishman's email and made no public statement.

110.    That evening, Yakoby replied to the professors with the same group of twelve administrators copied, expressing his disappointment at Professor Küçük's response, including his failure to acknowledge that the Palestine Writes speakers had a long, reprehensible record of calls for violence. Yakoby thanked Professor Fleishman for his response, but noted that even though the Department was now aware of the problematic speakers, it still had not withdrawn its support for the event. Yakoby did not receive any substantive responses to this email.

111.    Students like Yakoby were not the only members of the Penn community concerned about Palestine Writes. On September 21, in an open letter, more than two thousand Penn alumni and affiliates, including members of its own Board of Trustees, expressed "deep concerns" about Palestine Writes, asking Penn to do "all within its power to distance itself from the event's antisemitic speakers, make clear that such antisemitism is wholly at odds with the university's values, and take proactive steps to ensure that Jewish students, faculty, and staff are safe and welcome at Penn."

112.    Rather than address or consider these concerns, Scott Bok, Chair of Penn's Board of Trustees, individually contacted signatory trustees to pressure them to step down from the Board, asking whether they could "continue to serve productively having signed that letter."  It is of course inconceivable that Bok, Magill, and Penn would similarly pressure Trustees objecting to a Penn event featuring speakers notorious for spewing slurs, disseminating conspiracy theories, and calling for violence against the Black, Hispanic, Asian, Muslim, or LGBTQ communities, or any minority group other than Jews.

113.    Some trustees expressed their disgust over Penn's enabling and encouragement of anti-Jewish hatred.  One trustee, Vahan Gureghian, resigned in protest, writing that Penn leadership had "failed us through an embrace of antisemitism, a failure to stand for justice, and complete negligence in the defense of its own students' well-being . . . I can no longer report back to [my] constituents that [Penn] is acting in their best interest."

114.    On September 22, President Magill finally issued a statement condemning the Hillel attack and, for the first time, acknowledged the September 13 antisemitic vandalism at Meyerson Hall.  Yakoby was shocked and disappointed that the administration had remained silent for more than a week before finally condemning such vile antisemitic provocations.

115.    The speakers at Palestine Writes lived up to their antisemitic pasts.  Abulhawa opened Palestine Writes by labeling criticism of the event as "hysterical and racist" and the "old, well- worn colonial script of the violent, dark, irrational and savage[.]"  She also asserted that Israeli "violence [] is on full display on this campus every year when Zionists have their so-called Birthright trips, propaganda tours to recruit young American Jews to become our colonizers, tormentors and lords."  Abulhawa also referred to Israel's Jews, a majority of whom

are of Middle Eastern descent, as "European colonizers" who "stole an entire country" and had no right to self-determination on their land.

116.   At the same event Professor Küçük encouraged Jewish students to attend, speakers decried "Jewish supremacism" and the "messianic mindset" of "religious Jews" who are willing to "put up with anything to take over more land."  Others, like Erakat and Sitta, advocated a single, Palestinian state, limiting Israel's Jews in number or concentrating them in "cantons."  Erakat further advocated Palestinian violence as "leverage" in the fight against Israel.

117.   Predictably, following this antisemitic event, another act of vandalism occurred, on September 25, when the Penn Chabad house (a center for Jewish religious, social, cultural, and educational activities at Penn) was vandalized with graffiti.  Despite receiving reports about it, and despite its practice of routinely releasing statements about nearly every activity concerning public safety on campus (excluding incidents impacting Jews), Penn did not release any statement responding to the defacement.

118.   Following Palestine Writes, on October 3, Yakoby sent another follow-up email to the twelve administrators he addressed in his September 19 letter and September 21 emails, noting that the department heads failed to acknowledge his letter and refused to take any steps to ensure Jewish students were safe and supported in their courses.  Yakoby did not receive a substantive response to his email.  Not one department had removed its name from the event, and, despite repeated calls for action, none issued statements condemning antisemitism either before nor following Palestine Writes.

119.   Penn's endorsement of the antisemitic Palestine Writes event, and refusal to heed the pleas of Jewish students and organizations to distance itself from it, heightened the already

dangerous and hostile anti-Jewish environment, and primed the pump for the torrent of anti-Jewish harassment and violence that would flood Penn's campus days later, following October 7.

### ii.   October 7, 2023: Hamas Terrorists Commit Grotesque Atrocities Against Innocent Civilians in Israel

120.    In its latest atrocity, on October 7, Hamas launched an unprovoked surprise attack on Israel, engaging in depraved acts of murder, torture, rape, violence, and kidnapping against Israeli citizens.  Thousands of armed terrorists invaded southern Israel, while others simultaneously launched thousands of rockets toward Israeli civilians and population centers. Once in Israel, the terrorists, acting as well-armed death squads, dispersed into Israeli towns shooting, raping, torturing, burning, and mutilating unarmed civilians, including infants, children, and the elderly, and taking hundreds of hostages and engaging in mass murder and rape at a music festival near Gaza's border with Israel.

121.    The IDF eventually repelled the terrorists and regained control over the affected area.  By the end of the October 7 massacre day, Hamas had killed over 1,200 people and abducted over 200 people.

122.    Several weeks later, a senior Hamas official hailed the slaughter and vowed that Hamas will repeat it, over and over again, until Israel is exterminated.  He explained during a television interview that October 7 was "just the first time, and there will be a second, a third, a fourth," promising another "October 7, October 10, October one-millionth."  When asked whether this meant the complete annihilation of Israel, he replied, "Yes, of course."

123.    On October 18, President Biden described the October 7 slaughter as follows:

> Scores of innocents—from infants to elderly grandparents, Israelis and Americans—taken hostage.  Children slaughtered.  Babies slaughtered.  Entire families massacred.  Rape, beheadings, bodies burned alive.  Hamas committed atrocities that recall the worst ravages of ISIS, unleashing pure unadulterated evil upon the world.

> There is no rationalizing it, no excusing it. Period. The brutality we saw would have cut deep anywhere in the world, but it cuts deeper here in Israel. October 7th, which was a sacred to—a sacred Jewish holiday, became the deadliest day for the Jewish people since the Holocaust. It has brought to the surface painful memories and scars left by a millennia of antisemitism and the genocide of the Jewish people.

124. At Penn, however, numerous students and faculty members enthusiastically celebrated and continue to celebrate Hamas's mass rape, murder, and kidnapping. Since then, many have engaged in harassment and violence against Jewish students in support of Hamas's attack and in condemnation of Israel's self-defense response.

### iii. Penn Student Groups and Faculty Enthusiastically Support Hamas's October 7 Atrocities

125. On October 7, while Israel was still tallying the innocent lives lost, tagging body parts, and working to secure its borders, PAO, a student organization at Penn whose primary objective is to secure an "end [to] the Israeli occupation of Palestine," promoted an "Emergency Solidarity Rally" at Rittenhouse Square Park (the "Rittenhouse Rally"), scheduled for the following day.

126. During the Rittenhouse Rally, speakers "saluted Hamas" for a "job well done" and delivered speeches infused with violent rhetoric against Jews, which were met with applause and amusement by the crowd. For example, one speaker stated: "I think we should all give an applause right now, to Hamas, for a job well done. When they woke up in the morning, and they found the field hands in the house, with a knife, ready to cut their fucking throats. I was late to the news, but when I heard it, I smiled. I don't want to hear that bullshit, 250, 250, innocent Israelis are dead. Fuck 'em. Again, I swear. I salute Hamas. A job well done." Speakers at the Rittenhouse Rally not only praised Hamas but also attempted to refute the claim that Hamas had slaughtered forty Israeli infants during the October 7 massacre.

127.    On its Instagram feed throughout the day, PAO posted support for Hamas, videos and images of the Rittenhouse Rally, and paid homage to Ahed Tamini, a Palestinian activist arrested by Israeli forces.  Tamini has issued sadistic threats against Jews, promising to "slaughter you and you will say that what Hitler did to you was a picnic.  We will drink your blood and eat your skulls.  Go ahead, we are waiting for you."

128.    The same day as the Rittenhouse Rally, Penn History and Middle East Studies Professor Eve Troutt Powell liked a post on Instagram praising the October 7 attack.  In response to a post stating that "any condemnation of violence is vapid if it does not begin & end with a condemnation of Israeli apartheid, settler colonialism, and occupation," Professor Powell wrote, "You are absolutely right.  There's been a lot of vapidity."

129.    On October 7, Huda Fakhreddine, Associate Professor of Arabic Literature and promoter of Palestine Writes, tweeted that "while we were asleep Palestine invented a new way of life" and reported, "[i]t must be emphasised [*sic*] that armed struggle by the Palestinian resistance against the occupier is legal under international law."  Later, on October 17, she posted that "Israel is antisemitic, anti-human, anti-children, anti-life!" and "the assumption that all Jewish people condone the genocidal Zionist project in Palestine is the epitome of antisemitism and a desecration of the memory of Holocaust martyrs."

130.    On October 7, Tukufu Zuberi, Professor of Sociology, retweeted a post by Kamau Franklin, which stated, "[b]y what standard of morality can the violence used by a slave to break his chains be considered the same as the violence of a slave master."

131.    On October 7, Anne Norton, Professor of Political Science and Economics, tweeted, "Palestinians have the right to defend themselves.  I 'utterly condemn' the occupation and structures of discrimination.  'There is no justification.'"  Two days later, Professor Norton

reposted a tweet calling allegations that Hamas terrorists dissected a pregnant woman and put babies in cages on October 7 a "circus."

132.    On October 9, in response to President Obama's Instagram post condemning the terrorist attack on Israel and slaughter of innocent civilians, Professor Norton responded, "I am ashamed of you."  On October 22, in response to a tweet reporting that "an international team of forensic pathologists examining the bodies of the victims [has concluded that] Hamas terrorist committed unfathomable atrocities on 10/7," Professor Norton responded, "Forensic pathologists or global press?  Which?  Neither identified.  Shameful and irresponsible – or worse-on your part."

133.    Professor Norton continued to spread and endorse antisemitic conspiracies.  On October 25, Norton agreed with a post asserting: "I have commented lightly on the absurd propaganda about Jewish Zionist students feeling unsafe on US college campuses but want to make clear: pro-Palestine students and faculty are being punished regularly for their speech. Nobody else."  On October 30, in response to an Instagram post that stated "They baked a baby. In an oven.  THEY BAKED A BABY IN AN OVEN.  THEY BAKED A BABY IN AN OVEN. Say ceasefire one more time, you fucking baby-murdering-loving ghouls," Professor Norton commented, "Ceasefire."

134.    On November 24, Professor Norton "liked" the following tweet by Shahid Bolsen regarding Israeli kidnapping victims: "Imagine being an Israeli who has been kept alive in Gaza by Hamas amidst the unprecedented bombing campaign of Gaza by your government.  While Gazans are being killed, city blocks flattened, bombs and missiles falling continuously; and you have now witnessed and experienced all of that for the first time ever as an Israeli; and experienced Hamas fighters doing everything they can to protect you from IDF attacks for 6

weeks.  Your government has been doing everything to kill you, and Hamas has kept you safe while their own people are dying."

135.     On October 15, Robert Vitalis, Professor of Political Science and Director of Penn's Middle East Center, updated his Facebook cover photo to a picture that reads in red letters, "NAKBA Since 1948."  On October 22, Professor Vitalis uploaded to Facebook a photo of the Hamas terror group's military wing emblem, with the caption: "A quick and easy way to reduce my friends list (and it will look cool on your jacket too)."

136.     On October 16, Fatemeh Shams, Associate Professor of Persian Literature, tweeted, "these kind[s] of statements that 'Hamas' is responsible for the lives of the people of Gaza are pure nonsense."  "If you are a Jewish college student who feels this way, please DM me. You've been brainwashed, as I was."  Shams also tweeted: "the extremists adhere to the Zionist ideology, who justify their colonial goals by abusing and hijacking the religious discourse that has no basis in the Torah, the Jewish holy book."  On October 20, Shams reposted on her Instagram page that Israel had bombed the Al-Ahli hospital in Gaza, despite numerous reports from western governments, including the U.S. government, that the attack came from a misfired Palestinian rocket within Gaza.

137.     That same day, Siarhei Biareishyk, Visiting Assistant Professor in the Department of Germanic Languages and Literatures, posted on his Instagram page a flyer advertising a collective walkout for Palestine.  According to reports, Professor Biareishyk ended his Russian history class early so that students could attend the walkout.

138.     Following the Hamas attack, the Palestine Writes speakers, who were invited to campus just days earlier, took to social media to spew their antisemitic venom.  For example, days after the attacks against Israel's civilian population, Refaat Alareer responded on social

media to a report that an Israeli baby was found in an oven baked to death by Hamas terrorists, with the comment, "With or without baking powder?"

139.    On the day of Hamas's barbaric massacre, President Magill, who had not yet condemned the deadliest day for Jews since the industrialized genocide of the Holocaust, posted a picture of herself and her dog on Instagram with the caption, "Don't let a little rain damper your Saturday."

**iv.    Jewish Students Become Targets for Hate Speech, Harassment, and Abuse**

140.    Immediately after October 7 and in the wake of the administration's endorsement of Palestine Writes, the anti-Jewish animus on Penn's campus intensified.  The murder of innocent Israelis unleashed even more unhinged antisemitism that, when coupled with the administration's inaction, exposed Jewish students to even more intimidation, harassment, discrimination, and assault.

141.    For example, on the afternoon of October 9, two days after the massacre in Israel, Davis left her Mediterranean Archeology class to walk through the center of campus to her next class, Chemistry, while wearing a Jewish Star of David necklace and other garb identifying her as Jewish.  As she walked by a group of pro-Palestine protestors gathered by the Split Button, a sculpture at the center of campus, one of the protestors, who had his face covered by a keffiyeh, called out to her, "yeah, that's right keep your head down."  Another man, also covered by a keffiyeh such that only his eyes were visible, yelled to Davis, "you are a dirty Jew, don't look at us."  Other protestors joined in, taunting  Davis with: "keep walking you dirty little Jew," "you know what you've done wrong."

142.    Davis, who grew up in a small town in Wyoming, had never experienced overt antisemitism until she arrived at Penn.  The antisemitic abuse she had encountered—within three

hundred yards from her dorm—terrified her.  Traumatized, she retreated to her dorm room and

wept, and she remained locked in her room for the remainder of the day, unable to attend her

scheduled classes or academic meetings.

143.    Given the anti-Jewish hostility raging on campus, the lack of administrative action

concerning Palestine Writes, Penn's silence in response to the October 7 massacre, and its

inaction after the antisemitic vandalism on campus, Davis decided not to report the incident.  She

was concerned that Penn administrators, faculty, and students would retaliate against her given

Penn's conduct in failing to condemn, and affirmatively promoting, antisemitism.

144.    In the days that followed, Davis tried to keep a low profile.  She was in constant

communication with her parents in Wyoming, who feared for her physical safety and emotional

health.  While she did her best to attend classes that week, she remained in a constant state of

fear, struggling to remain focused on her schoolwork.

145.    Penn classrooms, too, are hotbeds of antisemitism.  Jewish students have been

forced to endure deliberate and targeted harassment by Penn's faculty.  To take just one example,

Ahmad Almallah, a lecturer in Penn's English department, has a history of discriminating against

Jewish students in his class.  In one such event, a Jewish student signed up for one of his courses,

titled "Modern Arabic Literature."  But after the first day of class, Professor Almallah switched

the course title to "Palestine and its Diaspora in its Literature and its Film."  Almallah soon

targeted the student with the question, "what do you think about the apartheid wall?"  After the

Jewish student responded that he was grateful the wall saved lives, Almallah and the other

students spent thirty minutes harassing him, stating, "that's what you people say to justify your

racism and genocide," and "violence isn't inherently bad, why should we not be able to do that?"

When the Jewish student reported the incident, the head of the English Department discouraged

the Jewish student from escalating the complaint to other administrators.  For the rest of the semester, the Jewish student was forced to read and present on class material that either insinuated or explicitly stated that Israel has no right to exist, and Almallah repeatedly pitted the student against the rest of the class in discussions.  During the student's end-of-semester presentation, he questioned what the class's repeated statements about "armed resistance meant," and noted that these statements made him nervous.  Almallah and the class jointly exclaimed, "that's exactly what we mean."  Penn has not announced any disciplinary action against Almallah.

### v.   Penn's Failure to Take Action Against or Even Condemn Calls for Violence Against Jews After October 7

146.    On October 10, three days after the Hamas massacre of innocent civilians, President Magill and Provost Jackson issued a statement to the Penn community in which they labeled the attack as the "War in the Middle East."  The statement, which was widely condemned for both its delayed timing and tepid response, praised Penn "leaders and administrators who quickly and thoughtfully mobilized, identifying and reaching out to students, faculty, and staff with connections to the region to offer assistance and resources."  Yakoby—whose concerns about being an Israeli Jew on campus were ignored just days earlier—was not one of the students "offer[ed] assistance and resources," even after seeking it.  In contrast to other statements Penn had made in solidarity with minorities targeted by other attacks, Penn's Jewish students—much less the word "Jewish"—were not mentioned in the release at all.

147.    Following the Rittenhouse Rally, eleven Penn clubs co-signed a "Statement of Solidarity with Palestine" endorsing the October 7 massacre, referring to Hamas's mass murder, rape, torture, beheading, and kidnapping of innocent civilians as a "dignified fight," blaming Israel for the murder of its own citizens, claiming that the university was "operating within a

vacuum of Zionist media propaganda," and accusing President Magill of using "Zionist rhetoric" in her October 10 statement and of taking a "cowardly stance in support of a colonial entity." The clubs that co-signed the statement were: Palestine Against the Occupation; the Radical South Asian Collective; Students for the Representation of China Town; Penn Philippine Association; Penn Pakistan Society; PAGE; Penn Repro Justice; Penn Bangla; Afghan Student Association; Fossil Free Penn; and Police Free Penn.

148.    On October 11, Yakoby began soliciting student signatures on a petition condemning the clubs' statement.  By October 12, the petition was signed by 952 people; as of the filing of this action, the petition has over 2,400 signatures, and six of the eleven clubs had removed their signatures from the statement.

149.    Also on October 12, Yakoby, via email, forwarded the petition to, among others, President Magill, Dean Fluharty, Vice Provost Kozuma, Wharton Business School Dean Erika James, and Penn Public Safety.  He expressed his concerns about the recent events on campus, including the Rittenhouse Rally, at which one speaker, Yakoby noted, stated "I think we should all give an applause right now, to Hamas, for a job well done.  When they woke up in the morning, and they found the field hands in the house, with a knife, ready to cut their fucking throats.  I was late to the news, but when I heard it, I smiled.  I don't want to hear that bullshit, 250, 250, innocent Israelis are dead. Fuck 'em. Again, I swear.  I salute Hamas.  A job well done."  Yakoby also referenced PAO's promotion of the Rittenhouse Rally and the group's public anti-Israel and anti-Jewish statement echoing the antisemitic speeches at the rally.

150.    Receiving no response, Yakoby followed up the next day with the same group of administrators to express his fear of returning to class on Monday: "I am deeply concerned about having to face fellow students who appear to believe that the events of last weekend are

52

something to 'smile' about.  This situation affects not only my personal well-being but also my ability to engage fully in the academic environment."  Yakoby asked the administration to immediately address the issue.

151.    On October 14, Vice Provost Kozuma responded to Yakoby, suggesting that they meet on October 19 with Paige Wigginton, the Director of Penn Special Services, which provides support services to members of the Penn community who are crime victims.  Yakoby requested that the meeting take place immediately, noting that he could not attend class because he is "genuinely scared of physical harm" from the students and groups promoting hate and violence on campus.  Kozuma agreed, and a meeting was scheduled for the evening on October 15 at Kozuma's office building.

152.    At the meeting, Yakoby presented Kozuma and Paige Wigginton with detailed information concerning the virulent antisemitism spreading across campus.  For approximately two hours, he explained how Palestine Writes caused some of the anti-Israel frenzy that he was currently witnessing on campus and pleaded with the administrators to act immediately to prevent future antisemitic incidents.  Yakoby in particular raised the antisemitism voiced at the Rittenhouse Rally and PAO's attendance at, and promotion and celebration of, the rally.  In keeping with Penn's pattern of, at best, deliberate indifference to antisemitism, his concerns fell on deaf ears, with Kozuma parroting Penn's preposterous assertion that there had been no hate speech and that Penn would not take any action to condemn or do anything else about PAO's endorsement of Hamas's massacre.

153.    Yakoby sent a follow-up email later that night to Kozuma, Wigginton, and President Magill, recounting the unproductive conversation and noting his disappointment in Penn's continued lack of response:

> I presented all of the information regarding a student organization promoting an event which 'Saluted Hamas' for a 'job well done.' As well as, their denial of the confirmed killing of 40 babies. I was told that since Thursday, when I informed you all of this, nothing, other than increased security of the rally tomorrow has been done. Moreover, I was told that currently, the university does not view this as hate speech. The university, in addition, said nothing can be done about it and that the student group is able to exercise their right to free speech. This is a very disappointing response from the administration, once again.

154. Kozuma eventually forwarded Yakoby's October 15 email to Julie Nettleton, the Executive Director for the Center for Community Standards and Accountability, and, on October 16, Ms. Nettleton proposed that Yakoby meet with her and Jen Mirel, Restorative Facilitation Specialist at the Center for Community Standards and Accountability. Yakoby eagerly agreed.

155. Earlier in the day, on October 15, after being criticized for her muted October 10 "War in the Middle East" statement, President Magill tried again, eight days after the massacre, with an updated statement, this time characterizing the attack as a "terrorist assault."

156. Magill belatedly attempted to distance the administration from Palestine Writes, which she had allowed to occur on campus weeks earlier, claiming that "individuals, with a public history of speaking out viciously against the Jewish people, appear[ed] on campus as part of the Palestine Writes Literature Festival . . . [t]he University did not, and emphatically does not, endorse these speakers or their views." Magill conceded, however, that "we should have moved faster to share our position strongly and more broadly with the Penn community." Magill also recognized "how painful the presence of these speakers on Penn's campus was for the Jewish community, especially during the holiest time of the Jewish year[.]" Magill's statement also acknowledged that there had been "recent antisemitic acts on campus" and concluded with a promise that she would endeavor to foster a safe and inclusive environment for Jewish students on campus.

157.    But as plaintiffs and other Jewish students would soon come to learn, Magill's statement was mere lip service.

### vi.    An Antisemitic Frenzy Engulfs Penn's Campus

158.    On October 16, to remind the Penn community of the innocent Israelis being held hostage by Hamas in Gaza, Yakoby and a friend hung "kidnapped" posters with pictures of the kidnapped babies, children, and other victims around campus.  As Yakoby was doing so, a man threateningly approached him and yelled "fuck you."  Yakoby immediately reported the incident to the first Penn police officer he could find.  Although the officer assured Yakoby that police would investigate and report back with an update, Yakoby has yet to receive any follow-up communication.  Only through the news would Yakoby learn that the same assailant was later taken into police custody for assaulting another Jewish student on campus who was wearing a yarmulke.

159.    After reporting the incident, Yakoby hurried home.  On his way, he saw students tearing down the posters he had just spent the morning putting up.  Shaken by these escalating acts of hate, Yakoby missed his next two classes.

160.    That same day, on October 16, PAO, in conjunction with faculty members, organized a walkout "to protest the ethnic cleansing of Palestinians in Gaza and [to] stand in solidity with Palestine."  The walkout, which turned into a seven-hour rally in the heart of campus, on College Green, and later a march down the main campus artery, Locust Walk, was so loud and disruptive that students reported that they could hear the chanting from inside their classrooms and dormitories.  From approximately 10:00 a.m. to 5:00 p.m., in the midst of midterm examinations, the library, in the center of campus, was essentially barricaded by the protestors.  Calls for violence against Jews filled the air.  The protesters chanted false and

genocidal antisemitic slogans, such as "there is only one solution: intifada revolution," "from the river to the sea, Palestine will be free," "intifada intifada," and "Israel, Israel, you can't hide, we charge you with Genocide."  Dozens of speakers, including faculty members and students, delivered virulently antisemitic speeches.  One speaker declared that "all settlers and all settlements are legitimate military targets and they will be targeted."  The same speaker told Jewish students to "go back to Moscow, Brooklyn . . . fucking Berlin where you came from."

161.    Professors, including Huda Fakhreddine, cheered the speaker on and clapped in approval, before expressing her view that "Israel is the epitome of antisemitism," and that the state of Israel "desecrates the memory of the Holocaust victims."  Professor Ahmad Almallah also spoke at the protest and concluded his speech by chanting "resistance is justified," "intifada, intifada, intifada" and "there is only one solution, revolution!"  Another speaker, addressing Jewish students who were standing nearby, proclaimed, "I hope you shit when you go on your bed tonight.  I hope your dreams are filled with the horrors of dead Palestinian babies, burned Palestinian children, dead Palestinian women, a hundred square miles, leveled. I hope this scorches your brain.  I hope you are terrified of this, because you should be."

162.    Plaintiffs and their fellow Jewish classmates were deeply shaken by these events. They could not believe that their own university would allow people on campus to demonize them, threaten them, and call for their demise, all without consequence.

163.    Davis was forced to confront the protestors on October 16, when she was again walking back from her Mediterranean Archeology class to her Chemistry class.  This time, the protest was significantly larger; instead of fifty protestors there were over one hundred, and the hate speech was incessant.

164.     As she walked by,  Davis saw Professor Shams standing on top of the Button sculpture.  Professor Shams used a bullhorn to announce that "Israelites" deserved the attack they received on October 7, that the violence was justified, and that "the Jews claimed they have loved ones who died, it's all a lie."

165.     As she tried to hurry past the protest, Davis also noticed a group of ten to fifteen students holding an Israeli flag a few feet away.  The students, one of which Davis recognized as a friend, looked upset.  Davis approached to console her friend and the rest of the students, and stood with them for approximately five to ten  minutes.  In just that short time, Davis witnessed a student with a yarmulke being harassed by protestors, who called out "how does it feel to be a part of a mass genocide?"  Similar profanities were directed at another Jewish student who was wearing a Star of David necklace.  Several students yelled to Davis, and the other Jewish students she was standing with, to "get out of here kikes!"  The same slur was shouted at  Davis by several other students.

166.     Fearing for her safety, Davis walked away to go to class.  As she moved away from the crowd, three men, whose faces were covered by keffiyehs and who were standing at the outskirts of the rally, assaulted Davis with the following statements: "you're a dirty little Jew, you deserve to die"; "you don't deserve to be on the same earth that we stand on"; and "the Jews deserve everything that is happening to them."  Davis was terrified and ran to class.

167.     When she arrived at class, Davis was still crying from the hate-filled threats she had just endured.  She was early and approached her professor.  Davis requested an extension on her class lecture note assignment, which is due after every class.  Showing no sympathy, the professor refused to provide any accommodation.  Davis walked out immediately and returned to

her dorm.  That night, and since the assault, Davis has been distraught and has had difficulty

sleeping.

168.    Later that day, Yakoby wrote to President Magill, Kozuma, and Paige Wigginton

to again warn them of the dire situation on campus:

> Hi All,
>
> I have already reported this to the penn police but I wanted to loop
> you in on the "freedom of speech" at this campus.  We put up flyers
> with images of child hostages in Gaza, calling for the release.  We
> have documented images and videos of the individuals who tore
> them down. Moreover, one individual came up to myself and
> another student and said "f*ck you"—we were standing doing
> nothing when this occurred. In addition, a student with a [yarmulke]
> was pushed by multiple people attending the rally.
>
> This is not freedom of speech, it is violence and it has become a
> pattern on this campus.
>
> What are you doing about it?

169.    The next day, on October 17,  Davis missed her classes and spent most of the day

hiding in her dorm.  In fact, she had missed every class that week and only attended one on

Friday to make up for a quiz she had missed.  Her mother, whom she confided in the day before,

contacted the campus Chabad Rabbi, Rabbi Ephraim Levin, who asked Davis to meet him at the

Chabad House.

170.    When she arrived at the Chabad House later that day, Davis met with Rabbi

Ephraim and recounted the harassment she experienced at the rally and elsewhere and the

anguish she had been  experiencing since.  While Rabbi Ephraim encouraged Davis to report the

incident, she was hesitant to do so, fearing retaliation by the administration and other students

and faculty.  Ultimately Davis agreed to file a report anonymously, which she did that evening

via Penn's Bias Incident Reporting system.

171.     The same day, on October 17, Yakoby met with Ms. Nettleton and Mirel to describe how he was assaulted on campus and to ask whether and why Penn permits pro-terrorist rallies on campus, like the one that occurred the day before.  Ms. Nettleton replied that the Office of Community Standards did not have an official response to Yakoby's question but told him that she would look into it.  Yakoby repeated his question to Nettleton multiple times via email on October 19, 23, 29, 30, and November 5, 8, and 28.  In his last email to Nettleton, Yakoby wrote:

> Over a month. I would love to know whether or not Penn allows for "pro-terrorist" rallies.  In our meeting you assured me you would find out and in an email you expected to get back to me within a week (it has been over a month).  I do not feel safe on penn's campus and this makes it significantly worse, considering the university seems to have no idea.  If this is true, saying that the university has "no idea" is sufficient answer but dodging is quite concerning.

172.     Yakoby has never received an answer to whether pro-terrorist rallies are permitted on campus.

173.     On October 17, Davis spoke to her academic advisor, Jason Breyan, to request help obtaining class accommodations because she was suffering from the day prior's assault.  Mr. Breyan suggested she email the Weingarten Center, Penn's academic support and disability center, to request an extension on her quiz that was scheduled for October 20.  She did so.  Despite the assurances by her academic advisor, the Weingarten Center replied to  Davis the day before her quiz, October 19, declining  Davis's extension request.

174.     On October 18, PAO organized another large rally on Penn's campus.  Much like the October 16 rally, chants for the annihilation of the Jewish state were incessant.  In response to the October 18 hate rally, President Magill issued a "Message to the Penn Community," belatedly asserting that "Penn will not tolerate and will take immediate action against any incitement to violence or, of course, actual violence."

175.    The October 18 rally included a march to the Lauder College House, Davis's dormitory, known to be a dormitory where a large number of Jewish students live.  Davis was still recovering from the October 16 harassment and hiding in her dorm when she heard chants outside her window.  Hearing calls for Israel's annihilation, Davis was instantly retraumatized. Already confined to her dormitory, she felt there was nowhere to hide.

176.    On October 20, "the Jews R Nazis" was found graffitied on a vacant building immediately adjacent to a Jewish fraternity house, Alpha Epsilon Pi.  At least one Jewish student reported the vandalism to the Penn police.  Another student, who saw the graffiti and had witnessed the antisemitic rallies, reported that she subsequently feared walking around campus.

177.    The following week witnessed nonstop antisemitic rallies and events by Penn student groups on Penn's campus and elsewhere.  On October 25, for example, PAO organized a "walk out for Palestine."  The following day, PAO promoted another rally that took place in downtown Philadelphia.

178.    At each event, the anti-Jewish and Israeli rhetoric intensified.  At an October 28 "Emergency Rally" for Palestine, promoted by PAO, student protesters reveled in Hamas's October 7 slaughter and called for violence against Jews.  By way of example only, one Penn student, Tara Tarawneh, addressed the crowd, referring to what she called the "joyful and powerful images which came from the glorious October 7th":

> How about the photos of the bulldozer breaking through the deathly border? Do you remember that picture? And the several other[?] [an attendee shouts, "Long live October 7th!"]
>
> I want you to picture those in your mind. I want you all to remember how you felt when you saw those images and heard the news. *I remember feeling so empowered and happy;* so confident that victory was near, and so tangible! I want all of you to hold that feeling in your hearts. Never let go of it. *Channel it through every action you take. Bring it to the streets!* Go down to the streets every day! And don't ever let them feel that you quietly accept this

> genocide! Free Free Palestine! [] *From the river to the sea* []*,*
> *Palestine will be free!*

179.     Following her hate-filled speech, on October 28, Tarawneh ripped down and stole

an Israeli flag from the front of several Jewish Penn students' home, and was arrested.  The

Philadelphia District Attorney charged Tarawneh with theft and receiving stolen property.  Yet

even though she was arrested,  criminally targeted Jewish students for violence, and had

celebrated Hamas's massacre and expressed admiration and support for a terrorist organization,

Tarawneh remains a student at Penn and was back in class by November 28.

**vii.     Rallies, Vandalism, and Antisemitic Threats Continue to Escalate Across Penn**

180.     Anti-Israel and anti-Jewish hate events on campus continued to rage in the weeks

that followed.  On October 31, for example, Yakoby visited the Penn Bookstore, only to find that

the Quran and other pieces of Muslim literature had replaced the material typically displayed in

the "Judaica" section.

181.     Under immense pressure from students, trustees, and donors, and faced with

growing external scrutiny, on November 1, Penn announced "Penn's Action Plan to Combat

Antisemitism" (the "Action Plan").  The announcement acknowledged that "Penn must do more"

and that the swath of recent antisemitic incidents were, "[r]egardless of form, . . . appalling and

unacceptable."  But Penn's "action" to "combat antisemitism" was nothing of the sort.  Instead

of meaningful action—such as disciplining offenders through bans, prohibitions, suspensions,

and expulsions—the "Action Plan" only included "reviews," "task forces," "advisory groups"

and "discussions."

182.     The Action Plan recognized the need for "Safety & Security," "Engagement," and

"Education," but offered no solutions.  As to "Safety & Security," for example, the Action Plan's

"Immediate Actions" included only "a review" of "existing safety and security for Penn-

61

affiliated religious life centers."  On "Engagement," Penn suggested convening task forces and advisory groups to have "conversations," and "advis[e] the president."

183.    Along with the announcement of the Action Plan came another hollow message from President Magill, this time purportedly to fight what she correctly recognized as the "pernicious and persistent" antisemitism on Penn's campus.  But President Magill's message instead minimized and undermined the Action Plan's focus on antisemitism, turning the supposed plan to combat antisemitism into a plan to combat a word salad of general hate sentiment: "Because hatred of one vulnerable group is so often intertwined with threats toward others, we will also vigilantly combat other forms of hate aimed at members of our community due to their background or beliefs."

184.    On November 6, while Yakoby was at Penn Hillel, he saw police and bomb-sniffing dogs enter the building.  Yakoby would later learn that Penn had received antisemitic emails threatening violence against the Jewish community, specifically naming Penn Hillel and Lauder College House.

185.    Penn maintains an emergency notification system for just this type of situation, which regularly alerts the community to crimes ranging from petty theft to serious felonies that occur both on and far off campus.  Yet the school shockingly did not use this system to alert Yakoby or other Jewish students at Hillel that they were in danger of actual threats of antisemitic violence.  In fact, Penn did not see fit to issue a single alert warning of antisemitic threats throughout October and November 2023, notwithstanding the many events detailed above. Yakoby was alarmed by Penn's failure to timely alert the Jewish community concerning actual threats of violence.  By failing to take action in response to violent threats targeting Penn's Jewish students and Jewish institutions, and by ignoring the pleas of plaintiffs and other Jewish

students for protection, Penn is inviting and fomenting violence against plaintiffs and Penn's Jewish students.

186.    Penn's egregious failure to take meaningful action delivered a clear and welcome message to Penn's antisemitic students and faculty members: the open season on Penn's Jews would continue.  On November 8, two days after the threat against Hillel and Lauder College House, Penn's campus was defaced with statements such as "From the River to the Sea, Palestine Will Be Free," and "Israel Commits Genocide" written in chalk across Locust Walk and on banners hung on campus property.  Later that day, PAO put on a light show that displayed across Penn Commons and Huntsman Hall featuring statements such as "Zionism is Racism," "From the Sea to the River, Palestine Will Live Forever," "Let Gaza Live," and "Free Palestine."

187.    On November 9, President Magill released a statement on Penn's Instagram account, claiming that the administration would hold those who orchestrated the light show responsible.  PAO, on its Instagram page, gleefully took responsibility, posting one image that same night with the caption, "in case you missed our light show."  To date, PAO is still active on campus and continues to break the university's rules with impunity.

188.    On November 14, having been shown for years that Penn's conduct codes do not apply to anti-Jewish abuse and harassment, a coalition of Penn students, staff, and faculty established a "Freedom School for Palestine" inside the campus student union, Houston Hall. For over three weeks, in violation of university rules, the group has camped out in the Reading Room in Houston Hall, staying past closing at midnight and disturbing students trying to study.

189.    On the first night, after midnight on November 15, long after Houston Hall was closed, Penn Police Deputy Chief of Investigations Michael Morrin told the protestors that they

would be arrested if they did not leave the building within the next thirty minutes.  Thereafter, members of Penn Police instead told the demonstrators that they could remain in Houston Hall overnight if they showed their school identification cards to staff members.

190.    Emboldened yet again by Penn's failure to act, the demonstrators have transformed the Reading Room, a central gathering place on campus, into an antisemitic war room, hanging anti-Israel banners on the walls and bellowing into bullhorns to express their hatred for Israel.  Encouraged by faculty members, including Professor Fakhreddine, individuals outside the Penn community have visited the war room to give lectures.  The occupying students and faculty receive daily food deliveries paid for with the assistance of faculty funding; in fact, public Venmo transactions show transfers to the "Freedom School" occupiers from faculty members like Sarah Leonard, fellow in the Wolf Humanities Center, and Marina Krikorian, coordinator of the Center for Advanced Research in Global Communication.  As of the filing of this action, the students and faculty continue to occupy the Reading Room, harassing and intimidating Jewish students.

191.    Multiple Jewish students have expressed that they do not feel safe walking into Houston Hall.  On one occasion, when two students, who are active Israel supporters, entered the student center, the Freedom School participants confronted them and told them to "step out."

192.    Despite the numerous and obvious violations of Penn's policies, including, among many others, the Guidelines' prohibition against impeding "movement in a University location," Penn has done nothing to discipline these protestors.  Instead, it permitted the protestors to expand their occupation of Houston Hall.  Penn tolerates trespass as long as the students involved are practicing and promoting antisemitism.

193.    On November 15, another Israeli flag was stolen from the same home of the Jewish students as the one that Tarawneh had victimized a few weeks earlier.

194.    On November 16, "missing cow" posters, which mock Israeli hostage posters, were found littered around campus and brought to Penn's attention.  The shameful posters include a photo of a cow silhouette and suggest a reward of a "box of chalk and a can of beer" for finding the missing cow.  The same day, a statement that read "90% of Pigs are Gas Chambered" was chalked on Locust Walk.

195.    On Saturday, November 18, the Penn Muslim Student Association hosted Yasir Fahmy on campus.  Fahmy has espoused antisemitic views and hatred for the LGBTQ community, including calling Zionism a "sick and sadistic, ideological cult – it's a political cult that has taken over the administration of Israel.  That movement operates from a place of pure self-interest . . . all they have is the propaganda.  All they have are the lies. All they can do is throw money at things."

196.    On November 28, Chavurah, a self-proclaimed "progressive anti-Zionist" Jewish club, planned to host a screening of "Israelism," a controversial documentary that argues American Jewish communities raise their children with pro-Israel indoctrination while omitting discussion of Palestinians' situation.  Penn denied the club's request to screen the film, citing safety concerns, but noting "we are actively working to find a date in February when the film can be viewed and discussed safely and constructively."  Chavurah ignored Penn's denial, releasing a statement that it will continue with the screening as planned, "whether or not we have the University's official permission."  PAO then posted a statement standing in solidarity with Chavurah's planned screening, "encouraging" students to attend, as well as co-organizing a protest against Penn.  As promised, Chavurah held the screening as planned.  Chavurah and PAO

faced no disciplinary action and continue to operate on campus, free to ignore Penn directives without repercussion.

197.     On December 3, a horde of more than a hundred antisemites marched across Penn's campus, calling for "intifada revolution," "long live the intifada," and praising the "glorious martyrs" who massacred over 1,200 innocent Israeli civilians.  Jews across Penn, including plaintiffs, were essentially trapped and unable to move freely around campus.  Davis, for example, was studying when she heard the mob marching and chanting, and she became concerned about walking home.  When the mob moved on and, she finally stepped outside, Davis saw a campus covered in graffiti—the words "Intifada," "Avenge Gaza," and "Free Palestine" covered Van Pelt Library; "Blood $" was sprayed across the on-campus TD Bank; and "Shame," "Intifada," and "Free Gaza" were plastered across several buildings surrounding student dormitories.

198.     The protestors eventually marched through Penn's campus and moved on to Center City, where they attacked a well-known restaurant, Goldie, solely because it is  owned by an Israeli Jew.  The mob gathered outside of the restaurant, chanting antisemitic statements and placing pro-Palestinian stickers on the restaurant's doors, in what Pennsylvania's Governor called a "blatant act of antisemitism."

**E.  Penn's Double Standard in Addressing Antisemitism**

199.     Penn's deliberate indifference in response to these antisemitic incidents—in which Jewish and Israeli students are victims—is dramatically at odds with how Penn readily takes action to enforce its codes and policies to investigate and address bias-related incidents when the victims are not Jewish or Israeli.  This discriminatory double standard has created, contributed to, aggravated, and exacerbated Penn's hostile educational environment and the

antisemitic abuse and harassment that plaintiffs and other Jewish students have been forced to endure at Penn.

200.    For example, Penn frequently invokes purported free speech concerns to support and protect students and faculty members who support Hamas, Palestinian terrorism, or antisemitism, even as it condemns and disciplines students and faculty members who espouse viewpoints and take positions that Penn selectively deems inappropriate.

201.    This is not new at Penn.  In 1993, for example, Eden Jacobowitz, an Orthodox Jewish freshman on campus, was charged by the university with hate speech in a series of widely publicized and disputed judicial proceedings based on his use of the term "water buffalo," in response to which the university sent the police to his dormitory and charged him with violating the university's racial harassment policy.

202.    More recently, Penn's relentless prosecution of Penn Law Professor Amy Wax exemplifies the university's hypocritical, selective outrage and double standard.  Professor Wax teaches a "Conservative Political and Legal Thought" seminar and expresses conservative ideas, including on race, family structure, and social welfare laws.  In response to comments she made regarding Black student academic performance, in 2018, Penn stripped Professor Wax of her first-year courses.  Then, in 2022, Penn Law Dean Ted Ruger announced that he was bringing "major" sanctions against Professor Wax, largely related to her race-related comments and writings outside Penn and the speakers she invited to her conservative legal thought class.  Such sanctions include the possibility of termination, notwithstanding her tenure.

203.    According to Dean Ruger, Professor Wax's statements violated Penn's policy against "exploitation, harassment, and discriminatory treatment of students" and against faculty

"conducting themselves in a manner reasonably interpreted as creating a hostile or

discriminatory classroom" and could "harm" students or cause them to feel "unwelcome."

204.    Penn's response to Professor Wax's statements outside the classroom and off

campus are in stark contrast to Penn's persistent refusal to enforce its polices with respect to

antisemitic hate speech and harassment on campus.  As Wax's attorney explained:

> My client is the victim of a glaring double standard which can only
> be explained by Penn's naked [] partisanship. If you are a Jew-hating
> and Israel-bashing propagandist, you can say anything and invite
> anyone you want to campus and you are protected by the school's
> commitment to academic freedom. However, if you are a white
> Jewish conservative thinker who openly challenges [certain liberal
> ideologies] and you assign books and invite speakers who support
> those views, then you need to go.

205.    Penn likewise practices a double standard in readily responding to attacks against

minority groups other than Jews.  For example, Penn took prompt action in response to violence

against Asian students in the wake of the COVID pandemic.

206.    Similarly, following George Floyd's murder in May 2020 in Minnesota, Penn's

president was quick to issue a statement in condemnation, stating:

> I especially want Penn's African American students, faculty, and
> staff to know how much they and their contributions to our
> community are treasured.  It is particularly important at this difficult
> time that Penn's students of color know their University supports
> them, which we unequivocally do.

207.    When war broke out in Ukraine in February 2022, the Russian and East European

Studies Department released the following statement:

> The Department of Russian and East European Studies at the
> University of Pennsylvania condemns in the strongest possible
> terms the unprovoked, needless, and cruel attack by the Russian
> Federation, with support from the state of Belarus, on Ukraine.  This
> unjust war is causing untold suffering and civilian death.  We stand
> in solidarity with Ukraine and with all people of the region, of all
> ethnicities and nationalities, who are defending Ukraine's
> population, aiding victims and refugees, and resisting and protesting

68

> the Russian Federation's criminal aggression.  We offer support to
> our students from the region who are suffering along with their
> homelands.  This war must stop, and we call on all concerned people
> to do everything in their power to achieve that end.

208.     Yet when it comes to Jews and Israel, it took Penn three different attempts, after

intense criticism from Congress, trustees, alumni, students, parents, and organizations such as the

ADL and the AJC, to issue a statement condemning the soaring and alarming increase in

antisemitism and antisemitic violence that has plagued Penn's Jewish students following

Palestine Writes and the October 7 Hamas massacre.

209.     Penn's failure and refusal to discipline antisemitic students and student groups

like PAO also stands in stark contrast to the discipline Penn has meted out in response to other

rulebreakers who do far less than call for the death of other students.  For example, while Penn

has failed and refused to take disciplinary action in response to any of the outrageous antisemitic

incidents described herein, it has readily disciplined students for minor violations of Penn's

COVID-19 curfew rules.

210.     On or about October 17, Matthew Wranovics, a Biddle Law Library staffer, was

caught ripping down Israeli hostage posters.  When a student asked, "why are you tearing them

down?" Wranovics replied, "Get the fuck out of my face."  The student explained that "innocent

people were killed," to which Wranovics responded, "there were innocent people killed in the

hospital bombing"—a reference to an explosion at the Al-Ahli Baptist Hospital, which was

caused by terrorists within Gaza.  The student who spoke with Wranovics later reported that his

"vicious verbal assault made me feel unsafe."  Emboldened by Penn's refusal to discipline

offenders like Wranovics, students, faculty, and other staff continue to rip down hostage posters

around Penn on a regular basis, even though such cruel and outrageous conduct violates Penn

policies, including, among others,  the Nondiscrimination Statement, the Code, and  the

Guidelines.

211.    Penn's double standard for Jews is also reflected in its faculty hiring decisions.  It

would be unimaginable for Penn to recruit and hire faculty members who call for violence

against any other minority group or citizens of any other country.  Yet Penn recruits, hires,

promotes, protects, and touts faculty members who express antisemitic views, endorse violence

against Jews, call for Israel's destruction, and justify, encourage, and celebrate violence against

Israel and its citizens.

212.    Penn not only hires and employs professors and staff who espouse antisemitic

viewpoints, but also awards them with distinguished honors.  For example, Professor Anne

Norton—who has described Jewish students' concerns about antisemitism on campus as "absurd

propaganda"—retains her title as the Stacey and Henry Jackson President's Distinguished

Professor.  Yet Penn swiftly punishes professors accused of other forms of racism, like Amy

Wax, even for off-campus statements.

213.    Penn has also suspended organizations that violate university policies.  In

February 2020, for example, Penn suspended the International Affairs Association's registration

with Penn, after the Office of Student Conduct found it responsible for "violating University

Anti-Hazing Policy by conducting organization-wide initiation events for new members that

involved drinking games, scavenger hunts and quizzes."

214.    Every single incident of antisemitic behavior—every instance of abuse,

harassment, and intimidation—detailed herein flagrantly violates Penn's policies.  Yet time and

again, incident after antisemitic incident, Penn has taken no disciplinary action.  As a result of

such discrimination and deliberate indifference, Penn has created, nurtured, and fostered a hostile educational environment for Jewish students.

**F.      Penn Discriminated Against Jews by Intentionally Reducing Its Jewish Enrollment**

215.    The population of Jewish Penn students has continuously and precipitously declined over the past twenty years.  In 2000, Jewish students accounted for approximately one-third of Penn's enrollment.  Today, that figure has more than halved, with a rapid decline in the early 2010s and over the past several years.  The Steinhardt Social Research Institute, for example, reported that in 2010, almost 20% of Penn students were Jewish, while in 2016, only 13% of the campus identified as Jewish, representing a 40% drop in just six years.  Other surveys estimate that Penn's Jewish population has decreased approximately 42% since 2000.

216.    In February 2023, for example, Penn's Hillel held a virtual meeting for parents and alumni to address the "serious decline in Jewish population" at Penn over "the past 15 years," about which it felt the need to "educat[e]" Penn.  Rabbi Gabe Greenberg, Executive Director of Penn's Hillel, noted that with the rise in antisemitism on college campuses, "[w]e are deeply concerned that a decline in Jewish students at this exact moment[] both sends the wrong message and concretely negatively affects the lived experience of Jewish students on campus."

217.    The dramatic decline in Jewish enrollment is hardly coincidental.  Penn has used various tactics to limit Jewish enrollment, and the only explanation for the precipitous drop is that Penn, in violation of applicable civil rights laws, has intentionally engineered it, which has only worsened the antisemitic environment on its campus.

**G.      Jewish Students Have Been Denied Equal Access to Penn's Educational Opportunities**

218.    Plaintiffs and other Jewish students are acutely aware that, solely because of their Jewish identity and/or Israeli citizenship, Penn views and treats them as second-class citizens in

the Penn community, underserving of the protections that Penn affords non-Jewish students.  As a result of Penn's persistent and unlawful failure and refusal to comply with its obligations to prohibit discrimination and harassment against Jewish and Israeli students, plaintiffs and other Jewish students, unlike other Penn students, have been deprived of the benefits that those other students enjoy at Penn, including but not limited to physical protection; emotional support; the sense of belonging and inclusion; the ability to speak freely in class and in written course work concerning their Jewish identity; their rights as individual human beings to express their identities; their rights as American citizens to freely express their religions and viewpoints; and their right to express their love and admiration for Israel, their ancestral homeland (and, for Yakoby, his country of citizenship), where they have many friends and family.  To the contrary, as a result of Penn's actions and inactions alleged herein, plaintiffs are made to feel that they are different from, and less important than, other students, some of whom, along with certain Penn faculty members, are able, with impunity and without consequence, to mock, taunt, jeer, deride, malign, castigate, ridicule, demonize, vilify, assault, abuse, harass, intimidate, isolate, ostracize, exclude, and marginalize them.

219.    The antisemitic events and incidents described herein have devasted plaintiffs' ability to participate in educational and other programs.  Penn's actions and inactions concerning antisemitism and anti-Jewish abuse, intimidation, harassment, and discrimination, as described herein, have created and fostered a hostile environment that has traumatized plaintiffs and made their college lives at Penn unbearable.  Plaintiffs do not feel physically safe on Penn's campus or in Penn's classrooms or other facilities.  They fear the harassment, abuse, and intimidation they might face, on any given day, from the professors who are supposed to teach them, and who are required to treat them with respect and dignity pursuant to the policies that Penn is required to

enforce equally for all students. Plaintiffs likewise fear the potential physical violence, harassment, abuse, and intimidation they might face, on any given day, from the students who are also required to follow university policies.

220.     As a result of Penn's actions and inactions as alleged herein, plaintiffs do not feel safe walking the campus, being in Penn's facilities, or going to class. Yakoby has repeatedly told the administration he fears for his physical safety and is forced to miss class because the administration will not address, and protect him from, the anti-Jewish harassment on campus. Yakoby is often late to or absent from class because of anxiety stemming from the abuse, harassment, intimidation, and assault that he and other Jewish students are forced to endure. Yakoby repeatedly voiced his concerns over Penn's failure to act with respect to Palestine Writes and post-October 7 events, and Penn has consistently ignored, dismissed, and acted with indifference to his concerns. As a result of Penn's indifference, he now fears that he has a target on his back for speaking out to administrators, including those within the Political Science Department, in which he is a major. He fears that his Political Science and Middle East Studies professors, among others, whose courses he must take to complete his Middle East Studies major, will not review his work fairly given their awareness of his Jewish and Israeli identity and their animus and hatred toward persons of his ethnicity, national origin, and citizenship. Yakoby's constant anxiety, triggered by Penn's hostile antisemitic environment, has been aggravated by the fact that he is still mourning friends and family members who were victims of Hamas's October 7 massacre.

221.     Davis's experience at Penn, as a freshman, has been devastating. Growing up in a small town in Wyoming, she was the only Jewish student in her high school. She chose to attend Penn in large part because during her application process, she was assured by Penn that it was a

welcoming, receptive, and nurturing environment for students, like her, whose Jewish identity is

a core part of their lives.  She came to Penn eager to proudly practice her Judaism, identify as a

Jew and an Israel supporter, and display her Jewish ancestry in the same way, and with the same

freedom, that other students are able to show pride in their identities.  Yet her three months at

Penn have been a nightmare.  She has been assaulted, mocked, abused, harassed, intimidated,

and demonized, solely because she is Jewish and supports her ancestral homeland and the people

who live there.  She is terrified not only for physical safety and indeed for her life, but also for

what will happen to her if she dares to speak out about the antisemitism she must constantly

confront on campus.  She has spent parts of her freshman fall semester cowering in her dorm

room rather than having to contend with rampaging mobs echoing the cries of terrorists to

slaughter Jews and eradicate the world's only Jewish country.  She is also devastated that she

attends a school that charges over $60,000 per year in tuition, fees, and other costs, and that told

her she would be safe and embraced as a Jewish student, but that, in reality, deems her unworthy,

inferior, and an appropriate target for violence, abuse, and ridicule.  She is excluded from the

same protections that Penn affords non-Jewish students who might be subjected to bias-related

harassment and intimidation.

## COUNT I
### Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*

222.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as

though fully stated herein.

223.    Penn receives financial assistance from the United States Department of

Education and is therefore subject to suit under Title VI of the Civil Rights Act of 1964.

224.    Discrimination against Jews and Israelis—including based on actual or perceived

ancestry, race, ethnic characteristics, or national origin—is prohibited under Title VI, as reflected

not only in decades of Title VI jurisprudence, but also in the written policies of the Office of Civil Rights of the United States Department of Education.

225.   Plaintiffs are and identify as Jewish, and their status and identification as Jews brings them within the scope of Title VI's protections.  Yakoby is an Israeli citizen and of Israeli national origin.

226.   Title VI prohibits a recipient of federal funds from intentionally treating any individual worse, even in part, because of his or her race, color, or national origin.

227.   The acts and omissions of Penn and its administrators have subjected plaintiffs to discrimination and harassment on the basis of their actual and/or perceived Jewish and/or Israeli ancestry, race, ethnic characteristics, or national origin.

228.   Penn and its administrators had actual notice that that discrimination and harassment, over which Penn had substantial control and the authority to remediate, was so severe, pervasive, and objectively offensive that it created a hostile environment based on Jewish and/or Israeli ancestry, race, ethnic characteristics, or national origin that deprived plaintiffs of full access to Penn's educational programs, activities, and opportunities.

229.   Penn and its administrators have intentionally discriminated against plaintiffs because of their actual and/or perceived Jewish and/or Israeli ancestry, race, ethnic characteristics, or national origin, as exhibited by their deliberate indifference to the antisemitic abuse, harassment, and intimidation of plaintiffs in violation of Title VI.  Specifically, Penn and its administrators failed to cure or otherwise adequately, appropriately, and meaningfully address, ameliorate, or remedy the discrimination against plaintiffs, and the hostile environment that Jewish and Israeli students, including plaintiffs, are forced to endure at Penn because of their race, ethnic characteristics, or national origin.  Additionally, Penn has failed to take prompt and

effective steps reasonably calculated to end the harassment, eliminate any hostile environment, and prevent the harassment from recurring.  Such unlawful deliberate indifference caused plaintiffs to be subjected to a hostile educational environment.

230.    The environment at Penn, which has been rendered hostile for Plaintiffs as a result of their Jewish and/or Israeli ancestry, race, ethnic characteristics, or national origin, is sufficiently severe, pervasive, persistent, and offensive such that it has deprived Plaintiffs, as Jewish and Israeli students, of equal access to the educational opportunities and benefits that Penn provides to non-Jewish and non-Israeli students.

231.    Penn and its administrators have actively and intentionally engaged in this pattern of severe and/or pervasive discrimination.

232.    Penn and its administrators also directly and intentionally discriminated against plaintiffs, with their actual or perceived Jewish and/or Israeli ancestry, race, ethnic characteristics, or national origin a substantial or motivating factor in Penn's actions.

233.    Penn has failed to act or has acted with leniency and/or delay in applying its policies when a known or reported incident involved antisemitism or where the victim was a Jewish or Israeli student, including plaintiffs.  As detailed above, Penn's actions and conduct were, and continue to be, intended to treat plaintiffs differently as Jewish and Israeli students as compared to incidents involving other similarly situated non-Jewish and non-Israeli students.

234.    Penn's violations of Title VI were the actual, direct, and proximate causes of plaintiffs' injuries.

235.    As a result of the foregoing, plaintiffs have suffered, and continue to suffer, substantial damages in an amount to be determined at trial.

236.     Plaintiffs have been and will continue to be injured because Penn has and will continue to deny them equal access to the educational opportunities and benefits provided to other students, and will continue to intentionally discriminate against them on the basis of Jewish ancestry, race, or ethnic characteristics, or national origin, and Israeli national origin.

237.     Plaintiffs are entitled to appropriate injunctive relief under Title VI, as Penn has knowledge of, and has been and continues to be deliberately indifferent to, a hostile environment that is severe, persistent, and pervasive.

238.     Plaintiffs are entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT II
### Breach of Contract

239.     Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

240.     At all relevant times, an express contractual relationship existed between Penn and plaintiffs by virtue of their enrollment at Penn and as defined by and through written Penn codes, policies, and procedures, including but not limited to Penn's (i) Code of Student Conduct; (ii) Guidelines on Open Expression; (iii) Nondiscrimination Statement; (iv) Charter of the Student Disciplinary System; (v) Principles of Responsible Conduct; (vi) Penn's Equal Opportunity and Affirmative Action Policy; and (vii) Faculty Handbook.  Through the documents and materials it publishes and provides to students, Penn makes express contractual commitments to its students concerning bias-related abuse, harassment, intimidation, and discrimination.

241.     Pennsylvania law recognizes that the relationship between a student and a university is contractual in nature; that the terms of student handbooks, guidelines, policies, procedures, course catalogs, registration materials, bulletins, circulars, and regulations become

part of that contract; and that students may bring a cause of action for breach of contract where

the university ignores or violates portions of these written contracts.

242.    Plaintiffs have complied with their obligations under these contracts.

243.    Penn breached its agreements with plaintiffs, and failed to comply with its

obligations under these contracts, throughout the course of plaintiffs' enrollment at Penn,

including by, among other things, failing to comply with the following provisions:

- "The University of Pennsylvania does not discriminate on the basis of race, color, sex, sexual orientation, gender identity, religion, creed, national or ethnic origin, citizenship status, age, disability, veteran status or any other legally protected class status in the administration of its admissions, financial aid, educational or athletic programs, or other University-administered programs or in its employment practices. " (Nondiscrimination Statement.)

- Students are guaranteed "[t]he right to have access to and participate in the academic and non-academic opportunities afforded by the University, subject to applicable standards or requirements." (Code of Student Conduct.)

- Penn community members must "respect the health and safety of others. This precludes acts or threats of physical violence against another person (including sexual violence) and disorderly conduct. This also precludes the possession of dangerous articles (such as firearms, explosive materials, etc.) on University property or at University events without University authorization." (Code of Student Conduct.)

- Penn community members must "respect the right of fellow students to participate in University organizations and in relationships with other students without fear, threat, or act of hazing." (Code of Student Conduct.)

- Penn community members must "refrain from conduct towards other students that infringes upon the Rights of Student Citizenship. The University condemns hate speech, epithets, and racial, ethnic, sexual and religious slurs."  (Code of Student Conduct.)

- Penn community members must "refrain from stealing, damaging, defacing, or misusing the property or facilities of the University or of others. This also precludes the disruption of University computing services or interference with the rights of others to use computer resources." (Code of Student Conduct.)

- Penn community members must "comply with policies and regulations of the University and its departments (*e.g.*, the University's Guidelines on Open

Expression, Anti-Hazing Regulations, Drug and Alcohol Policies, Sexual Harassment Policy, etc.)."  (Code of Student Conduct.)

- Penn community members must "comply with federal, state, and local laws." (Code of Student Conduct.)

- Penn community members must respect "the right of others to pursue their normal activities within the University and to be protected from physical injury or property damage."  (Guidelines on Open Expression.)

- Penn community members must not "hold meetings, events or demonstrations under circumstances where health or safety is endangered"; or "knowingly interfere with unimpeded movement in a University location."  (Guidelines on Open Expression.)

- "[A]ll members of the University community need to understand and uphold both legal requirements and the highest of ethical standards."  (Principles of Responsible Conduct.)

- "[T]eacher[s] should at all times show respect for the opinions of others, and should indicate when they are not speaking for the institution."  (Faculty Handbook.)

- "[T]he obligation to comply with all provisions of the Code of Student Conduct; with all other policies and regulations of the University, its Schools, and its Departments; and with local, state, and federal laws," for which failure will be met with sanctions, including but not limited to: warning, reprimand, fine, restitution, disciplinary probation, withdrawal of privileges, suspension, indefinite suspension, or expulsion.  (Charter of the Student Disciplinary System.)

244.    Penn also has breached the implied covenant of good faith and fair dealing in its contracts with students, including plaintiffs.

245.    Among other things, Penn breached the implied covenant by applying and selectively enforcing Penn's student handbooks, university bulletins, regulations, codes, policies, and procedures described above in a bad faith and discriminatory way that was and continues to be improperly motivated by shared ancestry, race, ethnic characteristics, or national origin bias, and by responding to and treating incidents of abuse, harassment, intimidation or discrimination against Jewish students, including plaintiffs, in a more lenient, tolerant, indifferent, forgiving, and nonchalant manner than it treated similar incidents against other minority groups, and by

failing to apply and enforce its aforementioned contracts when responding to and treating incidents of abuse, harassment, and intimidation of, or discrimination against, Jewish students, including plaintiffs.

246.     As a proximate and foreseeable consequence of the foregoing breaches, plaintiffs have been damaged in amounts to be determined at trial.

**COUNT III**
**Pennsylvania Unfair Trade Practices and Consumer Protection Laws -**
**73 Pa. Stat. Ann. § 201-1 *et seq.***

247.     Plaintiffs repeat and reallege the allegations of the preceding paragraphs above as though fully set forth herein.

248.     The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") provides consumer protection by declaring as unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce" in Pennsylvania.  73 Pa. Stat. Ann. § 201-3.

249.     The UTPCPL is to be construed liberally to even the bargaining power between consumers and businesses.

250.     At all relevant times, Penn offered for sale to the public educational goods and services.

251.     Plaintiffs purchased these goods and services from Penn for personal purposes, namely by accepting admission to and enrolling at Penn, and paying tuition to Penn, to pursue an education.

252.     Penn has not acted in accordance with, and has not followed through on, its statements against discrimination, abuse, safety, and harassment that were made in connection with the sale of its educational goods and services, and which include those reflected, embodied, and set forth in Penn's rules and policies, including its: (i) Code of Student Conduct; (ii)

Guidelines on Open Expression; (iii) Nondiscrimination Statement; (iv) Charter of the Student Disciplinary System; (v) Principles of Responsible Conduct; (vi) Penn's Equal Opportunity and Affirmative Action Policy; and (vii) Faculty Handbook.  Instead, Penn engaged in the  acts or practices described herein, which were unfair or deceptive or misleading in a material way in violation of UTPCPL, that were aimed at consumers of its goods and services for personal purposes (namely, current and prospective students), and that were likely to mislead a reasonable prospective or current student acting reasonably under the circumstances.  Such unfair or deceptive acts or practices include unfairly or deceptively leading plaintiffs to believe that Penn would apply, enforce, and follow the rules and policies, and the commitments contained therein; and unfairly or deceptively causing plaintiffs to believe that if they paid tuition and fees to Penn, then Penn would uphold, adhere to, abide by, comply with, and equally apply its stated rules and policies, and the commitments contained therein, to foster, ensure, maintain, and create an environment free of discrimination, abuse, harassment, and intimidation, and provide an adequate and appropriate setting and environment in which all students, of whatever ancestry, race, ethnicity, or national origin, could freely express their identity and ancestry, could learn and grow, and could participate fully and meaningfully in Penn's educational and other programs.

253.    Plaintiffs saw, heard, and were aware of Penn's unfair, deceptive and misleading acts, statements, warranties, omissions, and representations described above before they enrolled at Penn, and after they were enrolled at Penn.

254.    Plaintiffs reasonably relied on these unfair, deceptive and misleading acts, statements, warranties, omissions, and representations in entering into a contractual agreement with Penn upon their enrollment, and continuing to make tuition and other payments to Penn while a student.

255.     Penn's unfair, deceptive, and misleading statements and practices described above proximately caused plaintiffs injury by causing them to enroll at Penn, and to pay tuition and fees to Penn, and to continue to maintain enrollment at, and pay tuition and fees to, Penn, based on their justifiable and reasonable reliance on Penn's representations that it would apply, enforce, and follow through on its codes and policies, and the commitments contained therein, concerning protecting students from harassment, abuse, intimidation and discrimination based on their ancestry, race, ethnicity, or national origin, would otherwise seek to protect students from such hateful and bigoted conduct, and would take actions and implement measures to adequately, appropriately, and sufficiently address such misconduct to foster, ensure, and maintain a safe educational and campus environment.

256.     Penn's failure, refusal, lack of ability and intention, and lack of commitment to combating, addressing, and ameliorating these deplorable actions, and to making good on and complying with its aforementioned statements, constitute unfair or deceptive practices, false representations of the quality and standards of Penn's educational goods and services, advertised goods or services with intent not to sell them as advertised, and fraudulent and deceptive conduct which created a likelihood of confusion and misunderstanding in violation of the UTPCPL.

257.     Penn's actions have caused plaintiffs to sustain actual, foreseeable damages, including the loss of the value of the tuition and fees they have paid Penn, loss of educational and extracurricular opportunities, economic injuries, and other direct and consequential damages.

258.     Accordingly, plaintiffs are entitled to statutory and/or actual damages in amounts to be determined at trial, a permanent injunction barring Penn from committing further violations of the UTPCPL, and to treble damages pursuant to 73 Pa. Stat. Ann. § 201–9.2, based on Penn's intentional, reckless, and wrongful violations.

259.    Plaintiffs are entitled to attorneys' fees and costs pursuant to 73 Pa. Stat. Ann. §

201–9.2.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs Yakoby and Davis, and each of them, pray and request that a

judgment be entered in each of their favor, and against Penn awarding them:

A.    Injunctive relief enjoining Penn and its agents from establishing, implementing,

instituting, maintaining, or executing policies, practices, procedures, or protocols

that penalize or discriminate against Jewish students, including plaintiffs, in any

way and ordering Penn to take all necessary and appropriate remedial and

preventative measures, including by, among other things: (i) terminating deans,

administrators, professors and other employees responsible for the antisemitic

abuse permeating the school, whether because they engaged in it or permitted it;

(ii) suspending or expelling students who engage in such conduct; and (iii)

adding required antisemitism training for Penn community members that includes

the adoption of the IHRA definition of antisemitism;

B.    Compensatory, consequential, and punitive damages in amounts to be determined

at trial;

C.    Statutory penalties, including treble damages, for violations of Pennsylvania

Unfair Trade Practices and Consumer Protection Law;

D.    Their reasonable attorneys' fees, costs of suit, and expenses;

E.    Pre-judgment interest and post-judgment interest at the maximum rate allowable

by the law; and

F.      Such other and further relief as the Court deems just and proper.


Dated:   Philadelphia, Pennsylvania          Respectfully submitted,
         December 5, 2023


                                            By:   */s/Eric A. Shore*

                                            **LAW OFFICES OF ERIC A. SHORE, P.C.**

                                                  Eric A. Shore (ID: 73807)
                                                  Briana Pearson-Prout (ID: 327007)
                                                  1500 JFK Boulevard
                                                  Suite 1240
                                                  Philadelphia, Pennsylvania 19102
                                                  Tel:  (856) 433-6198
                                                  erics@ericshore.com
                                                  brianap@ericshore.com

                                                        - and -

                                            **KASOWITZ BENSON TORRES LLP**

                                                  Marc E. Kasowitz*
                                                  Daniel R. Benson*
                                                  Mark P. Ressler*
                                                  Andrew L. Schwartz*
                                                  Joshua E. Roberts*
                                                  Jillian R. Roffer*
                                                  Yarden N. Hodes*
                                                  1633 Broadway
                                                  New York, New York 10019
                                                  Tel:  (212) 506-1700
                                                  mkasowitz@kasowitz.com
                                                  dbenson@kasowitz.com
                                                  mressler@kasowitz.com
                                                  aschwartz@kasowitz.com
                                                  jroberts@kasowitz.com
                                                  jroffer@kasowitz.com
                                                  yhodes@kasowitz.com

                                            **Pro hac vice* application forthcoming

                                            *Attorneys for Plaintiffs*

84