**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PENNSYLVANIA**

EYAL YAKOBY and JORDAN DAVIS,

                        Plaintiffs,

    v.

UNIVERSITY OF PENNSYLVANIA,

                        Defendant.

No. 2:23-cv-04789 (KNS)

**ORAL ARGUMENT REQUESTED**

<u>**DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT WITH PREJUDICE AND MOTION TO STRIKE**</u>

## TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION TO DISMISS AND MOTION TO STRIKE .................1

INTRODUCTION ........................................................................................................1

BACKGROUND .........................................................................................................5

STANDARD OF REVIEW ............................................................................................7

ARGUMENT .............................................................................................................8

I.      Plaintiffs' Claims Should Be Dismissed Under Rule 12(b)(1) Because Plaintiffs' Challenge to Penn's Ongoing Response to Antisemitism Is Premature ...........................8

II.     Plaintiffs' Claim for Injunctive Relief Should Be Dismissed Under Rule 12(b)(1) for Lack of Standing ........................................................................................................10

        A.      Plaintiffs Have Not Alleged a Clearly Impending Future Injury Traceable to Penn's Alleged Title VI Violation ...........................................................11

        B.      Plaintiffs' Requested Remedy Would Not Redress Plaintiffs' Alleged Injury ...........................................................................................................15

III.    Plaintiffs' Title VI Claim Should Be Dismissed Under Rule 12(b)(6) .........................17

        A.      Plaintiffs Do Not Plausibly Allege That Penn Discriminated Against Them ....18

        B.      Plaintiffs Fail to Allege Penn Was Deliberately Indifferent to a Hostile Educational Environment .............................................................................19

                1.      Plaintiffs do not plausibly plead that they were subject to severe and pervasive harassment. ........................................................20

                2.      Plaintiffs do not plausibly allege that Penn's responses were clearly unreasonable in light of known circumstances. ......................21

IV.     The Court Should Strike Plaintiffs' Request for Disciplinary Measures ......................29

V.      Plaintiffs' Contract Claim Should Be Dismissed Under Rule 12(b)(6) ........................30

VI.     Plaintiffs' UTPCPL Claim Should Be Dismissed Under Rule 12(b)(6) ........................34

        A.      Plaintiffs Have Not Pled that Penn Engaged in Any Conduct Proscribed by the UTPCPL ...........................................................................................35

        B.      Plaintiffs Have Not Pled Justifiable Reliance .................................................37

CONCLUSION .........................................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abadi v. Target Corp.*,
2023 WL 4045373 (3d Cir. June 16, 2023) ...................................................15

*Adamian v. Jacobsen*,
523 F.2d 929 (9th Cir. 1975) .........................................................................26

*Agency for Int'l Development v. Alliance for Open Society Int'l, Inc.*,
570 U.S. 205 (2013)........................................................................................25

*Alexander v. Sandoval*,
532 U.S. 275 (2001) .......................................................................................17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...................................................................................7, 35

*B.W. v. Career Technology Center of Lackawanna County*,
422 F. Supp. 3d 859 (M.D. Pa. 2019), *on reconsideration in part*, 2019 WL 6875493
(M.D. Pa. Dec. 17, 2019) ...............................................................................22

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)..........................................................................................7

*Bey v. East Penn School District*,
2017 WL 3129127 (E.D. Pa. July 24, 2017) .................................................17

*Blunt v. Lower Merion School District*,
767 F.3d 247 (3d Cir. 2014)......................................................................18, 20

*Brown-Dickerson v. City of Philadelphia*,
2016 WL 1623438 (E.D. Pa. Apr. 25, 2016) .................................................12

*Buccigrossi v. Thomas Jefferson University*,
2022 WL 1093127 (E.D. Pa. Apr. 12, 2022) ...........................................31, 34

*Buck v. Hampton Township School District*,
452 F.3d 256 (3d Cir. 2006)........................................................................8, 23

*Canfield v. Amica Mutual Insurance Co.*,
2020 WL 5878261 (E.D. Pa. Oct. 2, 2020)................................................8, 29

*Cavaliere v. Duff's Business Institute*,
605 A.2d 397 (Pa. Super. Ct. 1992) ...............................................................31

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ..................................................................................................13

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ....................................................................................3, 11, 12

*Constitution Party of Pennsylvania v. Aichele*,
   757 F.3d 347 (3d Cir. 2014) ...............................................................................13, 15

*Corsale v. Sperian Energy Corp.*,
   374 F. Supp. 3d 445 (W.D. Pa. 2019), *aff'd*, 819 F. App'x 127 (3d Cir. 2020) ...............34, 37

*Corsale v. Sperian Energy Corp.*,
   412 F. Supp. 3d 556 (W.D. Pa. 2019) ....................................................................36

*David v. Neumann University*,
   187 F. Supp. 3d 554 (E.D. Pa. 2016) ...........................................................31, 32, 33

*Davis ex rel. LaShonda D. v. Monroe County Board of Education*,
   526 U.S. 629 (1999) .................................................3, 4, 9, 10, 17, 19, 20, 21, 30

*Doe v. Abington Friends School*,
   2022 WL 16722322 (E.D. Pa. Nov. 4, 2022) .........................................................32

*Doe v. County of Centre*,
   242 F.3d 437 (3d Cir. 2001) .............................................................................8, 10

*Doe v. Haverford College*,
   2023 WL 5017964 (E.D. Pa. Aug. 7, 2023) ........................................................8, 30

*Doe v. Sacks*,
   2024 WL 402945 (S.D.N.Y. Feb. 2, 2024) ..................................................22, 24, 27

*Doe v. University of Chicago*,
   2017 WL 4163960 (N.D. Ill. Sept. 20, 2017) ........................................................24

*Doe v. Willits Unified School District*,
   473 F. App'x 775 (9th Cir. 2012) .........................................................................21

*Doug Grant, Inc. v. Greate Bay Casino Corp.*,
   232 F.3d 173 (3d Cir. 2000) .................................................................................7

*Ellison v. American Board of Orthopaedic Surgery*,
   11 F.4th 200 (3d Cir. 2021) ...............................................................................13

*Felber v. Yudof*,
   851 F. Supp. 2d 1182 (N.D. Cal. 2011) ................................................................28

iii

*Gat v. University of Pittsburgh of Commonwealth System of Higher Education*,
    91 A. 3d 723 (Pa. Super. Ct. 2014)........................................................................34

*Gjeka v. Delaware County Community College*,
    2013 WL 2257727 (E.D. Pa. May 23, 2013)........................................................32

*Hanover Prest-Paving Co. v. Tile Tech, Inc.*,
    2022 WL 1493568 (M.D. Pa. May 11, 2022)....................................................4, 30

*Hartig Drug Co. v. Senju Pharmaceutical Co.*,
    836 F.3d 261 (3d Cir. 2016)....................................................................................7

*HB v. Monroe Woodbury Central School District*,
    2012 WL 4477552 (S.D.N.Y. Sept. 27, 2012).....................................................21

*Houston v. Easton Area School District*,
    355 F. App'x 651 (3d Cir. 2009) ..........................................................................19

*Hunt v. U.S. Tobacco*,
    538 F.3d 217 (3d Cir. 2008), as amended (Nov. 6, 2008) ...............................35, 37

*KF ex rel. CF v. Monroe Woodbury Central School District*,
    2013 WL 177911 (S.D.N.Y. Jan. 16, 2013), *aff'd*, 531 F. App'x 132 (2d Cir. 2013).............24

*Langadinos v. Appalachian School of Law*,
    2005 WL 2333460 (W.D. Va. Sept. 25, 2005) ....................................................18

*Loduca v. WellPet LLC*,
    549 F. Supp. 3d 391 (E.D. Pa. 2021) ...................................................................34

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).........................................................................................3, 15

*Mandel v. Board of Trustees of California State University*,
    2018 WL 1242067 (N.D. Cal. Mar. 9, 2018)...................................................24, 29

*Manning v. Temple University*,
    2004 WL 3019230 (E.D. Pa. Dec. 30, 2004), *aff'd*, 157 F. App'x 509 (3d Cir. 2005)...........38

*McNair v. Synapse Group Inc.*,
    672 F.3d 213 (3d Cir. 2012).............................................................................11, 12

*MJG v. School District of Philadelphia*,
    2017 WL 5010033 (E.D. Pa. Nov. 2, 2017), *aff'd sub nom. M.J.G. v. School District of
    Philadelphia*, 774 F. App'x 736 (3d Cir. 2019)....................................................30

*Murphy v. Duquesne University of the Holy Ghost*,
    777 A.2d 418 (Pa. 2001) ......................................................................................33

*Nungesser v. Columbia University,*
169 F. Supp. 3d 353 (S.D.N.Y. 2016)............................................................31

*Papish v. Board of Curators of University of Missouri,*
410 U.S. 667 (1973) (per curiam)..................................................................27

*Peachlum v. City of York,*
333 F.3d 429 (3d Cir. 2003)...............................................................3, 8, 10

*Public Citizen, Inc. v. National Highway Traffic Safety Administration,*
489 F.3d 1279 (D.C. Cir. 2007)...................................................................13

*Rickenbaker v. Drexel University,*
2022 WL 970768 (E.D. Pa. Mar. 30, 2022)..................................35, 36, 38

*Rivera v. Dealer Funding, LLC,*
178 F. Supp. 3d 272 (E.D. Pa. 2016)......................................................8, 30

*Rodriguez v. Maricopa County Community College District,*
605 F.3d 703 (9th Cir. 2010) ..........................................21, 25, 26, 27

*Saravanan v. Drexel University,*
2017 WL 5659821 (E.D. Pa. Nov. 24, 2017) ..............................18, 22

*Saxe v. State College Area School District,*
240 F.3d 200 (3d Cir. 2001)..........................................................................25

*Schaller v. U.S. Social Security Administration,*
844 F. App'x 566 (3d Cir. 2021) ..................................................................11

*Schuchardt v. President of the United States,*
839 F.3d 336 (3d Cir. 2016)............................................................................7

*Seldon v. Home Loan Services, Inc.,*
647 F. Supp. 2d 451 (E.D. Pa. 2009) ....................................34, 36, 37

*Smith v. University of Pennsylvania,*
534 F. Supp. 3d 463 (E.D. Pa. 2021) ..............................................31, 34

*Sosa v. New York City Dep't of Education,*
368 F. Supp. 3d 489 (E.D.N.Y. 2019) ......................................................18

*Soule v. Connecticut Ass'n of Schools, Inc.,*
90 F.4th 34 (2d Cir. 2023) (en banc) .......................................................16

*Spokeo, Inc. v. Robins,*
578 U.S. 330 (2016)......................................................................................11

*Steel Co. v. Citizens for a Better Environment*,
   523 U.S. 83 (1998) ................................................................................15, 16

*Stouffer v. Union Railroad Co., LLC*,
   85 F.4th 139 (3d Cir. 2023) .........................................................................7

*Swartley v. Hoffner*,
   734 A.2d 915 (Pa. Super. Ct. 1999) .............................................................31

*Swiderski v. Urban Outfitters, Inc.*,
   2017 WL 6502221 (S.D.N.Y. Dec. 18, 2017) ...............................................28

*Texas v. United States*,
   523 U.S. 296 (1998) .................................................................................3, 10

*Vurimindi v. Fuqua School of Business*,
   2010 WL 3419568 (E.D. Pa. Aug. 25, 2010), *aff'd*, 435 F. App'x 129 (3d Cir. 2011).....32, 33

*Vurimindi v. Fuqua School of Business*,
   435 F. App'x 129 (3d Cir. 2011) ..............................................................31, 32

*Wertz v. Ryan*,
   2022 WL 118135 (E.D. Pa. Jan. 12, 2022) ...................................................13

*Whitfield v. Notre Dame Middle School*,
   412 F. App'x 517 (3d Cir. 2011) ..............................................................19, 20

*Williams v. Jersey Shore Area School District*,
   2023 WL 3513677 (M.D. Pa. May 17, 2023)..............................................22, 28

*Wolfe v. City of Portland*,
   566 F. Supp. 3d 1069 (D. Or. 2021) ............................................................15

*Zavada v. East Stroudsburg University*,
   2023 WL 5532809 (M.D. Pa. Aug. 28, 2023) ...............................................21, 29

**Rules**

Fed. R. Civ. P. 12(b)(1).....................................................................1, 7, 10, 11, 17

Fed. R. Civ. P. 12(b)(6).........................................................................................1, 7

Fed. R. Civ. P. 12(f).........................................................................................1, 8, 30

**NOTICE OF MOTION AND MOTION TO DISMISS AND MOTION TO STRIKE**

Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(f), the University of Pennsylvania[1] (Penn) moves to dismiss the Complaint or, in the alternative, strike in part Plaintiffs' request for relief.  Penn's Motion to Dismiss and Motion to Strike are based on this Notice of Motion, the supporting Memorandum of Points and Authorities, and the declaration of David Gringer, dated February 12, 2024, and the exhibits attached thereto.

**INTRODUCTION**

The University of Pennsylvania condemns antisemitism and all forms of hate, emphatically and unconditionally.  It is "anathema to the most fundamental ideals of [the] University" (former President Amy Gutmann, 2017), "unconscionable" and "inimical to our values" (former President Amy Gutmann, 2021), "pernicious," "appall[ing]," and "heartbreaking" (former President Liz Magill, 2023).  Gringer Decl., Exs. 1, 2, 3.[2]  "Jewish faculty, students, staff, and alumni [have] been an important part of the success of Penn as a leading University." *Id.*, Ex. 3.  Penn is proud of its long history of being a welcoming place for Jewish people—starting with the enrollment of its first Jewish student in 1772—and it is committed to remaining one. *Id.*, Ex. 4.  Antisemitism has no place at Penn and should be unacceptable everywhere.

Penn has not stood idly by as the scourge of antisemitism rises throughout the nation. Instead, it has led the fight against antisemitism by implementing a comprehensive Action Plan to Combat Antisemitism, guided by the U.S. National Strategy to Counter Antisemitism.  The University's initiative centers around three areas for action: (1) ensuring the safety of every

---

[1] "The University of Pennsylvania" does not exist as a legal entity.  The Trustees of the University of Pennsylvania is the correct corporate name for the University and should be substituted as the defendant.

[2] Copies of certain materials cited in this brief are attached as Exhibits to the Declaration of David Gringer filed concurrently herewith ("Gringer Decl.").

member of the Penn community, (2) engaging deeply with the Jewish community and broader Penn community to develop solutions to combat antisemitism; and (3) ensuring that everyone at Penn is educated and knowledgeable about antisemitism.  Those efforts are well under way.  Penn is working with federal and local law enforcement as part of its investigations into various incidents of antisemitism that occurred on or near campus during the Fall 2023 semester, and its investigations have led to the arrest of individuals (not all of whom are Penn affiliates) who engaged in antisemitic conduct on or around Penn's campus.  Penn has also created a University Task Force on Antisemitism, which has met regularly, has engaged with the community in numerous ways, and has publicly reported on its progress.

Penn's serious and considered efforts to combat and eradicate antisemitism defeat any possible claim that it has been indifferent to antisemitism.  Plaintiffs are two Jewish students who were affected by incidents of antisemitism on campus during the fall of 2023.  They are concerned for their safety and worried that they may be treated unfairly because of their Jewish identity. Compl. ¶¶ 220-21.  Plaintiffs disagree with some of Penn's responses, but they concede the critical facts:  that Penn condemned antisemitism in multiple public statements throughout the Fall 2023 semester, and announced its Action Plan just weeks after the October 7, 2023 terrorist attacks in response to a concerning rise of antisemitic conduct.

Plaintiffs' perspectives and experiences matter to Penn.  But this lawsuit is not the right vehicle for Plaintiffs' grievances.  They seek judicial vindication of their policy disagreements with Penn's disciplinary decisions, and relief that would commandeer core decisions of university administration.  Settled precedent forecloses those efforts and this case should be dismissed for multiple reasons, including that the issues Plaintiffs raise are not ripe, Plaintiffs lack standing to sue for injunctive relief, and the Complaint fails to plead cognizable claims under Title VI of the

Civil Rights Act (Count I), for breach of contract (Count II), or under the Pennsylvania Unfair Trade Practices and Consumer Protection Laws (Count III).

First, *the issues presented by the lawsuit are not ripe.* To rule on the merits of each of Plaintiffs' claims, the Court must decide whether Penn responded to and disciplined alleged antisemitic conduct that occurred during fall 2023 consistent with University policies. This question is "contingent" on the outcome of Penn's ongoing investigations, disciplinary proceedings, and Action Plan steps. *Texas v. United States*, 523 U.S. 296, 300 (1998). The investigations are also affected by pending criminal investigations into certain individuals. Given this, "the facts of the case" are not "sufficiently developed to provide the court with enough information on which to decide [Plaintiffs' claims] conclusively." *Peachlum v. City of York*, 333 F.3d 429, 433-34 (3d Cir. 2003).

Second, *Plaintiffs do not have standing for injunctive relief.* Plaintiffs seek a sweeping injunction under Title VI that would bring all Penn "policies, practices, procedures, [and] protocols" under the Court's oversight, Compl., Prayer for Relief, (A), without establishing standing for injunctive relief. Plaintiffs do not show a certainly impending future injury traceable to Penn's alleged violation of Title VI. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). Nor do they show it is "likely, as opposed to merely speculative," that their claimed injuries would be redressed by their injunction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Third, *Plaintiffs fail to state a claim under Title VI.* Plaintiffs' allegations fall short of showing that Penn's response to antisemitic harassment and discrimination was "clearly unreasonable in light of the known circumstances." *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999). Plaintiffs ignore the myriad steps Penn has taken to root

out antisemitism (many of which are apparent on the face of Plaintiffs' Complaint), which show that Penn takes the problem seriously.  Nor do Plaintiffs show that Penn's responses to the various individual incidents they allege occurred were ever unreasonable.  As the Complaint alleges, whenever Penn has been made aware of antisemitic conduct, it has taken action—promptly initiating investigations and, where appropriate, disciplinary proceedings, in response to reports of conduct threatening members of its community, and otherwise violating its policies.  Plaintiffs disagree with Penn's disciplinary decisions, but settled precedent forecloses using Title VI to litigate such disagreements.  With few exceptions (which Penn continues to address appropriately), the conduct alleged by the Complaint is expressive in nature, and the reasonableness of Penn's response must be evaluated against its obligation to respect the free speech rights of the University's community members.  Title VI does not require a private university to enforce antidiscrimination policies at the expense of free speech, particularly where such enforcement would, if carried out by a public university, violate the First Amendment.

*Fourth*, *Plaintiffs' request for disciplinary measures should be stricken because such relief is unavailable under Title VI.*  Under the mantle of Title VI, Plaintiffs seek a mandatory injunction requiring Penn to terminate, suspend, and expel faculty, staff, and students.  Compl., Prayer for Relief, (A)(i)-(ii).  But Title VI does not permit private plaintiffs to make "remedial demands." *Davis*, 526 U.S. at 648.  Because this demand for relief is not cognizable as a matter of law, the Court should strike it.  *See Hanover Prest-Paving Co. v. Tile Tech, Inc.*, 2022 WL 1493568, at *2 (M.D. Pa. May 11, 2022).

*Fifth, Plaintiffs fail to state a breach of contract claim.*  To proceed on their breach of contract theory, Plaintiffs must identify concrete promises they claim Penn breached.  Not one of the policy provisions that Plaintiffs identify Penn as supposedly having breached contains a

promise that is sufficiently definite to be an enforceable contract term.

*Sixth, Plaintiffs fail to state a claim for violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Laws (UTPCPL).*  Plaintiffs do not, as they must, plausibly allege facts to support their claim that Penn's policies were deceptive or that they reasonably relied on their misunderstanding of Penn's policies in enrolling at Penn, especially because those policies expressly state that Penn does not regulate the content of speech, which is what Plaintiffs now seek to fault Penn for supposedly failing to do.

## BACKGROUND

Penn strives to foster a campus environment where all students feel safe, welcome, and free to speak and engage in academic inquiry and opportunities to the fullest.  Compl. ¶ 38.  Penn expects that all members of its community will conduct themselves in a manner that respects others' rights to access the full opportunities of the University, to freely express themselves, and to be free from discrimination.  *Id.* ¶ 41.  Penn approaches the regulation of expression consistent with the First Amendment.  The content of speech is not, on its own, a basis for regulation or disciplinary action, even where speech involves views that are controversial, offensive, hurtful, painful, or scary to others.  *Id.* ¶ 42.  That does not stop Penn from condemning hateful speech, such as antisemitism.  Penn firmly believes antisemitism is "wholly unacceptable anywhere." Gringer Decl., Ex. 2.  Nor does Penn's policy of not regulating the content of speech stop it from disciplining hateful expression that violates other Penn policies, such as speech that not only expresses a hateful view but also threatens "violence against another person."  Compl. ¶ 42.

Recent years have seen a deeply troubling resurgence of antisemitism on college and university campuses around the country, and across American society.  Compl. ¶¶ 3, 26, 29-30. Penn is no exception.  Several years before Plaintiffs enrolled at Penn, antisemitic posters and flyers were disseminated around campus.  *Id.* ¶ 63.  The unfortunate resurgence of antisemitism

has also been seen in increasingly vitriolic discourse after the Hamas attacks.  Often that has led to ignorant, dismissive, or intentionally provocative statements made—including statements about Israel and its right to exist.  Tensions spiked during the fall semester of 2023 after Hamas committed a "horrific assault … that targeted civilians" "result[ing] in the tragic loss of life and escalating violation and unrest [across] the region."  Gringer Decl., Ex. 5.  In the aftermath, there were large rallies and demonstrations across campus.  Some individuals expressed sympathy with Hamas, *see* Compl. ¶¶ 125-27, controversial and disputed arguments and antisemitic tropes, *see id.* ¶¶ 160-61, or outright antisemitic slurs, harassing and threatening conduct, *see id.* ¶¶ 165-66.

In University-wide statements, Penn was adamant that "[t]here is no justification—none—for [Hamas's] heinous attacks."  Gringer Decl., Ex. 6.  Penn acknowledged that "across our Penn community, people are hurting.  They are angry and scared."  *Id*.  In response to the vitriolic speech at protests and demonstrations, Penn was unequivocal that "hateful speech has no place at Penn.  No Place. … In this tragic moment, we must respect the pain of our classmates and colleagues."  *Id*., Ex. 7.

Penn Public Safety increased its presence at and "closely monitor[ed] protests, rallies, and other gatherings," and increased security presence "in religious, cultural, and other spaces" around the University.  *Id*., Ex. 8.  Penn Public Safety investigated "acts of hate," involving "local and federal authorities."  *Id*., Ex. 15.  Penn Public Safety immediately responded to reports of antisemitic threats of violence, theft, and defacement of property.  *See id.*, Exs. 9, 10, 11, 12, 13, 14, 15.  Where the perpetrators have been identified, these investigations have resulted in arrests and/or referrals to student discipline.  *See id.*, Ex. 16.  "Penn is [taking] and will continue to take action on any violation of our policies or the law."  *Id.*, Ex. 15.

Penn also took numerous steps to address and prevent antisemitism.  On November 1,

2023—before Plaintiffs filed suit—Penn announced an Action Plan to Combat Antisemitism. Compl. ¶ 181; Gringer Decl., Ex. 3. Penn has also established a Presidential Commission on Countering Hate and Building Community to investigate how Penn students, staff, and faculty experience hate and discrimination, and recommended strategies to both strengthen Penn's sense of community and support community members who have been impacted by antisemitism and other forms of hate. *Id.*; Compl. ¶ 183.

## STANDARD OF REVIEW

Under Federal Rule 12(b)(1), a defendant can challenge the subject-matter jurisdiction allegations in the complaint by presenting competing facts. *See Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016). "When considering a factual challenge, the plaintiff [has] the burden of proof that jurisdiction does in fact exist, the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case, and no presumptive truthfulness attaches to [the] plaintiff's allegations." *Id.* (internal quotations omitted); *Schuchardt v. President of the United States*, 839 F.3d 336, 343 (3d Cir. 2016). The Court may also "consider facts outside the pleadings." *Stouffer v. Union R.R. Co., LLC*, 85 F.4th 139, 143 (3d Cir. 2023).

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Even on a motion to dismiss, the Court "need not accept as true unsupported conclusions and unwarranted inferences," *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 183-84 (3d Cir. 2000) (cleaned up), and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678. At this stage, the Court may consider the complaint's allegations, as well as any documents "attached to or submitted with the complaint, and any 'matters incorporated by reference or integral to the claim, [and] items

subject to judicial notice.'" *Buck v. Hampton Twp. School Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

Under Federal Rule 12(f), the Court may strike from a complaint any "redundant, immaterial, impertinent, or scandalous matter," *Canfield v. Amica Mut. Ins. Co.*, 2020 WL 5878261, at *2 (E.D. Pa. Oct. 2, 2020), including claims for relief that are unavailable for a plaintiff's asserted causes of action, *see Rivera v. Dealer Funding, LLC*, 178 F. Supp. 3d 272, 281 (E.D. Pa. 2016) ("A demand for damages that is not recoverable as a matter of law may be stricken pursuant to Rule 12(f)."); *Doe v. Haverford Coll.*, 2023 WL 5017964, at *11 (E.D. Pa. Aug. 7, 2023) (striking request for injunctive relief because "equitable relief is [un]available when a plaintiff has an adequate remedy at law" (citation omitted)).

## ARGUMENT

### I.     Plaintiffs' Claims Should Be Dismissed Under Rule 12(b)(1) Because Plaintiffs' Challenge to Penn's Ongoing Response to Antisemitism Is Premature

The ripeness doctrine requires a "real, substantial controversy between the parties" "of sufficient immediacy and reality to justify judicial resolution." *Peachlum v. City of York*, 333 F.3d 429, 434 (3d Cir. 2003); *see also Doe v. County of Centre*, 242 F.3d 437, 453 (3d Cir. 2001) (in evaluating ripeness, courts look at the "fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration" (citation omitted)).  No such controversy exists here.  The gravamen of Plaintiffs' claims is a challenge to what they perceive to be a failure on Penn's part to discipline this recent conduct that they allege is antisemitic.  But the relevant alleged incidents all took place in the last few months, and the actions Penn has taken (even before Plaintiffs filed suit), and is taking, in response to antisemitism on its campus are ongoing.

*First*, there is no substantial legal controversy between Plaintiffs and Penn.  *See Peachlum*, 333 F.3d at 433.  At most, Plaintiffs have alleged their "abstract disagreement," *Doe*, 242 F.3d at 453, with the approach Penn has taken to addressing antisemitic harassment and discrimination,

while it also balances the free speech interests of the University community and the due process requirements for disciplinary proceedings.  *See Davis*, 526 U.S. at 649 (recognizing "school administrators shoulder substantial burdens as a result of legal constraints on their disciplinary authority").  But Penn *is* enforcing its policies with respect to violations that involve antisemitic conduct.  *See* Gringer Decl., Ex. 15 (November 10, 2023, message: "Please be assured that we are investigating these and other potential acts of hate … I want to make clear that Penn is and will continue to take action on any violation of our policies or the law.").  The disciplinary proceedings related to antisemitic incidents in fall 2023 are ongoing, *see id.*, Ex. 16 (Action Plan update noting cases referred to "the Center of Community Standards and Accountability for violations of the Code of Student Conduct"), and it cannot be disputed that Penn's leadership adamantly condemns antisemitism and "has iniatat[ed] a series of action steps to prevent, address, and respond to antisemitism," *id.*, Ex. 4.

*Second*, Penn has not decided against pursuing disciplinary measures; it simply has not concluded its investigations and disciplinary proceedings  (or has not publicly disclosed the results thereof, in keeping with relevant laws and policies regarding student privacy).  *Id.*, Ex. 16 (noting ongoing investigations and proceedings with individuals and student organizations).  Likewise, Penn's Taskforce on Antisemitism and other bodies convened under the Action Plan are still engaging with the community and experts to determine what measures to recommend the University adopt.  The Taskforce's first charge is "to engage broadly and deeply to understand how members of the Penn Community experience antisemitism on campus."  *Id.*, Ex. 17.  It has already received "approximately 170 individual inputs" "representing a broad array of ideas and perspectives," "conducted informational interviews with a wide variety of Penn experts," and "will soon launch a series of campus listening sessions."  *Id*.  The Taskforce's second charge is to

"identify best practices for addressing antisemitism." *Id.*, Ex. 19 at 2. Then it will "recommend to the president programmatic strategies to prevent and counter antisemitism." *Id.*. The Chair of the Taskforce, Dean Mark Wolff, has said, "[i]f our Task Force is successful, I believe that we will lay the groundwork for transcendent educational resources to combat the ancient scourge of antisemitism." *Id.* at 3. Plaintiffs guess that these efforts will amount to nothing, but their unsupported speculation is not enough to ripen this dispute for judicial resolution. *See Texas v. United States*, 523 U.S. 296, 300 (1998) (A claim is not ripe when it rests on "contingent future events that may not occur as anticipated, or indeed may not occur at all." (citation omitted)). Accordingly, "the facts of the case" are not "sufficiently developed to provide the court with enough information on which to decide … conclusively" the adequacy of Penn's response. *Peachlum*, 333 F.3d at 433-34.

Moreover, having to litigate the adequacy of Penn's response to antisemitism while that response is ongoing would impose substantial "hardship" on Penn. *See Doe*, 242 F.3d at 453. It would subject Penn's investigations, disciplinary proceedings, and the Action Plan's collaborative effort involving hundreds of members across the Penn community, in consultation with external experts on antisemitism, *see* Gringer Decl., Exs. 16, 17, 18, 19, to judicial "second-guessing" based on the perspective of two students who, however justifiably upset about their experience at Penn, do not have a right to "particular remedial demands," *Davis*, 526 U.S. at 648. The Court should dismiss Plaintiffs' Complaint under Rule 12(b)(1), or at minimum stay the proceedings until Penn's ongoing responses to the antisemitic incidents of fall 2023 have concluded.

## II.   Plaintiffs' Claim for Injunctive Relief Should Be Dismissed Under Rule 12(b)(1) for Lack of Standing

Even if the Court is not convinced Plaintiffs' lawsuit is premature, Plaintiffs' request for injunctive relief on their Title VI claim still warrants dismissal under Rule 12(b)(1).

Plaintiffs request sweeping injunctive relief that would bring all Penn "policies, practices, procedures, [and] protocols" under the Court's oversight, and would require Penn to terminate, expel, and suspend faculty, staff, and students who had nothing to do with Plaintiffs' alleged injuries.  Compl., Prayer for Relief, (A), (A)(i)-(ii).  Plaintiffs seek this extreme remedy despite having no standing for prospective relief in the first place, which is their burden to establish.  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  At the pleading stage, Plaintiffs must "clearly allege facts demonstrating" they "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.*  Because they have failed to do so—and cannot do so—their request for injunctive relief should be dismissed under Rule 12(b)(1).

### A.    Plaintiffs Have Not Alleged a Clearly Impending Future Injury Traceable to Penn's Alleged Title VI Violation

"The primary element of standing is injury in fact," which is "comprised of three sub-elements: first, the invasion of a legally protected interest; second, that the injury is both 'concrete and particularized'; and third, that the injury is 'actual or imminent, not conjectural or hypothetical.'" *Schaller v. U.S. Soc. Sec. Admin.*, 844 F. App'x 566, 570 (3d Cir. 2021) (citation omitted).  The third element requires clearly pled facts showing the "threatened injury" is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) (rejecting an "objectively reasonable likelihood standard").  An allegation of "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 223 (3d Cir. 2012) (citation omitted).

The future injuries Plaintiffs fear are not "certainly impending."  The Complaint pleads two instances in October in which Ms. Davis was harassed by other students with antisemitic comments and slurs as she observed and walked by protests.  Compl. ¶¶ 141, 165-66.  The

Complaint also alleges that on one occasion when Mr. Yakoby was hanging "kidnapped" posters, a man "threateningly approached him and yelled 'fuck you,'" and that Mr. Yakoby was often late to class or missed class. *Id.* ¶¶ 158, 220.  These instances of "past exposure" to incidents of alleged harassment do not, standing alone, establish an entitlement to prospective injunctive relief. *McNair*, 672 F.3d at 223; *Brown-Dickerson v. City of Philadelphia*, 2016 WL 1623438, at *6 (E.D. Pa. Apr. 25, 2016) ("Even if a plaintiff has standing for a damages claim, she must establish standing in order to obtain prospective relief.").

Plaintiffs lack standing because they have not clearly alleged facts that suggest a repetition of their previous alleged injuries is certainly impending.  While Plaintiffs speculate that their harassment occurred because Penn was too lenient on antisemitic speech, they allege no facts to support the conclusion that those instances of harassment arose from deliberate indifference to antisemitism.  The catalyst for the campus climate in fall 2023 was a sudden terrorist attack and the ensuing war—a geopolitical event that continues to evolve.  Penn is engaged in a "whole-University" effort to ensure that discourse over the very divisive issues raised by the Israel-Hamas war remains respectful of all students.  Gringer Decl., Ex. 3; *see also id.*, Exs. 4, 16, 17, 18, 20. Plaintiffs, therefore, can only speculate that they will face harassment from other students and (contrary to reality) that Penn will be deliberately indifferent to such harassment.  *See Clapper*, 568 U.S. at 410-11 (chain of speculative events involving actions of third parties does not satisfy "certainly impending" injury requirement).  Instead of pleading facts showing future harassment is "certainly impending," Plaintiffs allege only that they have continuing subjective fears that the harassment they experienced in fall 2023 may (at some indeterminate point) repeat.  Compl. ¶¶ 220-21.  But Plaintiffs' "[s]ubjective apprehensions"—however valid—"cannot control the determination as to whether the future harm that [they] fear[] is 'actual or imminent' rather than

'conjectural or hypothetical." *Wertz v. Ryan*, 2022 WL 118135, at *6 (E.D. Pa. Jan. 12, 2022) (citation omitted).   And standing for prospective relief cannot flow from the "emotional consequences of a prior act" or general fears that past injuries will be repeated, as Plaintiffs allege here. *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983).

To be sure, Plaintiffs try to shore up their theory of personal injury by alleging that other Jewish students were subjected to different kinds of harassment and antisemitic conduct.   Penn takes each of those allegations seriously.   But for purposes of Plaintiffs' standing, those allegations are irrelevant because Plaintiffs cannot lessen their burden or surmount standing "merely by aggregating" the injuries of different students. *Public Citizen, Inc. v. National Highway Traffic Safety Admin.*, 489 F.3d 1279, 1294 (D.C. Cir. 2007).   And the requirement that the injury be "particularized" means the injury must be "one that affects the plaintiff in a personal and individual way." *Ellison v. Am. Bd. of Orthopaedic Surgery*, 11 F.4th 200, 205 (3d Cir. 2021).   These Plaintiffs allege no such facts.

The Complaint, moreover, fails to plead facts showing a line of causation between any certainly impending injury and any alleged Title VI violation, as is required to pursue injunctive relief. *See Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347, 366 (3d Cir. 2014) ("A federal court may act only to redress injury that fairly can be traced to the challenged action of the defendant." (citation omitted)).   As discussed below, Penn did not violate Title VI.   But for standing purposes, it is enough that none of Plaintiffs' conclusory claims that Penn "will continue" to violate Title VI, Compl. ¶ 236, and that Penn's Action Plan to Combat Antisemitism is not "meaningful," *id.* ¶ 181, comes close to plausibly connecting any future injury to Penn's conduct.

The gravamen of Plaintiffs' Title VI claim is that Penn failed to act in response to acts of antisemitism on its campus.[3]  But on the face of the Complaint and materials incorporated in the Complaint, that is implausible.  Under its Action Plan, announced November 1, 2023, Penn created (1) a Task Force on Antisemitism to identify best practices and strategies for countering antisemitism on campus, (2) an Executive Planning group to implement a review of Penn training and education programs to ensure antisemitism awareness is part of Penn's equity and inclusion programs, and (3) a Student Advisory Group to advise Penn's leaders on efforts to combat antisemitism.  Gringer Decl., Ex. 4.  Penn also undertook reviews of safety and security for religion-affiliated centers and groups in and around campus and of procedures for allowing external groups to use the campus.  *Id.*, Ex. 16.  It committed to taking timely and appropriate action in response to reports of conduct that violates Penn's policies or the law.  *Id.*  To date, three individuals (two Penn affiliates and one non-affiliate) have been arrested for antisemitic actions on or around Penn's campus, and affiliated individuals were referred to the Center for Community Standards and Accountability for violations of the Code of Student Conduct.  *Id.*  In addition, Penn sent its senior leadership to attend the November 2023 Brandeis Center Leadership Symposium on Antisemitism in Higher Education.  *Id.*, Ex. 18.  Recognizing that addressing the campus climate in fall 2023 required building community across Penn's diverse campus, Penn also established a Presidential Commission on Countering Hate and Building Community to address the interconnectedness of antisemitism, Islamophobia, and other forms of hate, discrimination, and bias on campus.  *Id.*, Ex. 3; *see also id.*, Ex. 20.  Penn is already making significant progress in its efforts under the Action Plan.  *See id.*, Exs. 16, 17, 18, 19.

---

[3] To the extent Plaintiffs suggest that Penn's former President was responsible for the challenged conduct, the Court can and should take judicial notice that she no longer serves as President.  *See* Gringer Decl., Ex. 22.

The Action Plan shows that the "challenged [in]action" in the Complaint, *Aichele*, 757 F.3d at 366, has changed (if it was ever present to begin with), and there is no plausible "certainly impending" injury traceable to Penn's deliberate indifference to a hostile education environment or intentional discrimination. *See Abadi v. Target Corp.*, 2023 WL 4045373, at *2 (3d Cir. June 16, 2023) (no standing for injunction concerning discriminatory enforcement of policy that had been lifted, even though it could be reinstated); *Wolfe v. City of Portland*, 566 F. Supp. 3d 1069, 1085 (D. Or. 2021) (no standing for injunction concerning police response to protests, where number and size of protests dissipated, and police response evolved).

**B.    Plaintiffs' Requested Remedy Would Not Redress Plaintiffs' Alleged Injury**

Plaintiffs lack standing for the additional reason that they fail to show it is "likely, as opposed to merely speculative, that the[ir] injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  To meet this standard, a plaintiff must show that the relief sought "would serve to … eliminate any effects of" the legal violation on the plaintiff.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 105-06 (1998).

Plaintiffs seek to enjoin "Penn and its agents from establishing, implementing, instituting, maintaining, or executing policies, practices, procedures, or protocols that penalize or discriminate against Jewish students, including plaintiffs, in any way."  Compl., Prayer for Relief, (A).  But Plaintiffs do not allege Penn's policies, procedures, and protocols are antisemitic, and while they claim (in conclusory fashion) that Penn had a practice of not applying its policies to antisemitic conduct, they allege nothing to clearly suggest such practices caused their injuries—here, three incidents of student-on-student harassment and their resulting anxiety.  Given this, an injunction that reaches all "policies, practices, procedures, or protocols" across the school would not amount to "remediation of [Plaintiffs'] own injur[ies]."  *Steel*, 523 U.S. at 106.  For instance, their injunction would reach admissions policies and athletic policies, even though they are not seeking

admission and neither Plaintiff claims to be a student athlete.  It is thus inconceivable that they would be injured in the future by those policies, and equally inconceivable that an injunction reaching those policies would do anything to redress an injury they could possibly suffer.  *See id.* at 106 (plaintiffs cannot pursue an "undifferentiated public interest").

Nor have Plaintiffs alleged any connection between their injuries and their request to enjoin Penn to terminate, suspend, and expel other students, faculty, and staff.  Compl., Prayer for Relief, (A)(i)-(ii).  Neither claims to have filed a complaint under Penn's disciplinary procedures, nor were they involved in the incidents they claim Penn failed to properly punish.  *See, e.g.*, Compl. ¶¶ 178-79.  So, disciplining other faculty, staff, and students would not address any "particularized harm" they've allegedly suffered.  *Soule v. Connecticut Ass'n of Schs., Inc.*, 90 F.4th 34, 50 (2d Cir. 2023) (en banc) (plaintiffs challenging policy recognizing transgender girls under Title IX had no standing to request the removal of "record times and achievements of transgender girls that have no impact on [p]laintiffs' own athletic achievements").  The standing requirement does not permit plaintiffs to pursue relief based on a "generalized interest in deterrence."  *Steel*, 523 U.S. at 108-09.  The same goes for their request to "enjoin" Penn to issue mandatory antisemitism training and adopt the IHRA definition of antisemitism.  Compl., Prayer for Relief, (A)(iii).  Nothing in the Complaint explains why this compelled speech would redress the student-on-student harassment they experienced.  It is merely "psychic satisfaction" of a "favorable judgment," which is impermissible.  *Steel*, 523 U.S. at 107.

*     *     *

Plaintiffs cannot remedy three past instances of student-on-student harassment, of which there is no certainly impending risk of repetition, with an injunction that would subject core decisions of the University to judicial oversight and terminate and expel faculty, staff, and students

16

who had nothing to do with their injuries.  Their requests for injunctive relief should be dismissed under Rule 12(b)(1).

### III.    Plaintiffs' Title VI Claim Should Be Dismissed Under Rule 12(b)(6)

In addition (or as an alternative) to striking Plaintiffs' request for injunctive relief, the Court should dismiss Plaintiffs' Title VI claims as inadequately pled.  Title VI "prohibits only intentional discrimination."  *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001).  A plaintiff may state a claim under Title VI either through direct evidence of intentional discrimination or "through a showing that the defendant acted with 'deliberate indifference,'" which is defined to mean "that the defendant had knowledge of the alleged misconduct, had the power to correct it, and yet failed to do so."  *Bey v. East Penn Sch. Dist.*, 2017 WL 3129127, at *4 (E.D. Pa. July 24, 2017).  Claims that a school was deliberately indifferent to a hostile educational environment require that a plaintiff show that the alleged harassment was so "severe, pervasive, and objectively offensive" as to have a "systemic effect on educational programs or activities," *Davis*, 526 U.S. at 633, 653, that the school knew about the harassment, and that its response was clearly unreasonable.

Plaintiffs appear to assert that Penn acted with discriminatory animus and that it was deliberately indifferent to third-party harassment, but they fail to state a claim under either theory. Though Plaintiffs make conclusory accusations that Penn is insensitive to antisemitism, their factual allegations show the exact opposite: Plaintiffs acknowledge several of Penn's statements condemning antisemitism, and they recognize that during last semester's turmoil Penn announced (and began to implement) a comprehensive Action Plan to Combat Antisemitism.  While Plaintiffs identify certain disciplinary actions they wish Penn would have taken, Title VI does not license courts to "second-guess[] the disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648.  This case is no exception.

### A.    Plaintiffs Do Not Plausibly Allege That Penn Discriminated Against Them

Plaintiffs have failed plausibly to allege that Penn ever acted with discriminatory animus or otherwise discriminated against them.  A *prima facie* Title VI claim requires that a plaintiff plead that "he was a member of a protected class qualified for the educational benefit or program at issue and he suffered an adverse action occurring 'under circumstances giving rise to an inference of discrimination.'"  *Saravanan v. Drexel Univ.*, 2017 WL 5659821, at *8 (E.D. Pa. Nov. 24, 2017) (quoting *Blunt v. Lower Merion School Dist.*, 767 F.3d 247, 275 (3d Cir. 2014)).  Plaintiffs have not identified a single "adverse action" that Penn took against them.  Their allegations instead focus on "omissions, rather than on any intentional decision to discriminate," and thus cannot be the basis for liability on a theory of intentional discrimination.  *Langadinos v. Appalachian Sch. of Law*, 2005 WL 2333460, at *10 (W.D. Va. Sept. 25, 2005).

Even assuming that Plaintiffs can establish that they personally suffered "an adverse action," none of their allegations plausibly establishes that those actions occurred "under circumstances giving rise to an inference of discrimination."  *Saravanan*, 2017 WL 5659821, at *8 (quoting *Blunt*, 767 F.3d at 275).  Plaintiffs do not identify any racially discriminatory animus or motive, instead "repeatedly and conclusively alleg[ing]" that Penn "discriminated against [them] on the basis of [their] race."  *Id.*  But far from establishing intentional discrimination, the allegations instead prove that Penn has stood steadfastly by its Jewish community and that, at every step, it has condemned antisemitism promptly, forcefully, and unequivocally.  *See infra* at 22-24.

Nor can Plaintiffs show intentional discrimination through a comparator, as they have failed to allege that similarly situated individuals outside their protected group "received more favorable treatment."  *Sosa v. New York City Dep't of Educ.*, 368 F. Supp. 3d 489, 513 (E.D.N.Y. 2019).  Plaintiffs float the phrase "selective enforcement," but they do not advance a single allegation that shows that Penn treated non-Jewish students any differently than it has treated Plaintiffs.  They

18

instead rely on a grab-bag of allegations, none of which plausibly supports an inference of discrimination. These include allegations that Penn released statements about other current events (although they concede Penn released similar statements condemning antisemitism), *see* Compl. ¶¶ 205-07, and various allegations relating to faculty hiring or firing (none of which relates to students or the student experience at Penn), *see id.* ¶¶ 202-04, 211-12. Plaintiffs also allege in conclusory fashion that Penn has taken a different approach when racist conduct has been directed at other student groups, *see, e.g.*, *id.* ¶¶ 208-10, but they come nowhere close to alleging facts that might plausibly show "substantial similarity" between the incidents or that those other groups were in fact treated differently, dooming any claim of disparate treatment they may intend to make. *See Houston v. Easton Area Sch. Dist.*, 355 F. App'x 651, 654-55 (3d Cir. 2009).[4]

## B. Plaintiffs Fail to Allege Penn Was Deliberately Indifferent to a Hostile Educational Environment

To state a Title VI claim for a hostile educational environment, Plaintiffs must allege harassment based on a protected characteristic that is so "severe, pervasive, and objectively offensive" that it "deprives the victim of equal access to the school's educational opportunities" and has a "systemic effect on educational programs or activities." *Whitfield v. Notre Dame Middle Sch.*, 412 F. App'x 517, 521-22 (3d Cir. 2011) (quoting *Davis*, 526 U.S. at 653). Under Title VI, a university may be held liable for third-party conduct only when a plaintiff shows that the school's "own deliberate indifference effectively 'caused' the discrimination." *Davis*, 526 U.S. at 642-43. To survive a motion to dismiss, Plaintiffs must allege that Penn exercised substantial control over the harassers, that the harassment was "severe and discriminatory," that Penn had "actual

---

[4] To be clear, Penn takes equally seriously all claims of harassment or discrimination on the basis of race, creed, or identity. Plaintiffs' argument that Penn affords certain groups preferential treatment is unsupported precisely *because* the conclusion they urge the Court to reach is false.

knowledge" of the harassment, and that Penn was "deliberate[ly] indifferen[t]" to the harassment. *Blunt*, 767 F.3d at 273 (citation omitted).  And they must also show that Penn's actions and responses were "clearly unreasonable in light of the known circumstances."  *Davis*, 526 U.S. at 648-49.

Plaintiffs' allegations fail to meet this high bar.  Although Plaintiffs color their Complaint with conclusory assertions that Penn acted unreasonably or improperly, their allegations instead make clear that whenever Penn has been made aware of any incidents of alleged or actual antisemitism, its response has been conscientious, forceful, and thorough.

### 1.      Plaintiffs do not plausibly plead that they were subject to severe and pervasive harassment.

The Complaint sweeps through decades of unconnected alleged incidents in search of a narrative.  But to survive a motion to dismiss, Plaintiffs allegations must show that Plaintiffs personally were subjected to harassment that was so "severe [or] pervasive" as to deprive them "of equal access to the school's educational opportunities."  *Whitfield*, 412 F. App'x at 521-22.  The Supreme Court has cautioned against setting too low a bar.  In *Davis*, it wrote that although "a single instance of sufficiently severe one-on-one peer harassment could be said to have such an effect, we think it unlikely that Congress would have thought such behavior sufficient … in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of … peer harassment."  526 U.S. at 652-53.

Mr. Yakoby alleges a single incident in which he was personally harassed—the October 16 incident when, as he was hanging "kidnapped" posters, an unknown individual approached him and yelled "fuck you."  Compl. ¶ 158.  Ms. Davis alleges two incidents where she was personally harassed.  In both, unknown protestors at a rally yelled antisemitic remarks at her as she walked

past on her way to class.  *See id.* ¶¶ 141, 165.  To be sure, each of those three incidents—only one

of which Plaintiffs allege was perpetrated by persons affiliated with Penn (and thus even able to

be disciplined by Penn)—is terrible, and Penn is committed to supporting Mr. Yakoby and Ms.

Davis.[5]  But even in the light most favorable to Plaintiffs, those incidents do not rise to a level

warranting Title VI liability or even stating a viable claim.  *See, e.g.*, *HB v. Monroe Woodbury*

*Cent. Sch. Dist.*, 2012 WL 4477552, at *15 (S.D.N.Y. Sept. 27, 2012) (although plaintiff was

called derogatory racial names on numerous occasions, the "one reference to race-related name

calling" in the complaint fell short of establishing severe and pervasive misconduct).  Plaintiffs

supplement their own experience with things that happened to other individuals who are not parties

to this suit.  *See, e.g.*, Compl. ¶¶ 179, 193; *see supra*.  But they cannot rely on allegations of others'

injuries to show that the harassment they personally experienced was either severe or pervasive.

### 2. Plaintiffs do not plausibly allege that Penn's responses were clearly unreasonable in light of known circumstances.

Plaintiffs fail to allege a single instance where Penn's response was "clearly unreasonable

in light of the known circumstances."  *Davis*, 526 U.S. at 648-49.  In evaluating whether a response

was clearly unreasonable, courts consider, among other things, "the time it took the [University]

to respond to complaints, the level of response, the effort expended to respond to the allegations,

and the efficacy of the response."  *Zavada v. East Stroudsburg Univ.*, 2023 WL 5532809, at *4

(M.D. Pa. Aug. 28, 2023).  To "meet this high standard," a plaintiff must thus show that there was

---

[5] Many of Plaintiffs' other allegations do not allege personal injury at all, and instead amount to little more than disagreement over Penn's decision not to sanction pure political speech. But as discussed *supra*, those are not the kinds of injuries that can lead to Title VI liability.  *See also Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 709 (9th Cir. 2010) ("To afford academic speech the breathing room that it requires, courts must defer to colleges' decisions to err on the side of academic freedom.  Otherwise, schools will inevitably reassess whether hiring a lightning rod like Kehowski—or, for that matter, Larry Summers or Cornel West—is worth the trouble.").

"an official decision not to remedy the violation and this decision must be clearly unreasonable." *Doe v. Willits Unified Sch. Dist.*, 473 F. App'x 775, 776 (9th Cir. 2012). "Deliberate indifference claims impose a significant burden on the plaintiff and consequently rarely proceed beyond a motion to dismiss," *Saravanan*, 2017 WL 5659821, at *7, and courts routinely grant motions to dismiss on hostile educational environment claims where the allegations cannot plausibly establish that the school's response was clearly unreasonable. *See Williams v. Jersey Shore Area Sch. Dist.*, 2023 WL 3513677, at *3-4 (M.D. Pa. May 17, 2023) (dismissing a hostile educational environment claim on a motion to dismiss because the allegations did not plausibly establish that the response was clearly unreasonable); *B.W. v. Career Tech. Ctr. of Lackawanna Cnty.*, 422 F. Supp. 3d 859, 885 (M.D. Pa. 2019) (similar, as to Count II), *on reconsideration in part*, 2019 WL 6875493 (M.D. Pa. Dec. 17, 2019); *Doe v. Sacks*, 2024 WL 402945, at *5-7 (S.D.N.Y. Feb. 2, 2024) (similar). This Court should do the same. Although Plaintiffs color their Complaint with conclusory assertions of unreasonableness, their *factual* allegations show otherwise.

> a) **Penn's unequivocal condemnation of antisemitism—and comprehensive plan to combat it—refutes any inference that Penn is deliberately indifferent.**

The undeniable conclusion that follows from Plaintiffs' allegations is that Penn has taken the problem of antisemitism seriously—a conclusion sufficient to defeat any inference that Penn has acted unreasonably or indifferently. Though Plaintiffs characterize those efforts as disingenuous, they do not deny that Penn made multiple statements last semester unequivocally condemning antisemitism (and the October 7, 2023, terrorist attacks). On September 12, 2023, Penn "unequivocally—and emphatically—condemn[ed] antisemitism as antithetical to [Penn's]

institutional values."  Gringer Decl., Ex. 21; *see also* Compl. ¶ 99.[6]  On September 22, 2023, the day after an antisemitic attack at Penn Hillel and shortly after another antisemitic incident, Penn responded by "unequivocally condemning such hateful acts," declaring as "unwavering" Penn's "commitment to ensuring our Jewish community feels safe and supported on our campus," and informing the community that Penn Police detained the individual responsible for the attack on Penn Hillel and that the police was "actively pursuing both incidents and following all protocols for potential bias incidents on campus."  Gringer Decl., Ex. 10; *see also* Compl. ¶ 114.  Just days after the October 7, 2023 terrorist attacks in Israel, Penn leadership issued a statement expressing that they were "devastated by the horrific assault on Israel by Hamas" and provided resources to support all affected—on campus and abroad—by the attacks.  *See* Gringer Decl., Ex. 5; Compl. ¶ 146.  On October 15, 2023, Penn leadership issued another statement that, again, condemned the October 7 terrorist attack, expressed sympathy to members of the Penn community affected by those attacks, and committed once more to monitoring threats of violence and fighting antisemitism; they emphasized that Penn stands "emphatically against antisemitism" and noted the University's "moral responsibility" to combat antisemitism.  *See* Gringer Decl., Ex. 6; Compl. ¶ 155.  Far from plausibly establishing that Penn was deliberately indifferent to antisemitism or Plaintiffs' experiences on campus, those statements reflect an unequivocal commitment to ensuring the safety and security of all students (including Plaintiffs).

Even more damaging to any theory of deliberate indifference is Penn's Action Plan to Combat Antisemitism, announced on November 1, 2023 (Compl. ¶ 181).  *See supra* at 6-7, 9-10, 14-15.  Plaintiffs concede that the Action Plan's three-pronged approach emphasized "Safety &

---

[6] Plaintiffs' Complaint refers to numerous public statements made by Penn and to Penn's Action Plan.  In ruling on a motion to dismiss, a court may take judicial notice of "matters incorporated by reference" in the complaint.  *Buck*, 452 F.3d at 260.

Security," "Engagement," and "Education."  Compl. ¶ 182.  While Plaintiffs try to dismiss the Action Plan as mere window dressing—apparently because it did not adopt their preferred disciplinary or remedial measures—the comprehensive plan further rebuts any possible inference of deliberate indifference because it shows that Penn listened and promptly took action to root out any vestiges of antisemitism on its campus.  Courts have credited such efforts as defeating any Title VI liability predicated on a hostile educational environment.  Consider *Mandel v. Board of Trustees of California State University*, where plaintiffs predicated their Title VI claim in part on characterizing the university's "broader steps to address … anti-Semitism at SFSU in general" as "disingenuous."  2018 WL 1242067, at *19 (N.D. Cal. Mar. 9, 2018).  The district court rebuffed those efforts, recognizing instead that a broad-based commitment to address the very problem plaintiffs identify is "problematic" to any theory of Title VI liability.  *Id.*  So too here.  Plaintiffs proffer not a single non-conclusory allegation that justifies their characterization of Penn's efforts as disingenuous—or that warrants an inference that Penn's conceded efforts to eradicate antisemitism from its campus is anything but genuine.

### b)       Penn responded reasonably to all alleged incidents.

Plaintiffs' allegations also refute any possible characterization of Penn's responses to the various incidents alleged in the Complaint as "clearly unreasonable."  Courts routinely refuse to countenance plaintiffs' attempts to leverage Title VI to challenge specific disciplinary decisions.  *See, e.g.*, *Sacks*, 2024 WL 402945, at *6 ("While Plaintiff may certainly wish that NYU had gone to greater lengths to identify and discipline the creators of the spreadsheet, the University's response was not, in fact, 'clearly unreasonable.'"); *KF ex rel. CF v. Monroe Woodbury Cent. Sch. Dist.*, 2013 WL 177911, at *7 (S.D.N.Y. Jan. 16, 2013) (school's failure to investigate, despite official policy requiring it, not "clearly unreasonable"), *aff'd*, 531 F. App'x 132 (2d Cir. 2013); *Doe v. University of Chicago*, 2017 WL 4163960, at *8 (N.D. Ill. Sept. 20, 2017) (school's refusal

24

to discipline a student who publicly accused plaintiff of sexual assault and lied about the outcome of her complaint not "clearly unreasonable"). Here, Plaintiffs' challenge fails for two separate reasons. First, foundational principles of academic freedom foreclose Plaintiffs' argument that Penn's decision not to censor or discipline pure political speech was clearly unreasonable. Second, although Plaintiffs identify certain incidents of antisemitic misconduct (including harassment), their allegations make clear that when Penn has been made aware of those incidents, it has responded promptly, investigating and holding perpetrators responsible.

*First*, Title VI does not create liability when a university opts not to censor pure political speech, even if that speech is offensive or "incompatible with [its] institutional values." Gringer Decl., Ex. 21. The Third Circuit has observed that "[n]o court or legislature has ever suggested that unwelcome speech directed at another's 'values' may be prohibited under the rubric of anti-discrimination." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 210 (3d Cir. 2001). Rightly so. "Intellectual advancement has traditionally progressed through discord and dissent, as a diversity of views ensures that ideas survive because they are correct, not because they are popular. Colleges and universities—sheltered from the currents of popular opinion by tradition, geography, tenure and monetary endowments—have historically fostered that exchange." *Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 708-09 (9th Cir. 2010). This is well established in the First Amendment context: "When laws against harassment attempt to regulate oral or written expression on such topics, however detestable the views expressed may be, we cannot turn a blind eye to the First Amendment implications." *Saxe*, 240 F.3d at 206. And just as Congress cannot discriminate against pure political speech directly, nor can its antidiscrimination laws be interpreted to require the same result. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013). Indeed, some courts have expressed "doubt that a college professor's

25

expression on a matter of public concern, directed to the college community, could ever constitute unlawful harassment and justify the judicial intervention that plaintiffs seek." *Rodriguez*, 605 F.3d at 710.  But this Court need not go that far.  Instead, it is enough to find that a decision to safeguard principles of academic freedom is not "clearly unreasonable" under the circumstances.

Plaintiffs devote 29 paragraphs to Penn's decision not to shut down the Palestine Writes Literature Festival.  *See* Compl. ¶¶ 92-119.  But Penn's decision not to shut down speech that Plaintiffs dislike is not a violation of the law.  And Plaintiffs concede that Penn leadership met with Jewish students multiple times leading up to the event to discuss the students' concerns.  *See id.* ¶¶ 96-97, 103.  They also concede that Penn issued multiple statements condemning antisemitism before the event.  *See id.* ¶¶ 99, 114; Gringer Decl., Exs. 9, 10.  Penn's prompt and reasonable responses dispel any inference that it was ever deliberately indifferent.

Many of Plaintiffs' other allegations are similar.  For example, Plaintiffs allege that certain members of Penn's faculty made offensive or hateful statements on social media.  *See* Compl. ¶¶ 128-37.  Those allegations fail at the outset because Plaintiffs never allege that Penn was aware of those statements.  But even if Penn were, its decision not to terminate faculty for their political views—even views expressed distastefully—cannot warrant Title VI liability.  It is again well established that "[t]he desire to maintain a sedate academic environment … [does not] justify limitations on a teacher's freedom to express himself on political issues in vigorous … and even distinctly unpleasant terms."  *Adamian v. Jacobsen*, 523 F.2d 929, 934 (9th Cir. 1975).  The same is true for Plaintiffs' allegations regarding a variety of other events on campus, like the Penn Muslim Student Association's hosting Yasir Fahmy on campus (Compl. ¶ 195) or a Jewish club's screening of "Israelism" (*id.* ¶ 196).  And it includes Penn's decision not to immediately sanction or shut down political protests on campus (*see, e.g.*, Compl. ¶¶ 190-91 (discussing a protest in

Houston Hall)).  Universities act well within their discretion when they choose to tolerate pure political speech and provide other avenues for fostering intellectual debate—including, as here, a decision not to censor the speech while unequivocally condemning it and providing resources to the community to seek support and express counterviews.  *See Rodriguez*, 605 F.3d at 710.  Title VI was designed to tolerate that choice.  Plaintiffs' call for Title VI-mandated discipline against individuals who expressed ideas they find disagreeable stretches the statute well beyond its constitutional moorings, *requiring* universities to adopt measures that, in the public university context, could well result in First Amendment liability.  *See, e.g.*, *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 667-68, 670-71 (1973) (per curiam) (public university could not expel a journalism student for distributing a newspaper with content that some found deeply offensive).  That interpretation of Title VI is untenable.  *See Sacks*, 2024 WL 402945, at *7 (finding that NYU's decision not to discipline students for online speech was not clearly unreasonable because to conclude otherwise "would necessarily put the University at risk of impermissibly restricting students' speech-protected values").

*Second*, while Title VI may create liability for deliberate indifference to known acts of harassment, Plaintiffs' allegations do not plausibly establish that Penn responded unreasonably to any known acts of antisemitic conduct.  For example, on October 16, Mr. Yakoby was harassed by an unknown man while hanging posters in support of the Israeli hostages.  While Plaintiffs assert that Mr. Yakoby did not "receive any follow-up communication," Compl. ¶ 158, they admit that the police officer on the scene indicated that Penn would investigate and that Mr. Yakoby's assailant was subsequently arrested, *id*.  Ms. Davis suffered two incidents of antisemitic harassment.  While tragic and intolerable, those incidents do not establish that Penn responded unreasonably.  Plaintiffs admit that Ms. Davis did not report the first incident, *see id.* ¶ 143 ("Davis

decided not to report the incident"), and that Ms. Davis filed an *anonymous* report for the second, *id.* ¶ 170—but never that Penn knew that Ms. Davis herself was subjected to any harassment.

Plaintiffs also allege certain incidents that affected other members of the Penn community, including an incident in which a student "ripped down and stole an Israeli flag" (and was arrested), Compl. ¶ 179, another incident involving the theft of an Israeli flag from a home (*id.* ¶ 193), and various protests that, if sometimes involving protected political speech, at other times descended into vandalism or other hateful conduct (*see, e.g.*, *id.* ¶ 198). These allegations fail to distinguish between incidents that happened on Penn's campus and those that happened elsewhere (*see id.* ¶ 198 (alleging an antisemitic attack on a restaurant in Center City)). None establishes that Penn was deliberately indifferent to any instances of antisemitism. In many of those incidents, Plaintiffs do not allege that Penn was on notice that a particular individual was likely to commit an act of antisemitism; because Penn could not have predicted those incidents in advance, its inability to prevent those events cannot be characterized as unreasonable. *See Swiderski v. Urban Outfitters, Inc.*, 2017 WL 6502221, at *9 (S.D.N.Y. Dec. 18, 2017) ("[G]enerally, an employer is not liable for failing to prevent an act of harassment by a first-time customer."). Just as important, none of the allegations "indicat[es] that [Penn's] response was undertaken with the knowledge that harassment would continue." *Williams*, 2023 WL 3513677, at *3-4 (granting a motion to dismiss because, even if the school district's response was insufficient to stop the bullying, it was not "clearly unreasonable"). To the contrary, such an inference is patently *im*plausible in light of Penn's forceful response to the various incidents of antisemitism that took place last semester— and its proactive efforts to stamp out antisemitism from its campus, *see infra*. *See also Felber v. Yudof*, 851 F. Supp. 2d 1182, 1188 (N.D. Cal. 2011) (where "the administration has engaged in an ongoing dialogue with the opposing parties," the fact that "the University may not have acted as

plaintiffs would prefer does not rise to 'deliberate indifference'"). Here too, *Mandel* is on point. There, the court found that "discrete 'failures' to impose discipline" did not "amount to deliberate indifference," even though (as here) plaintiffs relied on the fact that "no student groups or individual students were disciplined with respect to" various antisemitic incidents. 2018 WL 1242067, at *19.

*   *   *

As noted, when evaluating whether a university may be held liable under Title VI for deliberate indifference to a hostile educational environment, courts consider "the time it took the [University] to respond to complaints, the level of response, the effort expended to respond to the allegations, and the efficacy of the response." *Zavada v. East Stroudsburg Univ.*, 2023 WL 5532809, at *4 (M.D. Pa. Aug. 28, 2023). Here, Penn's responses were invariably prompt. Penn issued multiple timely statements to address the tumult on campus, and it promptly met with Jewish students throughout the semester, heard their concerns, and provided support. Penn also—again, promptly—organized a comprehensive action plan to eradicate antisemitism, investing considerable resources in examining existing policies and procedures and in reviewing where Penn can do better. And Penn has invested considerable resources to ensure that Plaintiffs—and all members of the Jewish community at Penn—may enjoy the full benefits of Penn's world-class education while knowing that they are safe.

## IV.   The Court Should Strike Plaintiffs' Request for Disciplinary Measures

In the event the Court rules Plaintiffs have standing for injunctive relief and have plausibly stated a claim under Title VI, it should nonetheless strike Plaintiffs' request for disciplinary measures. Compl., Prayer for Relief, (A)(i)-(ii). "The purpose of a Rule 12(f) motion is to 'clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters.'" *Canfield v. Amica Mut. Ins. Co.*, 2020 WL 5878261, at *2 (E.D. Pa. Oct. 2, 2020) (citation

omitted).  Courts accordingly strike demands for relief that is not recoverable.  *See Rivera v. Dealer Funding, LLC*, 178 F. Supp. 3d 272, 281 (E.D. Pa. 2016) (striking "damages [that] are not recoverable against" the defendant); *Hanover Prest-Paving Co. v. Tile Tech, Inc.*, 2022 WL 1493568, at *5 (M.D. Pa. May 11, 2022) (striking request for disgorgement because "disgorgement is not available as a remedy for patent infringement"); *see also Doe v. Haverford Coll.*, 2023 WL 5017964, at *11 (E.D. Pa. Aug. 7, 2023) (striking request for injunctive relief where "plaintiff has an adequate remedy at law").

Under Title VI, Plaintiffs cannot recover relief requiring Penn to take specific disciplinary measures.  "School administrators receive substantial deference in cases of alleged student-on-student harassment; victims of harassment have, for example, no 'right to make particular remedial demands." *MJG v. Sch. Dist. of Philadelphia*, 2017 WL 5010033, at *8 (E.D. Pa. Nov. 2, 2017) (citation omitted), *aff'd sub nom. M.J.G. v. Sch. Dist. of Philadelphia*, 774 F. App'x 736 (3d Cir. 2019).  Plaintiffs confuse the role that a university's disciplinary practices play in a Title VI lawsuit.  While disciplinary practices may speak to the reasonableness of a university's response, Title VI does not require funding recipients to take a particular "form of disciplinary action"; courts afford "flexibility" in determining the appropriate response to harassment and discrimination on their campus.  *Davis*, 526 U.S. at 648-49 (disagreeing that the provision of a cause of action for student-on-student harassment requires schools to "suspend or expel a student accused of [] harassment" and stating that it is "erroneous[] [to] imagine[] that victims of peer harassment now have a Title IX right to make particular remedial demands").  Plaintiffs' request for disciplinary measures must be stricken under Rule 12(f).

## V.    Plaintiffs' Contract Claim Should Be Dismissed Under Rule 12(b)(6)

"To assert a claim for breach of contract, the student must allege 'a specific contractual undertaking which was breached, clearly and directly resulting in at least some demonstrable

damages.'" *Smith v. University of Pennsylvania*, 534 F. Supp. 3d 463, 470 (E.D. Pa. 2021) (citing *Cavaliere v. Duff's Bus. Inst.*, 605 A.2d 397, 401 (Pa. Super. Ct. 1992)).  "[T]he allegations must relate to a specific and identifiable promise that the school failed to honor."  *Vurimindi v. Fuqua Sch. of Bus.*, 435 F. App'x 129, 133 (3d Cir. 2011) (citing *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. Ct. 1999)).  While the contract between a student and a university may encompass "written guidelines, policies, and procedures as contained in the written materials distributed to the student over the course of their enrollment in the institution," *Swartley*, 734 A. 2d at 919, "[n]ot every statement in a university's written material create[s] a contractual obligation," *Buccigrossi v. Thomas Jefferson Univ.*, 2022 WL 1093127, at *3 (E.D. Pa. Apr. 12, 2022).  To state a claim for breach of contract, a student must identify an *express* promise the university failed to honor.  *See Smith*, 534 F. Supp. 3d at 474 ("A cause of action for breach of an implied promise is not cognizable under Pennsylvania law in the higher education context.").  None of the provisions that Plaintiffs identity "create[s] any sort of affirmative, enforceable duty on the part of the University."  *David v. Neumann Univ.*, 187 F. Supp. 3d 554, 559-60 (E.D. Pa. 2016).

*First*, Plaintiffs attempt to rely on the University's Nondiscrimination Statement is foreclosed under Pennsylvania law.[7]  Under Pennsylvania law, a school's antidiscrimination statements are not a part of the contract between the university and the student, unless they express some affirmative commitment on the university's part in terms "sufficiently definite" to be enforced.  *David*, 187 F. Supp. 3d at 559.  Penn's Nondiscrimination Statement is simply "a general statement of a university's adherence to 'existing anti-discrimination laws.'"  *Nungesser v.*

---

[7] That statement establishes that Penn "does not discriminate on the basis of" "religion, creed, national or ethnic origin," "in the administration of its admissions, financial aid, educational or athletic programs, or other University-administrated programs or in its employment practices."  Compl. ¶ 243, bullet 1.

*Columbia Univ.*, 169 F. Supp. 3d 353, 370 (S.D.N.Y. 2016) (such statements cannot "create a separate and independent contractual obligation"). It does not make any sufficiently definite promises to students about the campus and learning environment to constitute a bargained-for agreement. *See Vurimindi v. Fuqua Sch. of Bus.*, 2010 WL 3419568, at *6 (E.D. Pa. Aug. 25, 2010), *aff'd*, 435 F. App'x 129 (3d Cir. 2011). Courts dismiss claims based on discrimination and harassment policies where, as here, the plaintiff alleges a general failure to provide a learning environment free of discrimination, without pointing to any specific duties imposed by the policy on the university. *See Gjeka v. Del. Cnty. Cmty. Coll.*, 2013 WL 2257727, at *13-14 (E.D. Pa. May 23, 2013) (claim that professor's violation of school harassment policy was a breach of the student-University contract dismissed); *Vurimindi v. Fuqua Sch. of Bus.*, 435 F. App'x 129, 132-33 (3d Cir. 2011) (claim that school permitted students and professor to harass plaintiff in violation of harassment policy dismissed where student merely pointed to provisions of policy "expressing Duke's view that harassment is unacceptable").

*Second*, Plaintiffs fare no better in their attempt to rely on the provisions of the Code of Student Conduct, Guidelines on Open Expression, Principles of Responsible Conduct, and Faculty Handbook that they cite, which simply set forth responsibilities and expectations for community members. *See* Compl. ¶ 243, bullets 2-12. These policies do not express any enforcement commitments on Penn's part, *see* Gringer Decl., Ex. 23, much less "contractually guarantee[] a right to specific types of investigation, support, or sanctions in the event that a student experiences offensive and unwelcome conduct," *David*, 187 F. Supp. 3d at 560. Instead, these provisions state the behavior community members are expected to exhibit. Gringer Decl., Ex. 23 ("Each individual member of this community is responsible for his or her own actions and is expected to respect the rights of others."); *cf. Doe v. Abington Friends Sch.*, 2022 WL 16722322, at *3-4 (E.D. Pa. Nov.

4, 2022) (finding handbook provisions that "describe specific actions to be carried out at specific times" in "mandatory language" sufficiently definite, and observing "[m]ere 'aspirational' language is not sufficiently definite to create an enforceable obligation").

*Third*, Plaintiffs invoke a provision of Penn's Charter of the Student Disciplinary System that asserts the failure to comply with "all provisions of the Code of Student Conduct[,] with all other policies and regulations of the University," and "with local, state, and federal law," "will be met with sanctions."  Compl. ¶ 243, bullet 13.  This provision is too vague to constitute an express commitment or to create an enforceable agreement.  *See Vurimindi*, 2010 WL 3419568, at *6 ("Vague or aspirational statements cannot form the basis for an enforceable agreement where there is no indication that the parties intended to enter into a bargain.").  Notably, the provision does not state what sanctions will apply to which policy violations, clarifying instead that sanctions may include anything from a "warning" and "reprimand" to "suspension" and "expulsion."  Compl. ¶ 243, bullet 13.  And even if this provision were sufficiently definite (it is not), Plaintiffs haven't alleged a breach of it, because they do not allege Penn failed to issue *any* sanctions against antisemitic conduct, but rather that Penn failed to issue "bans, prohibitions, suspensions, and expulsions." *Id.* ¶ 181.

Having failed to identify any specific contractual obligations in any of the challenged provisions, Plaintiffs resort to pleading a violation of the "implied covenant of good faith and fair dealing," Compl. ¶ 244, but this argument is also unavailing.  Under Pennsylvania law, the obligation of good faith and fair dealing "is tied specifically to and is not separate from the express duties a contract imposes on the parties," and "an alleged breach of the duty of good faith and fair dealing is construed as a breach of contract claim." *David*, 187 F. Supp. 3d at 561 (citing *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 434 n.11 (Pa. 2001)).  Moreover, "[t]he only

implied contract Pennsylvania recognizes in the educational context is a private educational institution's obligation to confer a degree upon a student's successful completion of the degree requirements." *Smith*, 534 F. Supp. 3d at 471 (citing *Gat v. Univ. of Pittsburgh of Comnw. Sys. of Higher Educ.*, 91 A. 3d 723, 731 (Pa. Super. Ct. 2014)).   "Pennsylvania does not recognize an action for breach of an implied contract in other educational contexts, such as evaluating academic performance and disciplining for violations of school policies."   *Id.*; *see also Buccigrossi*, 2022 WL 1093127, at *3 ("[T]here is a right to an education and a degree, but the case law stops short of requiring more.").

## VI.   Plaintiffs' UTPCPL Claim Should Be Dismissed Under Rule 12(b)(6)

Plaintiffs' claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL) should also be dismissed.   The UTPCPL "aims to protect the consumers of the Commonwealth against fraud and unfair or deceptive business practices." *Corsale v. Sperian Energy Corp.*, 374 F. Supp. 3d 445, 459 (W.D. Pa. 2019), *aff'd*, 819 F. App'x 127 (3d Cir. 2020). "To state a cognizable UTPCPL claim, a plaintiff must establish that the defendant engaged in an activity proscribed under the law, that the plaintiff 'justifiably relied on the defendant's wrongful conduct or representation and … suffered harm as a result of that reliance.'" *Loduca v. WellPet LLC*, 549 F. Supp. 3d 391, 400 (E.D. Pa. 2021).   Plaintiffs fail to do so.   Their Complaint lacks allegations that would support an inference that Penn engaged in "an[y] activity proscribed" under the UTPCPL.   *Loduca*, 549 F. Supp. 3d at 400.   It also lacks allegations that could support Plaintiffs' cursory claim that they reasonably relied on Penn's purportedly deceptive conduct when they chose to enroll at Penn, which they must plead sufficiently regardless of the UTPCPL provision they invoke.   *See id.*; *Seldon v. Home Loan Servs., Inc.*, 647 F. Supp. 2d 451, 466 (E.D. Pa. 2009) ("a plaintiff must prove … reliance and causation with respect to all subsections of the UTPCPL, upon which [the] plaintiff brings a claim").

### A. Plaintiffs Have Not Pled that Penn Engaged in Any Conduct Proscribed by the UTPCPL

To state a claim, Plaintiffs must at least plausibly allege that Penn "made a false or misleading statement of fact, concealed information, or engaged in deceptive conduct." *Rickenbaker v. Drexel Univ.*, 2022 WL 970768, at *5 (E.D. Pa. Mar. 30, 2022). Plaintiffs contend that through its various policies on harassment, discrimination, free expression, and discipline, Penn made "false representations of the quality and standards of Penn's educational goods and services," "advertised goods and services with [the] intent not to sell them as advertised," and engaged in "fraudulent and deceptive conduct which created the likelihood of confusion and misunderstanding." Compl. ¶¶ 252, 256. But these are merely "bald assertions" and "legal conclusions," which merit no credit. *Hunt v. U.S. Tobacco*, 538 F.3d 217, 227 (3d Cir. 2008), as amended (Nov. 6, 2008); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (plaintiffs must allege more than "[t]hreadbare recitals of the elements" of a legal violation and "mere conclusory statements").

Plaintiffs do not identify any false statements in any of the policies they claim are deceptive, or any specific information Penn supposedly concealed. And their allegations that Penn engaged in deceptive conduct defy common sense. Plaintiffs contend that they were deceived by Penn's policies into believing Penn would "*ensure*, maintain, and create an environment *free of* discrimination, abuse, harassment, and intimidation, and provide an adequate and appropriate setting and environment in which all students, of whatever ancestry, race, ethnicity, or national origin, could freely express their identity and ancestry, could learn and grow, and could participate fully and meaningfully in Penn's educational and other programs." Compl. ¶ 252. But they allege that sanctionable "antisemitic conduct" includes such things as: co-authoring a report recommending a boycott of Israel and engaging in other activities supporting a boycott, divestment, and sanctions against Israel (BDS), and hosting speakers who are anti-Zionism, and/or

accuse Israel of "apartheid," "settler colonialism," and maintaining a "policy of ethnic cleansing." *Id.* ¶¶ 58, 73, 79, 82-84, 91.  Their theory is thus that Penn's policies deceived them into believing that Penn would guarantee an "environment free of "discrimination, abuse, harassment, and intimidation" by regulating the content of expression that they find distasteful.

As an initial matter, Plaintiffs point to no provisions of Penn's policies where Penn warrants to each of the thousands of students on its open, urban campus that it will "ensure" an "environment free of discrimination, abuse, harassment, and intimidation"—and indeed Plaintiffs' Complaint shows no university could convincingly make such a guarantee without gutting the free speech principles that are elemental to academic inquiry.  *See supra* at 25-27.  And even if Plaintiffs could point to a statement that proclaimed such a guarantee, the statement would be plain puffery, which "is not actionable under the UTPCPL."  *Corsale v. Sperian Energy Corp.*, 412 F. Supp. 3d 556, 562-63 (W.D. Pa. 2019) (puffery is "exaggeration or overstatement expressed in broad, vague, and commendatory language").

To be deceptive, conduct must be "likely to deceive a consumer acting reasonably under similar circumstances," which is certainly not the case here.  *Rickenbaker*, 2022 WL 970768, at *5; *Seldon*, 647 F. Supp. 2d at 470.  The very policies Plaintiffs claim are deceptive inform them quite expressly that Penn will not restrict speech based on its content.  The Code of Student Conduct says that "the content of student speech or expression is not by itself a basis for disciplinary action."  Compl. ¶ 42.  The Guidelines on Open Expression state, "the University affirms that the substance or the nature of the views expressed is not an appropriate basis for any restriction upon or encouragement of an assembly or a demonstration."  Gringer Decl., Ex. 24, § I(B).  And the Faculty Handbook says, "[i]t is the policy of the University of Pennsylvania to maintain and encourage freedom of inquiry, discourse, teaching, research, and publication and to

36

protect any member of the academic staff against influences, from within or without the University, which would restrict a member of the academic staff in the exercise of these freedoms in their area of scholarly interest." *Id.*, Ex. 25, § II(A). No reasonable consumer could be "deceived" into believing, as Plaintiffs claim they were, that Penn would enforce these policies to "ensure" an "environment free of" the speech alleged in their Complaint, as these policies state the exact opposite. *See Corsale*, 374 F. Supp. 3d at 460 (plaintiffs could not claim defendants' fee charges were deceptive conduct where the charges were expressly stated in materials plaintiffs received).

### B.   Plaintiffs Have Not Pled Justifiable Reliance

To state a claim under the UTPCPL, Plaintiffs must also provide a factual basis for their contention that they acted in reliance of a misrepresentation or deception. Simply proclaiming they "reasonably relied" on alleged deceptions when they enrolled, as Plaintiffs do here, does not suffice. Take *Seldon v. Home Loan Services*, where the plaintiffs "merely allege[d] a list of misrepresentations" were made about a loan, but did not "describe the actual terms, conditions, or characteristics of the loan and in what respect defendants misrepresented those aspects of the loan." 647 F. Supp. 2d 451, 470-71 (E.D. Pa. 2009). The court held the plaintiffs failed to plead justifiable reliance because they did "not set forth how their knowledge of the loan's actual terms would have changed their conduct." *Id.* (citation omitted). Similarly, in *Hunt v. U.S. Tobacco*, the Third Circuit held that the plaintiff could not plead reliance by arguing he "presum[ed]" he was "paying prices set by an efficient market," without also stating "how his knowledge that the market was inefficient would have changed his conduct." 538 F.3d 217, 227 (3d Cir. 2008), as amended (Nov. 6, 2008). Here, Plaintiffs list a series of Penn policies that supposedly contain deceptive information, Compl. ¶ 252, but they allege nothing to suggest they had actually read any of these policies, which include the *Faculty* Handbook, when considering whether to enroll in the college, and it is not plausible

37

that they did.  Nor do they set out what provisions of these policies they were influenced by.  Nor do they allege facts raising a plausible inference that they chose to enroll in Penn and not a different university, and chose to stay at Penn instead of transferring or withdrawing, because of their review of Penn's policies.  *See Rickenbaker*, 2022 WL 970768, at *5 (dismissing claim where "[p]laintiffs fail to allege that they … chose not to transfer or withdraw because they justifiably relied on Drexel's alleged misrepresentations").

Even if Plaintiffs had pled facts showing reliance on their perception that Penn would ensure an environment free of speech that they find hurtful, offensive, and outrageous, their reliance would not have been justified because Penn's policies say that "the content of student speech or expression is not by itself a basis for disciplinary action."  Compl. ¶ 42.  So, Plaintiffs could have "ascertained" through "common prudence or diligence" that Penn's policies would not be enforced to restrict most of the speech they challenge.  *Manning v. Temple Univ.*, 2004 WL 3019230, at *11 (E.D. Pa. Dec. 30, 2004), *aff'd*, 157 F. App'x 509 (3d Cir. 2005).  As Plaintiffs fail to plead Penn engaged in conduct that would violate the UTPCPL or that they justifiably relied on allegedly deceptive conduct, their UTPCPL claim should be dismissed.

## CONCLUSION

The tragic events of October 7 have posed challenges for universities across the country. Penn is no different in that regard.  But this lawsuit is not the right vehicle to figure out the way forward.  Lawsuits like those filed by Plaintiffs' counsel against several universities do not make things easier and certainly do not create an environment conducive to change.  This lawsuit has no merit on the facts and the law and should be dismissed with prejudice.

Dated:  February 12, 2024

Respectfully submitted,

/s/ David Gringer
David Gringer (*pro hac vice*)
Alan Schoenfeld (*pro hac vice* pending)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8864
Facsimile: (212) 230-8888
david.gringer@wilmerhale.com
alan.schoenfeld@wilmerhale.com

Seth P. Waxman (*pro hac vice* pending)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
seth.waxman@wilmerhale.com

Sean V. Burke
Office of General Counsel
University of Pennsylvania
FMC Tower at Cira Centre South
2929 Walnut Street, Suite 400
Philadelphia, PA 19104-5099
Telephone: (215) 746-5200
Facsimile: (215) 746-5222

*Attorneys for Defendant University of
Pennsylvania*