## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EYAL YAKOBY, JORDAN DAVIS, NOAH RUBIN and STUDENTS AGAINST ANTISEMITISM, INC.,

        Plaintiffs,

    v.

THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA,

        Defendant.

No. 2:23-cv-04789 (KNS)

**AMENDED COMPLAINT**

Jury Trial Demanded

Plaintiffs Eyal Yakoby, Jordan Davis and Noah Rubin (collectively, the "Individual Plaintiffs"), and Students Against Antisemitism, Inc. ("SAA"), for their amended complaint against defendant The Trustees of the University of Pennsylvania ("Penn"), allege as follows:

### PRELIMINARY STATEMENT

1.     Penn, the historic 300-year-old Ivy League university, has transformed itself into an incubation lab for virulent anti-Jewish hatred, harassment, and discrimination. Once welcoming to Jewish students, Penn now subjects them to a pervasively hostile educational environment. Among other things, Penn enforces its own rules of conduct selectively to avoid protecting Jewish students from hatred and harassment, hires rabidly antisemitic professors who call for anti-Jewish violence and spread terrorist propaganda, and ignores or dismisses Jewish students' pleas for protection. In doing so, Penn has placed the Individual Plaintiffs, SAA members, and other Jewish and Israeli students at severe emotional and physical risk and has deprived them of the full benefits of the Penn educational experience American taxpayers are partially funding.

2.     This lawsuit seeks to hold Penn accountable under Title VI of the Civil Rights Act of 1964 for the damage it has caused the Individual Plaintiffs and SAA members and for its

failure to remedy the hostile environment on its campus.  The harassment and discrimination on campus and in the classroom are relentless and intolerable.  The Individual Plaintiffs, SAA members, and their Jewish peers are routinely subjected to vile and threatening antisemitic slurs and chants such as "Intifada Revolution," "from the River to the Sea, Palestine will be free" "Fuck the Jews," "the Jews deserve everything that is happening to them," "globalize the Intifada," "you are a dirty Jew, don't look at us," "keep walking you dirty little Jew," "get out of here kikes!" and "go back to . . . where you came from."  The Individual Plaintiffs, SAA members, and other Jewish students must traverse classrooms, dormitories, and buildings vandalized with antisemitic graffiti.  Subjected to intense anti-Jewish vitriol, these students have been deprived of the ability and opportunity to fully and meaningfully participate in Penn's educational and other programs.

3.      Antisemitism has been a growing institutional problem on Penn's campus and other university campuses for many years, increasing by over forty percent in 2022 alone, and the abuse and intimidation have steadily intensified.  A recent study found that nearly seventy-three percent of Jewish college students have seen or been the victim of antisemitism since the start of the fall 2023 semester.  Penn is among the most perilous and unwelcoming campuses in the country for Jewish students.

4.      Penn for years has been acutely aware of the antisemitism permeating its campus, but rather than remedy it—as it would and has for bigotry affecting any other group—it has chosen to exacerbate it.  The Individual Plaintiffs, SAA members, and numerous others have explicitly and repeatedly warned Penn administrators that the hostile environment they have created endangers Jewish students.  For example, over the weekend of September 22-24, 2023, Penn proudly hosted an anti-Jewish hate-fest, euphemistically dubbed the "Palestine Writes

Literature Festival," that calls to mind the infamous August 2017 Unite the Right hate rally in Charlottesville, Virginia.  Like Charlottesville, the Penn anti-Jewish festival invited some of the world's most virulent antisemites, including people who, before speaking at Penn, asserted that "most Jews [are] evil" and that Jews are "European colonizers."  But while the disgraceful Virginia rally was organized by neo-Nazi white supremacists, the disgraceful Penn festival was sponsored by the university and its professors.  When one plaintiff warned Penn administrators in the days before the event that he and other Jewish students were "terrified," he was encouraged to attend the hate-fest—as the then director of Penn's Middle East Center put it, the festival "will prove to be an enriching or perhaps even liberating experience to anyone."

5.     Incredibly, Penn's administration did not just ignore students' pleas to distance itself from the festival and antisemitic speakers invited to attend but also thumbed its nose at the pleas of Penn's own trustees and alumni.  In an open letter, more than 2,000 Penn community members, including students, faculty, alumni, and trustees, expressed "deep concerns" about the hate-festival, urging Penn to do "all within its power to distance itself from the event's antisemitic speakers, make clear that such antisemitism is wholly at odds with the university's values, and take proactive steps to ensure that Jewish students, faculty, and staff are safe and welcome at Penn."  Penn, led by its then-President M. Elizabeth Magill, rejected pleas to distance itself from the festival, and instead, then Board of Trustees Chairman Scott Bok, the Chairman and Chief Executive Officer of investment bank Greenhill, pressured objecting trustees to step down.  As one trustee stated upon resigning in disgust, Penn "failed us through an embrace of antisemitism, a failure to stand for justice, and complete negligence in the defense of its own students' well-being. . . ."

6.      The antisemitic speakers at the festival lived up to their reputations, inveighing against "Jewish supremacism" and the "messianic mindset" of "religious Jews" who are willing to "put up with anything to take over more land."  After Hamas's horrific mass slaughter, rape, and kidnapping of more than 1,200 Israeli civilians on October 7, 2023, one of the invited speakers at the Palestine Writes Literature Festival stooped to the previously unimaginable low of joking about reports that the Hamas attackers had burned an Israeli baby in an oven, asking "with or without baking powder?"  Similar stomach-turning anti-Jewish conduct, by students and faculty alike, are commonplace at Penn.

7.      The October 7 massacre turbocharged antisemitism at Penn.  Emboldened by years of Penn's tolerance and enabling of antisemitism, and its deliberate indifference to Jewish students' complaints, Penn students and faculty openly support and extol Hamas's atrocities. Even though such hate speech and conduct violate Penn's codes of conduct, Penn has refused to mete out any discipline, sitting idly by as the anti-Jewish harassment escalated.  Penn's motto is "Leges sine Moribus vanae," *i.e.*, "Laws without morals are useless"—the same can be said for codes of conduct without enforcement.  Penn's refusal to enforce its own codes of conduct against antisemitism predictably ensured that the October 7 terrorist attack would make anti-Jewish abuse even more pervasive on campus.

8.      On December 3, 2023, for example, a mob of students and other community members rampaged across Penn's campus chanting antisemitic slogans calling for the destruction of Israel, the sole Jewish country in the world, and vandalizing multiple Penn buildings by scrawling the word "intifada"—the name for the horrific suicide bombing campaigns that murdered hundreds of Israeli civilians in the 1980's, 1990's, and 2000's.  Before terrorizing Penn's campus, the mob headed to Center City in Philadelphia to attack a restaurant,

Goldie, solely because it is owned by an Israeli Jew.  Penn and its campus police were aware of the protest before it started, but unlike how Penn approaches other crimes or incidents on or near campus, Penn failed to promptly notify its students that a mob was marching towards campus, and did nothing to prevent the mob from defacing university buildings and screaming genocidal chants.  Pennsylvania Governor Joshua Shapiro, and several Pennsylvania members of Congress, immediately condemned the event as a "blatant act of antisemitism."  Shockingly, two days later, on December 5, 2023, President Magill testified before the House Committee on Education and the Workforce that advocating for the genocide of Jews does not necessarily constitute bullying or harassment at Penn.  Meanwhile, Penn disseminates on its website antisemitic cartoons by a faculty member depicting, among other things, Jews drinking the blood of Palestinians.

9.      And the increasingly hostile and intolerable environment for Jews on campus has been heightened by the recent drastic decrease in the number of Jewish students at Penn, leaving those Jewish students who do enroll even more isolated and unsafe against, and further emboldening, their antisemitic attackers and abusers.

10.     Evidencing its discriminatory double standard, Penn, in contrast to its tolerance and enabling of those expressing and spreading antisemitism, including students and faculty supporting Hamas and harassing Jewish students, aggressively enforces its codes of conduct to address what Penn deems to be bias against other minorities and readily disciplines students and faculty who harass other groups or espouse viewpoints Penn selectively deems inappropriate.  It is inconceivable that Penn would allow any group other than Jews to be targeted for abuse or allow students and professors to call for the annihilation of any other country.  When it comes to the protection of Penn's Jewish students, Penn's rules do not apply.

11.     Penn's double standard is typified by the contrast between Penn's failure and refusal to do anything about—and its complicity in—its facultys' advocacy and dissemination of antisemitic views with its extensive efforts—efforts it has taken pains to publicize—to discipline Penn Law Professor Amy Wax for expressing views on race Penn disapproved of.  In July 2023, a Penn hearing board recommended "major sanctions" including, among other things, suspension, public reprimand, and loss of Professor Wax's named chair, for "flagrantly violat[ing] [Penn] norms to treat all students with equitable due respect" and creating a "hostile campus environment and a hostile learning atmosphere."  But Penn not just tolerates but furthers its faculty and students' incessant defamation of Jews and Israelis and advocacy of Israel's destruction.  Penn well knows how to act in response to bigotry and harassment but is, and has been, deliberately indifferent to the egregiously hostile campus environment and hostile learning atmosphere facing its Jewish students.

12.     Penn's conduct, as alleged herein, is and has been in egregious violation of Title VI of the Civil Rights Act of 1964.  Penn has allowed endemic antisemitism to exclude Jewish and Israeli students from the full and equal participation in, and to deprive them of the full and equal benefits of, their educational experience at Penn, and has invidiously discriminated against them, by among other things, failing to protect them in the way Penn protects other groups—all based on their race, ethnicity, religion, citizenship, and/or national origin.  That Penn has done so for years and continues to do so to this day further confirms that it has responded to antisemitism with, at best, deliberate indifference, that Penn cannot be left to its own devices, and that Penn's response has been clearly ineffective and clearly unreasonable.  Penn must now be compelled through injunctive relief to take all necessary, and appropriate remedial, corrective, and preventative measures such as the following: (i) disciplinary measures, including termination,

against deans, administrators, professors, and other employees responsible for antisemitic abuse, whether because they engage in it or permit it; (ii) disciplinary measures, including suspension or expulsion, against students who engage in such conduct; (iii) declining and returning donations, whether from foreign countries or elsewhere, implicitly or explicitly conditioned on the hiring or promotion of professors who espouse antisemitism or the inclusion of antisemitic coursework or curricula; (iv) adding required antisemitism training for Penn community members; (v) appointing a neutral expert monitor to oversee compliance with this Court's order; and (vi) paying damages for, among other things, lost or diminished educational opportunities.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and § 1343 over the claims arising under Title VI of the Civil Rights Act of 1964 ("Title VI") (42 U.S.C. § 2000d *et seq.*).  This Court has supplemental jurisdiction over plaintiffs' related state law claims under 28 U.S.C. § 1367(a) because those claims arise out of the same case or controversy as plaintiffs' federal claim.

14.     This Court has personal jurisdiction over Penn because it is based and operates in Philadelphia, Pennsylvania.

15.     Venue in this district is proper under 28 U.S.C. § 1391 because it is the judicial district in which a substantial part of the events or omissions giving rise to plaintiffs' claims occurred and where Penn is located.

## PARTIES

16.     Plaintiff Eyal Yakoby is a dual American-Israeli citizen, and a Jewish student at Penn, which he has attended since August 2021.  He is a senior studying Political Science and Modern Middle East Studies in the College of Arts and Sciences.  He is also a member of SAA.

7

17.     Plaintiff Jordan Davis is a Jewish student at Penn, which she has attended since August 2023.  She is a freshman in the College of Arts and Sciences.  She is also a member of SAA.

18.     Plaintiff Noah Rubin is a dual American-Israeli citizen, and a Jewish student at Penn, which he has attended since August 2021.  He is a junior studying electrical engineering and economics at Penn Engineering and the Wharton School.  Rubin served as the co-president of the Penn Israel Public Affairs Committee from August 2022 until January 2024.  He is also a member of SAA.

19.     Plaintiff Students Against Antisemitism, Inc. is a not-for-profit corporation organized under the laws of the State of Delaware, formed to defend human and civil rights, including the right of individuals to equal protection and to be free from antisemitism in higher education, through litigation and other means.  SAA is comprised of voluntary members, including students at higher education institutions, who support SAA's mission and who have been personally aggrieved or otherwise impacted by antisemitism and discrimination in higher education.  SAA's members include current and former Jewish and/or Israeli Penn students who are experiencing a severe and pervasive hostile educational environment, which causes them to lose the benefits of Penn's educational and extracurricular opportunities.

20.     SAA Member #1 is a Jewish alumna of Penn who graduated in May 2023.  She studied Modern Middle East Studies in the College of Arts and Sciences.

21.     SAA Member #2 is a Jewish student at Penn, which he has attended since August 2022.  He is a junior studying Finance and Legal Studies at the Wharton School.

22.     The University of Pennsylvania is a private university, also known as the Trustees of the University of Pennsylvania, which is organized under the laws of Pennsylvania and

located in Philadelphia, Pennsylvania.  At all times relevant to this complaint, Penn was and

continues to be a recipient of federal funding, making it subject to Title VI.  As of June 30, 2023,

Penn's endowment fund stood at $21 billion.

## FACTS

A.    **Federal, State, and Local Laws Protect Against Antisemitism**

23.    Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, prohibits

discrimination on the basis of race, color, or national origin in any program or activity that

receives federal funding or other federal financial assistance, and protects all students, including

Jewish and Israeli students, in such programs or activities.

24.    Since at least September 2004, it has been the policy of the Office of Civil Rights

("OCR") of the U.S. Department of Education ("DOE"), the agency responsible for enforcing

Title VI, to investigate claims related to antisemitism.  In an October 26, 2010 letter to federally

funded schools, OCR confirmed that such schools are "responsible for addressing harassment

incidents about which [they] know[] or reasonably should have known," and must address "anti-

Semitic harassment," stating that such harassment violates Title VI when it creates a "hostile

environment" based on "actual or perceived shared ancestry or ethnic identity as Jews," in which

"the conduct is sufficiently severe, pervasive, or persistent so as to interfere with or limit a

student's ability to participate in or benefit from the services, activities, or opportunities offered

by a school," or when the "harassment is encouraged, tolerated, not adequately addressed, or

ignored by school employees."

25.    The Obama, Trump, and Biden Administrations have confirmed the urgent need

to combat antisemitism in educational institutions.  In June 2010, President Barack Obama's

State Department adopted a working definition of antisemitism developed by the European

Monitoring Center on Racism and Xenophobia. The State Department also adopted contemporary examples of antisemitism, which include ways that antisemitism manifests itself "with regard to the State of Israel":

- "Using the symbols and images associated with classic anti-Semitism to characterize Israel or Israelis";

- "Drawing comparisons of contemporary Israeli policy to that of the Nazis";

- "Blaming Israel for all inter-religious or political tensions";

- "Applying double standards by requiring of it a behavior not expected or demanded of any other democratic nation"; and

- "Denying the Jewish people their right to self-determination, and denying Israel the right                                                                to                                                                exist."

26.     In December 2019, President Donald Trump issued Executive Order 13899 on "Combating Anti-Semitism," directing the executive branch to enforce Title VI against discrimination "rooted in anti-Semitism as vigorously as against all other forms of discrimination prohibited by Title VI," and in doing so, to consider the definition of antisemitism promulgated by the International Holocaust Remembrance Alliance ("IHRA"), an intergovernmental organization comprising over thirty-five countries.

27.     Under the IHRA definition, the following are "contemporary examples of antisemitism":

- "Calling for, aiding, or justifying the killing or harming of Jews in the name of a radical ideology or an extremist view of religion";

- "Making mendacious, dehumanizing, demonizing, or stereotypical allegations about Jews as such or the power of Jews as collective—such as, especially but not exclusively, the myth about a world Jewish conspiracy or of Jews controlling the media, economy, government, or other societal institutions";

- "Accusing Jews as a people of being responsible for real or imagined wrongdoing committed by a single Jewish person or group, or even for acts committed by non-Jews";

- "Denying the fact, scope, mechanisms (*e.g.* gas chambers) or intentionality of the genocide of the Jewish people at the hands of National Socialist Germany and its supporters and accomplices during World War II (the Holocaust)";

- "Accusing the Jews as a people, or Israel as a state, of inventing or exaggerating the Holocaust";

- "Accusing Jewish citizens of being more loyal to Israel, or to the alleged priorities of Jews worldwide, than to the interests of their own nations";

- "Denying the Jewish people their right to self-determination, *e.g.*, by claiming that the existence of a State of Israel is a racist endeavor";

- "Applying double standards by requiring of [Israel] a behavior not expected or demanded of any other democratic nation";

- "Using the symbols and images associated with classic antisemitism (*e.g.*, claims of Jews killing Jesus or blood libel) to characterize Israel or Israelis";

- "Drawing comparisons of contemporary Israeli policy to that of the Nazis";

- "Holding Jews collectively responsible for actions of the state of Israel"; and

- "Criminal acts are antisemitic when the targets of attacks, whether they are people or property – such as buildings, schools, places of worship and cemeteries – are selected because they are, or are perceived to be, Jewish or linked to Jews[.]"

28.     On January 4, 2023, DOE, citing the "rise in reports of anti-Semitic incidents," released a fact sheet, "Protecting Students from Discrimination Based on Shared Ancestry or Ethnic Characteristics," which reiterated that Title VI protects "students who experience discrimination, including harassment, based on their . . . (i) shared ancestry or ethnic characteristics; or (ii) citizenship or residency in a country with a dominant religion or distinct religious identity."

29.     In May 2023, President Biden released the U.S. National Strategy to Counter Antisemitism, described as the "most ambitious and comprehensive U.S. government-led effort to fight antisemitism in American history," and DOE launched its Antisemitism Awareness Campaign.

30.     On November 7, 2023, OCR released a letter "remind[ing] colleges, universities, and schools that receive federal financial assistance of their legal responsibility under T Title VI . . . to provide all students a school environment free from discrimination based on race, color, or national origin, including shared ancestry or ethnic characteristics."  The letter stated: "It is your legal obligation under Title VI to address prohibited discrimination against students and others on your campus—including those who are perceived to be Jewish [or Israeli] . . . in the ways described in this letter."  Given the rise in antisemitism on campus, DOE also announced plans to hold technical assistance webinars to ensure that students facing discrimination on campus have the information they need to file a formal complaint with OCR.

31.     As the historical birthplace of the Jewish people, the land of Israel is at the core of Jewish identity, ancestral tradition, religion, and culture.  Jewish civilization has been centered for thousands of years on its homeland in Israel, where Jews have had a continuous presence since ancient times.  The movement for the reestablishment, development, and protection of the Jewish nation in the land of Israel, known as Zionism, arises from Jews' ethnic and historic roots in that land and their right to self-determination.  Zionism is central to the Individual Plaintiffs' and SAA members' Jewish identities, and many are descendants of survivors of the Nazis, with family and friends in Israel.

32.     Anti-Zionism is not merely a political movement—although many try to disguise it as such—but is a direct attack against Israel as a Jewish collectivity.  Nearly half of the Jews in the world live in Israel.  Anti-Zionism is discriminatory and antisemitic when expressed in terms of, for example: applying double standards not applicable to other countries or peoples in assessing Israel's legitimacy and conduct; denying that Jewish civilization is indigenous to the land of Israel; denying the Jewish people's right to self-determination or the right of the State of

Israel to exist; denying that the State of Israel has the right to self-defense against terrorism, invasion, or the murder, rape, and kidnapping of its citizens; accusing Israel of being inherently racist or comparable to the Nazis; or invoking classic antisemitic canards against Israel and its people.  "When people criticize Zionists," Dr. Martin Luther King, Jr. explained, "they mean Jews.  You're talking anti-Semitism."

33.     The widespread anti-Jewish hate that has gripped Penn and other universities since October 7, 2023 confirms that in nearly all instances, anti-Zionism is rarely anything more than thinly veiled antisemitism.  Penn's Jewish students have been threatened with antisemitic slurs and chants such as "Intifada Revolution," "from the River to the Sea," "Fuck the Jews," "the Jews deserve everything that is happening to them," "globalize the Intifada," "you are a dirty Jew, don't look at us," "keep walking you dirty little Jew," "get out of here kikes!" and "go back to Moscow, Brooklyn . . . fucking Berlin where you came from."

34.     Antisemitism is a core tenet of Hamas—an extreme Islamist terrorist group explicitly committed to the destruction of Israel and its Jewish inhabitants, the creation of an Islamic Palestinian state in Israel's place, and the annihilation of all Jews around the world. Hamas's 1988 charter states: "The Day of Judgment will not come about until Muslims fight the Jews and kill them."  In October 1997, the U.S. State Department designated Hamas, which has controlled Gaza since 2007, a Foreign Terrorist Organization.

35.     In keeping with its charter and goals, since its inception, Hamas has carried out numerous indiscriminate terror attacks on Israeli civilians through bombings, rocket barrages, shootings, and stabbings, including during two Intifadas.  In fact, the Intifadas were carried out through a campaign of suicide bombs, many of which included nails dipped in rat poison. During the Second Intifada, from approximately September 2000 through February 2005, Hamas

claimed responsibility for over fifty suicide bombings, including the August 9, 2001 bombing of a Jerusalem pizzeria, which murdered seven children; the December 1, 2001 double-suicide bombing in the crowded Ben Yehuda pedestrian mall in Jerusalem, murdering eleven; and the March 27, 2002 suicide bombing at a Passover Seder at the Park Hotel in Netanya, murdering thirty.  Over the next twenty years, Hamas murdered scores more through similar suicide bombings, public bus attacks, booby traps, shootings, and other acts of terror.

36.     Hamas leaders are clear about their agenda: kill all Jews.  In December 2008, for example, Hamas spokesperson Fawzi Barhoum called for suicide attacks and warned that "Hamas will continue the resistance until the last drop of blood."  A month later, in January 2009, Hamas leader Mahmoud Al-Zahar promised that Hamas would "lay the foundation for a tomorrow without Zionists."  Ten years on, Hamas's message and purpose were still the same; in 2019, a senior Hamas terrorist, Fathi Hamad, encouraged Palestinians across the globe to kill Jews, stating, "[s]even million Palestinians outside, enough warming up, you have Jews with you in every place.  You should attack every Jew possible in all the world and kill them."

37.     In the wake of Hamas's October 7 terrorist attack against Israel (discussed in more detail below), which, as President Biden observed, contributed to an "alarming" rise in antisemitism at schools and on college campuses, OCR announced that it was expediting its processing of discrimination complaints involving antisemitism.  At least seven bills have been introduced in both houses of Congress condemning support for Hamas, Hezbollah, and other terrorist organizations at American universities which has created a hostile educational environment for Jewish students, faculty, and staff.  On October 18, 2023, the U.S. Senate passed a resolution condemning "antisemitic student activities," and on November 2, 2023, the U.S.

House passed a resolution condemning support for Hamas, Hezbollah, and other terrorist organizations at American universities.

**B.     Penn Fails to Enforce Its Own Policies to Protect Jewish Students**

38.     Penn has issued at least seven policies designed and intended to protect students from discrimination, harassment, and intimidation: (i) Code of Student Conduct; (ii) Guidelines on Open Expression; (iii) Nondiscrimination Statement; (iv) Charter of the Student Disciplinary System; (v) Principles of Responsible Conduct; (vi) Penn's Equal Opportunity and Affirmative Action Policy; and (vii) Faculty Handbook.

39.     Among other things, Penn asserts that its procedures, policies, and handbooks provide "guidance for fair and consistent treatment of everyone within the Penn community." Penn repeatedly assures and represents to students that it is "strongly committed to providing respectful work and learning environments for all members of its community," and that its policies prohibiting discrimination, harassment, and intimidation of the type the Individual Plaintiffs and SAA members have experienced are "intended to reinforce that commitment."

40.     Penn's assertions, assurances, and representations have proven false.  As alleged in detail herein, Jewish and Israeli students are routinely targeted for antisemitic discrimination, harassment, and intimidation, without consequence, by their peers and professors.  Even though every instance of antisemitic behavior alleged herein is prohibited by one or more of Penn's policies, Penn has done nothing to enforce these policies to remedy or prevent that behavior, and certainly nothing approaching the manner in which Penn has enforced them with respect to misconduct not involving antisemitism.  Penn selectively enforces its own rules, deeming Jewish students unworthy of the protections it readily affords non-Jewish students victimized by discrimination, harassment, and intimidation.

### i.    Code of Student Conduct

41.    In the Code of Student Conduct (the "Code"), Penn asserts that it is a "community in which intellectual growth, learning from others, mutual tolerance, and respect for freedom of thought and expression are principles of paramount importance," and becoming a Penn student entails "an obligation" to promote Penn's welfare by assuming certain "rights and responsibilities."  Under the Code, students, faculty, staff, and those otherwise affiliated with Penn, are each "responsible for his or her own actions and [are] expected to respect the rights of others."

42.    The Code expressly "affords every student certain rights"—known as the "Rights of Student Citizenship"—that Penn claims "are essential to the University's educational mission and its character as a community," including:

- "The right to have access to and participate in the academic and non-academic opportunities afforded by the University, subject to applicable standards or requirements.";

- "The right to be free from discrimination on the basis of race, color, gender, sexual orientation, religion, national or ethnic origin, age, disability, or status as a disabled or Vietnam Era veteran."; and

- "The right to fair University judicial process in the determination of accountability for conduct."

43.    The Code also provides that students are "expected to exhibit responsible behavior regardless of time or place," and that failure to do so "may result in disciplinary action by the University."  According to the Code, responsible behavior is a "standard of conduct which reflects higher expectations than may be prevalent outside the University community," and includes the following obligations:

- "To respect the health and safety of others. This precludes acts or threats of physical violence against another person (including sexual violence) and disorderly conduct. This also precludes the possession of dangerous articles (such as firearms,

explosive materials, etc.) on University property or at University events without University authorization.";

- "To respect the right of fellow students to participate in University organizations and in relationships with other students without fear, threat, or act of hazing.";

- "To refrain from conduct towards other students that infringes upon the Rights of Student Citizenship. The University condemns hate speech, epithets, and racial, ethnic, sexual and religious slurs.  However, the content of student speech or expression is not by itself a basis for disciplinary action. Student speech may be subject to discipline when it violates applicable laws or University regulations or policies.";

- "To refrain from stealing, damaging, defacing, or misusing the property or facilities of the University or of others. This also precludes the disruption of University computing services or interference with the rights of others to use computer resources.";

- "To comply with policies and regulations of the University and its departments (*e.g.*, the University's Guidelines on Open Expression, Anti-Hazing Regulations, Drug and Alcohol Policies, Sexual Harassment Policy, etc.)."; and

- "To comply with federal, state, and local laws."

44.    Penn has a history of selectively enforcing the Code to exclude Jewish students from the Code's protections.

**ii.    Guidelines on Open Expression**

45.    The Guidelines on Open Expression (the "Guidelines") govern Penn's purported dedication to "freedom of thought, inquiry, speech, and lawful assembly."  According to the Guidelines, Penn "affirms the right of members of the University community to assemble and demonstrate peaceably in University locations within the limits of the[] Guidelines and undertakes to ensure that such rights shall not be infringed."  Under the Guidelines, Penn also supposedly supports "the right of others to pursue their normal activities within the University and to be protected from physical injury or property damage."  The Guidelines apply to all

demonstrations in a University location, which includes: (i) Penn's campus; (ii) any location

owned, leased, or used by Penn; and (iii) areas immediately adjacent to Penn.

46.     The Guidelines state that every member of the Penn community is expected to

know and follow the Guidelines, and individuals whose conduct violates the Guidelines may be

held accountable, including by referral to the Office of Student Conduct to determine

disciplinary proceedings.  Individuals or groups violate the Guidelines if:

- "They interfere unreasonably with the activities of other persons. The time of day, size, noise level, and general tenor of a meeting, event or demonstration are factors that may be considered in determining whether conduct is reasonable";

- "They cause injury to persons or property or threaten to cause such injury";

- "They hold meetings, events or demonstrations under circumstances where health or safety is endangered"; or

- "They knowingly interfere with unimpeded movement in a University location."

47.     As part of the Guidelines, Penn established the Committee on Open Expression—

a standing committee of the University Council (a forum made up of faculty, administration,

staff, and students that recommends general policies and advises the administration of the

university).  The Committee on Open Expression is tasked with: (i) "participating in the

resolution of conflicts that may arise from incidents or disturbances implicating the[]

Guidelines"; (ii) "mediating among the parties to prevent conflicts and violations of the[]

Guidelines"; (iii) "interpreting the[] Guidelines"; (iv) "advising administrative officers when

appropriate"; and (v) "recommending policies and procedures for the improvement of all levels

of communication."

48.     Penn's Vice Provost for University Life ("Vice Provost") is charged with

"[o]bservation of meetings, events or demonstrations, when deemed necessary" to "protect and

maintain the right of open expression" under the Guidelines, and the Vice Provost or the Vice

Provost's delegates present at the event (the "Open Expression Observer") may "instruct anyone whose behavior is violating or threatens to violate the[] Guidelines to modify or terminate such behavior."

### iii.    Nondiscrimination Statement

49.     Penn's Nondiscrimination Statement states that Penn "values diversity and seeks talented students, faculty and staff with diverse backgrounds, experiences, and perspectives," and that Penn does not discriminate on the bases of several characteristics, including "race . . . religion . . . national or ethnic origin . . . or any other legally protected class status in the administration of its admissions, financial aid, educational or athletic programs, or other University-administered programs or in its employment practices."

### iv.    Principles of Responsible Conduct

50.     According to Penn's Principles of Responsible Conduct, Penn's mission "is to offer a world class education to [its] students, train future leaders of our country, expand and advance research and knowledge, [and] serve [the Penn] community and society both at home and abroad[.]"  In pursuit of this mission, Penn states that "all members of the University community need to understand and uphold both legal requirements and the highest of ethical standards."  Penn has enumerated ten Principles of Responsible Conduct (the "Principles") "to distill [its handbooks, manuals, web-sites, and other materials] for easy review and access" and "articulate the basic expectations that should guide each [member of the Penn community] in [their] work at Penn," including the following:

- **Principle One - Ethical and Responsible Conduct**: "Penn's faculty, administration and staff should conduct themselves ethically, with the highest integrity, in compliance with all applicable laws, regulations, and University policies, in all aspects of their work . . . . Their conduct should always reflect their positions of trust and loyalty with respect to the University, the Health System, and members of these communities.";

- **Principle Two - Respect for Others in the Workplace**: "Penn is an institution that values academic freedom, diversity and respect for one another. Penn is committed to the principle of nondiscrimination and does not tolerate conduct that constitutes harassment on any basis, including sexual, racial, ethnic, religious, or gender.";

- **Principle Six - Environmental Health and Safety**: "Penn is committed to the protection of the health and safety of the University community and the creation of a safe working environment. To accomplish this end, Penn provides training in health and safety regulation and policy and Penn faculty, administration, and staff are expected to comply with sound practices and legal requirements."; and

- **Principle Ten - Responsible Reporting of Suspected Violations and Institutional Response**: "Penn faculty, administration and staff are expected to report suspected material violations of University and Health System policies, as well as violations of applicable laws and regulations[.]"

51.     Penn's faculty, administration, and staff have consistently failed to apply these Principles to combat antisemitism and protect Penn's Jewish and Israeli students, including the Individual Plaintiffs and SAA's Jewish and Israeli members.

### v.     Faculty Handbook

52.     Penn's Faculty Handbook provides that all "teacher[s] should remember that the public may judge the profession and the institution by their utterances" and that "teacher[s] should at all times show respect for the opinions of others, and should indicate when they are not speaking for the institution." The Faculty Handbook incorporates Penn's: (i) Charter of the University Student Disciplinary System; (ii) Guidelines on Open Expression; (iii) Equal Opportunity and Affirmative Action Policy; and (iv) Confiscation of Publications.

### vi.     Equal Opportunity and Affirmative Action Policy

53.     Penn's Office of Affirmative Action and Equal Opportunity Programs, in collaboration with its Division of Human Resources and the Office of the Provost, oversees the implementation and administration of the Equal Opportunity and Affirmative Action Policy (the "Policy"), which includes Penn's nondiscrimination policies and programs.

54.     According to the Policy, "diversity is prized at Penn as a central component of its mission and helps create an educational and working environment that best supports the University's commitment to excellence in teaching, research, and scholarship."  Under the Policy, Penn proclaims that it maintains a "substantive institutional commitment to diversity along dimensions of race . . . [and] ethnicity," and "prohibits unlawful discrimination based on race, color, sex, sexual orientation, gender identity, religion, creed, national or ethnic origin, citizenship status, age, disability, veteran status, or any other legally protected class."  Penn further "recognizes the right of members of the [Penn] community to raise questions and pursue complaints of discrimination and adheres to a strict policy that prohibits retaliation for doing so."

### vii.     Charter of the Student Disciplinary System

55.     Penn's Charter of the Student Disciplinary System (the "Disciplinary System") "sets forth the procedures under which alleged violations of the Code of Student Conduct . . . and other policies, rules, and regulations are resolved," and establishes "the responsibility of all students at the University of Pennsylvania to exhibit responsible behavior regardless of time or place."  This responsibility includes but is not limited to "the obligation to comply with all provisions of the Code of Student Conduct; with all other policies and regulations of the University, its Schools, and its Departments; and with local, state, and federal laws."

56.     The stated purpose of the Disciplinary System is to "further the educational mission of the University of Pennsylvania by providing a fair and effective mechanism for investigating and resolving disputes involving students and alleged violations by students of the University's rules, regulations, and policies."

57.     Where a violation is found, the Disciplinary System provides for sanctions, including but not limited to: warning, reprimand, fine, restitution, disciplinary probation, withdrawal of privileges, suspension, indefinite suspension, or expulsion.

21

C.      **Penn's History of Antisemitism and Civil Rights Violations**

i.      **Reported Incidents of Antisemitism from 2015 Through Spring 2022**

58.      Antisemitism at Penn is hardly a new phenomenon; to the contrary, it has permeated campus life for years prior to Hamas's October 7 attack.  For nearly a decade, there has been a steady increase in antisemitic incidents at Penn.  And despite repeated assurances by Penn that it would take meaningful steps to address and remedy antisemitism on campus, Penn has offered only hollow platitudes while doing little to nothing to rectify the problem.  Instead, rather than discipline the perpetrators, Penn opted to forsake the victims, permitting them to be targeted for abuse and harassment, and to decrease its Jewish student population through its admissions policies.  Penn's supposed commitment to free expression rings hollow in light of the blatant double standard it exhibits in suppressing conduct it finds disagreeable while at the same time defending conduct that attacks Jews or Israelis.  Penn has been on notice of the wide-spread antisemitism on its campus since at least 2015, but has been unwilling to enforce its codes of conduct to counter the antisemitic hate that has taken over its campus.

59.      In March 2015, for example, eight student groups—including the Penn Arab Student Society, Penn for Immigrant Rights, Penn Students for Justice in Palestine, Students Organizing for Unity and Liberation, Penn Amnesty International, Penn Non-Cis, and the Student Labor Action Project—announced "Penn Divest from Displacement," a proposal that the University divest from corporations profiting from "displacement" around the world.  While this proposal purported to address the problem of "displacement" globally, at least half of the movement's identified companies were targeted only because of their connection to Israel.

60.      In October 2015, Professor John L. Jackson, then Dean of Penn's School of Social Policy and Practice and the current Provost at Penn, co-authored a report for the American Anthropological Association ("AAA") recommending an academic boycott of Israel, alone

among all of the world's countries, that led to a resolution being introduced to AAA's membership to boycott Israeli academic institutions.  As the Anti-Defamation League ("ADL") described it, the resolution was an "effort to delegitimize and demonize Israeli academia" and a "bigoted and ham-handed attempt to indict any academic simply on the basis of their nationality."  Though the measure failed in 2016, it was reintroduced in March 2023 and passed by 71 percent.

61.     Several months later, in April 2016, various student groups, including Penn's chapter of the national Students for Justice in Palestine ("SJP") group—an anti-Zionist student group then formally recognized by Penn—organized events for its first annual "Israeli Apartheid Week."  Israeli Apartheid Week is an annual program organized by anti-Israel activists in cities across the globe, focused on support for the Boycott, Divestment, Sanctions movement ("BDS") and slander of Israel as a "racist," "apartheid" state.  For instance, as part of the 2016 Israeli Apartheid Week programming, SJP erected an "Apartheid Wall," meant to evoke the Israeli-West Bank barrier, built by Israel to prevent suicide bombings and other attacks originating within the West Bank during the Second Intifada.  SJP's "Apartheid Wall" falsely accused Israel of segregation and violations of international law.

62.     Another SJP-organized Israeli Apartheid Week event included a screening, in Penn's Williams Hall, of "The Occupation of the American Mind."  The film, narrated by Roger Waters, features antisemitic themes and tropes, accusing "the Israel lobby" of "shap[ing] American perceptions of the Israeli-Palestinian conflict" and facilitating "media coverage . . . slanted heavily in favor of Israeli interests."  Additionally, several of the film's speakers justify terrorism against Israelis as legitimate "resistance," demonize Israel, falsely accuse the Israeli government of "terror[ism]," "murderous attacks," and "acting like a monster," and call Israeli

23

soldiers' actions "inhumane" and "brutal."  The following year, in March 2017, SJP again screened the antisemitic film in Penn's Huntsman Hall, home to the Wharton School, advertising it as a "documentary" about "Israel's public relations wars in the United States."

63.     In April 2017, SJP held its second annual Israeli Apartheid Week.  Lauding the event, SJP's president emphasized that "[w]e make it very clear that we're anti-Zionism, which is the political ideology of an ethnocentric . . . State of Israel[.]"  To that end, SJP held several antisemitic events, including "Solidarity in the Face of Apartheid," which falsely accused both Israel and the U.S. of apartheid, and "Christians in Palestine," which falsely charged that Palestinian Christians are "victims of the Israeli Occupation" and "victims being forced to flee from their historical homeland."

64.     Less than a week later, on April 24, flyers with swastikas and phrases like "join your local Nazis" were posted around campus.  As complaints poured in, Penn administrators refused to immediately require the removal of the flyers, citing the Guidelines.  As a Penn spokesperson put it, "[t]he content of student speech or expression is not by itself a basis for disciplinary action" and, referring to provisions of the Code, which state that "[n]o posters shall be prohibited or restricted solely on the basis of their content, except when they may violate other applicable laws or regulations."

65.     Of course, flyers containing a swastika—the Nazi symbol associated with the Nazi extermination of six million Jews—violated Penn policies, including but not limited to the Code, the Guidelines, and the Nondiscrimination Statement, all of which Penn refused to enforce.  Penn's inaction concerning swastika flyers could not be more different from its zealous enforcement of conduct codes when the alleged offender was Jewish or when an incident purportedly victimized a non-Jewish minority group.  For instance, as alleged below, a few

months after Penn refused to remove the swastikas, a Jewish professor was barred from teaching after making comments critical of racial preference policies in universities.

66.     In August 2017, SJP participated in creating and distributing the "Penn Disorientation Guide."  Although it is described as "a resource for people fighting against injustice," the Disorientation Guide's only substantive mention of Jews, other than the anti-Zionist group Jewish Voice for Peace, is to label them racists and oppressors and claim that Israel is actually "Israeli occupied Palestine."

67.     On September 26, 2017, Penn Law Palestine Solidarity ("PLPS"), in conjunction with SJP and National Lawyers Guild ("NLG"), a bar association with a well-documented history of anti-Zionism, hosted yet another screening of the "The Occupation of the American Mind" on Penn's campus.

68.     PLPS and NLG followed up a month later, on October 23, 2017, by issuing an open letter to Penn Law students who had organized a trip to Israel.  The letter accused the students of "whitewash[ing] and perpetuat[ing] Israel's decades-long oppression and dispossession of Palestinians" and "being complicit in the systematic exclusion and institutional racism perpetrated by the Israeli state."  The letter concluded by calling for boycotting of Israel.

69.     In April 2018, SJP held its third annual Israeli Apartheid Week, "seeking to raise awareness of Israel's apartheid system of oppression over the Palestinian people and to build support for the [BDS] movement."

70.     On April 7, 2018, as part of Israeli Apartheid Week, SJP hosted "Politics of Place: A Panel Discussion" with George Ciccariello-Maher and Marc Lamont Hill.  At the time, Ciccariello-Maher was well-known for radical and incendiary speech, having tweeted, for example, "All I want for Christmas is white genocide," and "Some guy in first class gave up his

seat for a uniformed soldier.  People are thanking him.  I'm trying not to vomit or yell about Mosul."  In December 2017, Ciccariello-Maher left his job at Drexel University after he was put on leave due to these and other hateful comments; Penn, on the other hand, welcomed the speakers to campus during the Palestine Writes Literature Festival.

71.     Similarly, Marc Lamont Hill is a self-described "social justice activist" who is radically anti-Israel.  In 2014, for example, Hill visited Israel and videoed himself claiming, "We came here to Palestine to stand in love and revolutionary struggle with our brothers and sisters; We come to a land that has been stolen by greed and destroyed by hate[.]"  Hill, however, was not in the Palestinian Authority-controlled territories—he was in Nazareth within Israel's sovereign borders.  Hill is also known to speak out in reverence and support of other antisemites, such as Louis Farrakhan (who called Adolf Hitler "a very great man" and Judaism a "dirty religion"), who Hill refers to as "my brother" and terrorists such as Ali Jiddah (who was convicted of planting bombs in downtown Jerusalem) whom Hill hailed as a "true revolutionary and a beautiful spirit."  In September 2018, Hill lost his job at CNN when he called for the eradication of Jews in Israel at a speech given in front of the United Nations, claiming that "what justice requires . . . is a free Palestine from the River to the Sea."

72.     During the April 7 "Politics of Place: A Panel Discussion," which was hosted at Penn's Irvine Auditorium, Ciccariello-Maher and Hill touted the BDS movement, as "essential," "so powerful" and a "global response to free Palestine."  Hill defended the concept of discriminating against Israeli academics by, for example, banning them from academic conferences.  Hill also stated to the Penn audience that one of the "dominant Zionist narratives" was that "indigenous people didn't deserve the land" and that purchasing products from Israeli companies "supports [the] occupation."  Leveraging classic antisemitic tropes of Jewish

26

influence in politics and media, Hill concluded by claiming that the "Democratic Party being bought and sold" by Jewish-funded lobbyists was the reason for what he claimed was the American left's "silence" regarding Israel and Palestine.

73.     Shortly after Israeli Apartheid Week, on April 13, 2018, a member of SJP authored a guest column in *The Daily Pennsylvanian* titled, "Israeli apartheid: real, brutal and deadly." The column falsely and baselessly singled out Israel for purported "inhumane acts such as murder, forcible transfer, imprisonment, or persecution of an identifiable group on racial, national, ethnic, cultural, religious, or other grounds, 'committed in the context of an institutionalized regime of systematic oppression and domination.'"

74.     On May 5, 2018, Penn permitted the Philadelphia Coalition for Boycott, Divestment and Sanctions against Israel to hold its "A Teach-In on Cultural Boycott" event in Penn's Houston Hall. The event was organized as part of the "Philly Don't Orchestrate Apartheid" campaign to pressure the Philadelphia Orchestra into canceling its planned performances in Israel. Speakers at the event repeatedly demonized Israel through centuries-old antisemitic canards and conspiracy theories asserting that Jews control the media and politics. Speaker Lawrence Davidson, for example, claimed that "Israel through its Lobby power, through its Zionist network, has influence beyond its own domain. And it uses that influence to systematically corrupt the politicians and practices of [the U.S.] . . . it's clear that they are creating a clear and present danger to our society, to our laws [and] to our culture." Davidson also attacked Judaism itself as having become "an adjunct of racist political ideology . . . tied to an apartheid regime." Another speaker, Hannah Mermelstein, denied the Jewish people's right to self-determination, calling for the "right of return," a euphemism for Israel's destruction, and claiming that "[w]e can't normalize Israel as a country."

75.     On April 1, 2019, a group of Penn Law students published a letter on Penn Law's website that demonized Israel and its supporters, claiming "[i]t is the influence of pro-Israel lobbying groups like AIPAC and bogus charges of anti-Semitism that are in reality hindering our ability to have a balanced discussion about Israel[.]"  It also accused Israel of "pinkwashing," arguing that "Israel's portrayal of itself as a haven for LGBTQ people in the Middle East represents a cynical and deliberate use of gay rights to distract from and normalize the Israeli occupation and settler colonialism[.]"  In fact, Israel is the only Middle East country tolerant and inclusive of an LGBTQ community; indeed, Tel Aviv is known as one of the most LGBTQ-friendly cities in the world.  To twist this fact to further slander Israel as "occupation and settler colonialism" is a cynical and deliberate expression of antisemitism.

76.     On January 15, 2020, Penn's Center for Africana Studies and Annenberg School for Communication co-sponsored an event commemorating Dr. Martin Luther King, Jr., the father of the American civil rights movement and a strong and vocal supporter of Israel and Zionism.  On March 25, 1968, ten days before his assassination, Dr. King, addressing a convention of American rabbis, said: "Peace for Israel means security, and we must stand with all our might to protect its right to exist, its territorial integrity.  I see Israel . . . as one of the great outposts of democracy in the world."  Although the event was supposed to honor Dr. King's legacy of social justice, one speaker, Gina Dent, falsely accused Israel of using prisons for political reasons, and stated that in Israel, "Palestinians are always labeled violent and then incarcerated just for their existence."  Dent further advocated Palestinian violence against Israel, telling the crowd that the definition of violence is situational and that she "will support people who are labeled violent when they are struggling for freedom."

77.     Later that year, on July 23, 2020, a Penn student posted, on the Brandeis Center-affiliated Instagram account "@jewishoncampus," that her professor in a required "anti-racism" course singled out Judaism as by far the most "privileged" identity:

> During my [Master's in Social Work] program, I was given a 'privilege quiz' by my professor who taught a mandatory course on racism.  The quiz listed several categories based on identity (e.g. religion, race, ethnicity).  In each category, the quiz then listed possible identities (e.g. Judaism, Christianity, Islam, etc.).  Next to each of these possible identities, the quiz assigned a positive or negative value.  The higher the value, the more we would need to 'check our privilege,' according to our professor.  Under the religion category, Judaism was ranked as the most privileged identity, with 25 points assigned. Christianity was ranked as the second most privileged category, with only 5 points assigned.  When I voiced my concerns to the classroom, I was met with laughter and eyerolls.

78.     Weeks later, on September 22, 2020, another harassed Penn student posted to "@jewishoncampus": "On the first day of [German] class, my professor noticed my yarmulke and advised me, only me, that I should 'be on my best behavior.'  I sat in class for a few more days, only to be met with more uncomfortable remarks: 'something tells me you never liked gefilte fish.'"  As a result of the mockery, the student dropped the class.

79.     Beginning on May 10, 2021, Hamas and the Palestinian Islamic Jihad (another U.S.-designated Foreign Terrorist Organization) attacked Israel with a barrage of rockets and missiles, launching over 4,300 rockets and missiles towards Israeli population centers.  In response to Israel defending itself, on May 19, 2021, Penn's Center and Program in Gender, Sexuality and Women's Studies signed a statement falsely asserting that Israel was engaging in "ethnic cleansing" and "ethnonationalist violence" against the Palestinian people, rejecting any "'both sides' rhetoric that erases the military, economic, media, and global power that Israel has over Palestine" and advocating the erasure of Israel, calling for the "end of Israel's military occupation of Palestine" and the Palestinian "right of return."

80.     The next day, as if to one-up the antisemitism of the Gender, Sexuality and
Women's Studies group, Penn Against the Occupation ("PAO"), a new anti-Israel student group,
called on Penn to divest from Israeli companies and terminate contracts with companies that
"enable" Israel.  PAO asserted that Israel, which has "genocidal, racist foundations," was
engaged in "ongoing ethnic cleansing" and "an ongoing project of settler colonialism that
depends on the marginalization and incremental destruction of Palestinian life."  The statement
was signed by twenty-nine groups and over three hundred members of the Penn community,
including professors Ania Loomba, Suvir Kaul, Chi-ming Yang, David Kazanjian, Meta Mazaj,
and Toorjo Ghose.

81.     Penn has not taken any action to investigate or discipline these or other professors
promulgating antisemitism.  Again, this is in stark contrast to its actions with respect to
expressions of other forms of bigotry.

82.     In December 2021, Penn Law Students for Justice in Palestine ("PLSJP")—a
Penn Law School organization dedicated to the "Palestinian liberation movement"—accused
participants in Penn Law's university-sponsored trip to Israel of "whitewash[ing] and
perpetuat[ing] Israel's decades-long oppression and dispossession of Palestinians," and repeating
false accusations of apartheid and that the Israeli military "frequently target[s] health care
workers."

83.     On March 31, 2022, the Middle East Center at Penn's School of Arts and
Sciences hosted a talk titled "Governance" with Noura Erakat, an assistant professor at Rutgers
University, who frequently compares Zionists to Nazis, claiming that Zionism is an ideology of
"Jewish superiority" "fundamentally rooted in the belief that Jews are God's chosen people."  On
October 7, 2023, Erakat supported Hamas's horrific attack on Israel, stating on social media:

30

"Any shock in response to this . . . attack reflects an expectation that those Palestinians die quietly and a complicity in their strangulation."

84.     At her March 2022 talk at Penn, Erakat invoked antisemitic tropes and conspiracy theories to accuse Israel of maintaining a "policy of ethnic cleansing" and "settler colonialism" which "marks all Palestinians for removal regardless of juridical or geographic demarcation" and to assert that Israel entered into the Abraham Accords—historic peace treaties between Israel and a number of Arab countries—to "suppress democracy, in order to fulfill and expand . . . capitalist interests at the expense of all peoples, not merely the Palestinians . . . ."  Penn did nothing to distance itself from Erakat, and, in fact, permitted her to return to the university to speak during the Palestine Writes Literature Festival.

85.     On May 4, 2022, Penn's Middle East Center hosted another speaker, Devin Atallah, an assistant professor at the University of Massachusetts, who falsely and baselessly demonized Israel, accusing Israel of being inherently racist and engaging in an "uncompromising practice and ideology" he called "unchilding," by which Israel wages "violence against Palestinian childhood."

**ii.     Antisemitism at Penn During the Fall 2022 and Spring 2023 Semesters**

86.     In August 2022, student groups released a 2022 version of the Penn Disorientation Guide, which reflected the same anti-Jewish sentiments as its predecessors. PAO's contribution to the guide falsely claimed that "Israel is a settler colonial state that uses apartheid to further its ethnic cleansing agenda."  PAO also listed the ways in which Penn allegedly "supports the occupation," including by cooperating with companies "complicit" in Israel's supposed violations of international law.  PAO went on to demonize Penn Hillel's Birthright Israel program, claiming that, "[b]y supporting Penn Hillel's Birthright Israel, the

University turns a blind eye to the crimes of Israeli occupation and erasure of Palestinian identity. . . . Birthright Israel advances a Zionist mission, disregarding Palestinian history and the reality of Israeli occupation."

87.     During the fall 2022 semester, SAA Member #1, a Modern Middle East Studies major, registered for a course in the Center for Programs in Contemporary Writing titled Modern Arabic Literature with Ahmad Almallah, a lecturer in Penn's English department.  The day before the first class, Professor Almallah amended the course title to Palestine and its Diaspora in its Literature and its Film.  SAA Member #1 nonetheless decided to remain enrolled in the course because it was one of the only courses that would fulfill her degree requirements.

88.     On the first day of the class, Professor Almallah stated that he had insisted on the title change and asked students in the course to introduce themselves and state why they were taking the course.  SAA Member #1 stated that the course credit was a requirement for her to graduate; that she was Jewish and had family living in Israel; that she was open-minded and wanted to learn about the subject matter of the course; and that she had taken Arabic courses in the past.

89.     Throughout the semester, Professor Almallah: read comics and readings with antisemitic tropes; engaged in extended tirades about the evils of Birthright trips and how Israel taught the American police to kill Black people (including blaming Israel for the death of George Floyd); brought PAO posters to class to promote PAO; and announced PAO events to encourage students to attend.  Several times, Professor Almallah, who otherwise never called on students, targeted SAA Member #1 for her opinion on his antisemitic tirades and pitted her against other students in the class.  In one instance, Professor Almallah unexpectedly called on SAA Member #1 to ask for her opinion on the Israeli-West Bank barrier wall, which Almallah referred to

throughout the course as the "apartheid wall." When SAA Member #1 responded that she was grateful because the wall saved lives, Professor Almallah and students harassed her for thirty minutes, stating, among other things, that "Jews exaggerate terrorist attacks just to satisfy their colonial and racist desires," "we only have rocks and you have nuclear weapons," and "there is a time for violence and this is the time."

90.     SAA Member #1 left the class in tears. She immediately emailed Professor Al Filreis, Director of the Center for Programs in Contemporary Writing, requesting an urgent, in-person meeting. On November 10, 2022, Professor Filreis responded that he was unable to meet with SAA Member #1, offering instead to have a brief telephone call. After SAA Member #1 reported her experience to him, Professor Filreis defended Professor Almallah, and suggested that SAA Member #1 take her concerns directly to Professor Almallah, rather than report it further. SAA Member #1 believed that, as the head of the department, Professor Filreis would be able to facilitate a discussion on her behalf. Rather than come to SAA Member #1's aid, however, he brushed her off and suggested Professor Almallah did not intentionally mean to chastise her for a full thirty minutes in class.

91.     SAA Member #1 remained in the course to avoid a "withdrawal" on her transcript, which could have adverse consequences for her as a straight-A student applying to medical school. Throughout the remainder of the semester, Professor Almallah forced her to read and present on class material that insinuated or explicitly stated that Israel has no right to exist. Professor Almallah would often express his view that the only solution to the Israel-Palestine conflict was the creation of a single Palestinian state in Israel's place. During one class, Professor Almallah remarked that he was not suggesting that all the Jews should be thrown into the sea, but only because that would not be "practical." At the end of the semester, students were

tasked with presenting on what Palestine meant to them.  When it was SAA Member #1's turn to present, feeling extremely vulnerable and nervous speaking to the hostile class, she began to cry as soon as she stood up.  SAA Member #1 tried to impart her feelings on Israel respectfully, including that she thought of it as a refuge for the Jewish people after the Holocaust.  Upon hearing this, one student, Tara Tarawneh, who would later be arrested for stealing an Israeli flag and praising the "joyful and powerful images which came from the glorious October 7th," stormed out of the classroom.  SAA Member #1's presentation focused on her desire for peace and dialogue but also questioned the class's endorsement of armed resistance.  When SAA Member #1 stated that her grandmother lived in Israel, and that calls for armed resistance made her feel unsafe, Professor Almallah and the other students stated that in Israel's case, armed, violent resistance is necessary.  Professor Almallah's antisemitic tirades have continued since SAA Member #1 took his class.  In October 2023, for example, Professor Almallah skipped two of his classes to speak at a Penn on-campus rally, concluding his speech with an explicit call for violence and terrorism against Jews, resulting in a petition calling for his removal that received over six thousand signatures.  Yakoby brought Professor Almallah's antisemitism to the attention of Penn's administration on November 1 and 16, 2023, but to no avail.  Professor Almallah still teaches and promotes antisemitism on Penn's campus.

92.     On October 24, 2022, PAO posted on Instagram a statement of solidarity with demonstrators who had been arrested at a Penn climate protest.  In its statement, PAO drew false comparisons between the arrests and Israel's policies: "The practice of arresting peaceful protesters is a staple of policing in both the United States and in Israeli-occupied Palestine. . . . We urge Penn not only to divest from all fossil fuel companies but to divest from companies that profit from Israeli apartheid, many of which are one and the same.  We recognize that policies of

forced displacement, from Palestine to the [University City] townhomes in Philadelphia, are all modern-day practices of settler colonialism."

93.     On November 9, PAO screened the propaganda film "Gaza Fights for Freedom" at Penn's Van Pelt Library.  The film is narrated by Abby Martin, who has a history of making antisemitic statements, including in 2013 that Israel uses "Hitler's methods" to maintain a "Jewish majority," and demonizing Israel and its citizens while defending and justifying Hamas. In the film, Martin glorifies the First and Second Intifada, equating the values and actions of Hamas to those of "progressive Jewish organizations worldwide."  The film also provides a platform to Mahmoud Al-Zahar, a Hamas co-founder, who in the film claims  "We are not playing terrorism or violence . . . we run effective self-defense by all means including using guns."  There is no doubt that Penn would not permit the on-campus screening of such a propaganda film targeting any minority group other than Jews or permit supporting a recognized terrorist organization responsible for murdering any group other than Jews.

94.     In March 2023, PAO held its annual Israel Apartheid Week.  On March 23, PAO hosted an event featuring speakers Noura Erakat and Mohammed El-Kurd.  Pointing to El-Kurd's vicious blood libels—including that Israel "harvest[s] Palestinian organs," has an "unquenchable thirst for Palestinian blood," and that "[t]here is no difference between a Zionist and a Nazi"—several Jewish groups signed a statement co-drafted by Rubin, asking Penn to condemn the event and El-Kurd's appearance on campus.  Penn remained silent.

95.     At the event, El-Kurd and Erakat delivered antisemitic diatribes calling for anti-Jewish violence.  Yakoby, who attended the event, sat stunned as the speakers compared Israel to the Nazis, claimed Zionism "is apartheid" and "has committed crimes against humanity," and called the ADL the "Apartheid Defense League."  The speakers also encouraged violence against

Israel, saying that Palestinians had the "legal right," and that it was part of their "humanity," to engage in "violent resistance" against Israel.  During Erakat's speech, she stared at the noticeably Jewish students wearing yarmulkes who sat in the back of the lecture room.  Although these students were sitting quietly and doing nothing to disturb Erakat's lecture, she repeatedly encouraged them to challenge her, saying, "I'm ready for you and will destroy you."  It is of course inconceivable that Penn would have permitted such an event had the speakers targeted any non-Jewish minority group for abuse and harassment.

96.     Further evidencing and underscoring the antisemitism and double standards motivating their activities, the anti-Israel assertions by Penn faculty and students, as alleged herein, are not only false, but they are based on double standards never applied to non-Jewish countries by their advocates, who ignore and are virtually never heard to protest actual racism, apartheid, genocide, or ethnic cleansing in non-Jewish countries.  Penn students and faculty are virtually never heard to condemn, let alone rally against, other countries with anything close to the same vitriol even though, unlike Israel, they can be fairly accused of crimes—including, for example, such Arab and Muslim countries as Syria and Yemen, which have killed hundreds of thousands of Arab civilians, including tens of thousands of Palestinians, and Pakistan, which is now expelling almost two million Afghan Muslims.

**D.     Penn's Deliberate Indifference to the Antisemitism on Campus Nurtures a Hostile Environment for Jewish Students**

97.     As a result of Penn's actions and inactions alleged herein, including permitting antisemitic events, speakers, screenings, flyers, and messages, and repeatedly failing and refusing to enforce its own policies or take disciplinary measures against students and professors who violate those policies, Penn has made it clear that it will permit, tolerate, and condone antisemitic activity.  Such deliberate indifference and discriminatory application of Penn's

policies cultivated an environment in which antisemitic activity, and the risk to Jewish students, drastically increased following Hamas's October 7 massacre.

i. **Penn Supports and Endorses an Antisemitic Hate Fest Dubbed the Palestine Writes Literature Festival**

98. From September 22 through 24, 2023, the eve of Yom Kippur, the holiest Jewish holiday, Penn hosted the Palestine Writes Literature Festival ("Palestine Writes"). The guest speakers included some of the world's leading activists with a history of voicing antisemitism and promoting violence against Jews. Despite the pleas of students, including Yakoby and Rubin, for Penn to condemn and disclaim its endorsement of the event, including the sponsorship of multiple Penn departments, Penn not only permitted but defended the holding of the event.

99. Palestine Writes was first announced on or about August 23, 2023. The event was to be sponsored by Penn's Wolf Humanities Center and the Department of Cinema and Media Studies, the Penn School of Arts and Sciences Middle East Center, the Penn School of Arts and Sciences Near Eastern Languages and Civilizations Center, Penn's Sachs Program for Arts Innovation, and Penn's Kelly Writers House. Together with false claims denying historical Jewish ties to the State of Israel, the event's website touted its featured speakers—a veritable who's who of leading Jew-haters—twenty-five of whom have been identified by the ADL as antisemitic, including:

- **Susan Abulhawa**, the Executive Director of Palestine Writes. Abulhawa has repeatedly compared Israel unfavorably to Nazi Germany (*e.g.*, "Calling Israel a Nazi state doesn't quite capture the depths of their malevolence") and has stated that she "takes comfort in knowing" that the Jewish state will one day be "wiped off the map" and that Israel is a "colonial nation of degenerates" and "one big, militarized tumor." After the October 7 attacks, Abulhawa celebrated the carnage, stating that "Palestinian fighters finally broke free . . . in a spectacular moment" and that the "brave Palestinian fighters overtook Israeli colonies built on their ancestral villages, seeing their stolen lands for the first time in their lives" and "inspired not only the whole of Palestine but the oppressed masses worldwide, to

imagine what freedom looks like; what resistance is possible; and what life is attainable";

- **Marc Lamont Hill**, the former CNN commentator who, as alleged herein, espoused antisemitic hate at a Penn event in 2018 and continues to do so, including, for example, by, in November 2022, praising a terrorist who planted a bomb in a Jerusalem movie theater as a "legend" and "beloved daughter of Jerusalem";

- **Roger Waters**, who narrated the film "The Occupation of the American Mind" and whom the U.S. Department of State has identified as having "a long track record of issuing antisemitic tropes to denigrate Jewish people," has compared Israel to Nazi Germany, denigrated what he called the "extraordinary powerful" "Jewish lobby" in the music industry, falsely stated that Israel subscribes to the idea that "the Jewish people are somehow superior to everybody else on the planet but particularly the Arabs" and that Zionism was "about a bunch of Europeans back in the middle of the 19th century deciding that they were going to take over this piece of land, and kick out anybody that lived there and take it over for themselves and their own little cabal.";

- **Salman Abu Sitta**, a Palestinian academic who has asserted that "Israeli savagery knows no bounds" and "[t]he Zionist god of this Israel has an insatiable lust for blood. Its altar must be anointed by the blood of innocent Palestinians." Abu Sitta claimed in a video that "Jews were hated in Europe because they played a role in the destruction of the economy in some countries." He also asserted in at least one article that Israel is worse than Nazi Germany: "Let nobody throw Auschwitz at me. It was a terrible crime committed during a world war. To reward a wartime crime with what is in effect an extended, far-reaching, and ongoing crime is obscene. Those wartime victims should have been as courageous as the Palestinians. They should have fought back against the aggressor, even against the odds, as we do. They should not have fled and, like cowards, attack innocent people in a faraway land who have done them no harm.";

- **Bill Mullen**, a professor and faculty advisor for Students for Justice in Palestine at Purdue University, who has advocated on behalf of antisemites like professor Steven Salaita, who had a professorship offer revoked after a series of antisemitic tweets, including one cheering the 2014 kidnapping of three Israeli high school students with the tweet, "You may be too refined to say it, but I'm not: I wish all the fucking West Bank settlers would go missing." Mullen has proposed that "the solution" for eliminating bias against professors like Salaita was to "de-zionize" American college campuses.;

- **David Palumbo-Liu**, a Stanford professor, who has stated, for example, that "If Israel is not the most hated nation in the world, there is something deeply wrong with the world.";

- **Refaat Alareer**, a professor at the Islamic University of Gaza, who asserts that "most Jews [are] evil." (While invited, Alareer was removed from the speaker line up on or about September 14, 2023 without explanation.);

- **Randa Abdel-Fattah**, an Australian writer who has stated that "Israel is a demonic, sick project, and I can't wait for the day we commemorate its end," and "Israel is an abomination . . . [and] its core identity [is] a racist, Jewish supremacist, settler-colonial regime of hell";

- **Aya Ghanameh**, an activist associated with the Rhode Island School of Design's chapter of Students for Justice in Palestine, who often calls for and defends violence against Jews in Israel, tweeting: "yeah i support violent resistance and what about it? liberation by any and all means necessary . . ." and "'israeli civilians' don't exist. militant settler armed society who r all drafted = everyone is a soldier. even if they're not officially in the army, they are a militia as a society." Following a terror attack in January 2023 that killed seven Jewish civilians at a synagogue in Jerusalem, Ghanameh tweeted "resistance is justified when people are occupied." Ghanameh has also tweeted "death to Israel"; and

- **Wisam Rafeedie**, a lecturer at Bethlehem University – Palestine, who in June 2023 praised the 1972 Lod Airport Massacre, at which 26 civilians were violently gunned down in Israel, including American citizens, and 80 others were injured.

100.    The program posted on the event website also previewed pre-festival events such as a screening of the Jordanian film "Farha," a modern-day blood libel, which claims to be "inspired by true events," including alleged atrocities by Israeli soldiers during the 1948 war when Arabs attacked Israel immediately after its founding, but which its director, Darin Sallam, has admitted is almost complete fiction.

101.    Another featured event was a panel celebrating the literature of Ghassan Kanafani, a spokesperson for the Popular Front for the Liberation of Palestine, which was responsible for the Lod Airport massacre and who had been photographed together with the gunmen. The panel was led in part by Louis Allday, who has written that Kanafani was his "hero" who taught that "armed struggle[ ]for the Palestinians . . . was legitimate and necessary."

102.    Palestine Writes was not only sponsored with Penn funds and promoted by Penn academic departments, but was also prominently featured on class syllabi. For instance,

Elementary Arabic I and Intermediate Arabic III made it mandatory for all students to attend the event, with "activities in class" to be "structured around" Palestine Writes.

103.    Almost immediately after students arrived on campus for the academic year on or about August 28, 2023, five students representing nine Penn Jewish organizations, including Rubin, met to discuss Palestine Writes and the risks it posed for Jewish students, and on September 1 wrote to President Magill, Provost Dr. John L. Jackson, Jr., Dean of the School of Arts and Sciences, Steven J. Fluharty, Vice Provost for University Life, Karu Kozuma, and four other administrators, expressing concern and dismay over Palestine Writes. The email requested "[t]hat the University issue a statement that condemns past articulations of antisemitism by some of the speakers and questions the judgment of and acknowledges the pain caused by academic departments that have chosen to put their names on the event" and "[t]hat moving forward, Penn will take proactive steps to create spaces for open dialogue that are respectful and conducive to a positive learning environment for all students and that concrete steps are taken to support life for Jewish students at Penn overall." The letter also requested a prompt meeting with the administration, some of whom agreed to meet on September 11.

104.    The September 11 meeting included a small group of Jewish Penn students, including Rubin; Vice Provost Kozuma; Jeffrey Kalhberg, Associate Dean in the School of Arts and Sciences; Heather J. Sharkey, Professor and Chair of the Department of Near Eastern Languages and Civilizations; and Rev. Charles (Chaz) Howard, Vice President of Social Equity and Community and University Chaplain. Although most of the students requesting the meeting were in the School of Arts and Sciences, its dean, Dean Fluharty, one of the administrators addressed in the letter, did not attend the meeting and made no apparent effort to respond to his students' concerns. At the meeting, students expressed concern for their safety, Penn's

sponsorship of antisemitic speakers, and class syllabi requiring attendance at the event. The administrators listened to the student concerns, but did not provide any concrete steps that they would implement to address, ameliorate, or mitigate the mounting and expected risk of harm the event would inflict on Jewish students.

105.    The next day, on September 12, President Magill, Provost Jackson, and Dean Fluharty published a brief statement concerning Palestine Writes, noting that "many have raised deep concerns about several speakers who have a documented and troubling history of engaging in antisemitism by speaking and acting in ways that denigrate Jewish people." Notably missing from the statement was any suggestion that Penn would defund the festival, remove its branding from the festival's advertisements, or prevent Penn professors from making the festival a requirement for certain courses. Penn refused to take any of these actions.

106.    In the wake of Penn's refusal to condemn an anti-Jewish hate fest featuring leading antisemites, the next day, September 13, a swastika was spray-painted at Meyerson Hall, in Penn's Weitzman School of Design.

107.    Yakoby, upon reading the September 12 statement, sent a letter, also signed by over two hundred other students, to Penn administrators responding to the statement which stated, among other things, that "regardless of whether [Palestine Writes] is 'affiliated' with UPenn or 'co-sponsored' by its departments, the perception is that UPenn agrees with and endorses the content of these programs – including the antisemitism of the speakers – and in so doing, it creates a hostile environment for all Jewish students, regardless of their course of study." The letter emphasized how Jewish students were "terrified" that Penn was giving a platform to antisemitic speakers who were invited precisely to spew anti-Jewish hatred on Penn's campus. The letter called out various speakers for their antisemitic rhetoric and planned roles in

Palestine Writes.  The letter concluded by noting that hosting these speakers violated Penn's community standards, including: (i) Penn's Nondiscrimination Statement; (ii) Code of Student Conduct; and (iii) Guidelines on Open Expression.  The letter also requested that the administration take swift and immediate action to protect a safe learning environment for Penn students.

108.    Yakoby sent the letter to more than twelve administrators—including President Magill, Provost Jackson, the School of Arts and Sciences Dean's Office, Professor Paul D. Sniegowski, Professor Huda Fakhreddine, Professor Sharkey, Professor Josef W. Wegner, Professor Ian Fleishman, Professor Rahul Maukerjee, Meta Mazaj, Undergraduate Chair of Cinema and Media Studies, Professor Bekir Harun Küçük, and John H. Ghavinian, Executive Director of Middle East Center.  As alleged below, Yakoby did not receive a response to his letter until September 21.

109.    On September 19, 2023, a group of Jewish students, including Rubin, attended a meeting with Kathleen Shields, Vice President for Public Safety, and Vice Provost Kozuma, to discuss the safety of the Jewish community at Penn, particularly given the upcoming Jewish holidays and the dangerously hostile atmosphere engendered by Palestine Writes.  At the meeting, Rubin requested additional security presence at three campus Jewish organizations, Hillel, Chabad, and MEOR Penn.  Shields, in response, patronized Rubin, stating that Hillel was the safest building on campus, and offered to give Rubin a tour of the University's security room.  Shields and Kozuma did not commit to additional security presence on campus, but they did agree to circulate information and resources regarding security to the presidents of the Jewish fraternities and sororities regarding campus safety.  Four weeks later, however, and Shields and

Kozuma had still not fulfilled their promises.  Rubin emailed Shields again on October 13 to note her failure to live up to that promise.

110.    Davis, who had just arrived on Penn's campus for her first semester of freshman year, was also deeply disturbed by the Jew-hating guest speakers invited to appear at Palestine Writes.  She authored an op-ed expressing her dismay over many of the speakers. Davis remarked that "when antisemites are given a platform on campus, antisemitism follows," and that Palestine Writes was no different.  "For the first time, I'm questioning whether I should wear my Star of David necklace to class.  Should I be scared when I go to the Hillel?  Should I stay quiet about my support for Israel?  Do I have to fear that . . . I [] will be attacked?"  Davis concluded her opinion piece with a plea to the administration, stating "[t]he livelihood of a group of students is at risk, and it is the duty of the university to prevent harm from reaching the lives of these students."

111.    Outside organizations and experts, like the American Jewish Committee ("AJC"), ADL Philadelphia, and the Jewish Federation of Greater Philadelphia, also raised alarms over Palestine Writes.  On September 20, for example, the AJC called on Penn to, among other things, unequivocally denounce the known antisemitic speakers and prohibit the use of any Penn branding that was being used to endorse or support the event.

112.    Then, on September 21 a Penn student broke into Penn's Hillel ahead of a morning prayer service.  The student knocked over several pieces of furniture and shouted antisemitic obscenities about Jewish people, including "Fuck the Jews" and "[the Jews] killed JC [Jesus Christ]."

113.    Later that day Yakoby, having received no response to his September 19 letter, sent a follow up email to the same group of administrators, including President Magill:

Hi All,

I wanted to follow up after my letter which was sent more than three days ago.  I have not had any response from any Department Chairs.  This is the voice of over 200 Penn Students who feel that your departments are failing them and paving the way to discrimination, harassment, and violence such as what we witnessed at Hillel today.  Your silence is deafening when 200+ students tell you, the faculty, that we are "terrified."  I hope this does not reflect your compassion as educators or your commitment to the work you do.

Allow me to quote some of the words of an upcoming speaker: "If a zionist breathes near me today I will destroy you."

We do not want to be destroyed, we want to be educated.

Thank you for your time.

114.     Professor Küçük replied to Yakoby's original September 19 email a few hours later.  Professor Küçük dismissed the Jewish students' fears in anticipation of Palestine Writes, while ignoring the fact that the festival's speakers included leading antisemites, and encouraging Yakoby and the other signatories to the letter to attend Palestine Writes (a portion of which was on Yom Kippur), which, he said, "will prove to be an enriching or perhaps even liberating experience to anyone."

115.     On the same day, Ian Fleishman, Chair of the Cinema and Media Studies department, also responded to Yakoby's email.  Professor Fleishman explained that when his department agreed to cosponsor Palestine Writes, it was "without any knowledge of particular participants and should in no way be taken as an endorsement of these individuals or the views they espouse."  The Cinema and Media Studies department, however, continued to list itself as a sponsor of the event following Professor Fleishman's email and made no public statement.

116.     That evening, Yakoby replied to the professors, copying the same group of twelve administrators, expressing his disappointment at Professor Küçük's response, including his failure to "acknowledge an ounce of any of these speakers['] anti Semitic past" despite that the

44

Palestine Writes speakers had a long, reprehensible record of calls for violence and noting that even though Professor Fleishman's department was now aware of the problematic speakers, it still had not withdrawn its support for the event.  Yakoby did not receive any substantive responses to this email.

117.    Abdulrahman Atta, a Penn professor of Elementary Arabic I, put Penn students enrolled in this course in the untenable position of either attending Palestine Writes or suffering academic consequences.  Professor Atta even charged students a sixty dollar cover fee for their attendance, which would be used to support Palestine Writes as well as other events on campus. An SAA student member of Jewish heritage who was enrolled in the course refused to attend the event and sacrificed his participation grade and standing with Professor Atta as a result. According to reports from *The Daily Pennsylvanian*, Professor Fakhreddine also told her students that attending Palestine Writes was mandatory.

118.    Students like the Individual Plaintiffs and SAA members were not the only members of the Penn community concerned about Palestine Writes.  On September 21, in an open letter, more than two thousand Penn alumni and affiliates, including students and members of Penn's own Board of Trustees, expressed "deep concerns" about Palestine Writes, asking Penn to do "all within its power to distance itself from the event's antisemitic speakers, make clear that such antisemitism is wholly at odds with the university's values, and take proactive steps to ensure that Jewish students, faculty, and staff are safe and welcome at Penn."

119.    Rather than address or consider these concerns, then Chair Bok individually contacted signatory trustees to pressure them to step down from the Board, asking whether they could "continue to serve productively having signed that letter."  It is of course inconceivable that Bok, President Magill, and Penn would similarly pressure trustees objecting to a Penn event

featuring speakers notorious for spewing slurs, disseminating conspiracy theories, and calling for violence against the Black, Hispanic, Asian, Muslim, or LGBTQ communities, or any minority group other than Jews.

120.    Some trustees expressed their disgust over Penn's enabling and encouragement of anti-Jewish hatred.  One trustee, Vahan Gureghian, resigned in protest, writing that Penn leadership had "failed us through an embrace of antisemitism, a failure to stand for justice, and complete negligence in the defense of its own students' well-being . . . I can no longer report back to [my] constituents that [Penn] is acting in their best interest."

121.    On September 22, President Magill finally issued a statement condemning the Hillel attack as an "assault on [Penn's] values and mission," and, for the first time, acknowledging the September 13 antisemitic vandalism at Meyerson Hall.  The Individual Plaintiffs and SAA members were shocked and disappointed that the administration had remained silent for more than a week before finally condemning such vile antisemitic provocations.  Despite its condemnation, Penn did not take any measures to discipline these perpetrators or prevent similar acts from recurring.

122.    The speakers at Palestine Writes lived up to their antisemitic pasts.  Abulhawa opened Palestine Writes by labeling criticism of the event as "hysterical and racist" and the "old, well-worn colonial script of the violent, dark, irrational and savage[.]"  She also asserted that Israeli "violence [] is on full display on this campus every year when Zionists have their so-called Birthright trips, propaganda tours to recruit young American Jews to become our colonizers, tormentors and lords."  Abulhawa also referred to Israel's Jews, a majority of whom are of Middle Eastern descent, as "European colonizers" who "stole an entire country" and had no right to self-determination on their land.

123.     At the same event Professor Küçük encouraged Jewish students to attend, speakers decried "Jewish supremacism" and the "messianic mindset" of "religious Jews" who are willing to "put up with anything to take over more land."  Others, like Erakat and Sitta, advocated a single, Palestinian state, limiting Israel's Jews in number or concentrating them in "cantons."  Erakat further advocated Palestinian violence as "leverage" in the fight against Israel.

124.     Following this antisemitic event, another act of vandalism occurred, on September 25, when the Penn Chabad house (a center for Jewish religious, social, cultural, and educational activities at Penn) was defaced with graffiti.  Despite receiving reports about it, and despite its practice of routinely releasing statements about nearly every activity concerning public safety on campus (excluding incidents impacting Jews), Penn did not release any statement responding to the defacing.

125.     Following Palestine Writes, Professor Atta stated to his Elementary Arabic I class that he had taken attendance at Palestine Writes and that any absences were unacceptable and punished those students including SAA members, who refused to attend the event.  Atta then required the students who had missed the festival to attend an alternative, off-campus event.

126.     On October 2, Yakoby sent another follow-up email to the twelve administrators he addressed in his September 19 letter and September 21 emails, noting that the department heads had failed to acknowledge his letter and refused to take any steps to ensure that Jewish students were safe and supported in their courses.  Yakoby did not receive a substantive response to his email.  Not one department had removed its name from the event, and, despite repeated calls for action, none issued statements condemning antisemitism before or after Palestine Writes.

127.    On November 7, during a meeting with John Ghazvinian, the executive director of the Middle East Center, concerning Yakoby's honors thesis paper, Ghazvinian warned Yakoby that some members of the Middle East Studies department that received his emails had sought to falsely report him to both the Philadelphia Police for inciting violence, as well as to the Penn administration for violating school policies.  Professor Ghazvinian cautioned Yakoby to be careful when speaking to these professors and administrators, suggesting that they had the power to negatively impact his career prospects.  Yakoby, fearing retaliation, no longer feels safe taking these professors' classes or interacting with them.

128.    Penn's endorsement of the antisemitic Palestine Writes event, and refusal to heed the pleas of Jewish students and organizations to distance itself from it, heightened the already dangerous and hostile anti-Jewish environment, and exacerbated the torrent of anti-Jewish harassment and violence that would flood Penn's campus days later, following October 7.

ii.    **October 7, 2023: Hamas Terrorists Commit Grotesque Atrocities Against Innocent Civilians in Israel**

129.    In its latest atrocity, on October 7, Hamas launched an unprovoked surprise attack on Israel, engaging in depraved acts of murder, torture, rape, violence, and kidnapping against Israeli citizens.  Thousands of armed terrorists invaded southern Israel, while others simultaneously launched thousands of rockets toward Israeli civilians and population centers.  Once in Israel, the terrorists, acting as well-armed death squads, dispersed into Israeli towns shooting, raping, torturing, burning, and mutilating unarmed civilians, including infants, children, and the elderly, and taking hundreds of hostages and engaging in mass murder and rape at a music festival near Gaza's border with Israel.

130.   The Israel Defense Forces ("IDF") eventually repelled the terrorists and regained control over the affected area.  By the end of the October 7 massacre day, Hamas had killed over 1,200 people and abducted over 200 people.

131.   Several weeks later, a senior Hamas official hailed the slaughter and vowed that Hamas will repeat it, over and over again, until Israel is exterminated.  He explained during a television interview that October 7 was "just the first time, and there will be a second, a third, a fourth," promising another "October 7, October 10, October one-millionth."  When asked whether this meant the complete annihilation of Israel, he replied, "Yes, of course."

132.   On October 18, President Biden described the October 7 slaughter as follows:

> Scores of innocents—from infants to elderly grandparents, Israelis and Americans—taken hostage.  Children slaughtered.  Babies slaughtered.  Entire families massacred.  Rape, beheadings, bodies burned alive.  Hamas committed atrocities that recall the worst ravages of ISIS, unleashing pure unadulterated evil upon the world. There is no rationalizing it, no excusing it.  Period.  The brutality we saw would have cut deep anywhere in the world, but it cuts deeper here in Israel.  October 7th, which was a sacred to—a sacred Jewish holiday, became the deadliest day for the Jewish people since the Holocaust.  It has brought to the surface painful memories and scars left by a millennia of antisemitism and the genocide of the Jewish people.

133.   At Penn, however, numerous students and faculty enthusiastically celebrated and continue to celebrate Hamas's mass rape, murder, and kidnapping.  Since then, many have engaged in harassment and violence against Jewish students in support of Hamas's attack and in condemnation of Israel's self-defense response.

### iii.   Penn Student Groups and Faculty Enthusiastically Support Hamas's October 7 Atrocities

134.   On October 7, while Israel was still tallying the innocent lives lost, tagging body parts and working to secure its borders, PAO promoted an "Emergency Solidarity Rally" at Rittenhouse Square Park (the "Rittenhouse Rally"), scheduled for the following day.

135.    During the Rittenhouse Rally, speakers "saluted Hamas" for a "job well done" and delivered speeches infused with violent rhetoric against Jews, which were met with applause and amusement by the crowd.  For example, one speaker stated: "I think we should all give an applause right now, to Hamas, for a job well done.  When they woke up in the morning, and they found the field hands in the house, with a knife, ready to cut their fucking throats.  I was late to the news, but when I heard it, I smiled.  I don't want to hear that bullshit, 250, 250, innocent Israelis are dead.  Fuck 'em.  Again, I swear.  I salute Hamas.  A job well done."

136.    On its Instagram feed throughout the day, PAO posted support for Hamas, videos and images of the Rittenhouse Rally, and paid homage to Ahed Tamini, a Palestinian activist arrested by Israeli forces who has said to Jews, we will "slaughter you and you will say that what Hitler did to you was a picnic.  We will drink your blood and eat your skulls.  Go ahead, we are waiting for you."

137.    The same day as the Rittenhouse Rally, Penn History and Middle East Studies Professor Eve M. Troutt Powell liked a post on Instagram praising the October 7 attack.  In response to a post stating that "any condemnation of violence is vapid if it does not begin & end with a condemnation of Israeli apartheid, settler colonialism, and occupation," Professor Powell wrote, "You are absolutely right.  There's been a lot of vapidity."  Yakoby was not surprised that Professor Powell made these statements—he had dropped Powell's course in the spring 2022 semester, after she said on the first day of class that "Israel is a psycho-Nazi state."

138.    On October 7, Professor Fakhreddine, Associate Professor of Arabic Literature and promoter of Palestine Writes, tweeted that "while we were asleep Palestine invented a new way of life" and reported, "[i]t must be emphasised [sic] that armed struggle by the Palestinian resistance against the occupier is legal under international law."  Later, on October 17, she

posted that "Israel is antisemitic, anti-human, anti-children, anti-life!" and "the assumption that all Jewish people condone the genocidal Zionist project in Palestine is the epitome of antisemitism and a desecration of the memory of Holocaust martyrs."

139.    On October 7, Tukufu Zuberi, Professor of Sociology, retweeted a post by Kamau Franklin, which stated, "[b]y what standard of morality can the violence used by a slave to break his chains be considered the same as the violence of a slave master."

140.    On October 7, Anne Norton, Professor of Political Science and Economics, tweeted, "Palestinians have the right to defend themselves.  I 'utterly condemn' the occupation and structures of discrimination.  'There is no justification.'"  Two days later, Professor Norton reposted a tweet calling allegations that Hamas terrorists cut open a pregnant woman and put babies in cages on October 7 a "circus."

141.    On October 9, in response to President Obama's Instagram post condemning the terrorist attack on Israel and slaughter of innocent civilians, Professor Norton stated, "I am ashamed of you."  On October 22, in response to a tweet reporting that "an international team of forensic pathologists examining the bodies of the victims [has concluded that] Hamas terrorist committed unfathomable atrocities on 10/7," Professor Norton responded, "Forensic pathologists or global press?  Which?  Neither identified.  Shameful and irresponsible – or worse-on your part."

142.    On October 25, Norton agreed with a post asserting: "I have commented lightly on the absurd propaganda about Jewish Zionist students feeling unsafe on US college campuses but want to make clear: pro-Palestine students and faculty are being punished regularly for their speech. Nobody else."  On October 30, in response to an Instagram post that stated "They baked a baby.  In an oven.  THEY BAKED A BABY IN AN OVEN.  THEY BAKED A BABY IN AN

OVEN.  Say ceasefire one more time, you fucking baby-murdering-loving ghouls," Professor Norton commented, "Ceasefire."

143.     On November 24, Professor Norton liked the following tweet regarding Israeli kidnapping victims: "Imagine being an Israeli who has been kept alive in Gaza by Hamas amidst the unprecedented bombing campaign of Gaza by your government.  While Gazans are being killed, city blocks flattened, bombs and missiles falling continuously; and you have now witnessed and experienced all of that for the first time ever as an Israeli; and experienced Hamas fighters doing everything they can to protect you from IDF attacks for 6 weeks.  Your government has been doing everything to kill you, and Hamas has kept you safe while their own people are dying."

144.     On October 15, Robert Vitalis, Professor of Political Science and Director of Penn's Middle East Center, updated his Facebook cover photo to a picture that read in red letters, "NAKBA Since 1948."  On October 22, Professor Vitalis uploaded to Facebook a photo of the Hamas terror group's military wing emblem, with the caption: "A quick and easy way to reduce my friends list (and it will look cool on your jacket too)."

145.     On October 16, Fatemeh Shams, Associate Professor of Persian Literature, tweeted, "these kind[s] of statements that 'Hamas' is responsible for the lives of the people of Gaza are pure nonsense."  "If you are a Jewish college student who feels this way, please DM me. You've been brainwashed, as I was."  Shams also tweeted: "the extremists adhere to the Zionist ideology, who justify their colonial goals by abusing and hijacking the religious discourse that has no basis in the Torah, the Jewish holy book."  On October 20, Shams reposted on her Instagram page that Israel had bombed the Al-Ahli hospital in Gaza, despite numerous

reports from western governments, including the U.S. government, that the attack came from a misfired Palestinian rocket within Gaza.

146.    That same day, Siarhei Biareishyk, Visiting Assistant Professor in the Department of Germanic Languages and Literatures, posted on his Instagram page a flyer advertising a collective walkout for Palestine.  According to reports, Professor Biareishyk ended his Russian history class early so that students could attend the walkout.

147.    On October 7, Christopher R. Rogers, a faculty member at Penn's Weitzman School, reposted the comment, "beautiful sight to wake up to this morning" with an image of Palestinians bulldozing the Israeli-Gaza barrier fence.  On February 29, 2024, Rogers encouraged *New York Times* staffers to quit their jobs after the paper published an article reporting on the paper's investigation confirming that Hamas had committed extensive acts of sexual violence against Israelis on October 7.  In fact, on March 4, 2024, the United Nations Office of the Special Representative of the Secretary-General on Sexual Violence in Conflict confirmed in a special report that "there are reasonable grounds to believe that conflict-related sexual violence occurred during the 7 October attacks in multiple locations across Gaza periphery, including rape and gang rape, in at least three locations."

148.    Following the Hamas attack, the Palestine Writes speakers, who had appeared on campus just days earlier, took to social media to spew their antisemitic venom.  For example, days after the attacks against Israel's civilian population, Refaat Alareer responded on social media to a report that an Israeli baby was found in an oven baked to death by Hamas terrorists, with the comment, "With or without baking powder?"

149.    On the day of Hamas's barbaric massacre, President Magill, who had not yet condemned the deadliest day for Jews since the industrialized genocide of the Holocaust, posted

a picture of herself and her dog on Instagram with the caption, "Don't let a little rain damper your Saturday."

150.    In the following weeks and months, members of Penn's faculty continued to disseminate antisemitism through their social media accounts and other platforms.  Professor Norton, for one, dropped any pretense that her antisemitism was merely anti-Zionism, liking a December 6 tweet referencing Jewish students' complaints about antisemitism that stated, "Playing the victim is what Jews are best at."  Professor Norton also reposted messages referring to Zionists as "Nazi-like Zionists" and IDF soldiers as "Israeli brown shirts"—a reference to the paramilitary wing of the Nazi Party.  And on January 19, Professor Norton liked the following: "There is 0 chance the world would accept to [*sic*] starve and torture 2.3 million Jews, displace them, make them die under the rubble, kids getting procedures without anesthesia, to fight a terrorist organization embedded among them.  0.  So yes, to them, Jewish lives matter more."  These professors, however, have not been disciplined in any way.

### iv.    Jewish Students Become Targets for Hate Speech, Harassment, and Abuse

151.    Immediately after October 7 and in the wake of the administration's endorsement of Palestine Writes, the anti-Jewish animus on Penn's campus intensified.  The murder of innocent Israelis unleashed even more unhinged antisemitism that, when coupled with the administration's inaction, exposed Jewish students to even more intimidation, harassment, discrimination, and assault.

152.    For example, on the afternoon of October 9, two days after the massacre in Israel, Davis left her Mediterranean Archeology class to walk through the center of campus to her next class, Chemistry, while wearing a Jewish Star of David necklace and other garb identifying her as Jewish.  As she walked by a group of pro-Palestine protestors gathered by the Split Button, a

sculpture at the center of campus, one of the protestors, who had his face covered by a keffiyeh, called out to her, "yeah, that's right keep your head down." Another man, also covered by a keffiyeh such that only his eyes were visible, yelled to Davis, "you are a dirty Jew, don't look at us." Other protestors joined in, taunting Davis with: "keep walking you dirty little Jew," "you know what you've done wrong." Penn had stationed Open Expression Observers at the rally; they did nothing to protect Davis from being harassed.

153.    Davis, who grew up in a small town in Wyoming, had never experienced overt antisemitism until she arrived at Penn. The antisemitic abuse she had encountered—within three hundred yards of her dorm—terrified her. Traumatized, she retreated to her dorm room and wept, and she remained locked in her room for the remainder of the day, unable to attend her scheduled classes or academic meetings.

154.    Given the anti-Jewish hostility raging on campus, the lack of administrative action concerning Palestine Writes, Penn's silence in response to the October 7 massacre, and its inaction after the antisemitic vandalism on campus, Davis decided not to report the incident. She was concerned that Penn administrators, faculty, and students would retaliate against her given Penn's conduct in failing to condemn, and affirmatively promoting, antisemitism.

155.    In the days that followed, Davis tried to keep a low profile. She was in constant communication with her parents in Wyoming, who feared for her physical safety and emotional health. While she did her best to attend classes that week, she remained in a constant state of fear, struggling to remain focused on her schoolwork.

### v.    Penn Fails to Take Action Against or Even Condemn Calls for Violence Against Jews After October 7

156.    On October 10, three days after the Hamas massacre of innocent civilians, President Magill and Provost Jackson issued a statement to the Penn community in which they

labeled the attack as the "War in the Middle East."  The statement, widely condemned for both its delayed timing and tepid response, praised Penn "leaders and administrators who quickly and thoughtfully mobilized, identifying and reaching out to students, faculty, and staff with connections to the region to offer assistance and resources."  Yakoby and Rubin—whose concerns about being Jewish on campus had been ignored just days earlier—were not among the students "offer[ed] assistance and resources," even after seeking them.  In contrast to other statements Penn had made in solidarity with minorities targeted by other attacks, Penn's Jewish students—much less the word "Jewish"—were not mentioned in the release at all.  This statement, like others that would follow, proved to be as hollow as it was deficient.

157.    Following the Rittenhouse Rally, eleven Penn clubs co-signed a "Statement of Solidarity with Palestine" endorsing the October 7 massacre, referring to Hamas's mass murder, rape, torture, beheading, and kidnapping of innocent civilians as a "dignified fight," blaming Israel for the murder of its own citizens, claiming that the university was "operating within a vacuum of Zionist media propaganda," and accusing President Magill of using "Zionist rhetoric" in her October 10 statement and of taking a "cowardly stance in support of a colonial entity." The clubs that co-signed the statement were: Palestine Against the Occupation; the Radical South Asian Collective; Students for the Representation of China Town; Penn Philippine Association; Penn Pakistan Society; Penn Association for Gender Equity; Penn Repro Justice; Penn Bangla; Afghan Student Association; Fossil Free Penn; and Police Free Penn.  Professor Fakhreddine later endorsed the statement on her Twitter account.

158.    On October 11, Yakoby began soliciting student signatures on a petition condemning the clubs' statement.  By October 12, the petition was signed by 952 people; as of

the filing of this action, the petition has over 2,400 signatures, and six of the eleven clubs had removed their signatures from the statement.

159.    Also on October 12, Yakoby, via email, forwarded the petition to, among others, President Magill, Dean Fluharty, Vice Provost Kozuma, Wharton Business School Dean Erika James, and Penn Public Safety.  He expressed his concerns about the recent events on campus, including the Rittenhouse Rally, at which one speaker, Yakoby noted, stated "I think we should all give an applause right now, to Hamas, for a job well done.  When they woke up in the morning, and they found the field hands in the house, with a knife, ready to cut their fucking throats.  I was late to the news, but when I heard it, I smiled.  I don't want to hear that bullshit, 250, 250, innocent Israelis are dead.  Fuck 'em.  Again, I swear.  I salute Hamas.  A job well done."  Yakoby also referenced PAO's promotion of the Rittenhouse Rally and the group's public anti-Israel and anti-Jewish statement echoing the antisemitic speeches at the rally.

160.    Receiving no response, Yakoby followed up the next day with the same group of administrators to express his fear of returning to class on Monday: "I am deeply concerned about having to face fellow students who appear to believe that the events of last weekend are something to 'smile' about.  This situation affects not only my personal well-being but also my ability to engage fully in the academic environment."  Yakoby asked the administration to immediately address the issue.

161.    On October 14, Vice Provost Kozuma responded to Yakoby, suggesting that they meet on October 19 with Paige Wigginton, the Director of Penn Special Services, which provides support services to members of the Penn community who are crime victims.  Yakoby requested that the meeting take place immediately, noting that he could not attend class because he is "genuinely scared of physical harm" from the students and groups promoting hate and

violence on campus.  Kozuma agreed, and a meeting was scheduled for the evening on October 15 at Kozuma's office building.

162.     At the meeting, Yakoby presented Kozuma and Wigginton with detailed information concerning the virulent antisemitism spreading across campus.  For approximately two hours, he explained how Palestine Writes caused some of the anti-Israel frenzy that he was currently witnessing on campus and pleaded with the administrators to act immediately to prevent future antisemitic incidents.  In particular, Yakoby raised concerns about the antisemitism voiced at the Rittenhouse Rally and PAO's attendance at, and promotion and celebration of, the rally.  In keeping with Penn's pattern of, at best, deliberate indifference to antisemitism, his concerns fell on deaf ears, with Kozuma parroting Penn's preposterous assertion that there had been no hate speech and that Penn would not take any action to condemn or do anything else about PAO's endorsement of Hamas's massacre.

163.     Yakoby sent a follow-up email later that night to Kozuma, Wigginton, and President Magill, recounting the unproductive conversation and noting his disappointment in Penn's continued lack of response:

> I presented all of the information regarding a student organization promoting an event which 'Saluted Hamas' for a 'job well done.' As well as, their denial of the confirmed killing of 40 babies.  I was told that since Thursday, when I informed you all of this, nothing, other than increased security of the rally tomorrow has been done. Moreover, I was told that currently, the university does not view this as hate speech.  The university, in addition, said nothing can be done about it and that the student group is able to exercise their right to free speech.   This is a very disappointing response from the administration, once again.

164.     Kozuma eventually forwarded Yakoby's October 15 email to Julie Nettleton, the Executive Director for the Center for Community Standards and Accountability.  On October 16,

Nettleton proposed that Yakoby meet with her and Jen Mirel, Restorative Facilitation Specialist at the Center for Community Standards and Accountability.  Yakoby eagerly agreed.

165.     Earlier in the day, on October 15, after being criticized for her muted October 10 "War in the Middle East" statement, President Magill tried again, eight days after the massacre, with an updated statement, this time characterizing the attack as a "terrorist assault."

166.     President Magill belatedly attempted to distance the administration from Palestine Writes, which she had allowed to occur on campus weeks earlier, claiming that "individuals, with a public history of speaking out viciously against the Jewish people, appear[ed] on campus as part of the Palestine Writes Literature Festival . . . [t]he University did not, and emphatically does not, endorse these speakers or their views."  President Magill conceded, however, that "we should have moved faster to share our position strongly and more broadly with the Penn community."  President Magill also recognized "how painful the presence of these speakers on Penn's campus was for the Jewish community, especially during the holiest time of the Jewish year[.]"  President Magill's statement also acknowledged that there had been "recent antisemitic acts on campus" and concluded with a promise that she would endeavor to foster a safe and inclusive environment for Jewish students on campus.

167.     But as the Individual Plaintiffs, SAA members, and other Jewish students would soon come to learn, President Magill's statement was mere lip service.

**vi.    An Antisemitic Frenzy Engulfs Penn's Campus**

168.     On October 16, to remind the Penn community of the innocent Israelis being held hostage by Hamas in Gaza, Yakoby and a friend hung "kidnapped" posters with pictures of the kidnapped babies, children, and other victims around campus.  As Yakoby was doing so, a man threateningly approached him and yelled "fuck you."  Yakoby immediately reported the incident

to the first Penn Police officer he could find.  Although the officer assured Yakoby that police would investigate and report back with an update, Yakoby has yet to receive any follow-up communication.  Only through the news would Yakoby learn that the same assailant was later taken into police custody for assaulting another Jewish student on campus who was wearing a yarmulke.  The same person was reported telling Jewish students that they can "either leave us in peace or go back to Moscow and Brooklyn."

169.    After reporting the incident, Yakoby hurried home.  On his way, he saw students tearing down the posters of Jewish kidnapping victims he had just spent the morning putting up. Shaken by these escalating acts of hate, Yakoby missed his next two classes.

170.    That same day, on October 16, PAO, in conjunction with faculty, organized a walkout "to protest the ethnic cleansing of Palestinians in Gaza and [to] stand in solidity with Palestine."  The walkout, which turned into a seven-hour rally in the heart of campus, on College Green, and later a march down the main campus artery, Locust Walk, was so loud and disruptive that students reported that they could hear the chanting from inside their classrooms and dormitories.  From approximately 10:00 a.m. to 5:00 p.m., in the midst of midterm examinations, the library, in the center of campus, was essentially barricaded by the protestors.  Calls for violence against Jews filled the air.  The protestors chanted genocidal antisemitic slogans, such as "there is only one solution: intifada revolution," "From the River to the Sea, Palestine will be free," "intifada intifada," and "Israel, Israel, you can't hide, we charge you with genocide." Dozens of speakers, including faculty and students, delivered virulently antisemitic speeches. One speaker pointed towards Jewish students quietly holding Israeli flags and declared that "all settlers and all settlements are legitimate military targets and they will be targeted."  The same

speaker told Jewish students to "go back to Moscow, Brooklyn . . . fucking Berlin where you came from."

171.     Professors, including Professor Fakhreddine, cheered the speaker on and clapped in approval, before expressing her view that "Israel is the epitome of antisemitism," and that the State of Israel "desecrates the memory of the Holocaust victims."  Professor Almallah also spoke at the protest and concluded his speech by chanting "resistance is justified," "intifada, intifada, intifada" and "there is only one solution, revolution!"  Professor Almallah missed teaching two of his classes to be present at the event.  Another speaker, addressing Jewish students who were standing nearby, proclaimed, "I hope you shit when you go on your bed tonight.  I hope your dreams are filled with the horrors of dead Palestinian babies, burned Palestinian children, dead Palestinian women, a hundred square miles, leveled. I hope this scorches your brain.  I hope you are terrified of this, because you should be," all while Open Expression Observers were in attendance.  Professor Loomba, the Catherine Bryson Professor of English, also spoke at the rally; she prevented a Jewish student from witnessing the protest, motioning the student away with her arms, while others cheered her on and chanted, "free, free, Palestine!"

172.     The Individual Plaintiffs, SAA members, and their fellow Jewish classmates were deeply shaken by these events.  They could not believe that their own university would allow people on campus to demonize them, threaten them, and call for their demise, all without consequence.

173.     Davis was forced to confront the protestors on October 16, when she was again walking back from her Mediterranean Archeology class to her Chemistry class.  This time, the protest was significantly larger; instead of fifty protestors there were over one hundred, and the hate speech was incessant.

174.     As she walked by, Davis saw Professor Shams standing on top of the Split Button sculpture.  Professor Shams used a bullhorn to announce that "Israelites" deserved the attack they received on October 7, that the violence was justified, and that "the Jews claimed they have loved ones who died, it's all a lie."  Professor Shams's antisemitic speech was reported on social media and in the school newspaper.

175.     As Davis tried to hurry past the protest, she noticed a group of ten to fifteen students holding an Israeli flag a few feet away.  The students, one of whom Davis recognized as a friend, looked upset.  Davis approached to console her friend and the rest of the students, and stood with them for approximately five to ten minutes.  In just that short time, Davis witnessed a student with a yarmulke being harassed by protestors, who called out "how does it feel to be a part of a mass genocide?"  Similar profanities were directed at another Jewish student who was wearing a Star of David necklace.  Several students yelled to Davis, and the other Jewish students she was standing with, to "get out of here kikes!"  The same slur was shouted at Davis by several other students.

176.     Fearing for her safety, Davis walked away to go to class.  As she moved away from the crowd, three men, whose faces were covered by keffiyehs and who were standing at the outskirts of the rally, assaulted Davis with the following statements: "you're a dirty little Jew, you deserve to die"; "you don't deserve to be on the same earth that we stand on"; and "the Jews deserve everything that is happening to them."  Davis was terrified and ran to class.  Once again, while Open Expression Observers were present, they did nothing to protect Davis.

177.     When she arrived at class, Davis was still crying from the hate-filled threats she had just endured.  She was early and approached her professor.  Davis requested an extension on her class lecture note assignment, which is due after every class.  Showing no sympathy, the

professor refused to provide any accommodation.  Davis walked out immediately and returned to her dorm.  That night, and since the assault, Davis has been distraught and has had difficulty sleeping.

178.    Later that day, Yakoby wrote to President Magill, Vice Provost Kozuma, and Director Wigginton to again warn them of the dire situation on campus:

> Hi All,
>
> I have already reported this to the penn police but I wanted to loop you in on the "freedom of speech" at this campus.  We put up flyers with images of child hostages in Gaza, calling for the release.  We have documented images and videos of the individuals who tore them down. Moreover, one individual came up to myself and another student and said "f*ck you"—we were standing doing nothing when this occurred. In addition, a student with a [yarmulke] was pushed by multiple people attending the rally.
>
> This is not freedom of speech, it is violence and it has become a pattern on this campus.
>
> What are you doing about it?

179.    The next day, on October 17, Davis missed her classes and spent most of the day hiding in her dorm.  In fact, she missed every class that week and save for one on Friday to make up for a quiz she had missed.  Her mother, whom she confided in the day before, contacted the campus Chabad Rabbi, Ephraim Levin, who asked Davis to meet him at the Chabad House.

180.    When she arrived at the Chabad House later that day, Davis met with Rabbi Ephraim and recounted the harassment she experienced at the rally and elsewhere and the anguish she had been experiencing since.  While Rabbi Ephraim encouraged Davis to report the incident, she was hesitant to do so, fearing retaliation by the administration and other students and faculty.  Ultimately Davis agreed to file a report anonymously, which she did that evening via Penn's Bias Incident Reporting system.

181.     The same day, on October 17, Yakoby met with Director Nettleton and Mirel to describe how he was assaulted on campus and to ask whether and why Penn permits pro-terrorist rallies on campus, like the one that occurred the day before.  Nettleton replied that the Office of Community Standards did not have an official response to Yakoby's question but told him that she would look into it.  Yakoby repeated his question to Nettleton multiple times via email on October 19, 23, 29, 30, and November 5, 8, and 28.  In his last email to Nettleton, Yakoby wrote:

> Over a month. I would love to know whether or not Penn allows for "pro-terrorist" rallies.  In our meeting you assured me you would find out and in an email you expected to get back to me within a week (it has been over a month).  I do not feel safe on penn's campus and this makes it significantly worse, considering the university seems to have no idea.  If this is true, saying that the university has "no idea" is sufficient answer but dodging is quite concerning.

182.     Yakoby has never received an answer to whether pro-terrorist rallies are permitted on campus.

183.     On October 17, Davis spoke to her academic advisor, Jason Breyan, to request help obtaining class accommodations because she was suffering from the day prior's assault. Breyan suggested she email the Weingarten Center, Penn's academic support and disability center, to request an extension on her quiz that was scheduled for October 20.  She did so. Despite the assurances by her academic advisor, the Weingarten Center replied to Davis the day before her quiz, October 19, declining Davis's extension request.

184.     On or about October 17, Matthew Wranovics, a Biddle Law Library staffer, was caught ripping down Israeli hostage posters.  When a student asked, "why are you tearing them down?"  Wranovics replied, "Get the fuck out of my face."  The student explained that "innocent people were killed," to which Wranovics responded, "there were innocent people killed in the hospital bombing"—a reference to the explosion at the Al-Ahli Arab Hospital caused by terrorists in Gaza misfiring a rocket aimed as Israeli civilians.  The student who spoke with

Wranovics later reported to Penn that his "vicious verbal assault made me feel unsafe." Emboldened by Penn's refusal to discipline offenders like Wranovics, students, faculty, and other staff continue to rip down hostage posters around Penn on a regular basis, even though such cruel and outrageous conduct violates Penn policies, including, among others, the Nondiscrimination Statement, the Code, and the Guidelines.

185.     On October 18, PAO organized another large rally on Penn's campus.  Much like the October 16 rally, chants for the annihilation of the Jewish state were incessant.  In response to the October 18 hate rally, President Magill issued a "Message to the Penn Community," belatedly asserting that "Penn will not tolerate and will take immediate action against any incitement to violence or, of course, actual violence."  Despite her claim that "hateful speech has no place at Penn," in the hours, days, weeks, and months that followed, hateful, antisemitic rhetoric has continued to permeate campus, and the administration has refused to take any action to address it in a meaningful way.

186.     The October 18 rally included a march to the Lauder College House, Davis's dormitory, known to be a dormitory where a large number of Jewish students live.  Davis was still recovering from the October 16 harassment and hiding in her dorm when she heard chants outside her window.  Hearing calls for Israel's annihilation, Davis was instantly retraumatized. Already confined to her dormitory, she felt that there was nowhere to hide.

187.     On the same day, Rubin was made aware of a message on a GroupMe chat detailing a meeting between the Muslim Student Association board, Provost Jackson, and Vice Provost Kozuma, concerning their complaint that President Magill's October 15 statement "failed to acknowledge the Palestinian, Muslim, or Arab communities."  The message stated that "[b]oth Provost Jackson and Vice Provost Karu [Kozuma] demonstrated support for Muslim

students and disapproved of President Magill's statement."  Rubin and Yakoby, who had met

with the provost and vice provost regarding concerns over antisemitism, were dismayed that the

administrators disapproved of President Magill's statement.

188.    On October 20, "the Jews R Nazis" was found graffitied on a vacant building

immediately adjacent to a Jewish fraternity house, Alpha Epsilon Pi.  At least one Jewish student

reported the vandalism to the Penn Police.  Another student, who saw the graffiti and had

witnessed the antisemitic rallies, reported that she subsequently feared walking around campus.

SAA Member #2 lives in a predominately Jewish fraternity house two blocks away from the

Alpha Epsilon Pi house that was vandalized.  As a result of the vandalism and anti-Jewish

hostility on campus, SAA Member #2, with the help of Rubin, arranged for a security camera to

be installed at his fraternity house.  Davis and Yakoby also heard about the vandalism at the

Alpha Epsilon Pi house via social media and word of mouth.

189.    The same week, SAA Member #2 spoke at a campus demonstration regarding the

growing antisemitism he was witnessing, including vandalism of the Hillel and regular calls for

Jewish genocide by Penn-sponsored groups, students, and faculty.  SAA Member #2 described

his shock at the hostility, and concluded with the sentiment of many in his audience: "These

blatant acts of antisemitism by students and professors at this university have made it unsafe to

be a Jewish student on campus."  The following week witnessed antisemitic rallies and events by

Penn student groups on Penn's campus.  On October 25, for example, PAO organized a "walk

out for Palestine" at which two hundred Penn community members gave speeches and chanted

antisemitic slogans before marching to the Split Button on campus.  Professor Almallah, who

spoke at the demonstration, chanted, alongside fellow rally goers, "from the River to the Sea,

Palestine will be free," "smash the settler Zionist state," "long live the intifada," and "every time the media lies, a neighborhood in Gaza dies."

190.    At each event, the anti-Jewish and anti-Israeli rhetoric intensified.  At an October 28 "Emergency Rally" for Palestine, promoted by PAO, student protestors reveled in Hamas's October 7 slaughter and called for violence against Jews.  By way of example only, one Penn student, Tara Tarawneh, addressed the crowd, referring to what she called the "joyful and powerful images which came from the glorious October 7th":

> How about the photos of the bulldozer breaking through the deathly border? Do you remember that picture? And the several other[?] [an attendee shouts, "Long live October 7th!"]
>
> I want you to picture those in your mind. I want you all to remember how you felt when you saw those images and heard the news. I remember feeling so empowered and happy; so confident that victory was near, and so tangible! I want all of you to hold that feeling in your hearts. Never let go of it. Channel it through every action you take. Bring it to the streets! Go down to the streets every day! And don't ever let them feel that you quietly accept this genocide! Free Free Palestine! [] From the river to the sea [], Palestine will be free!

191.    On the way to give her hate-filled speech, on October 28, Tarawneh ripped down and stole an Israeli flag from the front of several Jewish Penn students' home and was arrested. The Philadelphia District Attorney charged Tarawneh with theft and receiving stolen property. Yet even though she was arrested, criminally targeted Jewish students for violence, and had celebrated Hamas's massacre and expressed admiration and support for a terrorist organization, Tarawneh remains a student at Penn and was back in class by November 28.

192.    The day after Tarawneh was arrested, Professor Küçük (who had previously dismissed Yakoby's concern that the Palestine Writes event featuring a roster of antisemitic speakers might be threatening to Jews) tweeted, "I don't know about you, but I haven't seen any actual antisemitism in my campus community (students, faculty, staff)."

193.     Since her arrest, Tarawneh has been involved in multiple antisemitic demonstrations, including one at the Split Button where she and approximately forty other students held hands in a circle, and chanted, "we are with Hamas."

**vii.     Rallies, Vandalism, and Antisemitic Threats Continue to Escalate Across Penn**

194.     Anti-Israel and anti-Jewish hate events on campus continued to rage in the weeks that followed.  On October 31, for example, Yakoby visited the Penn Bookstore, only to find that the Quran and Muslim books had completely replaced the material typically displayed in the "Judaica" section.

195.     Under immense pressure from students, trustees, and donors, and faced with growing external scrutiny, on November 1, Penn announced "Penn's Action Plan to Combat Antisemitism" (the "Action Plan").  The announcement acknowledged that "Penn must do more" and that the swath of recent antisemitic incidents were, "[r]egardless of form, . . . appalling and unacceptable."  But Penn's belated "Action Plan" to "combat antisemitism" was nothing of the sort—in ignoring the effective and urgent actions needed to be taken, it was yet more evidence of Penn's deliberate indifference to the hostile environment Jewish students face.  Instead of meaningful action—such as disciplining offenders through bans, prohibitions, suspensions, and expulsions—the "Action Plan" only included "reviews," "task forces," "advisory groups" and "discussions."

196.     The Action Plan recognized the need for "Safety & Security," "Engagement," and "Education," but offered no solutions.  As to "Safety & Security," for example, the Action Plan's "Immediate Actions" included only "a review" of "existing safety and security for Penn-affiliated religious life centers."  On "Engagement," Penn suggested convening a task force, the

University Task Force on Antisemitism (the "Task Force"), and other advisory groups to have "conversations," and "advis[e] the president."

197.    Along with the announcement of the Action Plan came another hollow message from President Magill, this time purportedly to fight what she correctly recognized as the "pernicious and persistent" antisemitism on Penn's campus.  But President Magill's message instead minimized and undermined the Action Plan's focus on antisemitism, turning the supposed plan to combat antisemitism into a plan to combat a word salad of general hate sentiment: "Because hatred of one vulnerable group is so often intertwined with threats toward others, we will also vigilantly combat other forms of hate aimed at members of our community due to their background or beliefs."  President Magill's Action Plan has not led to any reduction of antisemitism or meaningful benefits for Jewish students on campus, who continue to be targeted and harassed by students, faculty, and professors.

198.    Rubin, who had repeatedly expressed concern over the administration's lack of response to the growing antisemitism on campus, particularly his safety concerns, during four separate meetings with administrators since the beginning of the fall 2023 semester, applied to serve on the Task Force and the President and Provost's Student Advisory Group (the "Student Advisory Group")—a group of twelve students who will meet with the President and Provost at least quarterly to discuss the Jewish student experience at Penn.  Penn rejected Rubin's Task Force application, opting instead to accept a student studying abroad the entire spring 2024 semester.  Rubin was, however, one of twelve students accepted to serve on the Student Advisory Group—which Rubin would soon come to learn was powerless and ineffective. Yakoby, who addressed antisemitism on campus during a December 5, 2023 press conference before the U.S. House Committee on Education and the Workforce (the "House Committee"), at

69

which President Magill was present, was not permitted to serve on the Task Force as a senior.

SAA Member #2's application to serve on the Task Force was also rejected.

199.   Not only has the Task Force been wholly ineffective, it further solidifies Penn's

steadfast refusal to address antisemitism in a serious manner.  By delegating Penn's

responsibilities to keep its Jewish students safe to a slow and powerless body, Penn has

effectively whitewashed its apathy to antisemitic violations of its policies, falsely presenting

Penn as repentant and responsive while enabling its administration to continue its indifference

unabated.  Though the Task Force was announced as the "centerpiece" of the Action Plan on

November 17, 2023, it has done nothing in the nearly four months since its inception, serving

only as another morass of useless bureaucracy standing in the way of meaningful change at Penn.

The first official update on the Task Force's "progress" came on January 16, 2024; Penn proudly

announced that the Task Force had established an email address for constituent input, had

"conducted informational interviews" with "Penn experts," and had met several times.  It also

announced a plan for "listening sessions" in the future.  Glaringly absent was a single mention of

any action taken to combat the still-uninterrupted culture of antisemitism that thrives at Penn.

Indeed, the chair of the Task Force admitted in late January that despite having been active for

over two months, the Task Force could not reach any consensus because of "massive"

differences in opinion.  The chair reiterated that the Task Force did not have a "disciplinary

function" and would merely make "recommendations" to the Penn President.  No

recommendations for meaningful action have yet been made, let alone adopted.  The chair noted

that although it was originally tasked with issuing a final report by May 17 (to recommend

policies for the next academic year), even this may not occur.

200.    On November 6, while Yakoby and Rubin were at Penn Hillel, they saw police and bomb-sniffing dogs enter the building.  Yakoby immediately called Director Wigginton to ask whether the Hillel was under a bomb threat.  Wigginton equivocated, until Yakoby told her that he was in the Hillel and saw the dogs, when she finally admitted that a threat had been made against the building.  Yakoby and Rubin would later learn that Penn had received antisemitic emails threatening violence against the Jewish community, specifically naming Penn Hillel and Lauder College House.  That night, Rubin's music group rehearsal was moved from the Hillel because of safety concerns.  Davis learned of the bomb threat the next day when a friend, who works at the Hillel, called her to warn her not to come by the building.  Davis, aware that the Hillel had been broken into earlier in the semester by a student who yelled antisemitic obscenities, avoided the Hillel in the days and weeks to come.

201.    Penn maintains an emergency notification system for just this type of situation, which regularly alerts the community to crimes ranging from petty theft to serious felonies that occur both on and far off campus.  Yet the school shockingly did not use this system to alert Yakoby or other Jewish students at Hillel that they were in danger of actual threats of antisemitic violence.  In fact, Penn did not see fit to issue a single alert warning of antisemitic threats throughout October and November 2023, notwithstanding the many events alleged herein. Yakoby was alarmed by Penn's failure to timely alert the Jewish community concerning actual threats of violence.  By failing to take action in response to violent threats targeting Penn's Jewish students and Jewish institutions, and by ignoring the pleas of the Individual Plaintiffs, SAA members, and other Jewish students for protection, Penn is inviting and fomenting violence against Penn's Jewish students.

202.     Penn's egregious failure to take meaningful action delivered a clear and welcome message to Penn's antisemitic students and faculty: the open season on Penn's Jews would continue.  On November 8, two days after the threat against Hillel and Lauder College House, Penn's campus was defaced with statements such as "From the River to the Sea, Palestine Will Be Free," and "Israel Commits Genocide" written in chalk across Locust Walk and on banners hung on campus property.  Later that day, PAO, Police Free Penn, and other non-student instigators put on a light show that displayed across Penn Commons and Huntsman Hall featuring statements such as "Zionism is Racism," "From the Sea to the River, Palestine Will Live Forever," "Let Gaza Live," and "Free Palestine."

203.     On November 9, President Magill released a statement on Penn's Instagram account, claiming that the administration would hold those who orchestrated the light show responsible.  Every single statement projected on these buildings, which President Magill correctly referred to as antisemitic, would be repeated and featured prominently on signs and banners in the days and weeks to come by Penn faculty and students, without repercussion or condemnation.  PAO, on its Instagram page, gleefully took responsibility, posting one image that same night with the caption, "in case you missed our light show."  Once again, Penn's statement proved to be mere lip service.  To date, PAO is still active on campus and continues to break the university's rules with impunity.

204.     On November 14, having been shown for years that Penn's conduct codes do not apply to anti-Jewish abuse and harassment, a coalition of Penn students, staff, and faculty established a "Freedom School for Palestine" ("Freedom School") inside the campus student union, Houston Hall.  For over three weeks, in violation of university rules, the group occupied

72

the Reading Room in Houston Hall, staying past closing at midnight, disturbing students trying to study, and refusing to allow certain Jewish students to enter the building.

205.    On the first night, after midnight on November 15, long after Houston Hall was closed, Penn Police Deputy Chief of Investigations Michael Morrin told the protestors that they would be arrested if they did not leave the building within the next thirty minutes.  Thereafter, members of Penn Police instead told the demonstrators that they could remain in Houston Hall overnight if they showed their school identification cards to staff members.

206.    Emboldened yet again by Penn's failure to act, the demonstrators transformed the Reading Room, a central gathering place on campus that Davis would frequent, into an antisemitic war room, hanging anti-Israel banners on the walls and bellowing into bullhorns (in violation of building policy) to express their hatred for Israel.  And despite the building being restricted to Penn-affiliated key-card holders, individuals outside the Penn community, encouraged by students and faculty, including Professor Fakhreddine and PAO, who promoted and supported the event on social media, were invited to espouse antisemitic views.

207.    The occupying students and faculty received daily food deliveries paid for with the assistance of faculty funding; in fact, public Venmo transactions show transfers to the Freedom School occupiers from faculty like Sarah Leonard, fellow in the Wolf Humanities Center, and Marina Krikorian, coordinator of the Center for Advanced Research in Global Communication.  These faculty with Venmo records were not the only people associated with the university to offer support.  Patricia Anton, chaplain for Muslim Life at Penn, was present at one of the group's events and shared a since-deleted post about a lecture concerning "Jewish supremacy in Israel/Palestine."  Several professors, including Professor Powell and Professor Norton, spoke throughout the program.

73

208.    Multiple Jewish students have expressed to Penn that they do not feel safe walking into Houston Hall.  On one occasion, Yakoby and Rubin entered the student center only to be turned away by Freedom School participants, who confronted them and told them to "step out."  Rubin later reported this incident on December 4 and 18, 2023, to administrators, including Kozuma and Charles Howard, University Chaplain and Vice President for Social Equity and Community, as well as members of the Antisemitism Task Force.  On November 15, SAA Member #2 also emailed President Magill and Bok to report that the sit-in and increasing antisemitism on campus left Jewish students feeling very unsafe.  In response to his email, SAA Member #2 was referred by Kathleen Shields Anderson, vice president for Public Safety, to the campus wellness resources.  Davis, who prior to November 14 regularly studied at Houston Hall, was forced to avoid the building throughout finals.

209.    Despite the numerous and obvious violations of Penn's policies, including, among many others, the Guidelines' prohibition against impeding "movement in a University location," Penn has not disciplined these protestors.  Instead, Penn permitted the occupiers to expand their occupation of Houston Hall, and even conduct their own programming, including a "full day" of events in "honor[ of ] martyred [Palestinian] media workers," which included partnering with the Annenberg School of Communication to project the names of alleged journalists who died in Gaza throughout the lobby of the Annenberg building.  The students continued to occupy Houston Hall until at least December 17.  Penn tolerates trespass as long as the students involved are practicing and promoting antisemitism.

210.    On November 15, another Israeli flag was stolen from the same home of the Jewish students as the one that Tarawneh had victimized a few weeks earlier.  Though Tarawneh

was later arrested by Philadelphia Police, Penn has yet to discipline her, and she continues to be enrolled at Penn and is permitted to take classes despite her criminal, antisemitic actions.

211.    On November 16, "missing cow" posters, which mock Israeli hostage posters, were found littered around campus and brought to Penn's attention.  The shameful posters include a photo of a cow silhouette and suggest a reward of a "box of chalk and a can of beer" for finding the missing cow.  The same day, a statement that read "90% of Pigs are Gas Chambered" was chalked on Locust Walk.  Davis saw these statements as she was crossing campus later that evening and immediately felt unsafe walking alone.

212.    On Saturday, November 18, Rubin sent the administration a petition containing over forty-five pages of signatures, asking the administration for additional security on campus, campus threat assessments, and to recognize the IHRA definition of antisemitism.  Months later, Rubin met with Michael Citro, Penn's Vice President and Chief of Staff, and Leah Popowich, assistant vice president and deputy chief of staff in the Office of the President, to discuss the petition, but ultimately the administration did not take any Rubin's suggestions.

213.    On November 28, Chavurah, a self-proclaimed "progressive anti-Zionist" club, planned to host a screening of "Israelism," a controversial documentary that argues American Jewish communities raise their children with pro-Israel indoctrination while omitting discussion of Palestinians' situation.  Penn denied the club's request to screen the film, citing safety concerns, but noting "we are actively working to find a date in February when the film can be viewed and discussed safely and constructively."  Chavurah ignored Penn's denial, releasing a statement that it will continue with the screening as planned, "whether or not we have the University's official permission."  PAO then posted a statement standing in solidarity with Chavurah's planned screening, "encouraging" students to attend, as well as co-organizing a

protest against Penn.  As promised, Chavurah held the screening as planned in a room that the Middle East Center had reserved for it, and posted a video on Instagram to help its invitees locate the screening room.  Though the administration expressly forbade the Middle East Center from screening the film, Chavurah, PAO, and the Middle East Center continue to operate on campus, free to ignore Penn directives without repercussion.

214.    On December 3, a horde of more than a hundred rally goers, including students, marched across Penn's campus, chanting, "from water to water, Palestine will be Arab" and "long live the intifada," calling for "intifada revolution," and praising the "glorious martyrs" who massacred over 1,200 innocent Israeli civilians.  Jews across Penn, including the Individual Plaintiffs and SAA members, were essentially trapped and unable to move freely around campus. Rubin, for example, had to cancel plans to work on a final project in a Penn engineering lab, which led to his first-ever grade of "Incomplete."  He would later need to finish the course over his winter break.  Davis was studying when she heard the mob marching and chanting, and she became concerned about walking home.  When the mob moved on and she finally stepped outside,  Davis saw a campus covered in graffiti—the words "Intifada," "Avenge Gaza," and "Free Palestine" covered Van Pelt Library; "Blood $" was spray-painted across the on-campus TD Bank; and "Fuck the IDF," "Shame," "Intifada," and "Free Gaza" were plastered across several buildings surrounding student dormitories.  Penn Police were present throughout the rally but did nothing to stop it.

215.    The mob eventually marched from downtown Philadelphia through Penn's campus.  While marching in Center City, they attacked a well-known restaurant, Goldie, solely because it is owned by an Israeli Jew.  The mob gathered outside of the restaurant, chanting

antisemitic statements and placing pro-Palestinian stickers on the restaurant's doors, in what Pennsylvania's Governor called a "blatant act of antisemitism."

216.    Notwithstanding that the police had been aware of the planned rally days before, Penn only issued a security alert at 7:22 p.m. that evening, over an hour after the rally had already made it to Penn's campus.  PAO posted the security alert on their Instagram page, thanking the university for promoting its rally.  Students—both Jewish and non-Jewish alike— including Yakoby, Rubin, and Davis heard "Intifada" chants and were scared to leave their residences.  Despite PAO's support, promotion, and organization of a rally that left Penn's campus littered with antisemitic graffiti, Penn has not disciplined the group.

217.    PAO immediately increased its antisemitic rhetoric.  Days later, PAO posted a graphic stating "globalize the Intifada," a call for violent resistance against Israel and Jews, to its Instagram page.

218.    On December 16, PAO posted a video in which the following chants were clearly audible: "from the River to the Sea, Palestine will be free" and, in Arabic, "from water to water, Palestine will be Arab."

219.    On December 25, PAO posted to Instagram: "We are all SJP."  Students for Justice in Palestine has expressed that its support of the October 7 massacre "[is] PART of this movement, not in solidarity with this movement."  On December 30, PAO shared a photo of ADL president Jonathan Greenblatt with bloody hands.  And on January 2, 2024, PAO released a post on Instagram mourning the death of Saleh al-Arouri, the founding commander of the military wing of Hamas, who had been designated as a terrorist by the United States since 2015. The same day, PAO posted a document titled "The Royal Flush of Pro-Palestinian Advocacy," to "equip [readers] with a Royal Flush of knowledge for countering Zionist narratives!"  The

document denied Israel's right to defend its civilians from October 7-style attacks: "Regarding Israel's right to defend itself, as one of the most brutal occupying powers in the world, the occupier generally does not have a right to defend itself, especially if it has sustained an expansionist ideology since its inception as a state."  And after *The New York Times* published the results of a two-month investigation in late December, finding that Hamas attackers brutally raped and mutilated Jewish women "everywhere they struck" on October 7, PAO responded with a post criticizing the "so-called investigation" and accusing *the Times* of "exploit[ing] [ ] sexual violence against women to push Israeli propaganda" by publishing it.  PAO also posted a video likening Israeli Prime Minister Benjamin Netanyahu to Hitler, transforming the phrase "Never Again!" into "Again!" while Netanyahu is displayed as performing a Nazi salute.  Rubin reported the majority of these posts, and many others, directly to the administration, including to interim President J. Larry Jameson and Provost Jackson on February 7, 2024.

**viii.  President Magill's December 5 House Antisemitism Hearing Testimony Confirms Penn's Deliberate Indifference to Its Hostile Anti-Jewish Environment**

220.    On December 5, 2023, President Magill, along with the presidents of the Massachusetts Institute of Technology and Harvard University, testified at the House Committee hearing on campus antisemitism (the "Antisemitism Hearing"), during which she repeatedly refused to acknowledge that calling for the genocide of the Jewish people is against Penn's policies, and refused to condemn the vile antisemitic rhetoric permeating Penn's campus.

221.    President Magill faced immediate public backlash for her testimony.  The Individual Plaintiffs, SAA members, and the community at large were appalled.  On December 9, 2023, President Magill resigned as president of the university.  Bok, then chairman of the Board of Trustees, announced that President Magill resigned after making an "unfortunate misstep" at the Antisemitism Hearing.  For his part, Bok too faced widespread criticism over

both his dismissive approach to concerns about antisemitism and his support of President Magill, leading to his resignation immediately after President Magill.  However, changing the leadership of Penn's administration did not address Penn's rampant antisemitism, which has continued unabated.

ix.    **Jewish Students Continue to be Met with Penn's Deliberate Indifference**

222.    Following the Antisemitism Hearing, Rubin and SAA Member #2 attempted to work with the administration to improve the hostile environment on campus, but, as they soon found out, the administration remained deliberately indifferent, at best, to Penn's egregious antisemitism problem.

223.    Rubin was scheduled to attend the first antisemitism Student Advisory Group meeting with President Magill on December 11, 2023, which was canceled without explanation by her office, and never rescheduled during the fall 2023 semester.

224.    On December 12, Rubin, SAA Member #2, and two other Jewish Penn students prepared and organized a presentation at Hillel explaining how the use of official Penn logos and marks by Penn-affiliated groups and schools engaged in antisemitic programming signaled Penn's support and acceptance of antisemitism.  In particular, the presentation, which was given to students and administrators, including Vice Dean of Wharton Diana C. Robertson, highlighted the use of Penn's intellectual property, including its school crest, to support Palestine Writes, PAO, and the Middle Eastern Studies and Near Eastern Languages and Civilians departments, whose members use the Penn brand to facilitate and offer workshops and lectures with a clear antisemitic, anti-Israel bias to faculty and students in K-12 schools throughout the Philadelphia community. The presentation proposed a stricter logo vetting process to ensure that Penn does not support and is not associated with antisemitism.

225.    In addition to Wharton Vice Dean Robertson, who was present for the December 12 presentation, SAA Member #2 provided copies of the presentation to the Penn Marketing Department, Communications Department, Office of Student Affairs, and Center for Community Standards.  Each administrator that SAA Member #2 contacted said they were powerless to respond to his concerns and referred him to a different department.

226.    On the day of the presentation, J. Larry Jameson, was appointed interim president of the university.  Interim President Jameson has mirrored the same indifference as his predecessor to the escalating antisemitism on campus.

227.    For years, Dwayne Booth, a lecturer at the Penn Annenberg School of Communication, has posted overtly antisemitic cartoons on social media and ScheerPost, a website for radical anti-Israel voices.  On Penn's website, Booth's faculty profile contained, until very recently, a hyperlink to Booth's personal website, containing hateful and disturbing images targeting Jews and Israel.  Although the hyperlink to Booth's personal website was taken down, Booth's faculty profile still prominently advertises that his work can be found on ScheerPost.com.

228.    One of Booth's cartoons prior to October 7 attempts to contextualize antisemitism as justifiable if viewed relative to Israel's treatment of Palestinians:  A Jewish child wearing a yarmulke sits on Santa's knee.  Santa tells him, "Yes, you're on the Naughty List permanently because you're Jewish and, yes, that's anti-Semitic and nothing but a grotesque prejudice that's been normalized by tradition and has turned countless generations of otherwise decent people into automatons of ritualized bigotry—but so what? Just imagine that I'm Israel and you're a Palestinian and it'll make perfect sense to you."

229.     After October 7, Booth's antisemitism escalated, containing classic antisemitic tropes including blood libels and narratives of Jewish greed and control.  For example, one of his cartoons, "The Anti-Semite," depicts three suited men standing in front of a combined American-Israeli flag, drinking from wine glasses, labeled "Gaza," which are filled with blood. The men look derisively behind them at a dove holding an olive branch.  The caption: "Who invited that lousy anti-Semite?"

230.     Other post-October 7 cartoons include an IDF soldier holding a gun to the head of a baby, a depiction of Israeli Prime Minister Netanyahu shoveling human skulls into a cremator, "as the first Israeli Prime Minister magnanimous enough to bring every last Palestinian man, woman, and child in on the peace process," and another of Netanyahu on the phone, saying "I think the world can see what the Palestinians are up to, trying to make it so their eventual Holocaust museum will be more heart-wrenching than ours, which is why its imperative that we incinerate them and everything they have—shoes, jewelry, family photos, watches, silverware, everything—so there will be nothing left for them to curate except their anti-Semitism."

231.     On December 11, Booth and Professor Carolyn Marvin broadcast an email conversation between them to the entire Annenberg School of Communication community, including students.  Booth shared his thoughts on the Antisemitism Hearing, and Professor Marvin replied-all with: "Thanks, [Booth].  Stefanik grilling was a show trial.  I have been so appreciative of your work for Scheerpost accompanying Chris Hedges."  Booth's reply copied the entire school: "Thanks, Carolyn.  Chris and I hung out all day yesterday to shoot a fundraising video for ScheerPost.  The guy never sleeps anymore, knowing so many people in Gaza.  I may be following him over to the region soon to do some artwork from ground zero of

the disaster." Penn administrators and faculty on the listserv neither protested these exchanges, nor has Booth been disciplined.

232.     On February 4, 2024, after a public outcry, interim President Jameson did not condemn the cartoons but said merely that they were posted on a "personal website, were not taught in the classroom and do not reflect the views of the University of Pennsylvania or me, personally." Moreover, after Rubin informed interim President Jameson, Provost Jackson, and others that Booth's official Penn website bio contained a link to the cartoons, the link to the cartoons remained on Penn's website for weeks, and has attracted additional postings of offensive antisemitic cartoons. Interim President Jameson's statement did nothing to deter or discourage Booth's antisemitism; indeed, new comics posted to his website (and which were linked to Penn's website) in the wake of the outcry are similarly offensive. Penn's refusal to discipline Booth—a non-tenured lecturer—for his advocacy and dissemination of antisemitism is particularly invidious when compared to the extensive efforts it has undertaken to discipline Professor Wax for expressing unpopular views on race.

**x.     Protests Carry on Unimpeded into 2024**

233.     At the start of the spring 2024 semester, Penn student organizations announced their endorsement of a one-week "global strike for Palestine." PAO, for example, encouraged students to boycott the first week of classes and promoted a rally on January 22 in front of Van Pelt Library. 2P2 Students for Collective Liberation, a newly formed Penn club whose mission is to support the "collective liberation of Palestine," called on students to avoid classes on January 24 and rally instead in support of Palestine. The Freedom School announced that it would hold additional demonstrations over the course of the coming weeks.

234.    The next week, antisemitic messages were plastered over Penn's community group on the social media app Sidechat, which requires a Penn email address to join.  Among the messages posted by members of the Penn community that students, including Yakoby, saw is: "When we say 'from the river to the sea' that's what we mean.  Israel is in the way now.  We must clear them out."

235.    On January 15, Penn announced the Presidential Commission on Countering Hate and Building Community (the "Commission"), whose mission is to "serve as a resource for other campus leaders, including those advancing key tenets of Penn's Action Plan to Combat Antisemitism."  One of the Commission members, Professor Küçük, has openly stated that he does not believe Penn has an antisemitism problem.  At least two other Commission members supported and promoted Palestine Writes.  The Commission, like the Task Force, has done nothing since its inception.

236.    On January 18, Penn faculty formed a new organization, "Faculty for Justice in Palestine."  Shortly thereafter, the group held a rally on the steps of College Hall, a campus building that hosts the School of Arts and Sciences and Department of History, blocking access to the building.  The group also held signs accusing Israel of "genocide" and displayed a long banner featuring the names of "Gazans murdered by Israel."  Davis has classes at College Hall and was walking by the rally when she saw students and faculty blocking the entrance.  This protest clearly violated the Guidelines which bar campus demonstrators from knowingly interfering "with unimpeded movement in a University location" and from interfering "unreasonably with the activities of other persons."

237.    On February 6, Rubin attended the first antisemitism Student Advisory Group meeting.  The twelve students were allotted two hours to introduce themselves and express their

primary concerns regarding antisemitism on campus and discuss the horrific hostile environment they experienced during the prior semester.  To Rubin's dismay, the administrators present at the meeting lacked any interest in his urgent and serious security concerns.  Rubin stated that the main priority was safety.  He questioned why Jewish organizations, some of which house up to two hundred students for Friday night Sabbath services, are not afforded security protection, and pleaded with the administration to conduct a threat assessment and make appropriate changes to police presence on campus.  Rubin's suggestions, which he had made countless times before, including on November 18, 2023, have not been implemented.

238.    That same day, Rubin attended a meeting with Laura Perna, Vice Provost for Faculty, who he had been referred to by the Office of Student Affairs on January 25.  At the meeting with Perna, Rubin shared videos and information regarding faculty that have espoused antisemitic viewpoints and conducted themselves in ways that violate school policies.  Perna admitted that Penn does not have a working definition of antisemitism and stated that the professors Rubin had identified were only a small minority.  Perna ended the meeting by promising Rubin that she would reach out to the students enrolled in Booth's course to offer them accommodations if they felt uncomfortable by his antisemitic comics.  Following the meeting, Rubin asked Perna whether she delivered the message to Booth's students.  Perna has yet to reply to Rubin's email.

239.    On February 18, the Freedom School occupied Van Pelt Library in a "study-in" that lasted eight hours in order to promote the false accusation that Israel was intentionally targeting Palestinian educators and schools.  The Freedom School hung posters, including one accusing Israel of "the mass destruction of education," and others that read "intifada" and "From the River to the Sea" on the furniture and windows of the library, which representatives of

Penn's Office of University Life requested be removed.  The group refused to remove the signs and remained in the Reading Room, disrupting other students, including Davis, who were trying to study.  To avoid the occupation, which made her unsettled and distracted her from her studies, Davis moved to another building.  Shortly thereafter, the Freedom School announced protests and "teach-ins" in the days and weeks ahead.  The Freedom School plans to continue these protests, despite the fact that they violate university conduct rules.

240.    On February 23, students, including the Individual Plaintiffs, received a message from Public Safety concerning "an anonymous email" received by administrators at Penn, "threatening violence that used hateful rhetoric based on religion and political affiliation."  The message failed to mention that the hateful rhetoric targeted Jewish and Israeli students.

241.    On February 25, PAO posted the names and images of six Jewish professors who they claim support Israel, encouraging its followers to "DM us if you recognize any other faculty in this picture so they may be shamed for their complicity."

242.    On February 26, while Rubin was studying in his campus dorm room for an exam, he was disturbed by another disorderly and unauthorized rally.  This one took place immediately outside the Caster Building, which houses Penn's School of Public Policy and Practice, and along Penn's Locust Walk.  The organization, Police Free Penn, in collaboration with PAO, promoted the rally and announced it on Instagram as the "Drexel & Penn Are Destroying Black Philly and Palestine Rally."  The announcement explicitly demanded an end to Zionism on campus.

243.    During the rally, students chanted "there is only one solution, Intifada revolution," "from the River the Sea, Palestine will be free," and other antisemitic expressions.  One speaker clarified: "We want all of Palestine.  We will not stop at ceasefire.  We will continue to push

until all these intuitions have divested and we see a full and completely liberated Palestine From the River to the Sea." Davis, who was attempting to walk to class, encountered the rally, which blocked Locust Walk and the entrance to the building in which her classroom was located. To evade the protest, Davis walked in the opposite direction of her class and did not return until she saw the march had continued along Locust Walk, at which point she took a longer route to her class to avoid protestors, causing her to be late. At the same time, a friend of Davis called her crying—she was studying in the library for a midterm she had later that day and was shaken by the protestors, who she could hear from within the building. Davis's friend ultimately missed her test that day due to the disruptions. SAA Member #2, who also had a midterm exam that day, heard the rally while preparing for the exam in Huntsman Hall. SAA Member #2 was distracted by these chants during his exam.

244. Later that day, Jordan Vaughan, one of the Philly Palestine Coalition members who organized the event on Penn's campus, posted the full names, phone numbers, and Instagram accounts of three Jewish students at Penn, apparently as an attempt to "dox" the students and make them feel unsafe on campus. PAO reposted Vaughn's post for the entire Penn community to see.

245. On February 29, 2024, the House Committee held a bipartisan roundtable to hear from Jewish students from nine universities about their experiences with antisemitism on campus. Rubin attended and described his experience at Penn, noting some of the events leading up to President Magill's and Chairman Bok's resignations had already been raised to the House Committee, but that the environment of hatred had continued. In particular, Rubin noted that: Tarawneh was still on campus; Faculty for Palestine was formed and staged a "die-in" blocking the entrance to College Hall; PAO made a joint post with the Philly Palestine Coalition

condemning Jewish Penn professors and exposing their names, faces, and positions; the American Association of University Professors at UPenn, the Faculty Senate, and *The Daily Pennsylvanian* repeatedly blame rich Jewish donors and politicians for attacking academic freedom, yet endorse academic sanctions against Professor Wax, the professor accused of racist speech; and that Dwayne Booth, who created horrifying blood libelous cartoons, is still teaching at Penn and continues to release more hateful content, which was linked on Penn's website.

246.    The next day, March 1, was interim President Jameson's first Board of Trustees meeting as president.  As soon as the meeting began a group of twelve pro-Palestinian protestors affiliated with the Freedom School started calling for "endowment transparency now" and "divest[ment] from genocide."  A Penn spokesperson stated that the students were "heard and acknowledged three times by the Chair of the Board" and that "their ongoing disruption of the meeting violates the University's Code of Student Conduct and Guidelines on Open Expression." The student protestors were so disruptive that the meeting had to be adjourned within minutes of starting.  Professor Fakhreddine later praised the protestors on social media.  Professor Fakhreddine is teaching a course this semester titled "From the River to the Sea."  A key part of the course is studying the works of terrorist Ghassan Kanafani, who was celebrated at Palestine Writes.

**E.  Penn's Double Standard in Addressing Antisemitism**

247.    Penn's deliberate indifference in response to its egregiously hostile environment—to which Jewish and Israeli students are subjected—is dramatically at odds with how Penn readily takes action to enforce its codes and policies to investigate and address bias-related incidents when the victims are not Jewish or Israeli.  This discriminatory double standard has created, contributed to, aggravated, and exacerbated Penn's hostile educational environment

and the antisemitic abuse and harassment that Individual Plaintiffs, SAA members, and other Jewish students have been forced to endure at Penn.  Penn's supposed commitment to free expression is flatly belied by the egregious double standard Penn displays in protecting speech.  Penn selectively enforces these principles and Penn policies—protecting some expression, including hate speech that spills into antisemitic harassment—but refuses to protect the expression of viewpoints it disfavors, including those that are pro-Jewish and pro-Israel.

248.    For example, Penn frequently invokes purported free speech concerns to support and protect students and faculty who support Hamas, Palestinian terrorism, or antisemitism, even as it condemns and disciplines students and faculty who espouse viewpoints and take positions that Penn selectively deems inappropriate.  In the Foundation for Individual Rights and Expression's 2024 College Free Speech Rankings—a comprehensive assessment of free speech on college campuses—Penn was ranked next to last.

249.    This is not new at Penn.  In 1993, for example, Eden Jacobowitz, an Orthodox Jewish freshman on campus, yelled at a group of boisterous sorority sisters disturbing his studying, "Shut up, you water buffalo!," a term commonly used in his native Hebrew to refer to a loud, rowdy person.  The campus police came to his apartment within minutes, and Jacobowitz was charged and prosecuted in a series of widely publicized proceedings for allegedly violating the university's racial harassment policy, despite zero evidence of racial animus.  In contrast, students like Tara Tarawaneh, who have regularly and openly called for and praised the killing of Jews, and even have been arrested for attacks on Jews, remains in class to this day.

250.    More recently, Penn has pursued Penn Law Professor Wax—including for "violat[ing] . . . broader professional standards, expectations and norms" and "inequitably targeted disrespect"—exemplifying the hypocritical, selective outrage and double standard.

Professor Wax teaches a "Conservative Political and Legal Thought" seminar and expresses conservative ideas, including on race, family structure, and social welfare laws. In response to comments she made regarding Black student academic performance, in 2018, Penn stripped Professor Wax of her first-year courses. Then, in 2022, Penn Law Dean Theodore W. Ruger submitted a case to Penn's Faculty Senate, charging Professor Wax with "flagrant disregard of the standards, rules, or mission of the University or the customs of scholarly communities" and seeking "major sanctions" against Professor Wax, largely related to her race-related comments and writings outside Penn and the speakers she invited to her class. In May 2023, a hearing board convened by the Faculty Senate held a three-day hearing on the charges.

251.   Less than two months later, the hearing board issued its findings, concluding that Professor Wax engaged in "flagrant unprofessional conduct," including "dereliction of her scholarly responsibilities." The hearing board stated that "[Professor Wax's] consistent reliance on misleading and partial information, which often leads her to make unsubstantiated statements and to draw sweeping and unreliable conclusions, violates the University of Pennsylvania's Faculty Handbook as well as broader professional standards, expectations and norms" and that because her controversial views "are presented as uncontroverted" and are "demeaning and demoralizing to minority groups," they "inequitably impact the learning environment" and "violate behavioral professional norms." The hearing board also found that Professor Wax's "history of disrespectful and dismissive treatment of various groups" "flagrantly violated [Penn] norms to treat all students with equitable due respect." In sum, the hearing board found, this "behavior ha[d] created a hostile campus environment and a hostile learning atmosphere." The hearing board's recommended "major sanctions" included, among other things, one-year

suspension at half pay, a "[p]ublic reprimand" by Penn, mandated "professional development" training, and loss of her named chair.

252.    Penn's response to Professor Wax's statements outside the classroom and off campus are in stark contrast to Penn's persistent refusal to enforce its polices with respect to antisemitic hate speech and harassment by other Penn faculty on and off campus, including, but not limited to, Professor Norton, Booth, and Professor Almallah, all of whom, as alleged herein, went well beyond expressing views which were "demeaning and demoralizing to minority groups," and "violating University of Pennsylvania's Faculty Handbook as well as broader professional standards, expectations and norms."

253.    Penn's free expression double standard has been particularly stark in the context of unauthorized and disruptive antisemitic demonstrations which run afoul of Penn's policies. Penn has and will swiftly and effectively enforce its policies to quell disturbances of campus life and learning, but refuses to do so for the benefit of Penn's Jewish community.  For example, on December 4, 2019, Penn Law Students for Israel ("PLSI") hosted an event featuring a general from the IDF, Amir Ebstein, as a guest speaker.  General Ebstein was booked months in advance and traveled from Israel for the event.  Before the event, and as provided for in the Guidelines, an Open Expression Observer—a delegate of the vice provost responsible for enforcing the Guidelines—spoke, putting attendees on notice of their duties and obligations under the Guidelines, including the prohibition of unreasonably interfering with the event.  Yet as soon as General Ebstein began speaking, protestors began shouting so loud that they drowned out his voice and General Ebstein was forced to sit down.  Even after the Open Expression Observer again warned the protestors that it was against Penn's policies to shout while General Ebstein was speaking, the protestors shouted so loud that General Ebstein was forced to stop his speech.

This cycle of events repeated itself until finally, the Open Expression Observer warned the protestors they would be removed if they continued.  Despite these warnings, the protestors continued chanting, and the Open Expression Observer did not follow through with the removal.

254.    The vice provost was aware of this event, as its delegate, the Open Expression Observer, was present and made halfhearted efforts to maintain decorum.  However, Penn never disciplined any of the students who violated the Guidelines and a litany of other policies during the event.  In fact, when PLSI students complained to then Penn Law Dean of Students Felicia Lin, they were told that "no Law School disciplinary action can move forward" until the Committee on Open Expression issues a decision on whether the Guidelines were violated.  But the dean of students was incorrect—it is the vice provost charged with enforcing the Guidelines, and the vice provost's delegate Open Expression Observer had made clear that those Guidelines were violated.  Yet nobody—not the vice provost, the Committee on Open Expression, nor the Law School—disciplined or sanctioned the violators.

255.    On the other hand, in October 2022, when student members of Fossil Free Penn ran onto the football field at Penn's homecoming football game to protest gentrification of University City, nineteen students were arrested by Penn Police officers.  Arrested students received sentences of community service and were put on disciplinary probation for the entire following semester.  Two participants were suspended from the Penn marching band.  Asked for comment by a reporter, a Penn spokesperson stated that the protest violated the Guidelines and was not "an appropriate expression of free speech, nor consistent with Penn's open expression guidelines."

256.    Penn likewise practices a double standard in readily responding to attacks against minority groups other than Jews.  The Individual Plaintiffs, SAA members, and other Jewish and

Israeli students at Penn, like Jews and Israelis around the world, were deeply and personally affected and traumatized by the October 7 attacks.  They felt the attack was an attack against them and their people, and were in need of support.  As with regard to other minorities and protected groups, they reasonably expected that Penn would immediately speak out in their unequivocal support and provide resources and accommodations to help them through a time of need.  For example, Penn took prompt action in response to violence against Asian students in the wake of the COVID pandemic.

257.    Similarly, following George Floyd's murder in May 2020 in Minnesota, Penn's president was quick to issue a statement and solidarity with its African-American community, stating:

> I especially want Penn's African American students, faculty, and staff to know how much they and their contributions to our community are treasured.  It is particularly important at this difficult time that Penn's students of color know their University supports them, which we unequivocally do.

258.    When war broke out in Ukraine in February 2022, the Russian and East European Studies Department released the following statement:

> The Department of Russian and East European Studies at the University of Pennsylvania condemns in the strongest possible terms the unprovoked, needless, and cruel attack by the Russian Federation, with support from the state of Belarus, on Ukraine.  This unjust war is causing untold suffering and civilian death.  We stand in solidarity with Ukraine and with all people of the region, of all ethnicities and nationalities, who are defending Ukraine's population, aiding victims and refugees, and resisting and protesting the Russian Federation's criminal aggression.  We offer support to our students from the region who are suffering along with their homelands.  This war must stop, and we call on all concerned people to do everything in their power to achieve that end.

259.    Yet when it comes to Jews and Israel, it took Penn three different attempts, after intense criticism from Congress, trustees, alumni, students, parents, and organizations such as the

ADL and the AJC, to issue a statement condemning the soaring and alarming increase in antisemitism and antisemitic violence that has plagued Penn's Jewish students following Palestine Writes and the October 7 Hamas massacre.

260.   Penn's failure and refusal to discipline antisemitic students and student groups like PAO, who regularly call for the eradication of Israel and its Jewish inhabitants, also stands in stark contrast to the discipline Penn has meted out in response to other rulebreakers who do far less.  For example, while Penn has failed and refused to take disciplinary action in response to any of the outrageous antisemitic incidents described herein, it has readily disciplined students for minor violations of Penn's COVID-19 curfew rules.

261.   Penn's double standard is also reflected in its faculty hiring decisions.  It would be unimaginable for Penn to recruit and hire faculty who call for violence against any other minority group or citizens of any other country.  Yet Penn recruits, hires, promotes, protects, and touts faculty who express antisemitic views, endorse violence against Jews, call for Israel's destruction, and justify, encourage, and celebrate violence against Israel and its citizens.

262.   Penn not only hires and employs professors and staff who espouse antisemitic viewpoints, but also awards them with honors.  For example, Professor Norton—who has described Jewish students' concerns about antisemitism on campus as "absurd propaganda"—retains her title as the Stacey and Henry Jackson President's Distinguished Professor.  Yet Penn swiftly punishes professors accused of other forms of racism, like Professor Wax.

263.   Penn has also suspended organizations that violate university policies.  In February 2020, for example, Penn suspended the International Affairs Association's registration with Penn, after the Office of Student Conduct found it responsible for "violating University

Anti-Hazing Policy by conducting organization-wide initiation events for new members that involved drinking games, scavenger hunts and quizzes."

264.    Every single incident of antisemitic behavior—every instance of abuse, harassment, and intimidation—detailed herein flagrantly violates Penn's policies.  Yet time and again, incident after antisemitic incident, Penn has taken no disciplinary action.  As a result of such discrimination and deliberate indifference, Penn has created, nurtured, and fostered a hostile educational environment for Jewish students.

**F.     Penn Discriminated Against Jews by Intentionally Reducing Its Jewish Enrollment**

265.    The population of Jewish Penn students has continuously and precipitously declined over the past twenty years.  In 2000, Jewish students accounted for approximately one-third of Penn's enrollment.  Today, that figure has more than halved, with a rapid decline in the early 2010s and over the past several years.  The Steinhardt Social Research Institute, for example, reported that in 2010, almost 20% of Penn students were Jewish, while in 2016, only 13% of the campus identified as Jewish, representing a 40% drop in just six years.  Other surveys estimate that Penn's Jewish population has decreased approximately 42% since 2000.

266.    In February 2023, Penn's Hillel held a virtual meeting for parents and alumni to address the "serious decline in Jewish population" at Penn over "the past 15 years," about which it felt the need to "educat[e]" Penn.  Rabbi Gabe Greenberg, Executive Director of Penn's Hillel, noted that with the rise in antisemitism on college campuses, "[w]e are deeply concerned that a decline in Jewish students at this exact moment[] both sends the wrong message and concretely negatively affects the lived experience of Jewish students on campus."

267.    The dramatic decline in Jewish enrollment is hardly coincidental.  Penn has used various tactics to limit Jewish enrollment, and the only explanation for the precipitous drop is

that Penn, in violation of applicable civil rights laws, has intentionally engineered it, which has only worsened the antisemitic environment on its campus.

**G.      Jewish Students Have Been Denied Equal Access to Penn's Educational Opportunities**

268.     The Individual Plaintiffs, SAA members, and other Jewish and/or Israeli students are acutely aware that, solely because of their Jewish identity and/or Israeli citizenship, Penn views and treats them as second-class citizens in the Penn community, undeserving of the protections that Penn affords non-Jewish students.  As a result of Penn's persistent and unlawful failure and refusal to comply with its obligations to prohibit discrimination and harassment against Jewish and Israeli students, the Individual Plaintiffs, SAA members, and other Jewish and/or Israeli students, unlike other Penn students, have been deprived of the benefits that those other students enjoy at Penn, including but not limited to physical protection; emotional support; the sense of belonging and inclusion; the ability to speak freely in class and in written course work concerning their Jewish identity; their rights as individual human beings to express their identities; their rights as American citizens to freely express their religions and viewpoints; and their right to express their love and admiration for Israel, their ancestral homeland (and, for Yakoby and Rubin, their country of citizenship), where they have many friends and family.  To the contrary, as a result of Penn's actions and inactions alleged herein, the Individual Plaintiffs and SAA's Jewish and/or Israeli Penn student members are made to feel less important than, and different from, other non-Jewish students.  Students, along with Penn faculty, are able to taunt, demonize, assault, harass, intimidate, ostracize, and discriminate against the Individual Plaintiffs and SAA's student members, and other Jews and/or Israelis with impunity.

269.     The antisemitic events and incidents described herein have severely damaged the ability of the Individual Plaintiffs and SAA members to participate in Penn's educational and

other programs.  Penn's actions and inactions concerning antisemitism and anti-Jewish abuse, intimidation, harassment, and discrimination, as described herein, have created and fostered a hostile environment that has traumatized the Individual Plaintiffs and SAA members and made their college lives at Penn unbearable.  The Individual Plaintiffs and SAA's Jewish and/or Israeli Penn student members, and other Jewish students do not feel physically safe on Penn's campus or in its classrooms and other facilities and avoid certain areas of campus.  They fear the harassment, abuse, and intimidation they might face, on any given day, from the professors who are supposed to teach them, and who are required to treat them with respect and dignity pursuant to the policies that Penn is required to enforce equally for all students.  The Individual Plaintiffs and SAA members likewise fear the potential physical violence, harassment, abuse, and intimidation they might face, on any given day, from the students who are also required to follow university policies.

270.    As a result of Penn's actions and inactions as alleged herein, the Individual Plaintiffs and SAA members do not feel safe walking the campus, being in Penn's facilities, or going to class.  The Individual Plaintiffs and SAA members intend to stay at Penn until graduation, and some had intended to apply to Penn's graduate schools.  However, because of the continuous calls by Penn students and faculty for the annihilation of Israel, the Individual Plaintiffs and SAA members reasonably fear that the antisemitic harassment they have experienced will continue unless and until the administration takes decisive action to combat it. Yakoby has repeatedly told the administration he fears for his physical safety and is forced to miss class because the administration will not address, and protect him from, the anti-Jewish harassment on campus.  Yakoby is often late to or absent from class.  Yakoby repeatedly voiced his concerns over Penn's failure to act with respect to Palestine Writes and post-October 7

events, and Penn has consistently ignored, dismissed, and acted with indifference to his concerns.  As a result of Penn's indifference, he now fears that he has a target on his back for speaking out to administrators, including those within the Political Science Department, in which he is a major.  He fears that his Political Science and Middle East Studies professors, among others, whose courses he must take to complete his Middle East Studies major, will not review his work fairly given their awareness of his Jewish and Israeli identity and their animus and hatred toward persons of his ethnicity, national origin, and citizenship.  Yakoby, who has been receiving death threats, such as "die Zionists pig," due to his activism on campus, now lives in fear for his safety.  If Penn continues to fail students like Yakoby, and if Penn's "ongoing" processes do not manifest in concrete action immediately, the harm that the Individual Plaintiffs and SAA members have experienced will continue to recur.  Indeed, as the demonstrators have made clear, they will not stop at "ceasefire"; just as Penn has made clear that it will do nothing to address antisemitic vitriol and harassment.

271.    Davis's experience at Penn, as a freshman, has been devastating.  Growing up in a small town in Wyoming, she was the only Jewish student in her high school.  She chose to attend Penn in large part because during her application process, she was assured by Penn that it was a welcoming, receptive, and nurturing environment for students, like her, whose Jewish identity is a core part of their lives.  She came to Penn eager to proudly practice her Judaism, identify as a Jew and an Israel supporter, and display her Jewish ancestry in the same way, and with the same freedom, that other students are able to show pride in their identities.  Yet her three months at Penn have been a nightmare.  She has been assaulted, mocked, abused, harassed, intimidated, and demonized, solely because she is Jewish and supports her ancestral homeland and the people who live there.  She is terrified not only for her physical safety and indeed for her life, but also

for what will happen to her if she dares to speak out about the antisemitism she must constantly confront on campus.  She has spent parts of her freshman fall semester cowering in her dorm room rather than having to contend with rampaging mobs echoing the cries of terrorists to slaughter Jews and eradicate the world's only Jewish country.  She is also devastated that she attends a school that charges over $60,000 per year in tuition, fees, and other costs, and that told her she would be safe and embraced as a Jewish student, but that, in reality, deems her unworthy, inferior, and an appropriate target for violence, abuse, and ridicule.  As a result of Penn's tolerance for antisemitism, antisemitic vitriol has been directed at Davis, who is now a public target as a result of filing the initial complaint in this action.  Davis has lost friends on campus, has been falsely labeled a racist, and is relentlessly bullied.  Because of the intense anti-Jewish vitriol she experienced as a result of Penn's deliberate indifference, Davis now attends counseling regularly.  She is excluded from the same protections that Penn affords non-Jewish students subjected to bias-related harassment and intimidation.

272.     As the co-President of the Penn Israel Public Affairs Committee, Rubin fears that students and faculty will target him for being an outspoken Jew.  Following the demonstrations and mobs rampaging campus, Rubin could not sleep for over two weeks.  Rubin, who has a rigorous schedule every semester and is in one of the most prestigious programs at Penn, got his first incomplete in the fall 2023 semester as a result of Penn's unwillingness to address the hostile environment he faced.  Rubin no longer attends certain events and avoids certain parts of campus during certain times.  Rubin copes with this new reality by channeling his efforts to advocate the rights of Jewish students.  He has spent countless hours documenting the antisemitism on campus, corresponding with other concerned Jewish students, and communicating with an administration whose deliberate indifference has deeply impacted

Rubin's college experience.  In response, Penn has been deliberately indifferent to Rubin, who has faced threats from students and community members due to his activism on campus.

273.   SAA Member #1's academic experience at Penn has been severely impacted by the antisemitism she faced in the classroom.  After taking a course with Professor Almallah, SAA Member #1 spent her last year on campus keeping to herself, too afraid to be ostracized in class for sharing her perspective.  As a religious individual easily identifiable as Jewish, SAA Member #1 experienced heightened fear on campus of potential physical or verbal assaults from classmates due to her Judaism and her vocal support for Israel's right to exist.  Consequently, SAA Member #1 has refrained from openly expressing her support for Israel on campus due to these concerns.

274.   SAA Member #2 has trouble focusing in class due to the antisemitism permeating campus.  When he runs into protestors on campus walkways, his trouble focusing on school work intensifies.  SAA Member #2 does his best to avoid these disruptions but is constantly taken off guard because the administration does nothing to warn students when and where they will occur.  When he is warned beforehand, SAA Member #2 takes alternative routes to and from campus to avoid rallies.  President Magill's testimony during the Antisemitism Hearing constantly replays in SAA Member #2's head, as does Tarawneh's speech praising the murder of Jews and the fact that she is still a student on campus.

275.   The Individual Plaintiffs and SAA's Jewish and/or Israeli Penn student members also justifiably fear the harassment, discrimination, and intimidation they face, on any given day, from professors and Penn leadership—who are supposed to teach and guide them—and from their fellow students, all of whom are required to treat them with respect and dignity under Penn's policies.  As a result of Penn's deliberate indifference to its hostile educational

environment, including its clearly unreasonable response—and/or failure to respond at all—to reported incidents, the Individual Plaintiffs and SAA's Jewish and/or Israeli Penn student members are often unable to focus, study, or perform their course work to the best of their ability, thereby inhibiting their ability to maximize their Penn education. These students have had to spend their time at Penn fearing for their physical safety, enduring anti-Jewish abuse and harassment, and communicating with Penn administrators in vain over antisemitism. They have been unable to focus on their coursework or otherwise enjoy their Penn experience.

276.    Penn's actions and inactions described above not only deprive the Individual Plaintiffs and SAA members of their right to the educational and extracurricular opportunities afforded other students—which have led and will continue to lead to adverse academic, social, and professional consequences—but also severely adversely affect their health, mental well-being, and sense of security.

### COUNT I
### Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*

277.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully stated herein.

278.    Penn receives financial assistance from the United States Department of Education and is therefore subject to suit under Title VI of the Civil Rights Act of 1964.

279.    Discrimination against Jews and/or Israelis—including based on actual or perceived ancestry, race, ethnic characteristics, or national origin—is prohibited under Title VI, as reflected not only in decades of Title VI jurisprudence, but also in the written policies of the Office of Civil Rights of the United States Department of Education.

280.    The Individual Plaintiffs are and identify as Jewish, and their status and identification as Jews brings them within the scope of Title VI's protections. Yakoby and Rubin

are Israeli citizens and of Israeli national origin.  The Individual Plaintiffs are current students at Penn.  SAA's members include current and former Jewish and/or Israeli students at Penn, who are also within the scope of Title VI's protections.

281.    Title VI prohibits a recipient of federal funds from intentionally treating any individual worse, even in part, because of his or her ancestry, race, ethnic characteristics, or national origin.

282.    The acts and omissions of Penn and its administrators have subjected, and continue to subject, the Individual Plaintiffs and SAA's Jewish and/or Israeli members to discrimination and harassment on the basis of their actual and/or perceived Jewish and/or Israeli ancestry, race, ethnic characteristics, or national origin.

283.    Penn and its administrators had actual notice that that discrimination and harassment, over which Penn had substantial control and the authority to remediate, was, and continues to be, so severe, pervasive, and objectively offensive that it created, and continues to create, a hostile environment based on Jewish and/or Israeli ancestry, race, ethnic characteristics, or national origin that deprives the Individual Plaintiffs and SAA's Jewish and/or Israeli members of full access to Penn's educational programs, activities, and opportunities.

284.    Penn and its administrators intentionally discriminate against the Individual Plaintiffs and SAA's Jewish and/or Israeli members because of their actual and/or perceived Jewish and/or Israeli ancestry, race, ethnic characteristics, or national origin, as exhibited by their deliberate indifference to the antisemitic abuse, harassment, and intimidation of the Individual Plaintiffs and SAA's Jewish and/or Israeli members in violation of Title VI. Specifically, Penn and its administrators clearly and unreasonably failed, and continue to fail, to cure or otherwise adequately, appropriately, and meaningfully address, ameliorate, or remedy the

discrimination against the Individual Plaintiffs and SAA's Jewish and/or Israeli members, and the hostile environment that Jewish and Israeli students, including the Individual Plaintiffs and SAA's Jewish and/or Israeli members, are forced to endure at Penn because of their race, ethnic characteristics, or national origin.  Additionally, Penn has failed to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment, and prevent the harassment from recurring.  Such unlawful deliberate indifference causes plaintiffs to be subjected to a hostile educational environment.

285.    The environment at Penn, which has been rendered hostile for the Individual Plaintiffs and SAA's Jewish and/or Israeli members as a result of their Jewish and/or Israeli ancestry, race, ethnic characteristics, or national origin, is sufficiently severe, pervasive, persistent, and offensive such that it deprives the Individual Plaintiffs and SAA's Jewish and/or Israeli members of equal access to the educational opportunities and benefits that Penn provides to non-Jewish and non-Israeli students.

286.    Penn and its administrators actively and intentionally engage in this pattern of severe and/or pervasive discrimination.

287.    Penn and its administrators also directly and intentionally discriminate against the Individual Plaintiffs and SAA's Jewish and/or Israeli members, with their actual or perceived Jewish and/or Israeli ancestry, race, ethnic characteristics, or national origin a substantial or motivating factor in Penn's actions.

288.    Penn continues to unreasonably fail to act, or to act inadequately and discriminatorily, and with leniency, tolerance, deliberate indifference, and/or unjustifiable delay in applying its policies to known or reported incidents involving antisemitism or where the victim or complainant was a Jewish and/or Israeli student, including the Individual Plaintiffs and

SAA's Jewish and/or Israeli members.  As detailed above, Penn's actions and inactions were, and continue to be, intended to treat Individual Plaintiffs and SAA's Jewish and/or Israeli members differently as Jewish and Israeli students as compared to incidents involving other similarly situated non-Jewish and non-Israeli students.

289.    Penn's acts and omissions were the actual, direct, and proximate causes of plaintiffs' injuries.

290.    As a result of the foregoing, the Individual Plaintiffs and SAA's Jewish and/or Israeli members have suffered, and continue to suffer, substantial damages in an amount to be determined at trial.

291.    The Individual Plaintiffs and SAA's Jewish and/or Israeli members have been and will continue to be injured because Penn has and will continue to deny them equal access to the educational opportunities and benefits provided to other students, and has and will continue to intentionally discriminate against them on the basis of Jewish ancestry, race, or ethnic characteristics, or national origin, and Israeli national origin.

292.    Plaintiffs are entitled to appropriate injunctive relief under Title VI, as Penn has knowledge of, and has been and continues to be deliberately indifferent to, a hostile environment that is severe, persistent, and pervasive; there is no adequate remedy at law to prevent Penn from continuing to discriminate against its students on the basis of Jewish and/or Israeli ancestry, race, ethnic characteristics, or national origin in violation of Title VI; and the harm plaintiffs will otherwise continue to suffer is irreparable.

293.    Plaintiffs are entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT II
### Breach of Contract

294.     Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

295.     At all relevant times, an express contractual relationship existed between Penn and the Individual Plaintiffs and SAA's Jewish and/or Israeli members by virtue of their enrollment at Penn and as defined by and through written Penn codes, policies, and procedures governing student and faculty conduct, including but not limited to Penn's (i) Code of Student Conduct; (ii) Guidelines on Open Expression; (iii) Nondiscrimination Statement; (iv) Charter of the Student Disciplinary System; (v) Principles of Responsible Conduct; (vi) Penn's Equal Opportunity and Affirmative Action Policy; and (vii) Faculty Handbook.  Through the documents and materials it publishes and provides to students, Penn makes express contractual commitments to its students concerning bias-related abuse, harassment, intimidation, and discrimination.

296.     Pennsylvania law recognizes that the relationship between a student and a university is contractual in nature; that the terms of student handbooks, guidelines, policies, procedures, course catalogs, registration materials, bulletins, circulars, and regulations become part of that contract; and that students may bring a cause of action for breach of contract where the university ignores or violates portions of these written contracts.

297.     The Individual Plaintiffs and SAA's Jewish and/or Israeli members have complied with their obligations under these contracts.

298.     Penn breached its agreements with the Individual Plaintiffs and SAA's Jewish and/or Israeli members, and failed to comply with its obligations under these contracts, throughout the course of the Individual Plaintiffs and SAA's Jewish and/or Israeli members'

enrollment at Penn, including by, among other things, failing to comply with the following provisions:

- "The University of Pennsylvania does not discriminate on the basis of race, color, sex, sexual orientation, gender identity, religion, creed, national or ethnic origin, citizenship status, age, disability, veteran status or any other legally protected class status in the administration of its admissions, financial aid, educational or athletic programs, or other University-administered programs or in its employment practices." (Nondiscrimination Statement.)

- Students are guaranteed "[t]he right to have access to and participate in the academic and non-academic opportunities afforded by the University, subject to applicable standards or requirements." (Code of Student Conduct.)

- Penn community members must "respect the health and safety of others. This precludes acts or threats of physical violence against another person (including sexual violence) and disorderly conduct. This also precludes the possession of dangerous articles (such as firearms, explosive materials, etc.) on University property or at University events without University authorization." (Code of Student Conduct.)

- Penn community members must "respect the right of fellow students to participate in University organizations and in relationships with other students without fear, threat, or act of hazing." (Code of Student Conduct.)

- Penn community members must "refrain from conduct towards other students that infringes upon the Rights of Student Citizenship. The University condemns hate speech, epithets, and racial, ethnic, sexual and religious slurs." (Code of Student Conduct.)

- Penn community members must "refrain from stealing, damaging, defacing, or misusing the property or facilities of the University or of others. This also precludes the disruption of University computing services or interference with the rights of others to use computer resources." (Code of Student Conduct.)

- Penn community members must "comply with policies and regulations of the University and its departments (*e.g.*, the University's Guidelines on Open Expression, Anti-Hazing Regulations, Drug and Alcohol Policies, Sexual Harassment Policy, etc.)." (Code of Student Conduct.)

- Penn community members must "comply with federal, state, and local laws." (Code of Student Conduct.)

- Penn community members must respect "the right of others to pursue their normal activities within the University and to be protected from physical injury or property damage." (Guidelines on Open Expression.)

- Penn community members must not "hold meetings, events or demonstrations under circumstances where health or safety is endangered"; or "knowingly interfere with unimpeded movement in a University location." (Guidelines on Open Expression.)

- Penn community members "may not have a 'heckler's veto' over speech with which they disagree." (Guidelines on Open Expression.)

- "[A]ll members of the University community need to understand and uphold both legal requirements and the highest of ethical standards." (Principles of Responsible Conduct.)

- "[T]eacher[s] should at all times show respect for the opinions of others, and should indicate when they are not speaking for the institution." (Faculty Handbook.)

- "[T]he obligation to comply with all provisions of the Code of Student Conduct; with all other policies and regulations of the University, its Schools, and its Departments; and with local, state, and federal laws," for which failure will be met with sanctions, including but not limited to: warning, reprimand, fine, restitution, disciplinary probation, withdrawal of privileges, suspension, indefinite suspension, or expulsion. (Charter of the Student Disciplinary System.)

299.    As a direct, proximate, and foreseeable consequence of the foregoing breaches, plaintiffs have been damaged in amounts to be determined at trial.

### COUNT III
### Pennsylvania Unfair Trade Practices and Consumer Protection Laws,
### 73 Pa. Stat. Ann. § 201-1 *et seq.*

300.    Rubin and Davis repeat and reallege the allegations of the preceding paragraphs above as though fully set forth herein.

301.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") provides consumer protection by declaring as unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce" in Pennsylvania. 73 Pa. Stat. Ann. § 201-3.

302.    The UTPCPL is to be construed liberally to even the bargaining power between consumers and businesses.

303.    At all relevant times, Penn offered for sale to the public educational goods and services.

304.    Rubin and Davis purchased these goods and services from Penn for personal purposes, namely by accepting admission to and enrolling at Penn, and paying tuition to Penn, to pursue an education.

305.    Penn has not acted in accordance with, and has not followed through on, its statements against discrimination, abuse, safety, and harassment that were made in connection with the sale of its educational goods and services, and which include those reflected, embodied, and set forth in Penn's rules and policies, including its: (i) Code of Student Conduct; (ii) Guidelines on Open Expression; (iii) Nondiscrimination Statement; (iv) Charter of the Student Disciplinary System; (v) Principles of Responsible Conduct; (vi) Penn's Equal Opportunity and Affirmative Action Policy; and (vii) Faculty Handbook.  Instead, Penn engages in the acts or practices described herein, which are unfair or deceptive or misleading in a material way in violation of UTPCPL, that are aimed at consumers of its goods and services for personal purposes (namely, current and prospective students), and that are likely to mislead a reasonable prospective or current student acting reasonably under the circumstances.  Such unfair or deceptive acts or practices include unfairly or deceptively leading Rubin and Davis to believe that Penn would apply, enforce, and follow the rules and policies, and the commitments contained therein; and unfairly or deceptively causing plaintiffs to believe that if they paid tuition and fees to Penn, then Penn would uphold, adhere to, abide by, comply with, and equally apply its stated rules and policies, and the commitments contained therein, to foster, ensure, maintain, and create an environment free of discrimination, abuse, harassment, and intimidation, and provide an adequate and appropriate setting and environment in which all students, of whatever ancestry, race, ethnicity, or national origin, could freely express their identity and ancestry, could

learn and grow, and could participate fully and meaningfully in Penn's educational and other programs.

306.    Rubin and Davis saw, heard, and were aware of Penn's unfair, deceptive and misleading acts, statements, warranties, omissions, and representations described above before they enrolled at Penn, and after they enrolled at Penn.

307.    Rubin and Davis reasonably relied on these unfair, deceptive and misleading acts, statements, warranties, omissions, and representations in entering into a contractual agreement with Penn upon their enrollment, and continue to make tuition and other payments to Penn while a student.

308.    Penn's unfair, deceptive, and misleading statements and practices described above proximately caused Rubin and Davis injury by causing them to enroll at Penn, and to pay tuition and fees to Penn, and to continue to maintain enrollment at, and pay tuition and fees to, Penn, based on their justifiable and reasonable reliance on Penn's representations that it would apply, enforce, and follow through on its codes and policies, and the commitments contained therein, concerning protecting students from harassment, abuse, intimidation and discrimination based on their ancestry, race, ethnicity, or national origin, would otherwise seek to protect students from such hateful and bigoted conduct, and would take actions and implement measures to adequately, appropriately, and sufficiently address such misconduct to foster, ensure, and maintain a safe educational and campus environment.

309.    Penn's failure, refusal, lack of ability and intention, and lack of commitment to combating, addressing, and ameliorating these deplorable actions, and to making good on and complying with its aforementioned statements, constitute unfair or deceptive practices, false representations of the quality and standards of Penn's educational goods and services with intent

not to sell them as advertised, and fraudulent and deceptive conduct which created a likelihood of confusion and misunderstanding in violation of the UTPCPL.

310.    Penn's actions have caused, and continue to cause, Rubin and Davis to sustain actual, foreseeable damages, including the loss of the value of the tuition and fees they have paid Penn, loss of educational and extracurricular opportunities, economic injuries, and other direct and consequential damages.

311.    Accordingly, Rubin and Davis are entitled to statutory and/or actual damages in amounts to be determined at trial, a permanent injunction barring Penn from committing further violations of the UTPCPL, and to treble damages pursuant to 73 Pa. Stat. Ann. § 201–9.2, based on Penn's intentional, reckless, and wrongful violations.

312.    Rubin and Davis are entitled to attorneys' fees and costs pursuant to 73 Pa. Stat. Ann. § 201–9.2.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray and request that a judgment be entered in each of their favor, and against Penn awarding them:

    A.  Injunctive relief enjoining Penn and its agents from establishing, implementing, instituting, maintaining, or executing policies, practices, procedures, or protocols that penalize or discriminate against Jewish and Israeli students, including plaintiffs, in any way and ordering Penn to take all necessary and appropriate remedial and preventative measures, such as the following: (i) disciplinary measures, including termination, against deans, administrators, professors and other employees responsible for the antisemitic abuse permeating the school that

plaintiffs and SAA members experience, whether because they engage in it or permit it; (ii) disciplinary measures, including suspension or expulsion, against students who engage in such conduct; (iii) declining and returning donations, whether from foreign countries or elsewhere, implicitly or explicitly conditioned on the hiring or promotion of professors who espouse antisemitism or the inclusion of antisemitic coursework or curricula; (iv) adding required antisemitism training for Penn community members; and (v) appointing a neutral expert monitor to oversee compliance with this Court's order.

B.      Compensatory, consequential, and punitive damages in amounts to be determined at trial;

C.      Statutory penalties, including treble damages, for violations of Pennsylvania Unfair Trade Practices and Consumer Protection Law;

D.      Reasonable attorneys' fees, costs of suit, and expenses;

E.      Pre-judgment interest and post-judgment interest at the maximum rate allowable by the law; and

F.      Such other and further relief as the Court deems just and proper.

Dated:    Philadelphia, Pennsylvania          Respectfully submitted,
          March 4, 2024


                                              By:  */s/ Eric A. Shore*_____

                                              **LAW OFFICES OF ERIC A. SHORE, P.C.**

                                                   Eric A. Shore (ID: 73807)
                                                   Briana Pearson-Prout (ID: 327007)
                                                   1500 JFK Boulevard
                                                   Suite 1240
                                                   Philadelphia, Pennsylvania 19102
                                                   Tel:  (856) 433-6198
                                                   erics@ericshore.com
                                                   brianap@ericshore.com

                                                   - and -

                                              **KASOWITZ BENSON TORRES LLP**

                                                   Marc E. Kasowitz*
                                                   Daniel R. Benson*
                                                   Mark P. Ressler*
                                                   Andrew L. Schwartz*
                                                   Joshua E. Roberts*
                                                   Jillian R. Roffer**
                                                   Scott Christopher*
                                                   Yarden N. Hodes*
                                                   1633 Broadway
                                                   New York, New York 10019
                                                   Tel:  (212) 506-1700
                                                   mkasowitz@kasowitz.com
                                                   dbenson@kasowitz.com
                                                   mressler@kasowitz.com
                                                   aschwartz@kasowitz.com
                                                   jroberts@kasowitz.com
                                                   jroffer@kasowitz.com
                                                   schristopher@kasowitz.com
                                                   yhodes@kasowitz.com

                                              *Admitted *pro hac vice*
                                              ** *pro hac vice* application pending

                                              *Attorneys for Plaintiffs*

                                                   111