**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| EYAL YAKOBY, JORDAN DAVIS, NOAH RUBIN, and STUDENTS AGAINST ANTISEMITISM, INC. | |
| Plaintiffs, | No. 2:23-cv-04789 (MSG) |
| v. | **ORAL ARGUMENT REQUESTED** |
| THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, | |
| Defendant. | |

**<u>DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT
WITH PREJUDICE AND MOTION TO STRIKE</u>**

## <u>TABLE OF CONTENTS</u>

NOTICE OF MOTION AND MOTION TO DISMISS AND MOTION TO STRIKE ..................1

INTRODUCTION ...........................................................................................................1

BACKGROUND .............................................................................................................4

ARGUMENT ..................................................................................................................6

I.      Plaintiffs' Claims Should Be Dismissed Under Rule 12(b)(1) Because Plaintiffs'
Challenge to Penn's Ongoing Response to Antisemitism Is Premature ............................6

II.     Plaintiffs' Claim for Injunctive Relief Should Be Dismissed Under Rule 12(b)(1) for
Lack of Standing ..........................................................................................................9

      A.     Plaintiffs Have Not Alleged a Clearly Impending Future Injury Traceable
to Penn's Alleged Title VI Violation ...................................................................9

      B.     Plaintiffs' Injunction Would Not Redress Their Alleged Injuries .........................16

III.    SAA's Claims Should Be Dismissed for Lack of Associational Standing .......................17

IV.    Plaintiffs' Title VI Claim Should Be Dismissed Under Rule 12(b)(6) .............................18

      A.     Plaintiffs Do Not Plausibly Allege That Penn Discriminated Against Them ........19

      B.     Plaintiffs Fail to Allege Penn Was Deliberately Indifferent to a Hostile
Educational Environment ...................................................................................21

           1.     Plaintiffs do not plausibly plead that they were subject to severe
and pervasive harassment. .......................................................................22

           2.     Plaintiffs do not plausibly allege that Penn's responses were
clearly unreasonable in light of known circumstances. ..............................24

V.     The Court Should Strike Plaintiffs' Request for Disciplinary Measures and Judicial
Regulation of Private Donations Based on Expression ...................................................33

VI.    Plaintiffs' Contract Claim Should Be Dismissed Under Rule 12(b)(6) ............................35

VII.   Plaintiffs' UTPCPL Claim Should Be Dismissed Under Rule 12(b)(6) ...........................37

      A.     Plaintiffs Do Not Plausibly Allege Penn's Policies Are Deceptive .....................38

      B.     Plaintiffs Have Still Not Pled Justifiable Reliance ...............................................39

CONCLUSION ..............................................................................................................40

i

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abadi v. Target Corp.*,
2023 WL 4045373 (3d Cir. June 16, 2023) ....................................................................11, 13

*Adamian v. Jacobsen*,
523 F.2d 929 (9th Cir. 1975) ..............................................................................................30

*Agency for Int'l Development v. Alliance for Open Society Int'l, Inc.*,
570 U.S. 205 (2013)............................................................................................................29

*Air Transport Ass'n of America v. Reno*,
80 F.3d 477 (D.C. Cir. 1996)..............................................................................................18

*Alexander v. Sandoval*,
532 U.S. 275 (2001)............................................................................................................18

*Allen v. Wright*,
468 U.S. 737 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v.*
*Static Control Components, Inc.*, 572 U.S. 118 (2014) ......................................................15

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)......................................................................................................19, 38

*B.W. v. Career Technology Center of Lackawanna County*,
422 F. Supp. 3d 859 (M.D. Pa. 2019)................................................................................25

*Barnett v. Johnson City School District*,
2005 WL 8178066 (N.D.N.Y. Feb. 2, 2005) ......................................................................17

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................................................................19

*Bird v. Mastery Charter Schools*,
2022 WL 1773673 (E.D. Pa. June 1, 2022)........................................................................23

*Blunt v. Lower Merion School District*,
767 F.3d 247 (3d Cir. 2014)........................................................................18, 19, 20, 22

*Brown-Dickerson v. City of Philadelphia*,
2016 WL 1623438 (E.D. Pa. Apr. 25, 2016) ......................................................................10

*Buccigrossi v. Thomas Jefferson University*,
2022 WL 1093127 (E.D. Pa. Apr. 12, 2022)......................................................................35

*Buck v. Hampton Township School District*,
452 F.3d 256 (3d Cir. 2006)......................................................................................26

*Canfield v. Amica Mutual Insurance Co.*,
2020 WL 5878261 (E.D. Pa. Oct. 2, 2020)................................................................33

*Cavaliere v. Duff's Business Institute*,
605 A.2d 397 (Pa. Super. Ct. 1992)...........................................................................35

*Caver v. City of Trenton*,
420 F.3d 243 (3d Cir. 2005)........................................................................................23

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)................................................................................................3, 11

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)....................................................................................................10

*Corsale v. Sperian Energy Corp.*,
374 F. Supp. 3d 445 (W.D. Pa. 2019), *aff'd*, 819 F. App'x 127 (3d Cir. 2020)...............37, 39

*Corsale v. Sperian Energy Corp.*,
412 F. Supp. 3d 556 (W.D. Pa. 2019)........................................................................38

*David v. Neumann University*,
187 F. Supp. 3d 554 (E.D. Pa. 2016) ..................................................................35, 36

*Davis ex rel. LaShonda D. v. Monroe County Board of Education*,
526 U.S. 629 (1999)..........................................................3, 4, 8, 19, 21, 22, 24, 34

*Doe v. Abington Friends School*,
2022 WL 16722322 (E.D. Pa. Nov. 4, 2022) ............................................................36

*Doe v. County of Centre*,
242 F.3d 437 (3d Cir. 2001).....................................................................................6, 8

*Doe v. Haverford College*,
2023 WL 5017964 (E.D. Pa. Aug. 7, 2023) ..............................................................33

*Doe v. Sacks*,
2024 WL 402945 (S.D.N.Y. Feb. 2, 2024)..................................................25, 28, 31

*Doe v. Sizewise Rentals, LLC*,
2010 WL 4861138 (D.N.J. Nov. 22, 2010), *aff'd*, 530 F. App'x 171 (3d Cir. 2013).............23

*Doe v. The Trustees of University of Pennsylvania*,
270 F. Supp. 3d 799 (E.D. Pa. 2017) ........................................................................27

*Doe v. University of Chicago*,
2017 WL 4163960 (N.D. Ill. Sept. 20, 2017) .......................................................28

*Doe v. Willits Unified School District*,
473 F. App'x 775 (9th Cir. 2012) ...........................................................................25

*Doug Grant, Inc. v. Greate Bay Casino Corp.*,
232 F.3d 173 (3d Cir. 2000).....................................................................................20

*Edwards v. California University of Pennsylvania*,
156 F.3d 488 (3d Cir. 1998)..................................................................................3, 34

*Ellison v. American Board of Orthopaedic Surgery*,
11 F.4th 200 (3d Cir. 2021) ...................................................................................9, 10

*Felber v. Yudof*,
851 F. Supp. 2d 1182 (N.D. Cal. 2011) ......................................................23, 24, 27

*Gjeka v. Delaware County Community College*,
2013 WL 2257727 (E.D. Pa. May 23, 2013) ...........................................................36

*Hanover Prest-Paving Co. v. Tile Tech, Inc.*,
2022 WL 1493568 (M.D. Pa. May 11, 2022)...........................................................33

*Hartig Drug Co. v. Senju Pharmaceutical Co.*,
836 F.3d 261 (3d Cir. 2016)........................................................................................7

*HB v. Monroe Woodbury Central School District*,
2012 WL 4477552 (S.D.N.Y. Sept. 27, 2012)........................................................24

*Houston v. Easton Area School District*,
355 F. App'x 651 (3d Cir. 2009) .............................................................................21

*Hunt v. U.S. Tobacco Co.*,
538 F.3d 217 (3d Cir. 2008)................................................................................38, 40

*Hunt v. Washington State Apple Advertising Commission*,
432 U.S. 333 (1977)..................................................................................................17

*KF ex rel. CF v. Monroe Woodbury Central School District*,
2013 WL 177911 (S.D.N.Y. Jan. 16, 2013), *aff'd*, 531 F. App'x 132 (2d Cir. 2013)............28

*L. L. v. Evesham Township Board of Education*,
710 F. App'x 545 (3d Cir. 2017) .........................................................................18, 22

*Langadinos v. Appalachian School of Law*,
2005 WL 2333460 (W.D. Va. Sept. 25, 2005) ........................................................19

*Loduca v. WellPet LLC,*
    549 F. Supp. 3d 391 (E.D. Pa. 2021) ...............................................................37, 38

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992).........................................................................................11, 16

*Lundy v. Hochberg,*
    91 F. App'x 739 (3d Cir. 2003) ..............................................................................15

*Lutter v. JNESO,*
    86 F.4th 111 (3d Cir. 2023) ..............................................................................11, 14

*Mandel v. Board of Trustees of California State University,*
    2018 WL 1242067 (N.D. Cal. Mar. 9, 2018).................................................27, 28, 33

*Manning v. Temple University,*
    2004 WL 3019230 (E.D. Pa. Dec. 30, 2004), *aff'd*, 157 F. App'x 509 (3d Cir. 2005) ..........40

*McNair v. Synapse Group Inc.,*
    672 F.3d 213 (3d Cir. 2012)....................................................................................10

*MJG v. School District of Philadelphia,*
    2017 WL 5010033 (E.D. Pa. Nov. 2, 2017), *aff'd sub nom. M.J.G. v. School District of Philadelphia,* 774 F. App'x 736 (3d Cir. 2019).................................................................34

*Papish v. Board of Curators of University of Missouri,*
    410 U.S. 667 (1973) (per curiam) ...........................................................................31

*Peachlum v. City of York,*
    333 F.3d 429 (3d Cir. 2003)..............................................................................3, 6, 8

*Pennsylvania Psychiatric Society v. Green Spring Health Servs., Inc.,*
    280 F.3d 278 (3d Cir. 2002).....................................................................................18

*Raines v. Byrd,*
    521 U.S. 811 (1997)..................................................................................................9

*Reilly v. Ceridian Corp.,*
    664 F.3d 38 (3d Cir. 2011)........................................................................................11

*Rickenbaker v. Drexel University,*
    2022 WL 970768 (E.D. Pa. Mar. 30, 2022).................................................38, 39, 40

*Rivera v. Dealer Funding, LLC,*
    178 F. Supp. 3d 272 (E.D. Pa. 2016) .......................................................................33

*Rodriguez v. Maricopa County Community College District,*
    605 F.3d 703 (9th Cir. 2010) ...................................................24, 29, 30, 31, 34

*Saravanan v. Drexel University*,
2017 WL 5659821 (E.D. Pa. Nov. 24, 2017) ...........................................................19, 20, 25

*Saxe v. State College Area School District*,
240 F.3d 200 (3d Cir. 2001)................................................................................................29

*Schuchardt v. President of the United States*,
839 F.3d 336 (3d Cir. 2016)..................................................................................................7

*Seldon v. Home Loan Services, Inc.*,
647 F. Supp. 2d 451 (E.D. Pa. 2009) .......................................................................38, 39, 40

*Simon v. Eastern Kentucky Welfare Rights Organization*,
426 U.S. 26 (1976)..............................................................................................3, 15, 17

*Smith v. University of Pennsylvania*,
534 F. Supp. 3d 463 (E.D. Pa. 2021) ...................................................................................35

*Sosa v. N.Y.C. Dep't of Education*,
368 F. Supp. 3d 489 (E.D.N.Y. 2019) .................................................................................20

*Soule v. Connecticut Ass'n of Schools, Inc.*,
90 F.4th 34 (2d Cir. 2023) (en banc) ..................................................................................16

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)...............................................................................................................9

*Steel Co. v. Citizens for a Better Environment*,
523 U.S. 83 (1998)........................................................................................................16, 17

*Stouffer v. Union Railroad Co.*,
85 F.4th 139 (3d Cir. 2023) ..................................................................................................7

*Swartley v. Hoffner*,
734 A.2d 915 (Pa. Super. Ct. 1999)....................................................................................35

*Swiderski v. Urban Outfitters, Inc.*,
2017 WL 6502221 (S.D.N.Y. Dec. 18, 2017) .....................................................................32

*Texas v. United States*,
523 U.S. 296 (1998)...............................................................................................................8

*Vurimindi v. Fuqua School of Business*,
2010 WL 3419568 (E.D. Pa. Aug. 25, 2010), *aff'd*, 435 F. App'x 129 (3d Cir. 2011).....36, 37

*Vurimindi v. Fuqua School of Business*,
435 F. App'x 129 (3d Cir. 2011) ...................................................................................35, 36

*Warth v. Seldin*,
    422 U.S. 490 (1975)..................................................................................................18

*Wertz v. Ryan*,
    2022 WL 118135 (E.D. Pa. Jan. 12, 2022) ............................................................11

*Whitfield v. Notre Dame Middle School*,
    412 F. App'x 517 (3d Cir. 2011) ..............................................................18, 21, 22

*Williams v. Jersey Shore Area School District*,
    673 F. Supp. 3d 688 (M.D. Pa. 2023)...............................................................25, 32

*Williams v. Pennridge School District*,
    2018 WL 6413314 (E.D. Pa. Dec. 6, 2018), *aff'd*, 782 F. App'x 120 (3d Cir. 2019) .............22

*Wolfe v. City of Portland*,
    566 F. Supp. 3d 1069 (D. Or. 2021) ......................................................................13

*Zavada v. East Stroudsburg University*,
    2023 WL 5532809 (M.D. Pa. Aug. 28, 2023) ........................................................25

**Other Authorities**

U.S. Dep't of Educ., Office for Civil Rights, 2003 Dear Colleague Letter on First
    Amendment (July 28, 2003), https://www2.ed.gov/about/offices/list/ocr/ firstamend.html ...29

**NOTICE OF MOTION AND MOTION TO DISMISS AND MOTION TO STRIKE**

Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(f), the Trustees of the University of Pennsylvania (Penn) move to dismiss the Amended Complaint or, in the alternative, strike in part Plaintiffs' request for relief.  Penn's Motion to Dismiss and Motion to Strike are based on this Notice of Motion, the supporting Memorandum of Points and Authorities, and the declaration of David Gringer, dated April 3, 2024, and the exhibits attached thereto.

## INTRODUCTION

Penn condemns antisemitism, emphatically and unconditionally.  It is "anathema to the most fundamental ideals of [the] University" (former President Amy Gutmann, 2017), "unconscionable" and "inimical to our values" (former President Amy Gutmann, 2021), "pernicious," "appall[ing]," and "heartbreaking" (former President Liz Magill, 2023).  Exs. 1, 2, 3.[1]  "Jewish faculty, students, staff, and alumni [have] been an important part of the success of Penn as a leading University."  Ex. 3.  Penn is proud of its long history of being a welcoming place for Jewish people—starting with the enrollment of its first Jewish student in 1772—and it is committed to remaining one.  Ex. 4.  Antisemitism has no place at Penn.

Penn "do[es] not, and will not, tolerate" "incidents of antisemitism," and has responded to them "with thorough investigation and concrete responses."  Ex. 22 (President J. Larry Jameson).  Penn has fought actively against antisemitism by implementing a comprehensive Action Plan to Combat Antisemitism, which centers around three areas for action: (1) ensuring the safety of every member of the Penn community, (2) engaging deeply with the Jewish community and broader Penn community to develop solutions to combat antisemitism; and (3) ensuring that everyone at Penn is educated and knowledgeable about antisemitism.  Those efforts are well under way.  Penn

---

[1] Unless otherwise noted, "Ex." citations reference exhibits to the Declaration of David Gringer filed concurrently.

is working with federal and local law enforcement as part of its investigations into incidents of antisemitism that occurred on or near campus during the fall 2023 semester, and its investigations have led to the arrest of individuals (not all of whom are Penn affiliates) who engaged in antisemitic conduct on or around Penn's campus.  Penn created a University Task Force on Antisemitism, which meets regularly, engages with the community in numerous ways, and reports to Penn's president and the public on its progress.  Penn also created a Student Advisory Group to advise University leaders on antisemitism, selecting Plaintiff Noah Rubin to serve on it.

Plaintiffs, three Jewish students and a group calling itself Students Against Antisemitism (SAA), disagree with some of Penn's responses.  Their perspectives and experiences matter to Penn, but this lawsuit is not the right vehicle for their grievances.  They seek judicial vindication of their policy disagreements with Penn's disciplinary decisions, and they demand relief that would commandeer core decisions of University administration—whom Penn hires and promotes, what Penn permits professors to teach, and what expression Penn allows on its campus.  Settled precedent forecloses those attempts.  And Penn's serious efforts to combat and eradicate antisemitism defeat any claim that it has been indifferent to antisemitism, and even more so any claim that it *continues* to be indifferent.  Penn's motion to dismiss, Dkt. 21, put Plaintiffs on notice of the fundamental flaws in their pleading, and they accordingly amended their complaint to add over 50 new paragraphs and 38 pages of allegations.  But the amendments do not and cannot mask Plaintiffs' continued failure to plead a ripe controversy and establish standing, and that they continue to fail to state cognizable claims for relief.

The Amended Complaint suffers from several threshold jurisdictional infirmities. Plaintiffs challenge Penn's responses to recent antisemitic incidents on the theory that those responses did not result in meaningful change to antisemitism on campus and that Penn failed to

discipline individuals for conduct in violation of its policies.  But Plaintiffs concede Penn's responses to recent antisemitic incidents are not yet finished, so their lawsuit is based on unsettled facts and their speculation that the considerable time and resources Penn is currently expending to address antisemitism will not change the campus environment.  As a result, their dispute is not ripe.  *See Peachlum v. City of York*, 333 F.3d 429, 433-34 (3d Cir. 2003).

Plaintiffs seek an injunction to remedy their alleged Title VI injuries, but they do not clearly allege (as they must) that they are at imminent risk of suffering future injury due to an ongoing violation of Title VI, or that their injunction would address those claimed injuries.  *See City of L.A. v. Lyons*, 461 U.S. 95, 105 (1983); *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 41-43 (1976).  They offer vague allegations of ongoing harassment by unspecified third parties, conduct they do not claim Penn knew about.  And because they concede Penn is taking action to address antisemitism, they resort to identifying a handful of disciplinary measures they believe Penn still fails to impose as a supposed ongoing Title VI violation.  But nowhere do Plaintiffs explain how a failure to discipline the individuals and groups named in their Amended Complaint could cause their injuries, which on the face of their allegations result from the actions of different, unspecified people.  Nor do they explain how any of the injunctive measures they request are related to their claimed injuries or would possibly address them.  In any event, Title VI precedent and principles of academic freedom foreclose their bid to enjoin Penn to take specific disciplinary measures or to decline donations to fund faculty who express or teach certain views. *See Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999); *Edwards v. California Univ. of Pennsylvania*, 156 F.3d 488, 492 (3d Cir. 1998).  So, at minimum, those requests must be stricken.

Even if Plaintiffs could surmount the ripeness and standing thresholds, they fail to state

cognizable claims for relief.  They do not plausibly allege that Penn ever acted with discriminatory animus toward them or that Penn's response to antisemitic harassment and discrimination was "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648.  Plaintiffs ignore the myriad steps Penn has taken to root out antisemitism (many of which are apparent on the face of Plaintiffs' Amended Complaint), which show that Penn takes the problem seriously. And Penn's responses to the various individual incidents they allege occurred have all been reasonable—whenever Penn has been made aware of antisemitic conduct, it has taken prompt action.  Plaintiffs disagree with Penn's disciplinary decisions, but settled precedent forecloses using Title VI to litigate such disagreements.  With few exceptions (which Penn continues to address appropriately), the conduct alleged by the Amended Complaint is expressive in nature, and the reasonableness of Penn's response must be evaluated against its obligation to respect the free speech rights of the University's community members.

Plaintiffs tack on claims for breach of contract and violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Laws (UTPCPL), but these rest on the implausible theory that Penn, through various policies, committed to maintain an environment free of conduct and speech Plaintiffs subjectively consider antisemitic, including through the regulation of pure political speech.  Plaintiffs have not pointed to a single policy provision that makes any enforceable promise to that effect, which dooms their breach of contract claim.  And Plaintiffs' UTPCPL claim fails because they do not plausibly allege any policy deceived them into believing (falsely) that Penn would regulate the content of speech—indeed, Penn's policies state the opposite.

This lawsuit raises serious allegations, but its theories of liability are unserious.  It has no merit on the facts and the law.  This Court should dismiss it with prejudice.

## BACKGROUND

College campuses are hotbeds of activism and disagreement about the conflict between

Israel and Gaza.  Though often heated, much of that speech serves important purposes central to universities' mission—including the collective search for truth through deliberation and the expressive virtues of disagreement.  At times, those disagreements have led to ignorant, dismissive, or intentionally provocative statements—including statements about Israel and its right to exist. The fervor on both sides of the debate has now spilled onto the Court's docket.  Plaintiffs identify numerous incidents they contend were antisemitic, including instances where faculty, students, and guest speakers called for boycotts of Israel, criticized Israel as an apartheid state, and "inveigh[ed] against 'Jewish supremacism' and the 'messianic mindset' of 'religious Jews.'"  AC ¶¶ 6, 59-61, 63.  The inverse is alleged in a related case, *Fakhreddine v. The University of Pennsylvania*, No. 24-cv-01034 (E.D. Pa.), where Penn was sued by faculty, students, and staff who "support Palestinian human rights and liberation from Israeli occupation."  Ex 26, ¶ 11.  The *Fakhreddine* plaintiffs contend that their speech criticizing Israel is not antisemitic and that it is protected by the First Amendment.  *Id.* ¶¶ 69-83.[2]  As the competing claims in these two lawsuits show, individuals who express strong pro-Israel or pro-Palestinian views are often challenged, rebuked, and sometimes harassed by others, but not by Penn.  *See* AC ¶¶ 270-72; Ex 26, ¶ 92.[3]

These schisms have only deepened in the wake of the "horrific assault" carried out by Hamas on October 7, 2023, "target[ing] civilians" and "result[ing] in the tragic loss of life and

---

[2] As Penn will show in its motion to dismiss there, those plaintiffs lack standing and have failed to state a claim.

[3] The complex debate of when speech that is critical of Israel spills into antisemitism strains judicial competence and is more nuanced than Plaintiffs suggest.  For example, although Plaintiffs rely in part on a 2019 executive order adopting the definition of antisemitism promulgated by the International Holocaust Remembrance Alliance ("IHRA"), *see* AC ¶¶ 26-27, they ignore that one of the authors of the IHRA definition has expressed concern that it has been used to try to impose a "de facto hate speech code on campus" and that "it sets up a system in which administrators have a reason to either condemn or try to suppress pro-Palestinian speech because their job is to keep the university from being sued under Title VI."  Eric Cortellessa, *The scholar who wrote the definition of anti-Semitism says it's been subverted*, The Times of Israel (Jan. 9, 2020. 4:44 AM), https://www.timesofisrael.com/the-scholar-who-wrote-the-definition-of-anti-semitism-says-its-been-subverted/.

escalating violation and unrest [across] the region." Ex. 5.  To Penn's dismay, at several protests and demonstrations, the discourse turned vitriolic, and in some cases hateful, *see* AC ¶¶ 170-71, and there have been instances of antisemitic threats of violence, theft, and defacement of property at or near Penn, *see id.* ¶¶ 112, 188, 191, 200, 202, 210.

In University-wide statements, Penn was adamant that "[t]here is no justification—none— for [Hamas's] heinous attacks."  Ex. 6.  In response to the vitriolic speech at protests, Penn was unequivocal that "hateful speech has no place at Penn. … In this tragic moment, we must respect the pain of our classmates and colleagues."  Ex. 7.  Penn also acted to ensure the safety of Jewish members of the Penn community.  Penn increased security at protests, rallies, and demonstrations and for "religious, cultural, and other spaces."  Ex. 8.  Penn investigated numerous "acts of hate," involving "local and federal authorities."  Ex. 15.  Where the perpetrators could be identified, these investigations have resulted in arrests and/or proceedings for student conduct violations.  *See* Ex. 16.  Penn is also taking and will continue to take steps to combat and prevent antisemitism.  On November 1, 2023—before Plaintiffs filed suit—Penn announced a University-wide Action Plan specific to combatting antisemitism.  AC ¶ 195; Ex. 3.  Penn also established a Presidential Commission on Countering Hate and Building Community to recommend strategies to both strengthen Penn's sense of community and support community members who have been impacted by antisemitism and other forms of hate.  Ex. 3; AC ¶ 235.

## ARGUMENT

**I.     Plaintiffs' Claims Should Be Dismissed Under Rule 12(b)(1) Because Plaintiffs' Challenge to Penn's Ongoing Response to Antisemitism Is Premature**

The ripeness doctrine requires a "real, substantial controversy between the parties" "of sufficient immediacy and reality to justify judicial resolution."  *Peachlum v. City of York*, 333 F.3d 429, 434 (3d Cir. 2003); *see also Doe v. County of Centre*, 242 F.3d 437, 453 (3d Cir. 2001) (in

assessing ripeness, courts look at the "fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration" (citation omitted)).  No ripe controversy exists here.

Plaintiffs challenge what they perceive to be a failure on Penn's part to respond to and discipline recent conduct they allege is antisemitic.  But the relevant alleged incidents all took place in the last several months, and the actions Penn has taken (even before Plaintiffs filed suit), and is taking, to address antisemitism have not concluded.  Penn's investigations and disciplinary proceedings related to antisemitic incidents in fall 2023 are ongoing, and the timeline of those efforts is affected by external criminal investigations into certain incidents.  *See* Ex. 16 at 2-3.[4] Penn's Task Force on Antisemitism, Student Advisory Group, and other bodies convened under the Action Plan are actively determining what measures to recommend the University adopt.  For instance, the Task Force is engaging with Penn's community and experts to understand how antisemitism is experienced among its diverse Jewish community.  Ex. 17.  It has already received "approximately 170 individual inputs" "representing a broad array of ideas and perspectives," "conducted informational interviews with a wide variety of Penn experts," and will be conducting a series of campus listening sessions.  *Id*.  After this essential groundwork, the Task Force will "identify best practices for addressing antisemitism," and "recommend to the president programmatic strategies to prevent and counter antisemitism."  *Id.*; Ex. 19 at 2.  Plaintiffs admit that the Task Force's work is ongoing and claim that Penn's new policies may not come into effect until the next academic year.  AC ¶ 199.  Moreover, they do not know the status of Penn's ongoing confidential investigations and disciplinary proceedings, much less can they predict the outcomes, or that the outcomes will be unreasonable.  Thus, their claims that Penn's efforts will not lead to

---

[4] Under Federal Rule of Civil Procedure 12(b)(1), a defendant can challenge the subject-matter jurisdiction allegations in the complaint by presenting competing facts.  *See Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016); *Schuchardt v. President of the United States*, 839 F.3d 336, 343 (3d Cir. 2016).  The Court may also "consider facts outside the pleadings."  *Stouffer v. Union R.R. Co.*, 85 F.4th 139, 143 (3d Cir. 2023).

meaningful measures to address antisemitism or to the fair application of Penn's policies are pure speculation, which is not enough to ripen this dispute for judicial resolution. *See Texas v. United States*, 523 U.S. 296, 300 (1998) (a claim is not ripe when it rests on "contingent future events that may not occur as anticipated, or indeed may not occur at all" (citation omitted)); *Peachlum*, 333 F.3d at 433-34 (a claim is not ripe if the facts are not "sufficiently developed to provide the court with enough information on which to decide [it] conclusively").

Having to litigate the adequacy of Penn's response to antisemitism while that response is ongoing would impose substantial "hardship" on Penn. *See Doe*, 242 F.3d at 453.  It would subject Penn's investigations, disciplinary proceedings, and the Action Plan's collaborative effort involving hundreds of members across the Penn community, *see* Exs. 16, 17, 18, 19, to judicial "second-guessing" based on the perspective of a handful of students who, however justifiably upset about their experience at Penn, do not have a right to "particular remedial demands," *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999).  In fact, before he joined as a Plaintiff in this lawsuit, Mr. Rubin was selected to serve on the Student Advisory Group advising leadership on efforts to address antisemitism.  AC ¶ 198.  He contends this process has moved too slowly, but he concedes that Penn's response is ongoing and nothing is yet settled.

At most, Plaintiffs have alleged their "abstract disagreement," *Doe*, 242 F.3d at 453, with the approach Penn has taken to address antisemitic harassment and discrimination, while balancing the free speech interests of the University community and the due process requirements for disciplinary proceedings.  *See Davis*, 526 U.S. at 649 (recognizing "school administrators shoulder substantial burdens as a result of legal constraints on their disciplinary authority").  But Penn *is* enforcing its policies with respect to violations that involve antisemitic conduct.  *See* Ex. 15 ("Please be assured that we are investigating these and other potential acts of hate … .  Penn is and

will continue to take action on any violation of our policies or the law.").  And it cannot be disputed that Penn's leadership adamantly condemns antisemitism and "has initiat[ed] a series of action steps to prevent, address, and respond to antisemitism."  Ex. 4.  The Court should dismiss Plaintiffs' Amended Complaint under Rule 12(b)(1), or at minimum stay the proceedings until Penn's ongoing responses to the antisemitic incidents of fall 2023 have concluded.

## II.     Plaintiffs' Claim for Injunctive Relief Should Be Dismissed Under Rule 12(b)(1) for Lack of Standing

Plaintiffs lack standing because they have not (as they must) "clearly allege[d] facts demonstrating" they "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

### A.     Plaintiffs Have Not Alleged a Clearly Impending Future Injury Traceable to Penn's Alleged Title VI Violation

The Amended Complaint cobbles together a set of alleged harms that fail to justify standing.  The first problem is that most of Plaintiffs' allegations describe harassing and antisemitic conduct suffered by other students—not Plaintiffs.  Penn takes each of those allegations seriously, but for standing purposes they are insufficient to establish Plaintiffs' "personal stake" in the dispute.  *Raines v. Byrd*, 521 U.S. 811, 819 (1997) ("We have consistently stressed that a plaintiff's complaint must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized as to him.").  Because the injury-in-fact requirement ensures litigants have more than "a mere interest in the problem," litigants must show they have personally suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Ellison v. American Bd. of Orthopaedic Surgery*, 11 F.4th 200, 205 (3d Cir. 2021) (citation omitted).  To be "particularized," the injury

must be "one that affects the plaintiff in a *personal* and *individual* way."  *Id.* (emphasis added).
Other students' injuries that do not result in specific harm to Plaintiffs are not particularized.

The second issue with Plaintiffs' claims is that the only non-conclusory conceivable
personal injuries occurred in the past.  *See* AC ¶¶ 151, 175-76 (alleging Ms. Davis was harassed
by other students with antisemitic slurs at two protests in October 2023), ¶ 168 (alleging man
yelled "fuck you" to Mr. Yakoby as he hung kidnapped posters on campus in October 2023), ¶¶ 87-
91 (alleging SAA Member #1 was harassed by a professor and students in fall 2022 (however, as
SAA Member #1 is an alumna, she has no entitlement to prospective relief and her claims cannot
be used for SAA's standing)), ¶ 208 (alleging Mr. Rubin and Mr. Yakoby were told to "step out"
of the student center by participants of the so-called "Freedom School" in December 2023).  While
past injuries may establish injury-in-fact for damages, they do not suffice for an injunction.  *See
Brown-Dickerson v. City of Philadelphia*, 2016 WL 1623438, at *6 (E.D. Pa. Apr. 25, 2016)
("Even if a plaintiff has standing for a damages claim, she must establish standing in order to
obtain prospective relief.").  Where plaintiffs seek prospective relief, the third element of injury-
in-fact—that the injury is actual or imminent—requires clearly pled facts showing the "threatened
injury" is "certainly impending."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)
(rejecting an "objectively reasonable likelihood standard").  Plaintiffs' allegations of past harm do
not meet or displace this requirement.  *See McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 223 (3d
Cir. 2012).

Plaintiffs attempted to address these flaws by amending their complaint with vague,
conclusory allegations that they continue to experience harassment from unspecified third parties
and must traverse a hostile campus where individuals still espouse ideas that Plaintiffs find
intolerable.  *See* AC ¶¶ 270-75.  These new allegations do not solve Plaintiffs' standing problems,

as Penn had nothing to do with the newly alleged third-party harassment and Plaintiffs do not even allege they informed Penn about it.  Plaintiffs cannot rely on injuries that "result from 'the independent action of some third party not before the court'" for standing.  *Lutter v. JNESO*, 86 F.4th 111, 127 (3d Cir. 2023) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)); *see also Reilly v. Ceridian Corp.*, 664 F.3d 38, 41-46 (3d Cir. 2011) (no standing where injury "stems from an indefinite risk of future harms inflicted by unknown third parties").  And Plaintiffs' "[s]ubjective apprehensions" that they will be harmed at some point in the future because there are still protests advocating views they find appalling do not rise to the level of "actual and imminent" future injuries.  *Wertz v. Ryan*, 2022 WL 118135, at *6 (E.D. Pa. Jan. 12, 2022).

What ultimately dooms Plaintiffs' standing is that they cannot clearly allege facts showing they are at risk of imminent future injury *because of* Penn's challenged conduct—here, Penn's alleged deliberate indifference to antisemitism.  *See City of L.A. v. Lyons*, 461 U.S. 95, 105 (1983) (standing for injunction barring police from using chokeholds "depended on whether [the petitioner] was likely to suffer future injury from the use of chokeholds by police officers"); *Lutter*, 86 F.4th at 127 (no standing without identifying a nexus between the injury-in-fact and defendants' conduct).  It is indisputable on the face of the Amended Complaint and the incorporated materials that Penn is taking serious, University-wide actions to address antisemitism, which is fatal to Plaintiffs' theory of an ongoing violation that justifies an injunction.  *See Abadi v. Target Corp.*, 2023 WL 4045373, at *2 (3d Cir. June 16, 2023) (where defendant did not presently engage in challenged conduct, claims of future injury "are too speculative to establish Article III standing").

First, Penn's Action Plan is modeled on the four pillars of the National Strategy to Counter Antisemitism, which *Plaintiffs* describe as the "most ambitious and comprehensive U.S. government-led effort to fight antisemitism in American history."  AC ¶ 29; Ex. 27 at 6.  And,

indeed, Penn's Action Plan is ambitious and comprehensive.  Penn is engaging with the Jewish community and broader community to understand and raise awareness of antisemitism at Penn (National Strategy Pillar 1), establishing, among other things, a Task Force on Antisemitism to identify best practices and strategies for countering antisemitism and a Student Advisory Group to advise Penn's leaders on efforts to combat antisemitism.  Ex. 4.  Penn is taking steps to ensure the safety and security of every member of the community (National Strategy Pillar 2), including: undertaking reviews of safety and security for religion-affiliated centers and groups, providing new or enhanced security to 17 locations around campus, having Penn police perform 1,000-2,000 special checks per week, contracting with a third-party security firm to conduct an additional 1,400 security checks since fall 2023, ensuring everyone at Penn understands how to report antisemitic conduct, committing to take timely and appropriate action in response to reports of conduct that violates University policies, and investigating the conduct of three student groups.  Ex. 16.  Penn is working to ensure everyone at Penn is educated and knowledgeable about antisemitism (National Strategy Pillar 3), by establishing an Executive Planning Group to implement antisemitism awareness in Penn's equity and inclusion programs, with individual schools already implementing antisemitism awareness training.  Ex. 4; Ex. 30.  And Penn created a Presidential Commission on Countering Hate and Building Community to address antisemitism, Islamophobia, and other forms of hate, discrimination, and bias (National Strategy Pillar 4).  Ex. 3.

Second, as Penn's former president informed the entire University in November 2023, Penn is investigating complaints of antisemitic and other divisive conduct that violates its policies and it is taking disciplinary actions:

> Penn has experienced appalling acts of antisemitism and other forms of hate on our campus—swastikas drawn on our walls, hateful antisemitic messages projected on our buildings, distributing emails threatening violence to individuals purely based on their Jewish and other identities, viral videos of people spewing hateful rhetoric

or ripping down posters. … *Please be assured that we are investigating these and other potential acts of hate, and where relevant, are working with local and federal authorities. Individual personnel matters or student disciplinary cases are confidential, and we cannot comment on them. But I want to make clear that Penn is and will continue to take action on any violation of our policies or the law.*

Ex. 15 (emphasis in original).  Despite the Amended Complaint's 312 paragraphs, it neglects to mention numerous investigations into reports of antisemitic conduct that Penn communicated to the University community, even while it points to some of these same communications in claiming (incorrectly) that Penn's response was lethargic.  *See* Ex. 10 (Penn police intervened in the incident involving the break-in at the Hillel, *see* AC ¶ 112, police investigated that incident and swastikas painted inside a Penn building, *see id.* ¶ 106, and Penn quickly removed the swastikas); Ex. 11 (Penn Police responded to antisemitic graffiti near Jewish fraternity house, *see* AC ¶ 188, and started a hate crime investigation); Ex. 12 (Penn Police responded to report of a stolen Israeli flag, *see* AC ¶ 191, investigated, identified a suspect, and submitted its findings to the District Attorney); Ex. 13 (Penn Police working with FBI to investigate emails threatening violence, *see* AC ¶ 200); Ex. 14 (Penn Police investigating messages projected on buildings, *see* AC ¶ 202).

Even if Plaintiffs could plausibly claim Penn was deliberately indifferent to antisemitism in the past (they cannot), Penn's actions over the past months vitiate any claims to a "certainly impending" injury traceable to Penn's deliberate indifference.  *See Abadi*, 2023 WL 4045373, at *2 (no standing for injunction concerning discriminatory enforcement of a policy that had been lifted, even though it could be reinstated); *Wolfe v. City of Portland*, 566 F. Supp. 3d 1069, 1085 (D. Or. 2021) (no standing for injunction concerning police response to protests, where the number and size of protests dissipated, and police response evolved).  Plaintiffs try to overcome this by claiming the Action Plan "ignore[es] the effective and urgent actions needed to be taken" "such as disciplining offenders through bans, prohibitions, suspensions, and expulsions."  AC ¶ 195, ¶ 199

(the Task Force does "not have a 'disciplinary function'").  Indeed, Penn's supposed failure to discipline certain individuals is the gravamen of Plaintiffs' claims that deliberate indifference continues.  *E.g.*, *id.* ¶ 81 (Penn has not "investigate[d] or discipline[d] these or other professors promulgating antisemitism."), ¶ 216 ("Penn has not disciplined the [student] group."),[5] ¶¶ 191, 210, 245, 249, 273 (student who "stole an Israeli flag" and "celebrated Hamas' massacre" "remains a student at Penn"); *but see* Ex. 12 (Penn referred stolen flag incident to District Attorney).

Plaintiffs speculate that Penn has not disciplined individuals.  But Plaintiffs have *no idea* whether disciplinary action has been taken, cannot know whether such action was taken, and candidly should not know whether such action was taken.  *See* Ex. 28 at III(F)(2) (noting Penn's policy that all aspects of disciplinary proceedings are confidential, as required by law).  For standing purposes, even if one accepted Plaintiffs' speculation, they have still not alleged a connection between Penn's supposed failure to discipline and any certainly impending future injury that is particular to them.  *See Lutter*, 86 F.4th at 128 (standing demands "a fairly traceable nexus between [a plaintiff's] injury-in-fact and conduct by [the defendants]").

First, there is no plausible basis to infer that the people Penn has allegedly failed to punish will cause a future injury to Plaintiffs, or that Penn's disciplinary decisions are "inhibiting [their] ability to maximize their Penn education."  AC ¶ 275.  Plaintiffs do not allege that they must, or even plan to, take classes with any of the professors they claim Penn should have disciplined.  They do not allege that any of the students whom Penn supposedly failed to discipline are people they must, or even do, interact with.  Thus, "[t]he links in the chain of causation between" Penn's alleged failure to discipline and Plaintiffs' feared injuries "are far too weak for the chain as a whole

---

[5] News sources have reported that Penn is investigating this student group.  *See* Vivi Sankar, *University investigating pro-Palestinian student group Penn Against the Occupation*, The Daily Pennsylvanian (Mar. 21, 2024, 2:04 AM), https://www.thedp.com/article/2024/03/penn-against-the-occupation-club-investigated.

to sustain [Plaintiffs'] standing." *Allen v. Wright*, 468 U.S. 737, 759 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

Second, Plaintiffs cannot establish traceability by speculating that Penn's supposed failure to discipline certain students and professors encourages the third-party harassment that is the true cause of their injuries. *See* AC ¶¶ 270-72. *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 41-42 (1976), is on point. There, respondents, indigent patients who were denied services at private hospitals, sued Department of Treasury officials for adopting an allegedly unauthorized revenue ruling that "encouraged' hospitals to deny services to" indigent patients. *Id.* at 41-42. The Court held that it was speculative whether the revenue ruling caused the hospital behavior that injured the patients—and thus speculative that requiring the officials to reverse the revenue ruling would result in the hospitals giving patients access to the services denied. *Id.* at 43 (finding it was "just as plausible" the hospitals "would elect to forgo favorable tax treatment to avoid" the costs of providing those services). *Id.*; *see also Lundy v. Hochberg*, 91 F. App'x 739, 743-44 (3d Cir. 2003) (no standing where plaintiff did not allege the third parties directly responsible for claimed injuries would change their behavior "but for" the defendant's challenged conduct).

As in *Simon*, any injury Plaintiffs claim is caused by third parties, not by Penn. Further, nothing supports the proposition that a favorable result would change the relevant third-party behavior. For Penn's disciplinary actions to have broad influence on the behavior of third parties, Penn would have to publicly broadcast disciplinary records—contrary to its legal obligations and policies. *See* Ex. 28 at III(F)(2). And Plaintiffs do not allege any specific information about the third parties responsible for their claimed injuries. Thus, there is no basis to draw any inferences about how those actors—who might not even be Penn affiliates over whom Penn could exercise

any discipline—would react to information about Penn's disciplinary actions. Plaintiffs' claims that they face imminent harm due to Penn's alleged failure to discipline should be rejected outright.

### B. Plaintiffs' Injunction Would Not Redress Their Alleged Injuries

Plaintiffs lack standing for the additional reason that they fail to show it is "likely, as opposed to merely speculative, that the[ir] injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). To meet this standard, a plaintiff must show that the relief sought "would serve to … eliminate any effects of" the legal violation on the plaintiff. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 105-06 (1998). Plaintiffs' injunction fails the redressability requirement because it is based on vindicating a "generalized interest in deterrence." *Id.* at 108-09. Their injunction would punish third parties and intervene in Penn's administrative decisions, but Plaintiffs fail to explain how any measure they demand would impact their claimed future injuries. *See Soule v. Connecticut Ass'n of Schs., Inc.*, 90 F.4th 34, 50 (2d Cir. 2023) (en banc) (plaintiffs challenging policy recognizing transgender girls under Title IX had no standing to request the removal of "record times and achievements of transgender girls that have no impact on [p]laintiffs' own athletic achievements").

As discussed above, Plaintiffs do not allege any connection between their injuries and the incidents or the people they allege Penn failed to discipline, so they have no standing to enjoin Penn to expel, terminate, and ban other individuals. *See* AC, Prayer for Relief, (A)(i)-(ii). Plaintiffs likewise fail to allege any connection between them and professors who allegedly espouse or teach antisemitic views—rather, Plaintiffs allege they avoid those professors and courses. *See id.* ¶ 137 (Mr. Yakoby dropped a course after the professor allegedly made antisemitic remarks). So, enjoining Penn to return donations to fund professors who "espouse antisemitism," *see id.* Prayer for Relief, (A)(iii), would also not impact Plaintiffs. Nor would Plaintiffs' injuries be redressed by enjoining Penn from maintaining policies or practices that are allegedly

antisemitic.  *See id*. Prayer for Relief, (A).  They do not allege any Penn policy is antisemitic, and while they make conclusory claims that Penn had a practice of not applying its policies to discipline antisemitic conduct, they allege nothing to clearly suggest such practice causes the harassment by unspecified third parties they claim to suffer.  *See Simon*, 426 U.S. at 43 (no standing where it is "speculative whether the desired exercise of the court's remedial powers" would address claimed injuries).  And nowhere do Plaintiffs explain why enjoining Penn to issue mandatory antisemitism training or imposing an expert monitor to oversee Penn's conduct, AC, Prayer for Relief, (A)(iv)-(v), would redress the harassment they claim to experience from unspecified third parties whom Penn might not be able to require to attend such training.  Plaintiffs seek only the "psychic satisfaction" of a "favorable judgment," which is impermissible.  *Steel*, 523 U.S. at 107.

To be clear, the fact that Plaintiffs lack Article III standing for their injunction does not mean their concerns do not matter to Penn.  To the contrary, as Plaintiffs' allegations show, Penn has repeatedly engaged with Plaintiffs when they have brought concerns to its attention, *see e.g.*, AC ¶¶ 159-64; *infra* at 27, and is expending considerable resources to respond to the recent antisemitism, *supra* at 11-12.  Indeed, Penn created a Student Advisory Group to advise University leaders on antisemitism, selecting Plaintiff Noah Rubin to serve on it.

## III.    SAA's Claims Should Be Dismissed for Lack of Associational Standing

Plaintiff SAA's claims should separately be dismissed for the additional, and independent, reason that SAA lacks associational standing.  An organization suing in place of its members must demonstrate that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  As to Title VI, courts will not recognize associational standing where an entity fails to "explain[] how [its] claims of intentional discrimination could be prosecuted without the participation of the individual members."  *Barnett v. Johnson City Sch. Dist.*, 2005 WL 8178066,

17

at *5 n.6 (N.D.N.Y. Feb. 2, 2005); *see also Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 289-90 (3d Cir. 2014) ("highly individualized" components of plaintiffs' claims preclude associational standing). The same principle bars SAA's claim on a hostile educational environment theory. Because SAA has to show that its members were personally subjected to "severe" and "pervasive" harassment that deprived each of them of "equal access to the school's educational opportunities," *Whitfield v. Notre Dame Middle Sch.*, 412 F. App'x 517, 521-22 (3d Cir. 2011), and because that inquiry is plaintiff-specific, *see L. L. v. Evesham Township Bd. of Educ.*, 710 F. App'x 545, 549 (3d Cir. 2017) (allowing one plaintiff's claim to proceed, while granting summary judgment as to others'), associational standing as to the Title VI claim is improper.

SAA likewise lacks standing to seek damages for breach of contract, *see* AC ¶ 295, because monetary relief claims require the individual participation of SAA's members. *See Pennsylvania Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 283 (3d Cir. 2002) (collecting cases). Determining whether each SAA member was injured, and the extent of the injury, requires an individualized inquiry into, among other things, how much tuition each member paid and the provisions of each member's purported contract with Penn. *See Warth v. Seldin*, 422 U.S. 490, 515 (1975) (denying standing for damages to home builders association); *Air Transp. Ass'n of Am. v. Reno*, 80 F.3d 477, 483 (D.C. Cir. 1996) (denying standing for damages to airline association).

## IV.   Plaintiffs' Title VI Claim Should Be Dismissed Under Rule 12(b)(6)

In addition (or as an alternative) to striking Plaintiffs' request for injunctive relief for lack of standing, the Court should dismiss Plaintiffs' Title VI claims as inadequately pled. Title VI "prohibits only intentional discrimination." *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001). Where, as here, plaintiffs contend that a school intentionally discriminated by being deliberately indifferent to a hostile educational environment, they must show that the alleged harassment was so "severe, pervasive, and objectively offensive" as to have a "systemic effect on educational

programs or activities," *Davis*, 526 U.S. at 633, 653, that the school knew about the harassment, and that its response was clearly unreasonable.

Although Plaintiffs added around 50 paragraphs to the complaint, their Title VI claim continues to suffer from the same basic flaws Penn previously identified in its motion to dismiss. Plaintiffs appear to assert that Penn acted with discriminatory animus and that it was deliberately indifferent to third-party harassment, but they fail to state a claim under either theory. Nothing in the Amended Complaint shows that Penn is insensitive to antisemitism, and the factual allegations compel the exact opposite conclusion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiffs again resort to identifying certain disciplinary actions they believe Penn should have taken, but Title VI does not license courts to "second-guess[] the disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648. This case is no exception.

### A.    Plaintiffs Do Not Plausibly Allege That Penn Discriminated Against Them

Plaintiffs have failed plausibly to allege that Penn ever acted with discriminatory animus or otherwise discriminated against them. A *prima facie* Title VI claim requires that a plaintiff plead that "he was a member of a protected class qualified for the educational benefit or program at issue and he suffered an adverse action occurring 'under circumstances giving rise to an inference of discrimination.'" *Saravanan v. Drexel Univ.*, 2017 WL 5659821, at *8 (E.D. Pa. Nov. 24, 2017) (quoting *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 275 (3d Cir. 2014)). Plaintiffs have not identified a single "adverse action" Penn took against them. They allege "omissions, rather than … any intentional decision to discriminate," which cannot be the basis for liability on a theory of intentional discrimination. *Langadinos v. Appalachian Sch. of Law*, 2005 WL 2333460, at *10 (W.D. Va. Sept. 25, 2005).

Nor can Plaintiffs plausibly establish that any supposed "adverse action" occurred "under circumstances giving rise to an inference of discrimination."  *Saravanan*, 2017 WL 5659821, at *8 (quoting *Blunt*, 767 F.3d at 275).  Plaintiffs do not identify any racially discriminatory animus or motive, and instead just "repeatedly and conclusively alleg[e]" that Penn "discriminated against [them] on the basis of [their] race."  *Id.*; *see also Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 183-84 (3d Cir. 2000) (court "need not accept as 'true unsupported conclusions and unwarranted inferences'").  Far from showing intentional discrimination, however, the allegations instead prove that Penn has stood steadfastly by its Jewish community and that, at every step, it has condemned antisemitism promptly, forcefully, and unequivocally.  *See infra* at 25-28.

Plaintiffs cannot show intentional discrimination through a comparator, as they have failed to allege that similarly situated individuals outside their protected group "received more favorable treatment."  *Sosa v. N.Y.C. Dep't of Educ.*, 368 F. Supp. 3d 489, 513-14 (E.D.N.Y. 2019). Plaintiffs float the phrase "selective enforcement," but they do not advance a single allegation showing that Penn treated non-Jewish students any differently than it has treated Plaintiffs. Plaintiffs point to statements Penn made about different recent events, but comparing the relative "strength" of public statements has nothing to do with discrimination and is entirely subjective anyway.  That a student would prefer a different adjective or adverb in a public statement is not discrimination.  In any event, Plaintiffs concede Penn released similar statements condemning antisemitism.  *See* AC ¶¶ 256-58.  They also float allegations relating to faculty hiring or firing, ignoring that none of those can possibly establish that Penn treats any students differently.  *See id.* ¶¶ 250-52, 261-62.  But in any event, none of the purported comparators is similarly situated.  Amy Wax—the only non-conclusory comparator on the faculty-discipline side—was, Plaintiffs admit, disciplined not merely for offensive speech but for "dereliction of her scholarly responsibilities,"

including a pattern of "sweeping and unreliable conclusions" that Penn concluded fell well below professional standards.  *See id.* ¶ 251.  The Court may also take judicial notice of the fact that her disciplinary charge *included* episodes of anti-Semitism.  *See* Ex. 29 (reporting that Wax said, "'there were some very smart Jews' among her past students but that Ashkenazi Jews are 'diluting [their] brand like crazy because [they are] intermarrying'").

Plaintiffs also allege in conclusory fashion that Penn has taken a different approach when other students or student groups have violated Penn's rules or policies, *see, e.g.*, AC ¶¶ 255, 59-60, but they come nowhere close to alleging facts that might plausibly show "substantial similarity" between the incidents or that those other groups were in fact treated differently. Nowhere do Plaintiffs explain, for example, why measures Penn took to address the COVID-19 pandemic are "substantially similar" to Penn's treatment of political speech and activism on campus.  Those flaws doom any claim of disparate treatment.  *See Houston v. Easton Area Sch. Dist.*, 355 F. App'x 651, 654-55 (3d Cir. 2009).[6]

## B.    Plaintiffs Fail to Allege Penn Was Deliberately Indifferent to a Hostile Educational Environment

To state a Title VI claim for a hostile educational environment, Plaintiffs must allege harassment based on a protected characteristic that is so "severe, pervasive, and objectively offensive" that it "deprives the victim of equal access to the school's educational opportunities" and has a "systemic effect on educational programs or activities."  *Whitfield v. Notre Dame Middle Sch.*, 412 F. App'x 517, 521-22 (3d Cir. 2011) (quoting *Davis*, 526 U.S. at 653).  Under Title VI, a university may be held liable for third-party conduct only when a plaintiff shows that the school's "own deliberate indifference effectively 'caused' the discrimination."  *Davis*, 526 U.S. at 642-43.

---

[6] To be clear, Penn takes equally seriously all claims of harassment or discrimination on the basis of race, creed, or identity.  Plaintiffs' argument that Penn affords certain groups preferential treatment is unsupported precisely *because* the conclusion they urge the Court to reach is false.

To survive a motion to dismiss, Plaintiffs must allege that Penn exercised substantial control over the harassers, that the harassment was "severe and discriminatory," that Penn had "actual knowledge" of the harassment, and that Penn was "deliberate[ly] indifferen[t]" to the harassment. *Blunt*, 767 F.3d at 273 (citation omitted); *see also Williams v. Pennridge Sch. Dist.*, 2018 WL 6413314, at *6 (E.D. Pa. Dec. 6, 2018) (Goldberg, J.) (describing deliberate indifference standard for peer harassment), *aff'd*, 782 F. App'x 120 (3d Cir. 2019).   And they must show that Penn's actions and responses were "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648-49.  Plaintiffs' allegations likewise fail to meet this high bar.

### 1.   Plaintiffs do not plausibly plead that they were subject to severe and pervasive harassment.

Plaintiffs' allegations must show they personally were subjected to harassment that was so "severe [or] pervasive" as to deprive them "of equal access to the school's educational opportunities."  *Whitfield*, 412 F. App'x at 521-22.  The Supreme Court has cautioned against setting too low a bar.  In *Davis*, it wrote that although "a single instance of sufficiently severe one-on-one peer harassment could be said to have such an effect, we think it unlikely that Congress would have thought such behavior sufficient … in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of … peer harassment."  526 U.S. at 652-53.  The relevant inquiry is plaintiff-specific, and each Plaintiff must show that they personally were subjected to such harassment. *See, e.g.*, *L. L. v. Evesham Township Bd. of Educ.*, 710 F. App'x 545, 549 (3d Cir. 2017) (finding that one plaintiff established a *prima facie* case of hostile environment but the others did not).

Plaintiffs' allegations fall well short.  For starters, plaintiffs in hostile-environment cases cannot establish causation "*solely* by pointing to comments that were directed at other individuals" because they "cannot show that the comments would not have been uttered or written but for

[plaintiff's] race if [plaintiff] was neither on the receiving end nor the subject of any comments." *Caver v. City of Trenton*, 420 F.3d 243, 263 (3d Cir. 2005).[7]   While such allegations could in theory be relevant to whether facially neutral conduct was in fact discriminatory, *see id.*, they cannot form the basis of the substantive claim.   *See also Felber v. Yudof*, 851 F. Supp. 2d 1182, 1188 (N.D. Cal. 2011) (observing that "a broad swath of the conduct alleged occurred at times and in places where plaintiffs were not present" and finding that those allegations were, at best, of "extremely marginal relevance").   Ignoring that core principle, Plaintiffs' claim of severe and pervasive harassment impermissibly depends on (1) allegations of events that happened to other people and that Plaintiffs learned about later, *see, e.g.*, AC ¶ 188 (SAA Member #2 lives "two blocks away" from vandalized house), or (2) allegations of general protests that were neither directed to Plaintiffs nor about them, but which Plaintiffs claim subjectively upset them.   *See, e.g.*, AC ¶ 214 (trying to predicate liability on Penn's response to the December 3, 2023 protest), ¶ 242 (Mr. Rubin was "disturbed by" a rally that criticized Penn as "[d]estroying … Palestine").

Here, the allegations about specific harassment directed to or targeting Plaintiffs are far too sporadic to establish severe and pervasive harassment.   Mr. Yakoby alleges that on October 16, he was hanging "kidnapped" posters when an unknown individual yelled "fuck you."   AC ¶ 168.   Ms. Davis alleges two incidents where unknown protestors at a rally yelled antisemitic remarks at her as she walked past.   *See id.* ¶¶ 152, 175.   Mr. Rubin and Mr. Yakoby allege that in December 2023 they were told to "step out" of the student center by participants in the so-called "Freedom School," AC ¶ 208, which is not a group that Penn recognizes or funds—indeed, Penn has extremely limited

---

[7] Although *Caver* was decided at the summary judgment stage, district courts in this Circuit have applied this principle at the motion to dismiss stage as well.   *See, e.g., Doe v. Sizewise Rentals, LLC*, 2010 WL 4861138, at *7 (D.N.J. Nov. 22, 2010), *aff'd*, 530 F. App'x 171 (3d Cir. 2013); *Bird v. Mastery Charter Schs.*, 2022 WL 1773673, at *5-6 (E.D. Pa. June 1, 2022) ("Plaintiff cannot show that she was subjected to pervasive discrimination based solely on examples of her supervisors at Mastery discriminating against others.").

insight into the Freedom School's activities, membership, and funding.  SAA Member #1 alleges

that when she took a seminar on "Palestine and its Diaspora in its Literature and its Film," students

and the professor made comments she perceived as anti-Zionist or antisemitic, and that she was

made to read and present on material "that insinuated or explicitly stated" anti-Israel sentiments.

AC ¶¶ 87-91; *but see Felber*, 851 F. Supp. 2d at 1188 (in the public university context, refusing to

predicate Title VI liability on "draw[ing] an untenable line that would remove from protection

signs and publications that are critical of Israel and supportive of Hamas and Hezbollah.").  Most

seriously, Mr. Yakoby alleges that he has received death threats due to his activism, AC ¶ 270, but

he does not allege Penn knew about those specific threats, who made those threats (and if they are

within Penn's control), or when those threats occurred, making it impossible to find the severe and

pervasive harassment necessary to subject Penn to Title VI liability for deliberate indifference.

To be sure, even a single incident of harassment, in Penn's view, is one too many.  And

Penn is committed to supporting Plaintiffs.  But even in the light most favorable to Plaintiffs, those

incidents do not rise to a level stating a viable Title VI claim for any of them.[8]  *See, e.g.*, *HB v.*

*Monroe Woodbury Cent. Sch. Dist.*, 2012 WL 4477552, at *15 (S.D.N.Y. Sept. 27, 2012) (noting

that the "one reference to race-related name calling" in the complaint fell short of establishing

severe and pervasive misconduct).

### 2.  Plaintiffs do not plausibly allege that Penn's responses were clearly unreasonable in light of known circumstances.

Plaintiffs fail to allege a single instance where Penn's response was "clearly unreasonable

in light of the known circumstances." *Davis*, 526 U.S. at 648-49.  In evaluating whether a response

---

[8] Many of Plaintiffs' other allegations do not allege personal injury, and amount to little more than disagreement over Penn's decision not to sanction pure political speech.  As discussed *supra*, those are not the kinds of injuries that can lead to Title VI liability.  *See also Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 709 (9th Cir. 2010) ("To afford academic speech the breathing room that it requires, courts must defer to colleges' decisions to err on the side of academic freedom.").

was clearly unreasonable, courts consider, among other things, "the time it took the [University] to respond to complaints, the level of response, the effort expended to respond to the allegations, and the efficacy of the response." *Zavada v. East Stroudsburg Univ.*, 2023 WL 5532809, at *4 (M.D. Pa. Aug. 28, 2023). To "meet this high standard," a plaintiff must thus show that there was "an official decision not to remedy the violation and this decision must be clearly unreasonable." *Doe v. Willits Unified Sch. Dist.*, 473 F. App'x 775, 776 (9th Cir. 2012). "Deliberate indifference claims impose a significant burden on the plaintiff and consequently rarely proceed beyond a motion to dismiss," *Saravanan*, 2017 WL 5659821, at *7, and courts routinely grant motions to dismiss on hostile educational environment claims where the allegations cannot plausibly establish that the school's response was clearly unreasonable. *See Williams v. Jersey Shore Area Sch. Dist.*, 673 F. Supp. 3d 688, 700-01 (M.D. Pa. 2023) (dismissing a hostile educational environment claim because the allegations did not plausibly establish that the response was clearly unreasonable); *B.W. v. Career Tech. Ctr. of Lackawanna Cnty.*, 422 F. Supp. 3d 859, 885 (M.D. Pa. 2019) (similar, as to Count II), *on reconsideration in part*, 2019 WL 6875493 (M.D. Pa. Dec. 17, 2019); *Doe v. Sacks*, 2024 WL 402945, at *5-7 (S.D.N.Y. Feb. 2, 2024) (similar). This Court should do the same. Although Plaintiffs color their Amended Complaint with conclusory assertions of unreasonableness, their factual allegations show otherwise.

> a) **Penn's unequivocal condemnation of antisemitism—and swift creation of a comprehensive plan to combat it—refutes any inference that Penn is deliberately indifferent.**

The undeniable conclusion that follows from Plaintiffs' allegations is that Penn has taken the problem of antisemitism seriously—a conclusion sufficient to defeat any inference that Penn has acted unreasonably or indifferently. Though Plaintiffs characterize Penn's efforts as disingenuous, they do not allege any *facts* to support their characterization. To the contrary, Plaintiffs do not deny that Penn made multiple statements last semester unequivocally condemning

antisemitism (and the October 7, 2023 terrorist attacks).   On September 12, 2023, Penn "unequivocally—and emphatically—condemn[ed] antisemitism as antithetical to [Penn's] institutional values." Ex. 21; *see also* AC ¶ 105.[9]   On September 22, 2023, the day after an antisemitic attack at Penn Hillel and shortly after another antisemitic incident, Penn responded by "unequivocally condemning such hateful acts," declaring as "unwavering" Penn's "commitment to ensuring our Jewish community feels safe and supported on our campus," and informing the community that Penn Police had removed the individual responsible for the attack on Penn Hillel and that the police were "actively pursuing both incidents and following all protocols for potential bias incidents on campus." Ex. 10; *see also* AC ¶ 121.   Just days after the October 7, 2023, terrorist attacks in Israel, Penn leadership issued a statement expressing that they were "devastated by the horrific assault on Israel by Hamas" and provided resources to support all affected—on campus and abroad—by the attacks.   Ex. 5; AC ¶ 156.   On October 15, 2023, Penn leadership issued another statement that, again, condemned the October 7 terrorist attack and reiterated that Penn was monitoring threats of violence and fighting antisemitism; they emphasized that Penn stands "emphatically against antisemitism" and noted the University's "moral responsibility" to combat antisemitism.   Ex. 6; AC ¶ 165.   Far from plausibly establishing that Penn was deliberately indifferent to antisemitism or Plaintiffs' experiences on campus, those statements reflect an unequivocal commitment to ensuring the safety and security of all students (including Plaintiffs).

Nor do the allegations establish that Penn ignored the Plaintiffs specifically.   Where, as here, "the administration has engaged in an ongoing dialogue with the opposing parties," the mere fact that "the University may not have acted as plaintiffs would prefer does not rise to 'deliberate

---

[9] Plaintiffs' Amended Complaint refers to numerous public statements made by Penn and to Penn's Action Plan.   In ruling on a motion to dismiss, a court may take judicial notice of "matters incorporated by reference" in the complaint. *Buck v. Hampton Township Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

indifference.'" *Felber*, 851 F. Supp. 2d at 1188 (granting motion to dismiss); *accord Mandel v. Bd. of Trustees of California State Univ.*, 2018 WL 1242067, at *20 (N.D. Cal. Mar. 9, 2018) (same); *see also Doe v. The Trustees of Univ. of Pennsylvania*, 270 F. Supp. 3d 799, 826 (E.D. Pa. 2017) (finding that "the Complaint does not state a cognizable claim of deliberate indifference based solely on an assertion that Plaintiff advanced arguments of … bias … and Defendant rejected them.").  Plaintiffs concede that such dialogue has been ongoing—and that Penn's administrators have met with Plaintiffs frequently to listen to their concerns.  *See, e.g.*, AC ¶¶ 103-04 (administrators met with students from Jewish organizations to discuss Palestine Writes "and the risks it posed for Jewish students"); ¶ 109 (on September 19, 2023, Penn's Vice President for Public Safety and Vice Provost met with a group of Jewish students (including Rubin)); ¶¶ 161-62 (on October 14, 2023, Yakoby demanded to meet with Penn's Vice Provost "immediately" to discuss his concerns, and the two met on October 15); ¶ 187 (acknowledging that Rubin and Yakoby had met with the Provost and Vice Provost regarding their "concerns over antisemitism"); ¶ 198 (alleging administrators met with Rubin *four times* beginning in the fall 2023 semester); ¶ 237 (recognizing that the Student Advisory Group, which included Rubin, met with administrators); ¶ 238 ("Rubin attended a meeting with Laura Perna, Vice Provost for Faculty").  As in *Felber*, Penn's repeated efforts to meet with and listen to Plaintiffs' concerns defeat any conclusory deliberate indifference argument.

Perhaps most damaging to any theory of deliberate indifference is Penn's Action Plan to Combat Antisemitism, announced on November 1, 2023 (AC ¶ 195).  *See supra* at 11-12.  Plaintiffs concede that the Action Plan's three-pronged approach emphasized "Safety & Security," "Engagement," and "Education."  AC ¶ 196.  While Plaintiffs try to dismiss the Action Plan as mere window dressing—apparently because it did not adopt their preferred remedial measures—

the comprehensive plan further rebuts any possible inference of deliberate indifference because it shows that Penn listened and promptly took action to root out antisemitism on its campus. Courts have credited such efforts as defeating any Title VI liability predicated on a hostile educational environment. Consider *Mandel v. Board of Trustees of California State University*, where plaintiffs predicated their Title VI claim in part on characterizing the university's "broader steps to address … anti-Semitism at SFSU in general" as "disingenuous." 2018 WL 1242067, at *19 (N.D. Cal. Mar. 9, 2018). The district court rebuffed those efforts, recognizing instead that a broad-based commitment to address the very problem plaintiffs identify is "problematic" to any theory of Title VI liability. *Id.* So too here. Plaintiffs proffer not a single non-conclusory allegation that justifies their characterization of Penn's efforts as disingenuous—or that warrants an inference that Penn's conceded efforts to eradicate antisemitism are anything but reasonable.

### b) Penn responded reasonably to all alleged incidents.

Plaintiffs' allegations also refute any possible characterization of Penn's responses to the various incidents alleged in the Amended Complaint as "clearly unreasonable." The crux of Plaintiffs' complaint turns on their specific grievances with disciplinary decisions. But courts routinely refuse to countenance plaintiffs' attempts to leverage Title VI to challenge specific disciplinary decisions. *See, e.g.*, *Sacks*, 2024 WL 402945, at *6 ("While Plaintiff may certainly wish that NYU had gone to greater lengths to identify and discipline the creators of the spreadsheet, the University's response was not, in fact, 'clearly unreasonable.'"); *KF ex rel. CF v. Monroe Woodbury Cent. Sch. Dist.*, 2013 WL 177911, at *7 (S.D.N.Y. Jan. 16, 2013) (school's failure to investigate, despite official policy requiring it, not "clearly unreasonable"), *aff'd*, 531 F. App'x 132 (2d Cir. 2013); *Doe v. University of Chicago*, 2017 WL 4163960, at *8 (N.D. Ill. Sept. 20, 2017) (school's refusal to discipline a student who publicly accused plaintiff of sexual assault and lied about the outcome of her complaint not "clearly unreasonable"). Here, Plaintiffs' challenge

28

fails for two separate reasons.  First, principles of academic freedom foreclose their argument that Penn's decision not to censor or discipline pure political speech was clearly unreasonable.  Second, Plaintiffs' allegations make clear that when Penn has been made aware of antisemitic misconduct, it has responded promptly, investigating and holding perpetrators responsible.

*First*, Title VI does not create liability when a university opts not to censor pure political speech, even if that speech is offensive or "incompatible with [its] institutional values."  Ex. 21. The Third Circuit has observed that "[n]o court or legislature has ever suggested that unwelcome speech directed at another's 'values' may be prohibited under the rubric of anti-discrimination." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 210 (3d Cir. 2001).  Rightly so.  "Intellectual advancement has traditionally progressed through discord and dissent, as a diversity of views ensures that ideas survive because they are correct, not because they are popular."  *Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 708-09 (9th Cir. 2010).  This is well established in the First Amendment context: "When laws against harassment attempt to regulate oral or written expression on such topics, however detestable the views expressed may be, we cannot turn a blind eye to the First Amendment implications."  *Saxe*, 240 F.3d at 206.  And just as Congress cannot discriminate against pure political speech directly, nor can its antidiscrimination laws be interpreted to require the same result.  *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013).  Indeed, the Department of Education's Office for Civil Rights (OCR) has expressly disclaimed that its regulations implementing Title VI require private universities "to limit free speech in ways that are more restrictive than at public educational institutions" and has observed "no conflict" between a properly interpreted Title VI "and the civil liberties guaranteed by the First Amendment."  U.S. Dep't of Educ., Office for Civil Rights, 2003 Dear Colleague Letter on First Amendment (July 28, 2003), https://www2.ed.gov/about/offices/list/ocr/

firstamend.html.  Some courts have expressed "doubt that a college professor's expression on a matter of public concern, directed to the college community, could ever constitute unlawful harassment and justify the judicial intervention that plaintiffs seek." *Rodriguez*, 605 F.3d at 710. But this Court need not go that far—it is enough to find that a decision to protect principles of academic freedom is not "clearly unreasonable" under the circumstances.

Plaintiffs devote 31 paragraphs to Penn's decision not to shut down the Palestine Writes Literature Festival, *see* AC ¶¶ 98-128, but a decision not to shut down speech that Plaintiffs dislike is not a violation of the law.  Plaintiffs concede that Penn leadership met with Jewish students— including Plaintiffs—multiple times leading up to the event to discuss the students' concerns. *See id.* ¶¶ 102-04 (on September 11, administrators met with a group of Jewish students, including Mr. Rubin, and "listened to the student concerns").  They also concede Penn issued multiple statements condemning antisemitism before the event. *See id.* ¶¶ 105, 121; Exs. 9, 10.  Penn's prompt and reasonable responses dispel any inference that it was ever deliberately indifferent.

Many of Plaintiffs' other allegations are similar.  For example, Plaintiffs allege that certain members of Penn's faculty made offensive or hateful statements on social media. *See* AC ¶¶ 137-47.  Those allegations fail at the outset because Plaintiffs never allege that Penn was aware of those statements at the time.  But even if Penn were, its decision not to terminate faculty for their political views—even views expressed distastefully—cannot warrant Title VI liability.  It is again well established that "[t]he desire to maintain a sedate academic environment … [does not] justify limitations on a teacher's freedom to express himself on political issues in vigorous … and even distinctly unpleasant terms." *Adamian v. Jacobsen*, 523 F.2d 929, 934 (9th Cir. 1975).  The same is true for Plaintiffs' allegations regarding a variety of other events on campus, like the Penn Muslim Student Association's hosting Yasir Fahmy on campus, AC ¶ 212, or a Jewish club's

screening of "Israelism," *id.* ¶ 213, and for Penn's decision not to immediately sanction or shut down political protests on campus, *see, e.g.*, AC ¶¶ 206-08 (discussing a protest in Houston Hall).

Universities act well within their discretion when they choose to tolerate pure political speech and provide other avenues for fostering intellectual debate—including, as here, a decision not to censor the speech while unequivocally condemning it and providing resources to the community to seek support and express counterviews. *See Rodriguez*, 605 F.3d at 710. Title VI was designed to tolerate that choice. Plaintiffs' call for Title VI-mandated discipline against individuals who expressed ideas they find disagreeable stretches the statute well beyond its constitutional moorings, *requiring* universities to adopt measures that, in the public university context, could well result in First Amendment liability. *See, e.g.*, *Papish v. Bd. of Curators of Univ. of Missouri*, 410 U.S. 667, 667-68, 670-71 (1973) (per curiam) (public university could not expel a student for distributing a newspaper with content that some found deeply offensive). That interpretation of Title VI is untenable. *See Sacks*, 2024 WL 402945, at *7 (decision not to discipline students for speech was not clearly unreasonable because to conclude otherwise would "put the University at risk of impermissibly restricting students' speech-protected values").[10]

*Second*, while Title VI may create liability for deliberate indifference to known acts of harassment that produce a hostile educational environment, Plaintiffs' allegations do not plausibly establish that Penn responded unreasonably to any known acts of antisemitic conduct. For example, on October 16, Mr. Yakoby was harassed by an unknown man while hanging posters in support of the Israeli hostages. While Plaintiffs assert that Mr. Yakoby did not "receive any follow-up communication," AC ¶ 168, they admit that the police officer on the scene indicated

---

[10] If nothing else, the *Fakhreddine* suit well reflects the hornet's nest that might result were Title VI to impose such requirements on private universities.

that Penn would investigate and that Mr. Yakoby's assailant was subsequently arrested, *id*.  Ms. Davis suffered two incidents of antisemitic harassment.  While tragic and intolerable, those incidents do not establish that Penn responded unreasonably.  Plaintiffs admit that Ms. Davis did not report the first incident, *see id.* ¶ 154 ("Davis decided not to report the incident"), and that Ms. Davis filed an *anonymous* report for the second, *id.* ¶ 180—but never that Penn knew that Ms. Davis herself was subjected to any harassment.

Plaintiffs also allege certain incidents that affected other members of the Penn community. *See, e.g.*, AC ¶ 191 (alleging student "ripped down and stole an Israeli flag" (and was arrested)), ¶215 (alleging protest descended into vandalism or other hateful conduct).  These allegations fail to distinguish between incidents that happened on Penn's campus and those that happened elsewhere (*see id.* ¶ 215 (alleging an antisemitic attack on a restaurant in Center City)).  None establishes that Penn was deliberately indifferent to any instances of antisemitism.  In many of those incidents, Plaintiffs do not allege that Penn was on notice that a particular individual was likely to commit an act of antisemitism; because Penn could not have predicted those incidents in advance, its inability to prevent those events cannot be characterized as unreasonable.  *See Swiderski v. Urban Outfitters, Inc.*, 2017 WL 6502221, at \*9 (S.D.N.Y. Dec. 18, 2017) ("[G]enerally, an employer is not liable for failing to prevent an act of harassment by a first-time customer.").  Just as important, none of the allegations "indicat[es] that [Penn's] response was undertaken with the knowledge that harassment would continue." *Williams*, 673 F. Supp. 3d at 700-01 (granting a motion to dismiss because, even if the school district's response was insufficient to stop the bullying, it was not "clearly unreasonable").  To the contrary, such an inference is patently *im*plausible in light of Penn's forceful response to incidents of antisemitism that took place last semester—and its proactive efforts to stamp out antisemitism from its campus,

*see infra*.  Here too, *Mandel* is on point.  There, the court found that "discrete 'failures' to impose discipline" did not "amount to deliberate indifference," even though plaintiffs claimed "no student groups or individual students were disciplined with respect to" various antisemitic incidents.  2018 WL 1242067, at *19.

In short, there is no plausible basis to claim Penn has been deliberately indifferent to a hostile educational environment.  Penn issued multiple timely statements to address the tumult on campus, and it promptly met with Jewish students, heard their concerns, and provided support.  Penn also promptly organized a comprehensive action plan to eradicate antisemitism, investing considerable resources in examining existing policies and procedures and in reviewing where Penn can do better.  And Penn has invested considerable resources to ensure that all Jewish students may enjoy the full benefits of Penn's world-class education while knowing that they are safe.

## V.     The Court Should Strike Plaintiffs' Request for Disciplinary Measures and Judicial Regulation of Private Donations Based on Expression

In the event the Court rules Plaintiffs have standing for injunctive relief and have stated a claim under Title VI, it should nonetheless strike Plaintiffs' request for disciplinary measures and for judicial regulation of Penn's receipt of private donations.  AC, Prayer for Relief, (A)(i)-(iii).  "The purpose of a Rule 12(f) motion is to 'clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters.'"  *Canfield v. Amica Mut. Ins. Co.*, 2020 WL 5878261, at *2 (E.D. Pa. Oct. 2, 2020) (citation omitted).  Courts accordingly strike demands for relief that are not recoverable.  *See Rivera v. Dealer Funding, LLC*, 178 F. Supp. 3d 272, 281 (E.D. Pa. 2016) (striking "damages [that] are not recoverable against" the defendant); *Hanover Prest-Paving Co. v. Tile Tech, Inc.*, 2022 WL 1493568, at *5 (M.D. Pa. May 11, 2022) (striking request that "is not available as a remedy" for the claim); *Doe v. Haverford Coll.*, 2023 WL 5017964, at *11 (E.D. Pa. Aug. 7, 2023) (striking injunction where "plaintiff has an adequate remedy at law").

Under Title VI, Plaintiffs cannot recover relief requiring Penn to take specific disciplinary measures.  For starters, the Supreme Court expressly rejected that proposition in *Davis*.  *See* 526 U.S. at 648 ("[T]he dissent erroneously imagines that victims of peer harassment now have a Title IX right to make particular remedial demands.").  "School administrators receive substantial deference in cases of alleged student-on-student harassment; victims of harassment have, for example, no 'right to make particular remedial demands.'"  *MJG v. Sch. Dist. of Philadelphia*, 2017 WL 5010033, at *8 (E.D. Pa. Nov. 2, 2017) (citation omitted), *aff'd sub nom. M.J.G. v. Sch. Dist. of Philadelphia*, 774 F. App'x 736 (3d Cir. 2019).  And academic freedom "demands substantial deference" to administrative decisions concerning faculty discipline.  *Rodriguez*, 605 F.3d at 708-09 (Title VII cannot be used to challenge to college's "decision not to take action against" professor who circulated "racially-charged" emails).  Title VI does not require funding recipients to take a particular "form of disciplinary action"; courts afford universities "flexibility" in determining the appropriate response to on-campus harassment.  *Davis*, 526 U.S. at 648-49.

Plaintiffs also cannot use Title VI to enjoin Penn to "declin[e] and return[] donations," to fund professors who express or teach ideas they view as antisemitic.  AC, Prayer for Relief, (A)(iii).  Such an injunction—which would require that the Court police Penn's decisions on whom it hires and what it lets professors express and teach—goes well beyond any reasonable relationship to the actual claims at issue here.  Indeed, even a much narrower injunction along those lines would violate foundational principles of academic freedom, which grant universities autonomy in deciding issues of hiring, retention, promotion, teaching, and course curriculums.  *Edwards v. California Univ. of Pennsylvania*, 156 F.3d 488, 492 (3d Cir. 1998) ("academic freedom" encompasses "who may teach, what may be taught, how it shall be taught, and who may be admitted to study" (citations omitted)); *see also Rodriguez*, 605 F.3d at 708-09 ("tenure and

monetary endowments" "shelter[]" universities "from the currents of popular opinion," fostering the university's role in "[i]ntellectual advancement").

## VI. Plaintiffs' Contract Claim Should Be Dismissed Under Rule 12(b)(6)

Plaintiffs have failed to identify an express promise Penn failed to honor.  A *prima facie* breach of contract claim requires a student to "allege 'a specific contractual undertaking which was breached, clearly and directly resulting in at least some demonstrable damages.'"  *Smith v. Univ. of Pennsylvania*, 534 F. Supp. 3d 463, 470 (E.D. Pa. 2021) (citing *Cavaliere v. Duff's Bus. Inst.*, 605 A.2d 397, 401 (Pa. Super. Ct. 1992)).  "[T]he allegations must relate to a specific and identifiable promise that the school failed to honor."  *Vurimindi v. Fuqua Sch. of Bus.*, 435 F. App'x 129, 133 (3d Cir. 2011) (citing *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. Ct. 1999)).  While the contract between a student and a university may encompass the school's "written guidelines, policies, and procedures," *Swartley*, 734 A.2d at 919, "[n]ot every statement in a university's written material create[s] a contractual obligation," *Buccigrossi v. Thomas Jefferson Univ.*, 2022 WL 1093127, at *3 (E.D. Pa. Apr. 12, 2022).  Here, none of the policy provisions that Plaintiffs identify "create[s] any sort of affirmative, enforceable duty on the part of the University."  *David v. Neumann Univ.*, 187 F. Supp. 3d 554, 559-60 (E.D. Pa. 2016).

*First*, Plaintiffs attempt to rely on the University's Nondiscrimination Statement is foreclosed under Pennsylvania law.[11]  Under Pennsylvania law, a school's antidiscrimination statements are not a part of the contract between the university and the student, unless they express some affirmative commitment on the university's part in terms "sufficiently definite" to be enforced.  *David*, 187 F. Supp. 3d at 559.  Penn's Nondiscrimination Statement simply professes

---

[11] That statement establishes that Penn "does not discriminate on the basis of" "religion, creed, national or ethnic origin," "in the administration of its admissions, financial aid, educational or athletic programs, or other University-administrated programs or in its employment practices."  AC ¶ 298, bullet 1.

its intent to adhere to antidiscrimination laws; it does not make any sufficiently definite promises to students about the campus and learning environment to constitute a bargained-for agreement. *See Vurimindi v. Fuqua Sch. of Bus.*, 2010 WL 3419568, at *6 (E.D. Pa. Aug. 25, 2010), *aff'd*, 435 F. App'x 129 (3d Cir. 2011).   Courts dismiss claims based on discrimination and harassment policies where, as here, the plaintiff alleges a general failure to provide a learning environment free of discrimination, without pointing to any specific duties imposed by the policies.  *See Gjeka v. Delaware Cnty. Cmty. Coll.*, 2013 WL 2257727, at *13-14 (E.D. Pa. May 23, 2013) (dismissing claim that professor's violation of anti-harassment policy breached the student-university contract); *Vurimindi*, 435 F. App'x at 132-33 (dismissing claim based on provisions of policy "expressing Duke's view that harassment is unacceptable").

*Second*, Plaintiffs fare no better with the provisions of the Code of Student Conduct, Guidelines on Open Expression, Principles of Responsible Conduct, and Faculty Handbook that they cite, which simply set forth responsibilities and expectations for community members.  *See* AC ¶ 298, bullets 2-13.  These policies do not express any enforcement commitments on Penn's part, *see* Ex. 23, much less "contractually guarantee[] a right to specific types of investigation, support, or sanctions in the event that a student experiences offensive and unwelcome conduct," *David*, 187 F. Supp. 3d at 560.  Instead, these provisions state the behavior community members are expected to exhibit.  Ex. 23 ("Each individual member of this community is responsible for his or her own actions and is expected to respect the rights of others."); *cf. Doe v. Abington Friends Sch.*, 2022 WL 16722322, at *3-4 (E.D. Pa. Nov. 4, 2022) (handbook provisions that "describe specific actions to be carried out at specified times" in "mandatory language" were sufficiently definite, but "[m]ere 'aspirational' language" did not "create an enforceable obligation").

*Third*, Plaintiffs invoke a provision of Penn's Charter of the Student Disciplinary System that asserts the failure to comply with "all provisions of the Code of Student Conduct[,] with all other policies and regulations of the University," and "with local, state, and federal law," "will be met with sanctions." AC ¶ 298, bullet 14. This provision is too vague to constitute an express commitment or to create an enforceable agreement. *See Vurimindi*, 2010 WL 3419568, at *6. It does not state what sanctions will apply to which policy violations, clarifying instead that sanctions may include anything from a "warning" to "expulsion." AC ¶ 298. And even if this provision were sufficiently definite (it is not), Plaintiffs have not alleged a breach of it, because they do not allege Penn failed to issue *any* sanctions against antisemitic conduct, but rather that Penn failed to issue Plaintiffs' favored sanctions: "bans, prohibitions, suspensions, and expulsions." *Id.* ¶ 195.

## VII.   Plaintiffs' UTPCPL Claim Should Be Dismissed Under Rule 12(b)(6)

Plaintiffs' claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL) should also be dismissed.[12] The UTPCPL "aims to protect the consumers of the Commonwealth against fraud and unfair or deceptive business practices." *Corsale v. Sperian Energy Corp.*, 374 F. Supp. 3d 445, 459 (W.D. Pa. 2019), *aff'd*, 819 F. App'x 127 (3d Cir. 2020). "To state a cognizable UTPCPL claim, a plaintiff must establish that the defendant engaged in an activity proscribed under the law, that the plaintiff 'justifiably relied on the defendant's wrongful conduct or representation and … suffered harm as a result of that reliance.'" *Loduca v. WellPet LLC*, 549 F. Supp. 3d 391, 400 (E.D. Pa. 2021). Plaintiffs fail to do so. The Amended Complaint does not plausibly allege Penn engaged in "an[y] activity proscribed" under the UTPCPL, *Loduca*, 549 F. Supp. 3d at 400, or that Plaintiffs reasonably relied on purportedly deceptive conduct when

---

[12] With respect to the UTPCPL, "Plaintiffs" refers to Ms. Davis and Mr. Rubin, who are the only Plaintiffs asserting claims under the statute.

they chose to enroll at Penn, *see id.*; *Seldon v. Home Loan Servs., Inc.*, 647 F. Supp. 2d 451, 466 (E.D. Pa. 2009) ("a plaintiff … must prove … reliance and causation").

### A.     Plaintiffs Do Not Plausibly Allege Penn's Policies Are Deceptive

Plaintiffs must at least plausibly allege that Penn "made a false or misleading statement of fact, concealed information, or engaged in deceptive conduct." *Rickenbaker v. Drexel Univ.*, 2022 WL 970768, at *5 (E.D. Pa. Mar. 30, 2022). Plaintiffs contend that through its various policies on harassment, discrimination, free expression, and discipline, Penn made "false representations of the quality and standards of Penn's educational goods and services," "with [the] intent not to sell them as advertised," and engaged in "fraudulent and deceptive conduct which created the likelihood of confusion and misunderstanding." AC ¶¶ 309, 256. But these are merely "bald assertions" and "legal conclusions," which merit no credit. *Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 227 (3d Cir. 2008), as amended (Nov. 6, 2008); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiffs make conclusory claims that they were deceived by Penn's policies into believing Penn would "*ensure*, maintain, and create an environment *free of* discrimination, abuse, harassment, and intimidation." AC ¶ 305 (emphasis added). However, Plaintiffs point to no specific provisions of Penn's policies where Penn warrants to each of the thousands of students on its open, urban campus that it will "ensure" an "environment free of discrimination, abuse, harassment, and intimidation"—and indeed Plaintiffs' Amended Complaint shows no university could convincingly make such a guarantee without gutting the free speech principles that are elemental to academic inquiry. *See supra* at 29-31. Even if Plaintiffs could point to a statement that made that guarantee, it would be plain unactionable puffery. *Corsale v. Sperian Energy Corp.*, 412 F. Supp. 3d 556, 562-63 (W.D. Pa. 2019) (puffery is "exaggeration or overstatement expressed in broad, vague, and commendatory language").

Moreover, as Plaintiffs allege that sanctionable "antisemitic conduct" includes pure political speech, *see supra* at 30; AC ¶¶ 60, 79-81, their theory of deception turns on their supposed belief that Penn's policies deceived them into thinking that Penn would guarantee an "environment free of "discrimination, abuse, harassment, and intimidation" by regulating the content of expression that they personally find distasteful.  But to be deceptive, conduct must be "likely to deceive a consumer acting reasonably under similar circumstances."  *Rickenbaker*, 2022 WL 970768, at *5; *Seldon*, 647 F. Supp. 2d at 470.  That condition is not met here—the very policies Plaintiffs claim are deceptive clearly state that Penn will not restrict speech based on its content. For example, the Code of Student Conduct says that "the content of student speech or expression is not by itself a basis for disciplinary action."  AC ¶ 43; *see also* Ex. 24, § I(B) (Guidelines on Open Expression: "the substance or the nature of the views expressed is not an appropriate basis for any restriction upon or encouragement of an assembly or a demonstration."); Ex. 25, § II(A) (Faculty Handbook: stating policy to protect faculty from restrictions on academic freedom). No reasonable consumer could be "deceived" into believing (as Plaintiffs claim) that Penn would enforce these policies to "ensure" an "environment free of" the speech alleged in their Amended Complaint, as these policies state the opposite.  *See Corsale*, 374 F. Supp. 3d at 460 (defendants' fee charges were not deceptive where they were expressly stated in materials plaintiffs received).

### B.      Plaintiffs Have Still Not Pled Justifiable Reliance

To state a claim under the UTPCPL, Plaintiffs must also provide a factual basis for their contention that they acted in reliance of a misrepresentation or deception.  Simply proclaiming they "reasonably relied" on alleged deceptions when they enrolled, as Plaintiffs do here, does not suffice.  AC ¶ 307.  Take *Seldon v. Home Loan Services*, where the plaintiffs "merely allege[d] a list of misrepresentations" were made about a loan, but did not "describe the actual terms, conditions, or characteristics of the loan and in what respect defendants misrepresented those

aspects of the loan." 647 F. Supp. 2d 451, 470-71 (E.D. Pa. 2009). The court held the plaintiffs

failed to plead justifiable reliance because they did "not set forth how their knowledge of the loan's

actual terms would have changed their conduct." *Id.* (citation omitted); *see also Hunt*, 538 F.3d at

227. Here, Plaintiffs list a series of Penn policies that supposedly contain deceptive information,

AC ¶ 305, but they allege nothing to suggest they had read any of these policies, which include the

*Faculty* Handbook, when considering whether to enroll at Penn, and it is not plausible that they

did. They also do not set out what provisions of these policies influenced them or allege that they

chose to enroll in Penn and not a different university (and chose to stay at Penn instead of

transferring or withdrawing) because of their review of Penn's policies. *See Rickenbaker*, 2022

WL 970768, at *5 (dismissing claim where "[p]laintiffs fail to allege that they … chose not to

transfer or withdraw because they justifiably relied" on misrepresentations").

    Even if Plaintiffs had pled facts showing reliance on their perception that Penn would

ensure an environment free of speech that they find hurtful, their reliance would not have been

justified because Penn's policies say that "the content of student speech or expression is not by

itself a basis for disciplinary action." AC ¶ 43. So, Plaintiffs could have "ascertained" through

"common prudence or diligence" that Penn's policies would not be enforced to restrict most of the

speech they challenge. *Manning v. Temple Univ.*, 2004 WL 3019230, at *11 (E.D. Pa. Dec. 30,

2004), *aff'd*, 157 F. App'x 509 (3d Cir. 2005).

## CONCLUSION

    The tragic events of October 7 have posed challenges for universities across the country.

Penn is no different in that regard. But this lawsuit is not the right vehicle to figure out the way

forward. Lawsuits like this do not make things easier and certainly do not create an environment

conducive to change. Plaintiffs have now tried twice to state a claim and fallen far short. This

lawsuit has no merit on the facts and the law and should be dismissed with prejudice.

Dated:  April 3, 2024

Respectfully submitted,

*/s/ David Gringer*
David Gringer (*pro hac vice*)
Alan Schoenfeld (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8864
Facsimile: (212) 230-8888
david.gringer@wilmerhale.com
alan.schoenfeld@wilmerhale.com

Seth P. Waxman (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
seth.waxman@wilmerhale.com

Sean V. Burke
Jason Gerard Canavan
Office of General Counsel
University of Pennsylvania
FMC Tower at Cira Centre South
2929 Walnut Street, Suite 400
Philadelphia, PA 19104-5099
Telephone: (215) 746-5200
Facsimile: (215) 746-5222

*Attorneys for Defendant the Trustees of the
University of Pennsylvania*