## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EYAL YAKOBY, JORDAN DAVIS, NOAH RUBIN and STUDENTS AGAINST ANTISEMITISM, INC., <br><br>         Plaintiffs, <br><br>   v. <br><br> THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, <br><br>         Defendant. | Case No. 2:23-cv-04789 (MSG) |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND STRIKE

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

SUMMARY OF FACTS ........................................................................................ 5

ARGUMENT .......................................................................................................... 9

I.      PLAINTIFFS STATE A HOSTILE EDUCATIONAL ENVIRONMENT CLAIM ......... 9

        A.      Plaintiffs Sufficiently Allege Harassment ............................................. 9

        B.      Plaintiffs Sufficiently Allege Actual Knowledge ................................ 12

        C.      Plaintiffs Sufficiently Allege Deliberate Indifference ......................... 13

                1.      Penn's Statements Are Inadequate............................................ 14

                2.      Penn's Meetings with Jewish Students Confirm Its Deliberate
                        Indifference ................................................................................ 16

                3.      Penn's Announcement of an "Action Plan" Is Inadequate ....... 17

                4.      Penn Has Not Responded Reasonably to Alleged Incidents ..... 18

                5.      Academic Freedom Is a Red Herring: Penn Can Uphold Its
                        Obligations Under Federal Law and Still Safeguard Free Speech .......... 21

II.     PLAINTIFFS STATE A DIRECT DISCRIMINATION CLAIM UNDER TITLE VI ... 22

III.    PLAINTIFFS ADEQUATELY ALLEGE STATE LAW CLAIMS ............................... 24

        A.      Plaintiffs Sufficiently Plead Breach of Contract.................................. 24

        B.      Plaintiffs Sufficiently Plead UTPCPL Claims ..................................... 25

IV.     THE COURT HAS SUBJECT MATTER JURISDICTION............................................ 27

        A.      Plaintiffs and SAA Have Standing ....................................................... 29

                1.      Plaintiffs Sufficiently Allege Ongoing and Future Injury-in-Fact........... 29

                2.      Plaintiffs' Ongoing and Future Injuries Are Traceable to Penn .............. 31

                3.      A Favorable Decision Will Redress Plaintiffs' Injuries ........................... 34

                4.      SAA May Seek Injunctive Relief ............................................... 36

        B.      Plaintiffs' Claims Are Ripe Under 12(b)(1) ......................................... 37

V.      PENN'S MOTION TO STRIKE SHOULD BE DENIED ................................................. 39

CONCLUSION............................................................................................................................. 40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.B v. Tredyffrin/Easttown Sch. Dist.*,
  2018 WL 2961138 (E.D. Pa. June 11, 2018) ................................................3, 13, 19

*Abadi v. Target Corp.*,
  2023 WL 4045373 (3d Cir. June 16, 2023) ................................................33

*Action All. of Senior Citizens of Greater Phila. v. Snider*,
  1994 WL 384990 (E.D. Pa. July 18, 1994) ................................................37

*Adamian v. Jacobsen*,
  523 F.2d 929 (9th Cir. 1975) ................................................21

*Aman v. Cort Furniture Rental Corp.*,
  85 F.3d 1074 (3d Cir. 1996) ................................................12

*Astaraee v. Villanova Univ.*,
  509 F. Supp. 3d 265 (E.D. Pa. 2020) ................................................23, 24

*Barnett v. Johnson City School District*,
  2005 WL 8178066 (N.D.N.Y. Feb. 2, 2005) ................................................37

*Blunt v. Lower Merion School District*,
  767 F.3d 247 (3d Cir. 2014) ................................................37

*Booker v. Bangor Area Sch. Dist.*,
  2015 WL 1344661 (E.D. Pa. Mar. 24, 2015) ................................................*passim*

*Brown v. Am. Airlines, Inc.*,
  2024 WL 1143478 (E.D. Pa. Mar. 15, 2024) ................................................40

*Cagnetti v. Juniper Vill. at Bensalem Operations*,
  2020 WL 4275640 (E.D. Pa. July 24, 2020) ................................................11

*Cannon v. Univ. of Chi.*,
  441 U.S. 677 (1979) ................................................9

*Castleberry v. STI Grp.*,
  863 F.3d 259 (3d Cir. 2017) ................................................9, 10

*Chancellor v. Pottsgrove Sch. Dist.*,
  529 F. Supp. 2d 571 (E.D. Pa. 2008) ................................................9

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983).................................................................................................33

*Contee v. Univ. of Pa.*,
   2021 WL 2661459 (E.D. Pa. June 29, 2021)...........................................................9

*Corsale v. Sperian Energy Corp.*,
   412 F. Supp. 3d 556 (W.D. Pa. 2019)....................................................................26

*D.B. v. Tredyffrin/Easttown Sch. Dist.*,
   2020 WL 6262181 (E.D. Pa. Oct. 23, 2020) .................................................*passim*

*Davis ex rel. Monroe Cnty. Bd. of Educ.*,
   526 U.S. 629 (1999)...............................................................................................38

*Davis v. Wells Fargo*,
   824 F.3d 333 (3d Cir. 2016) .......................................................................27, 28, 32

*Doe v. Abington Friends School*,
   2022 WL 16722322 (E.D. Pa. Nov. 4, 2022) ........................................................25

*Doe v. County of Centre*,
   242 F.3d 437 (3d Cir. 2001) .............................................................................38, 39

*Doe v. Haverford Coll.*,
   2023 WL 5017964 (E.D. Pa. Aug. 7, 2023) .........................................................40

*Doe v. L. Sch. Admission Council, Inc.*,
   791 F. App'x 316 (3d Cir. 2019) ...........................................................................38

*Doe v. Manor Coll.*,
   479 F. Supp. 3d 151 (E.D. Pa. 2020)..................................................................9, 13

*Doe v. Sacks*,
   2024 WL 402945 (S.D.N.Y. Feb. 2, 2024).............................................................13

*Doe v. Trustees of the Univ. of Pa.*,
   270 F. Supp. 3d 799 (E.D. Pa. 2017)..................................................................13, 16

*Earl v. NVR, Inc.*,
   990 F.3d 310 (3d Cir. 2021) .................................................................................25

*Ellison v. American Board of Orthopedic Surgery*,
   11 F.4th 200 (3d Cir. 2021) ..................................................................................29

*Felber v. Yudof*,
   851 F. Supp. 2d 1182 (N.D. Cal. 2011)................................................................18

*Freedom from Religion Found. v. New Kensington Arnold Sch. Dist.*,
    832 F.3d 469 (3d Cir. 2016) .................................................................35

*Friedman v. Lansdale Parking Auth.*,
    151 F.R.D. 42 (E.D. Pa. 1993)...............................................................9

*Gjeka v. Delaware County Community College*,
    2013 WL 2257727 (E.D. Pa. May 23, 2013).........................................25

*Goodwin v. Pennridge Sch. Dist.*,
    309 F. Supp. 3d 367 (E.D. Pa. 2018).............................................*passim*

*Gotha v. United States*,
    115 F.3d 176 (3d Cir. 1997) .................................................................32

*Hall v. Millersville Univ.*,
    22 F.4th 397 (3d Cir. 2022) .................................................................12

*Hanover Prest-Paving Co. v. Tile Tech, Inc.*,
    2022 WL 1493568 (M.D. Pa. May 11, 2022).........................................40

*Haque v. Swarthmore Coll.*,
    2017 WL 3218073 (E.D. Pa. July 28, 2017) .........................................18

*Hargrave v. Cnty. of Atl.*,
    262 F. Supp. 2d 393 (D.N.J. 2003).......................................................11

*Houston v. Easton Area Sch. Dist.*,
    355 F. App'x 651 (3d Cir. 2009)..........................................................23

*Jie Fang v. Dir. U.S. I.C.E.*,
    935 F.3d 172 (3d Cir. 2019) .................................................................38

*Katchur v. Thomas Jefferson Univ.*,
    354 F. Supp. 3d 655 (E.D. Pa. 2019).....................................................9

*Kehr Packages, Inc. v. Fidelcor, Inc.*,
    926 F.2d 1406 (3d Cir. 1991) ...............................................................27

*Kelly v. RealPage Inc.*,
    47 F.4th 202 (3d Cir. 2022) .................................................................29

*King v. M.R. Brown, Inc.*,
    911 F. Supp. 161 (E.D. Pa. 1995).........................................................11

*Krebs v. New Kensington-Arnold Sch. Dist.*,
    2016 WL 6820402 (W.D. Pa. Nov. 17, 2016) .......................................16

*L. L. v. Evesham Twp. Bd. of Educ.*,
　　710 F. App'x 545 (3d Cir. 2017) ................................................................. 11, 37

*Levine v. First Am. Title Ins.*,
　　682 F. Supp. 2d 442 (E.D. Pa. 2010) ............................................................. 26, 27

*Loduca v. WellPet LLC*,
　　549 F. Supp. 3d 391 (E.D. Pa. 2021) ................................................................. 25

*Lundy v. Hochberg*,
　　91 F. App'x 739 (3d Cir. 2003) ......................................................................... 34

*Lutter v. JNESO*,
　　86 F.4th 111 (3d Cir. 2023) ............................................................................... 32

*Mandel v. Board of Trustees of California State University*,
　　2018 WL 1242067 (N.D. Cal. Mar. 9, 2018) ...................................................... 18

*Mason v. Roman Cath. Archdiocese of Trenton*,
　　2019 WL 1320299 (D.N.J. Mar. 22, 2019) ........................................................ 19

*Massachusetts v. EPA*,
　　549 U.S. 526 (2007) .......................................................................................... 35

*M.S ex rel. N.S. v. Twin Valley Sch. Dist.*,
　　2016 WL 11698061 (E.D. Pa. June 14, 2016*)* .................................................. 19

*Nardella v. Phila. Gas Works*,
　　2012 WL 1150127 (E.D. Pa. Apr. 5, 2012) ....................................................... 23

*Price ex rel. O.P. v. Scranton Sch. Dist.*,
　　2012 WL 37090 (M.D. Pa. Jan. 6, 2012) ............................................................ 19

*Pa. Psychiatric Soc. v. Green Spring Health Servs., Inc.*,
　　280 F.3d 278 (3d Cir. 2002) .............................................................................. 36

*Pacheco-Figueroa v. United States*,
　　2023 WL 6436703 (E.D. Pa. Sept. 29, 2023) .................................................... 34

*Peachlum v. City of York*,
　　333 F.3d 429 (3d Cir. 2003) .............................................................................. 38

*Pelzer v. City of Philadelphia*,
　　2007 WL 1377662 (E.D. Pa. May 7, 2007) ........................................................ 39

*Plains All Am. Pipeline L.P. v. Cook*,
　　866 F.3d 534 (3d Cir. 2017) .............................................................................. 37

*Pocono Mtn. Charter Sch. v. Pocono Mtn. Sch. Dist.*,
  908 F. Supp. 2d 597 (M.D. Pa. 2012) ......................................................29

*R.L. v. Cent. York Sch. Dist.*,
  183 F. Supp. 3d 625 (M.D. Pa. 2016) ......................................................22

*Rabinowitz v. St. Joseph's Reg'l High Sch.*,
  2023 WL 3597633 (D.N.J. May 23, 2023) ..............................................11

*Raines v. Byrd*,
  521 U.S. 811 (1997) ................................................................................29

*Richard Roe W.M. v. Devereux Found.*,
  650 F. Supp. 3d 319 (E.D. Pa. 2023) ..............................................*passim*

*Rivera v. Dealer Funding, LLC*,
  178 F. Supp. 3d 272 (E.D. Pa. 2016) ......................................................40

*Roche v. Aetna Health Inc.*,
  2014 WL 1309963 (D.N.J. Mar. 31, 2014) ..............................................28

*Schmidt v. Skolas*,
  770 F.3d 241 (3d Cir. 2014) ......................................................................9

*Schuchardt v. President of the U.S.*,
  839 F.3d 336 (3d Cir. 2016) ..............................................................27, 29

*Commonwealth ex rel. Shapiro v. Golden Gate Nat'l Senior Care LLC*,
  648 Pa. 604 (2018) ..................................................................................26

*Simon v. E. Ky. Welfare Rts. Org.*
  426 U.S. 26 (1976) ..................................................................................34

*Soule v. Conn. Ass'n of Schs., Inc.*,
  90 F.4th 34 (2d Cir. 2023) ......................................................................35

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ..........................................................................37, 39

*Swiderski v. Urban Outfitters, Inc.*,
  2017 WL 6502221 (S.D.N.Y. Dec. 18, 2017) ........................................12

*T.B. v. New Kensington-Arnold Sch. Dist.*,
  2016 WL 6879569 (W.D. Pa. Nov. 22, 2016) ....................................11, 12

*T.E. v. Pine Bush Cent. Sch. Dist.*,
  58 F. Supp. 3d 332 (S.D.N.Y. 2014) ..................................................13, 14

*Toy v. Metro. Life Ins.*,
  593 Pa. 20 (2007)..................................................................................................27

*TruePosition, Inc. v. LM Ericsson Tel. Co.*,
  2012 WL 3584626 (E.D. Pa. Aug. 21, 2012) ...............................................38, 39

*Velez v. QVC, Inc.*,
  227 F. Supp. 2d 384 (E.D. Pa. 2002) .......................................................................10

*Warth v. Seldin*,
  422 U.S. 490 (1975)..................................................................................................36

*Wertz v. Ryan*,
  2022 WL 118135 (E.D. Pa. Jan. 12, 2022) ...............................................................31

*Whitfield v. Notre Dame Middle Sch.*,
  412 F. App'x 517 (3d Cir. 2011) ..............................................................................37

*Williams v. Jersey Shore Area School District*,
  673 F. Supp. 3d 688 (M.D. Pa. 2023).......................................................................20

*Williams v. Lenape Bd. of Educ.*,
  2020 WL 2111221 (D.N.J. May 4, 2020).........................................................*passim*

*Wolfe v. City of Portland*,
  566 F. Supp. 3d 1069 (D. Or. 2021) .........................................................................33

## Constitutional Provisions, Statutes, and Rules

U.S. Const. amend. I...................................................................................................22

42 U.S.C. § 2000d et seq. ...................................................................................*passim*

73 Pa. Stat. Ann. § 201-1 *et seq.*...............................................................................25

Fed. R. Civ. P. 12(b)(1) ............................................................................1, 27, 28, 34

Fed. R. Civ. P. 12(b)(6) .......................................................................................9, 28

Fed. R. Civ. P. 12(f).................................................................................................40

Fed. R. Civ. P. 15.....................................................................................................40

## Other Authorities

Catherine E. Lhamon, *"Dear Colleague" Letter* (Nov. 7, 2023),
   https://www2.ed.gov/about/offices/list/ocr/letters/colleague-202311-
   discrimination-harassment-shared-ancestry.pdf ..................................................22

Holocaust Encyclopedia, *University Student Groups in Nazi Germany*,
   https://encyclopedia.ushmm.org/content/en/ article/university-student-groups-
   in-nazi-german ...................................................................................................................4

Romina Ruiz-Goiriena, *Hamas and Iran Celebrate Anti-Gaza War Protests Taking
   US Colleges by Storm*, USA Today (Apr. 25, 2024 11:28 a.m.) ...............................................4

Plaintiffs respectfully submit this memorandum of law in opposition to the motion of defendant The Trustees of the University of Pennsylvania ("Penn") to dismiss and to strike.[1]

## PRELIMINARY STATEMENT

Penn's arguments in its motion could hardly be more disingenuous. Antisemitism is sweeping our country's college campuses. In the wake of the worst attack on Jews since the Holocaust—Hamas's murder, rape, and kidnapping of hundreds of Israelis on October 7, 2023—college students and faculty at Penn and other campuses are rallying to celebrate Hamas, a U.S. designated terrorist organization. Jewish students are being assaulted, blocked by student occupiers from entering their own campuses, and met with genocidal and antisemitic chants and taunts—such as "Intifada revolution,"[2] "Nazi-like Zionists" and "Israeli brown shirts," "Playing the victim is what Jews are best at," "you are a dirty Jew, don't look at us," "keep walking you dirty little Jew," "get out of here kikes," "you're a dirty little Jew, you deserve to die," and "the Jews deserve everything that is happening to them." ¶¶ 2, 33, 150, 152, 170, 175-76, 189-90, 202, 214, 218, 228 234, 239, 243, 246; Yakoby Decl. ¶¶ 11, 13; Davis Decl. ¶ 2. Plaintiffs' complaint includes detailed allegations of years of antisemitic harassment, abuse, and invidious double standards targeting Jewish students at Penn, culminating in an even more egregiously hostile environment since the October 7 massacre. No other student group in recent memory has been made to live in such fear.

Meanwhile, seeking to evade all accountability for having facilitated the very antisemitism that has robbed plaintiffs and other Jewish students at Penn of their educational experiences, Penn

---

[1] Capitalized terms not defined herein have the meanings ascribed to them in the amended complaint. Dkt. 28 ("complaint," cited herein as "¶ _" ). "Plaintiffs" refers to Eyal Yakoby, Jordan Davis, Noah Rubin, and the Students Against Antisemitism ("SAA") members referred to in the complaint. "Mem." refers to Penn's memorandum of law in support of its motion. Dkt. 41. Unless otherwise noted, all emphases are added. In support of their opposition to Penn's motion to dismiss on Rule 12(b)(1) grounds, plaintiffs also refer to the declarations of plaintiffs Eyal Yakoby ("Yakoby Decl.") and Jordan Davis ("Davis Decl."), filed herewith.

[2] The Intifadas were murderous campaigns in 1987 to 1993 and 2000 to 2005 of suicide bombings and shootings against Israeli civilians in buses, cafes, pizza shops, markets, and Passover Seders. ¶ 35.

argues that the relentless antisemitism that plaintiffs have experienced was merely "sporadic" and not sufficiently severe and pervasive, Mem. 22-24; that, in any event, this lawsuit should be dispensed with because Penn's efforts to address its antisemitism problem, which it takes "seriously," are "ongoing," *id.* 7, 8, 11, 27, and its "not yet finished" efforts may change the campus environment, *id.* 3; and that, as a result, plaintiffs lack standing to bring their claims, which Penn says are not ripe, *id.* 6-16. Moreover, as Jewish students live in fear for their physical safety, Penn insists that *it* is the victim because allowing this civil rights lawsuit to proceed would impose a "hardship" on Penn by subjecting its efforts (or lack thereof) to judicial scrutiny. *Id.* 8.

Penn's efforts to minimize the nature and extent of antisemitism on campus and exaggerate the substance and efficacy of its purported remedial efforts are contrived, groundless, and, frankly, shameful. The complaint sets forth in detail the intensifying of Penn's pervasive hostile educational environment—including over fifty-five egregiously antisemitic incidents lasting for days or weeks—just in the five months between October 7 and the filing of the amended complaint. To assert, as Penn does, that such incidents are too "sporadic," or not "directed to Plaintiffs nor about them," to state a claim, Mem. 9, 23, is false and insulting to the Jewish student victims.

In addition, Penn's response has been wholly and woefully insufficient. It is inconceivable that Penn would have permitted any other group to be targeted like this in the first place—it would not have spun itself as the victim which would suffer "hardship" if forced to address the problem; it would not have come up with amorphous "plans"; rather, it would have cracked down after the first epithet. And in saying that its efforts are "ongoing," and therefore that it has not been deliberately indifferent to antisemitism, Penn misstates the law and impermissibly relies on statements of purported fact. But rather than support Penn's motion to dismiss, at most these purported facts raise myriad issues of fact that can be resolved only after discovery.

2

In fact, as the complaint makes clear, Penn cannot be trusted to carry out its purported plans to fight antisemitism. Penn for years has enabled pervasive antisemitism to fester, it selectively decides not to enforce its policies governing student and faculty conduct when the targets are Jewish students, and the month before October 7, it welcomed to its campus vocal antisemites—people Penn admitted it knew had "denigrated Jewish people," ¶ 105—demonstrating to the Penn community that Jew-hatred is permitted at Penn. Faced with rampant antisemitism on campus, Penn's response has ranged, at best, from nonexistent to ineffective.

In short, there is no "trust-us, we're-fixing-it" defense, a defense which, if available, would eviscerate Title VI, but especially so given that there is no end in sight to the intensifying antisemitism, as confirmed by the latest events. Yakoby Decl. ¶¶ 9-12; Davis Decl. ¶¶ 4, 6-7. Penn's Jewish students, like any other victims of discrimination, do not have the luxury of giving Penn still more time to "fix" a problem it has permitted to fester and intensify. A school is deliberately indifferent to harassment where, as here, it "fails adequately to respond." *A.B v. Tredyffrin/Easttown Sch. Dist.*, 2018 WL 2961138, at *5 (E.D. Pa. June 11, 2018).

To fully appreciate how specious Penn's argument is and how empty Penn's pieties are, one only need imagine (or review Penn's history to see) what Penn's response would have been (or has been) if even a tiny fraction of the abuse Penn's Jewish students have endured had been directed against any other protected group. Penn would not have played victim—it would not have stood for the harassment for one minute. For example, it is impossible to conceive of Penn's president testifying before Congress that advocating genocide against African Americans or Asian Americans or Arab Americans does not contravene Penn's policies—as Penn's president did with respect to Jews—it is impossible to conceive of Penn arguing to the Court trust us; we're fixing campus-wide, continuous, months' long onslaughts against any other protected group. So-called

"academic freedom" is also not an excuse—as plaintiffs allege, ¶¶ 247-64, when it comes to discrimination against other groups, Penn does not give a fig for academic freedom. If faculty need to be disciplined or dismissed to stop them from creating or contributing to the anti-Jewish hostile educational environment on Penn's campus, then that is what Title VI requires.

Nor is it an excuse to say that the antisemitism at Penn is really anti-Zionism or mere political disagreement with the policies of Israel. Plaintiffs do not seek to deny anyone the right to disagree with or criticize Israeli policies. But no other country or people in the world—including countries such as China, Syria, Sudan, Turkey, and the list goes on and on—has been subjected to anything close to the kind of abuse on Penn's campus as Israel, abuse which goes far beyond mere political disagreements to the denial of its very right to exist and to defend itself, notwithstanding that those other countries have killed far more civilians and have "displaced" and violated the rights of far more people than Israel. As the Obama, Trump, and Biden administrations have recognized, what the campus mobs are doing is antisemitism, plain and simple.

On Germany university campuses, during the 1930s, "[p]aramilitary student groups often interrupted lectures, provoked skirmishes, and physically intimidated Jewish students in actions tolerated by university administrations and encouraged by the Nazi party."[3] Now, at Penn and other American campuses, organized and disciplined mobs of supporters of the terrorist militia Hamas are disrupting campus life and harassing Jewish students in actions tolerated and enabled by university administrations. And their efforts are being encouraged by the leading murderous antisemites in the world today, the modern-day Nazis—Hamas and Iran's Ayatollah Khamenei.[4]

---

[3] Holocaust Encyclopedia, *University Student Groups in Nazi Germany*, https://encyclopedia.ushmm.org/content/en/article/university-student-groups-in-nazi-germany.

[4] Romina Ruiz-Goiriena, *Hamas and Iran Celebrate Anti-Gaza War Protests Taking US Colleges by Storm*, USA Today (Apr. 25, 2024 11:28 a.m.), https://www.usatoday.com/story/news/politics/2024/04/24/hamas-iran-support-college-protests/73447123007/.

This must be stopped now. As shown further below, Penn's motion should be denied in its entirety.

## SUMMARY OF FACTS

For years before the horrific October 7 terrorist attack, Penn fostered an environment accepting of antisemitism. *E.g.*, ¶¶ 58-95. A few weeks before October 7, for example, Penn proudly hosted and sponsored an anti-Jewish hate fest—the "Palestine Writes Literature Festival." ¶¶ 98-128. The guest speakers included individuals who Penn acknowledged "have a documented and troubling history of engaging in antisemitism by speaking and acting in ways that denigrate Jewish people," ¶ 105, as well as those who had said they "take[] comfort in knowing" the Jewish state will be "wiped off the map," referred to a terrorist who planted a bomb in a Jerusalem movie theater as a "legend" and "beloved daughter of Jerusalem, and tweeted "death to Israel," ¶ 99. Despite the pleas of plaintiffs and other Jewish students, ¶¶ 104, 107, 109-10, outside organizations and experts, ¶ 111, and more than two thousand Penn alumni and affiliates, including members of Penn's Board of Trustees, ¶ 118, that Penn do "all within its power to distance itself" from the Palestinian Writes Festival, Penn not only permitted but defended the event. ¶¶ 114, 122-23. Worse yet, for many students, including SAA members, attendance at Palestine Writes was made a mandatory class requirement. ¶ 125.

In the wake of Penn's refusal even to condemn, the anti-Jewish hate fest, on September 13, a swastika was spray-painted on campus. ¶ 106. Days later, a Penn student broke into Penn's Hillel ahead of a morning prayer service, knocked over furniture and shouted antisemitic obscenities, including "Fuck the Jews." ¶ 112. Then, on September 25, the Penn Chabad, a Jewish center, was defaced with graffiti. ¶ 124.

Since October 7, the hostile environment for Penn's Jewish students has worsened, with no fewer than fifty-five incidents of antisemitism, including incidents lasting for weeks. For example, students and faculty used Penn's campus as the staging ground for a disruptive walkout

and antisemitic rally filled with genocidal chants calling for the destruction of Israel and violence against its Jewish people. ¶¶ 170-77. In the midst of midterm examinations, the library, in the center of campus, was essentially barricaded by students and faculty, ¶ 170, and while Penn officials stood idly by, Davis and other Jewish students were targeted with antisemitic slurs such as "get out of here kikes," and as Davis left for class, she was assaulted by three men who told her, "you're a dirty little Jew, you deserve to die," which Davis reported to Penn's Bias Incident Reporting system. ¶¶ 175-76, 180. Similar rallies occurred on campus in the days that followed and were promoted by students and faculty. *E.g.*, ¶¶ 185-86 189-90, 204-09. Professors even ended classes early and excused absences from class to encourage students to participate. ¶ 146.

Rallies that violated Penn's Open Expression Guidelines and other policies, continued in the months after the October 7 attack, including on December 3, when over one hundred students and others marched through Penn's campus, chanting "from water to water, Palestine will be Arab" and "long live the intifada," leaving in their tracks a campus filled with antisemitic graffiti. *E.g.*, ¶ 214-16. Such hate-filled rallies continued unimpeded into the spring semester. On January 18, Penn faculty held their own rally on the steps of College Hall, blocking access to the building and displaying signs accusing Israel of genocide. ¶ 236. At another rally on February 26, students chanted, "there is only one solution, Intifada revolution." ¶¶ 242-43.

Penn has also allowed students, staff, and faculty to use its platforms to promote antisemitic conduct. On November 14, a group of Penn students, staff, and faculty set up a so-called "Freedom School for Palestine" inside Houston Hall. ¶ 104. For over three weeks, the group flouted Penn's policies, occupying the Reading Room in Houston Hall, staying past closing, disturbing students trying to study, and preventing Rubin and Yakoby and other Jewish students from accessing the building. ¶¶ 204, 208. During the spring semester, the group occupied Penn's Van Pelt library,

violating university policies and disrupting plaintiffs' and other students' studying. ¶ 239. Members of student groups are permitted to violate Penn's policies with impunity, including by displaying antisemitic slogans on Penn's buildings, ¶¶ 202-03, posting antisemitic messages on social media, *e.g.*, ¶¶ 216-19, 234, 241, and organizing disruptive and unauthorized rallies on campus, *e.g.*, ¶¶ 170-77, 214-16, 233, 246.

Penn has failed to alert its community of threats targeting Jewish individuals and institutions on campus, including on November 6, when Penn failed to alert the community that Penn had received emails threatening violence against Penn's Jewish community. ¶ 200. Meanwhile, plaintiffs encounter antisemitic posters and graffiti plastered on or near campus on a daily basis. *E.g.*, ¶ 188 ("Jews R Nazis"); ¶ 202 ("Zionism is Racism"); ¶ 211 ("90% of Pigs are Gas Chambered").

Over twenty-seven antisemitic incidents involve professors, including Professor Ahmad Almallah, who harassed SAA Member #1, the only Jewish student in the class, during lectures and repeatedly promoted antisemitic tropes and conspiracy theories throughout the semester. ¶¶ 87-91. Almallah remarked in class that was not suggesting that all Jews be thrown into the sea, but only because that was "not practical." ¶ 91. In October 2023, Almallah missed two of his classes to speak at a campus rally, with an "explicit call for violence and terrorism against Jews." *Id.* Almallah continues to teach at Penn, despite Jewish students' complaints and a petition with over six thousand signatures demanding his removal. *Id.* Professor Anne Norton has expressed her disdain for the Jewish state, as well as plaintiffs and other Jewish students, on multiple occasions both on campus and online. ¶¶ 140-43, 150. In one instance, Norton "liked" a December 6 tweet that stated, referring to Jewish students' complaints about antisemitism, "playing the victim is what Jews are best at." ¶ 150. Norton participated in the weeks-long "Freedom School" takeover. ¶ 207.

7

Professor Huda Fakhreddine told her students that their attendance at Palestine Writes was mandatory. ¶ 117. Fakhreddine tweeted, referring to Hamas's October 7 massacre, that "while we were asleep Palestine invented a new way of life." ¶ 138. Fakhreddine also participated in campus rallies, cheering speakers on and clapping in approval when they said that Jewish students should "go back to Moscow, Brooklyn . . . fucking Berlin where you came from." ¶¶ 170-71. Fakhreddine is teaching a course during the spring 2024 semester titled "From the River to the Sea." ¶ 246. Professor Dwayne Booth has created horrifying blood libel cartoons, and the website where he shares them is promoted in his biography on Penn's website. ¶¶ 227-232.

Plaintiffs, on numerous occasions, have pleaded with Penn to enforce its policies to prevent the harassment they are enduring, but Penn's responses have been woefully inadequate. For example, plaintiffs, and other Jewish students, reported safety and other concerns before and after the Palestine Writes Literature festival, but while the administration acknowledged that the event's speakers were known antisemites, it welcomed them anyway, setting the stage for a spate of antisemitic incidents, including vandalism at Penn's Hillel and Chabad. ¶¶ 98-128. When SAA Member #2 reported to then President Magill and then Trustee Bok that Jewish students felt unsafe entering Houston Hall during a three-week occupation by students and faculty, he was referred to "campus wellness resources." ¶¶ 204-09. When Yakoby spent two hours presenting detailed information to administrators on the rising antisemitism at Penn in the wake of Hamas's October 7 terrorist attack, they downplayed and dismissed his concerns. ¶¶ 162-63. Penn has consistently refused to do anything close to what is necessary to correct its hostile environment.[5]

---

[5] *E.g.*, ¶¶ 104-05, 107-09, 113-14, 116, 118-19, 121, 124, 126, 152, 158-64, 168, 181-85, 19-92, 198, 200-01, 203, 209, 212, 214-16, 220, 223-25, 235, 237-38, 246.

## ARGUMENT

A Rule 12(b)(6) motion must be denied where the "plaintiff may be entitled to relief under any reasonable reading of the complaint." *Contee v. Univ. of Pa.*, 2021 WL 2661459, at *2 (E.D. Pa. June 29, 2021). The court "accept[s] all of the complaint's well pleaded facts as true," and construes these facts "in the light favorable to the plaintiff." *Id.*[6]

## I.   PLAINTIFFS STATE A HOSTILE EDUCATIONAL ENVIRONMENT CLAIM

To allege a hostile educational environment under Title VI, a plaintiff must plead that: the university "was 'deliberately indifferent' to known acts of harassment by teachers or peers; and [] the harassment was 'so severe [or] pervasive[] that it effectively bar[red] the victim's access to an educational opportunity or benefit.'" *Booker v. Bangor Area Sch. Dist.*, 2015 WL 1344661, at *2 (E.D. Pa. Mar. 24, 2015). "Whether an environment is hostile requires looking at the totality of the circumstances." *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017).[7] Courts "look to the totality of the circumstances when determining deliberate indifference," which presents a "fact-based question[s], for which bright line rules are ill-suited." *Doe v. Manor Coll.*, 479 F. Supp. 3d 151, 162 (E.D. Pa. 2020); *Chancellor v. Pottsgrove Sch. Dist.*, 529 F. Supp. 2d 571, 575 (E.D. Pa. 2008) (hostile educational environment "is a question of fact").

### A.   Plaintiffs Sufficiently Allege Harassment

Plaintiffs allege more than enough to plead a claim—severe and pervasive and objectively

---

[6] Penn, on its Rule 12(b)(6) motion, Mem. 21, 26, 29-30, relies on exhibits that should not be considered, as they are neither integral to, nor incorporated by reference in, the complaint. *Friedman v. Lansdale Parking Auth.*, 151 F.R.D. 42, 44 (E.D. Pa. 1993); *see also Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014). Here, Exhibit 9 to the Declaration of David Gringer (Dkt. 41-1, "Gringer Exs."), a statement from leadership, is not referred to in the complaint at all. Gringer Exs. 5, 6, 10, 21, and 29—all Penn statements and a letter from a dean regarding a professor—are referred to in the complaint in passing with, at most, limited quotes. In any event, none support Penn's motion.

[7] Title VI and Title IX claims are analyzed similarly. *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 694-96 (1979). Title VII cases are also instructive. *Katchur v. Thomas Jefferson Univ.*, 354 F. Supp. 3d 655, 664 n.6 (E.D. Pa. 2019).

offensive harassment on Penn's campus, "not just specific instances of harassment" but "background harassment that pervade[s]" Penn. *Williams v. Lenape Bd. of Educ.*, 2020 WL 2111221, at *17 (D.N.J. May 4, 2020). Plaintiffs and other Jewish students at Penn are regularly subjected to relentless and intolerable harassment, ¶ 2, they are physically and verbally assaulted on campus and at school-sponsored and faculty-endorsed events with genocidal threats, such as "Intifada revolution" and "globalize the Intifada," *e.g.*, ¶¶ 2, 33, 170, and antisemitic slurs, including "get out of here kikes," "Fuck the Jews," "keep walking you dirty little Jew," "go back to . . . Berlin," and "you're a dirty little Jew, you deserve to die," *e.g.*, ¶¶ 33, 168, 176.

Penn as much as concedes that it has a pervasive antisemitism problem—in its memorandum, it uses numerous adjectives in saying that it condemns antisemitism and devotes several pages to its supposed efforts to combat it. Penn admits, for example, that "at several protests and demonstrations, the discourse turned vitriolic, and in some cases hateful, and there have been instances of antisemitic threats of violence, theft, and defacement of property at or near Penn," Mem. 6, but says they are not actionable because they were merely "sporadic," *id*. 23. Penn's argument is contrary to the facts—it is impossible to read plaintiffs' allegations and conclude that the harassment they have been enduring was "sporadic."

Whether Penn's hostile environment is severe or pervasive must be evaluated—not by disaggregating the incidents of harassment—but by the "totality of the circumstances." *Castleberry*, 863 F.3d at 264. Disaggregating the incidents "undercuts the totality of the circumstances inquiry because it robs the incidents of their cumulative effect, and of course, when the complaints are broken into their component parts, each claim is more easily dismissed." *Velez v. QVC, Inc.*, 227 F. Supp. 2d 384, 410 (E.D. Pa. 2002) (cleaned up). The Third Circuit "dictates that a jury be permitted to evaluate instances of impermissible harassment *in the aggregate* in order

to ascertain whether the incidents *collectively* created a hostile [] environment." *King v. M.R. Brown, Inc.*, 911 F. Supp. 161, 166 (E.D. Pa. 1995) (emphases in original); *see also Rabinowitz v. St. Joseph's Reg'l High Sch.*, 2023 WL 3597633, at *5 (D.N.J. May 23, 2023) (a reasonable jury could find severe or pervasive discrimination based on "the swastika [graffiti], the other graffiti, the coin throwing [where at least one student associated the coin throwing with plaintiff's Jewish identity], the *Schindler's List* reenactment, and the Hitler's birthday" celebration); *Williams*, 2020 WL 2111221, at *17 (denying summary judgment where hostile educational environment involved not just "specific instances of harassment" but "background harassment that pervaded the [school's] locker room").[8]

Likewise, Penn's assertion that antisemitic incidents do not count if they were not "directed" at plaintiffs but only "affected other members of the Penn community," Mem. 23, 32, is contrary to controlling law. In fact, "instances of [] discrimination" "not specifically targeted at a plaintiff or his or her protected status are still probative of the overall hostile environment." *Cagnetti v. Juniper Vill. at Bensalem Operations*, 2020 WL 4275640, at *2 (E.D. Pa. July 24, 2020); *see also Williams*, 2020 WL 2111221, at *17 (plaintiff raised triable issue of severe or pervasive harassment based, in part, on his "presen[ce] . . . when white players called other black players the n-word"); *Hargrave v. Cnty. of Atl.*, 262 F. Supp. 2d 393, 415 (D.N.J. 2003) (hostile environment supported by "[p]laintiff's testimony [] suggest[ing] that she was aware that several

---

[8] Penn's erroneous view of the law is exemplified by its assertion that "severe and pervasive harassment [is] necessary to subject Penn to Title VI liability for deliberate indifference," Mem. 24—in fact, a hostile environment is adequately pled where the harassment is "severe *or* pervasive." *L. L. v. Evesham Twp. Bd. of Educ.*, 710 F. App'x 545, 549 (3d Cir. 2017) (emphasis in original). Indeed, even a "single utterance can be enough." *Williams*, 2020 WL 2111221, at *16. Courts regularly find allegations of far less severe or pervasive verbal harassment than the allegations here, even viewed individually, sufficient to raise triable issues. *See, e.g., Booker*, 2015 WL 1344661, at *1-4 (hostile educational environment adequately pled based on verbal harassment); *T.B. v. New Kensington-Arnold Sch. Dist.*, 2016 WL 6879569, at *5 (W.D. Pa. Nov. 22, 2016) (same).

11

other female employees had allegedly been subjected to similar sexually offensive comments").[9]

### B.      Plaintiffs Sufficiently Allege Actual Knowledge

Penn does not dispute that it had actual knowledge of nearly all incidents of harassment alleged in the complaint; in fact, it asserts (falsely) that it "responded reasonably to all alleged incidents." Mem. 28. Rather, Penn points to a few incidents for which it claims plaintiffs did not plead actual knowledge. *Id*. 24, 32. But whether Penn's awareness of those incidents rises to "actual knowledge" is a "fact-based inquiry." *D.B. v. Tredyffrin/Easttown Sch. Dist.*, 2020 WL 6262181, at *17-18 (E.D. Pa. Oct. 23, 2020).[10] In any event, Penn need not have actual knowledge of every incident, only "enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based." *T.B.*, 2016 WL 6879569, at *6 (cleaned up). Likewise, whether Penn was "on notice that a particular individual was likely to commit an act of antisemitism" and could "have predicted those incidents in advance," Mem. 32, is irrelevant, even assuming that were true. It is sufficient that Penn was on notice of the harassment perpetrated by the student and faculty groups over whom Penn exercises disciplinary control.[11]

---

[9] In evaluating the severity or pervasiveness of the harassment, courts also look behind coded language, such as "Zionists" rather than "Jews." *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3d Cir. 1996) ("It has become easier to coat various forms of discrimination with the appearance of propriety, or to ascribe some other less odious intention to what is in reality discriminatory behavior.").

[10] Penn also argues that certain allegations "fail to distinguish between incidents that happened on Penn's campus and those that happened elsewhere." Mem. 32. But Penn can and has disciplined students and faculty for off-campus misconduct—when the misconduct is antisemitic, it selectively chooses not to do so.

[11] Thus, Penn's case, *Swiderski v. Urban Outfitters, Inc.*, 2017 WL 6502221, at *9 (S.D.N.Y. Dec. 18, 2017), Mem. 32, supports plaintiffs, not Penn. There, the court denied summary judgment, because—as here—the employer had sufficient notice of and control over potential customer harassment where it knew that other customers had harassed female employees, *id*. at *8-9; *see Hall v. Millersville Univ.*, 22 F.4th 397, 408 (3d Cir. 2022) (even harassment by non-community member can give rise to deliberate indifference liability where school "exercised control over [the harasser] and the context in which [plaintiff's] harassment occurred").

### C.       Plaintiffs Sufficiently Allege Deliberate Indifference

A university acts deliberately indifferent when its response to harassment is "clearly unreasonable in light of the known circumstances," *D.B.*, 2020 WL 6262181, at \*18.  When it "fails adequately to respond" to harassment, *A.B*, 2018 WL 2961138, at \*5. "Failing to undertake new measures when an initial approach has failed is sufficient to show deliberate indifference." *Goodwin v. Pennridge Sch. Dist.*, 309 F. Supp. 3d 367, 376 (E.D. Pa. 2018). "Courts look to the totality of the circumstances when determining deliberate indifference, and deliberate indifference will often be a fact-based question, for which bright line rules are ill-suited." *Manor Coll.*, 479 F. Supp. 3d at 162.

Unlike Penn's cases, Mem. 27-28, which involved isolated incidents involving one or a few victims and harassers,[12] this case involves a massive institutional problem—"harassment that pervade[s]" Penn, not merely "specific instances of harassment." *Williams*, 2020 WL 2111221, at \*17 (deliberate indifference was a triable issue where school "address[ed] specific instances of harassment" but "never took meaningful action to address the background harassment"); *see also T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 365, 367 (S.D.N.Y. 2014) (denying summary judgment where the school had "a culture of anti-Semitism" that "was more than a collection of individual incidents of bigotry"). Penn acknowledges its problem is substantial—it contends that, in what it calls its "broad-based commitment to address" and "efforts to eradicate antisemitism," it made "statements" condemning antisemitism and the October 7 terrorist attack, met with Jewish students, and announced an "Action Plan to Combat Antisemitism." Mem. 25-28.

---

[12] *Doe v. Sacks*, 2024 WL 402945, at \*1-2 (S.D.N.Y. Feb. 2, 2024) (alleged harassment of single plaintiff consisted of anonymous Google Spreadsheet accusing him of sexual misconduct); *Doe v. Trustees of the Univ. of Pa.*, 270 F. Supp. 3d 799, 805 (E.D. Pa. 2017) (alleged harassment of single plaintiff consisted of being subjected to university disciplinary proceeding for a sexual assault accusation).

But even if these purported efforts were properly considered on this motion (and they should not), Penn's efforts, as the complaint alleges, have been abjectly unsuccessful. Antisemitism at Penn has only worsened and intensified, and it could not be clearer that far more work is needed. Under such circumstances, whether Penn has been deliberately indifferent cannot be resolved on its say-so but must be resolved by the trier of fact. *See, e.g.*, *Goodwin*, 309 F. Supp. 3d at 376 (deliberate indifference was a triable issue notwithstanding that the school claimed "12 actions taken in response to [plaintiff's] complaints" of harassment, including multiple meetings with plaintiff, meeting with a harasser, and individualized accommodations); *Williams*, 2020 WL 2111221, at *17-18 (deliberate indifference to race-based harassment a triable issue where school disciplined individuals, launched multiple investigations, and arranged professional training).

1.     *Penn's Statements Are Inadequate*

Penn relies on four "statements" it contends "reflect an unequivocal commitment to ensuring the safety and security of all students." Mem. 26. But those statements reflect just the opposite: they show that Penn was acutely aware of its antisemitism problem, but rather than take effective action to protect its Jewish students, it issued nothing more than ineffective platitudes. That is deliberate indifference. *See Goodwin*, 309 F. Supp. 3d at 376 (school's verbal actions—such as holding meetings and responding to student and parent's messages—in response to student complaints were insufficient); *Pine Bush*, 58 F. Supp. 3d at 364-65 (reasonable jury could find school deliberately indifferent where its "seminars" and "assemblies, even ones that specifically address[ed] the discrimination complained of" proved ineffective).

For instance, Penn's September 12 statement specifically acknowledged that it knew that Palestine Writes speakers had "a documented and troubling history of engaging in antisemitism by speaking and acting in ways that denigrate Jewish people," ¶ 105, but Penn nonetheless

welcomed these known antisemites onto campus, ¶ 122. It is impossible to imagine or point to any circumstances (and Penn of course does not do so) where Penn welcomed speakers who it knew had a history of "denigrat[ing]" any other group. The next day, on September 13, a swastika was spray-painted on campus. ¶ 106. Just over a week later, a Penn student broke into Penn's Hillel, "knock[ing] over several pieces of furniture and shout[ing] antisemitic obscenities about Jewish people, including 'Fuck the Jews' and '[the Jews] killed JC.'" ¶ 112. Rather than take concrete actions to address and prevent such incidents, such as disciplining the perpetrators, Penn, on September 22, issued another statement. ¶ 121. Predictably, this statement was similarly ineffective in addressing Penn's antisemitism problem. In fact, just three days later, Penn's Chabad was defaced with graffiti. ¶ 124; *see Goodwin*, 309 F. Supp. 3d at 376 ("Failing to undertake new measures when an initial approach has failed is sufficient to show deliberate indifference.").

Penn's post-October 7 statements fare no better. Its October 10 statement was widely and justifiably condemned for its delayed timing and tepidness, and, as alleged in the complaint, "Yakoby and Rubin—whose concerns about being Jewish on campus had been ignored just days earlier—were not among the students Penn 'offer[ed] assistance and resources,' even after seeking them." ¶ 156. Most glaringly, this statement did not mention Penn's Jewish students or antisemitism, *id.*, even though Penn now gratuitously cites to it to "refute[] any inference that Penn is deliberately indifferent," Mem. 25-26. Penn, in its October 15 statement, acknowledged again that "individuals, with a public history of speaking out viciously against the Jewish people, appear[ed] on campus as part of the Palestine Writes Literature Festival" and "promise[d] [to] endeavor to foster a safe and inclusive environment for Jewish students on campus," ¶¶ 165-66—but, as plaintiffs allege, Penn has abjectly failed to fulfill this promise.

2.       *Penn's Meetings with Jewish Students Confirm Its Deliberate Indifference*

Penn contends that its meetings with plaintiffs and other Jewish students and its "ongoing dialogue with the opposing parties" "to listen to their concerns" "defeat any conclusory deliberate indifference argument." Mem. 26-27. But as with its inadequate statements, these meetings, part of Penn's ineffective and "clearly unreasonable" response to its antisemitism problem, *D.B.*, 2020 WL 6262181, at *18, were not "concrete steps," let alone effective steps, "to address, ameliorate, or mitigate" the concerns plaintiffs and other students raised, ¶ 104. Again, *a* response does not equate to an *adequate* response. *See, e.g.*, *Goodwin*, 309 F. Supp. 3d at 376 ("defendant's responses," which included student meetings, "did not address the harassment, and in some cases were not even designed to do so," as the school "took no disciplinary action" against the harassers); *Krebs v. New Kensington-Arnold Sch. Dist.*, 2016 WL 6820402, at *4 (W.D. Pa. Nov. 17, 2016) (deliberate indifference adequately pled where school participated in "multiple meetings and conferences" in response to repeated complaints of harassment).[13] That antisemitism persisted and intensified following Penn's meetings again negates Penn's argument.

Penn also ignores plaintiffs' allegations concerning what occurred during the meetings. Penn touts, for example, its September 19, 2023 meeting with Rubin and other Jewish students, Mem. 27, at which Rubin requested additional security presence for three campus Jewish organizations. But Penn ignores the allegations that during the meeting, it patronizingly told Rubin, among other things, that Hillel was the safest building on campus and then made a promise, which it failed to fulfill, to provide the Jewish organizations with safety information. ¶ 109. Penn also cites an October 15, 2023 meeting, Mem. 27, but ignores plaintiffs' allegations that after Yakoby

---

[13] Penn's citation to *Trustees of University of Pennsylvania,* 270 F. Supp. 3d at 826, Mem. 27, is inapposite as the court there held only that a plaintiff disciplined for sexual assault could not show deliberate indifference "based solely" on the school's rejecting his allegations of gender bias during the disciplinary proceeding.

spent "approximately two hours" "present[ing] [Penn administrators] with detailed information concerning the virulent antisemitism spreading across campus," and pleaded for immediate action to prevent further antisemitism incidents, "his concerns fell on deaf ears," with Penn denying that there had been any hate speech and refusing to respond to a student organization's endorsement of Hamas's October 7 massacre, ¶ 162. Penn similarly points to a February 6, 2024 meeting with Rubin, Mem. 27, at which he provided videos and information concerning faculty espousing antisemitic viewpoints and violating Penn policies, including a professor's antisemitic cartoons, but Penn omits that it downplayed the problem and failed to follow up regarding a promise to Rubin that it would assist students offended by the cartoons, ¶ 238. And even if Penn "contest[s] [plaintiffs'] characterization[s] of the . . . meeting[s], . . . at this stage the Court must assume the truth of [plaintiffs'] account." *Williams*, 2020 WL 2111221, at *17 n.20 (deliberate indifference triable issue, in part, because when "plaintiffs initially complained to school officials about the racial slurs being used . . . at the . . . meeting, those officials brushed their concerns aside"); *Booker*, WL 1344661, at *3 (allegation that school administrator responded to report of racist song by downplaying it as "just a silly song with a few lines," combined with the school's "failure to discipline a harassing student or prevent future harassment," sufficient "to show deliberate indifference by the defendant at the motion to dismiss stage").

3.  *Penn's Announcement of an "Action Plan" Is Inadequate*

Penn asserts that its November 1, 2023 *announcement* of an Action Plan to Combat Antisemitism is "most damaging to any theory of deliberate indifference." Mem. 27. As with its previous inadequate statements and meetings, this announcement and Penn's "Action Plan" were also ineffective and "clearly unreasonable in light of the known circumstances." *D.B.*, 2020 WL 6262181, at *18. Among other things, although it acknowledged that "Penn must do more," ¶ 195,

the plan lacked meaningful action, instead merely providing for "review," "conversations," and "advis[ement]," ¶ 196. Along with Penn's other inadequate responses, this announcement represents nothing more than confirmation of Penn's awareness that it had, and has, an antisemitism problem that goes far beyond "sporadic." Plaintiffs allege numerous antisemitic incidents—in fact, Penn's hostile environment intensified—following the announcement of the Action Plan, which was and remains "[in]effective in preventing . . . further harassment," *Goodwin*, 309 F. Supp. 3d at 376, and confirms Penn's deliberate indifference.[14]

4.    *Penn Has Not Responded Reasonably to Alleged Incidents*

Penn falsely asserts that plaintiffs "fail to allege a single instance where Penn's response was 'clearly unreasonable in light of the known circumstances,'" Mem. 24; as shown, plaintiffs allege that each of Penn's responses and non-responses was clearly unreasonable. The proof is in the pudding—responses that do not cure the problem are clearly unreasonable.

Penn claims that "courts routinely refuse to countenance plaintiffs' attempts to leverage Title VI to challenge specific disciplinary decisions." Mem. 28. But this off-the-mark argument misconstrues plaintiffs' allegations. Plaintiffs are not challenging any specific disciplinary decisions. In fact, Penn did not take any disciplinary decisions that could be challenged, and if it did, there has been no public disclosure of any such decisions.[15] Instead, plaintiffs take issue with

---

[14] Penn cites *Felber v. Yudof*, 851 F. Supp. 2d 1182, 1188 (N.D. Cal. 2011), for the proposition that "ongoing dialogue" forecloses a finding of deliberate indifference, Mem. 26, but conspicuously omits that in addition to ongoing dialogue, the school in *Felber* also had "campus police . . . arrest[] [] disruptive protestors." Penn cites *Mandel v. Board of Trustees of California State University*, 2018 WL 1242067, at *19 (N.D. Cal. Mar. 9, 2018) for the proposition that a school failing to discipline certain students does not amount to deliberate indifference, Mem. 33, but again Penn neglects critical facts, including that the decision was based on plaintiffs' failure, unlike here, to allege that the offending students had "repeatedly violated the Student Conduct Code such that the failure to discipline one or more of them amounts to deliberate indifference."

[15] Despite Penn's argument that "Plaintiffs . . . cannot know whether [disciplinary] action was taken, and candidly should not know whether such action was taken" because it is "contrary to [Penn's] legal obligations and policies," Mem. 22-23, "materials covered by FERPA are" actually "discoverable in the context of a civil action," *Haque v. Swarthmore Coll.*, 2017 WL 3218073, at *2 (E.D. Pa. July 28, 2017).

18

Penn's utter inaction—*i.e.*, its "failure to discipline [] harassing student[s] or prevent future harassment," *Booker*, 2015 WL 1344661, at *3, or even announce that it took disciplinary actions which could have served a deterrent purpose. That failure is "evidence of [its] deliberate indifference." *Id.* This Court and others routinely find deliberate indifference adequately pled when the defendant-school did not discipline the harassers. *See, e.g.*, *id.*; *A.B*, 2018 WL 2961138, at *5 (allegations that administrators were "deliberately indifferent because they failed to question or discipline" harasser sufficient to state a claim); *Price ex rel. O.P. v. Scranton Sch. Dist.*, 2012 WL 37090, at *7 (M.D. Pa. Jan. 6, 2012) (deliberate indifference sufficiently pled where no indication that school disciplined harassers); *Mason v. Roman Cath. Archdiocese of Trenton*, 2019 WL 1320299, at *5 (D.N.J. Mar. 22, 2019) ("Here, although 'courts should refrain from second-guessing the disciplinary decisions made by school administrators,' one could reasonably find that a single day of in-school suspension for what essentially amounts to a threat of physical violence . . . was 'clearly unreasonable.'").[16]

Cherry-picking examples, Penn argues that plaintiffs' "allegations do not plausibly establish that Penn responded unreasonably to any known acts of antisemitic conduct." Mem. 31-32. But Penn ignores not just that its overall response has been ineffective—pervasive antisemitism has intensified—but also numerous allegations of specific unreasonable responses to antisemitic incidents, including, for example: After Davis was severely harassed on October 16, 2023—with students screaming at her and other Jewish students, "get out of here kikes," and other attendees calling her a "dirty little Jew [who] deserve[s] to die," all in the presence of Open Expression Observers (Penn staff or faculty who are selected to uphold Penn policies)—she "request[ed] help

---

[16] Penn is also incorrect in asserting that its failure to investigate is not clearly unreasonable. Mem. 28, 31-33. Plaintiffs "have pled sufficient facts that may give rise to a conclusion that [the school] . . . acted with deliberate indifference by making no effort to investigate or stop the harassment." *M.S ex rel. N.S. v. Twin Valley Sch. Dist.*, 2016 WL 11698061, at *12 (E.D. Pa. June 14, 2016*)*.

obtaining class accommodations because she was suffering from the day prior's assault," but

Penn's academic support and disability center denied her request. *Id.* ¶¶ 48, 175, 176, 183.

- During the fall 2022 semester, when SAA Member #1 was harassed by her professor, including by facilitating classroom discussion about "Jews exaggerate[ing] terrorist attacks to justify their colonial and racist desires," she reported the harassment to the department head who defended the professor and instructed her to take her concerns to the professor directly "rather than report it further." ¶¶ 87-91. SAA Member #1 continued to endure harassment during that class. Despite Yakoby also reporting this professor for antisemitism, he "still teaches and promotes antisemitism on Penn's campus." ¶ 91.

- On November 6, 2023, Yakoby and Rubin were at Penn Hillel when they observed "police and bomb-sniffing dogs enter the building." ¶ 200. Yakoby contacted Penn's Director of Special Services, who "admitted that a threat had been made against the building." *Id.* Penn did not use its emergency notification system to alert its community about the bias-motivated threat. ¶ 201. On December 4 and 18, 2023, when Rubin reported him and Yakoby being denied access to a Penn building by Freedom School participants, he was merely referred to "campus wellness resources." ¶ 208.

- On December 3, 2023, "a horde of more than a hundred rally goers, including students, marched across Penn's campus," calling for the genocide of Jews (with chants such as, "from water to water, Palestine will be Arab" and "long live the intifada"), defacing buildings, and denying plaintiffs freedom of movement around campus. ¶ 214. "Penn Police were present throughout the rally but did nothing to stop it." *Id.*

Penn absurdly argues that plaintiffs' allegations do not support an inference that Penn had

knowledge that the harassment would persist despite its responses. Mem. 32.[17] But that is the

essence of plaintiffs' allegations—in the face of months and even years of campus antisemitism,

Penn's response has been "[in]effective in preventing . . . further harassment," *Goodwin*, 309 F.

Supp. 3d at 376, and therefore "clearly unreasonable in light of the known circumstances," *D.B.*,

2020 WL 6262181, at *18. Deliberate indifference (like insanity) is evidenced by doing the same

thing over and over and expecting a different result.

---

[17] Penn cites *Williams v. Jersey Shore Area School District*, 673 F. Supp. 3d 688, 700 (M.D. Pa. 2023), but there, the school's response to student-on-student bullying not "clearly unreasonable" because it involved meetings with plaintiffs, "investigations of the incidents and the offending students, disciplinary action, documentation of incidents, and review of camera footage."

5.    *Academic Freedom Is a Red Herring: Penn Can Uphold Its Obligations Under Federal Law and Still Safeguard Free Speech*

Penn contends that "Title VI does not create liability when a university opts not to censor pure political speech," that it has no Title VI liability for its hostile educational environment because "[i]ntellectual advancement has traditionally progressed through discord and dissent." Mem. 29. At issue here is not "pure political speech" or "academic freedom," but out-and-out antisemitic slurs and speech and conduct that—as the Obama, Trump and Biden administrations, and the International Holocaust Remembrance Alliance, have recognized, ¶¶ 24-30—are antisemitic. At issue here is Penn's outrageous invidious double standard in censoring so-called "pure political speech" to protect only groups other than Jewish and Israeli students. At issue here is the right under Title VI of Jewish and Israeli students to be treated no worse than any other group and to be free from the hostile environment that Penn shamelessly defends here.

As plaintiffs allege, when it comes to discrimination against other groups, Penn does not give a fig for academic freedom. ¶¶ 247-64. If students or faculty need to be disciplined or dismissed to stop them from creating or contributing to the hostile educational environment on Penn's campus, then that is what Title VI requires. If, on the other hand, Penn does not wish to comply with Title VI, if it wants its faculty and students to have the "academic freedom" to spew antisemitism, its path is clear: forego receiving federal taxpayer funds and return the funds it has received. None of the cases Penn cites, all of which involve public schools, support its position.[18] Nor could they, because Penn *does* restrict "pure political speech" it deems objectionable; it just *chooses not to do so* when the harassment is antisemitic. For example, Penn is vigorously pursuing

---

[18] For example, Penn cites *Adamian v. Jacobsen*, 523 F.2d 929 (9th Cir. 1975), to support that "[t]he desire to maintain a sedate academic environment . . . [does not] justify limitations on a teacher's freedom to express himself on political issues in vigorous . . . and even distinctly unpleasant terms," Mem. 30, but omits the very next line that recognizes an exception for speech that "involves substantial disorder or invasion of the rights of others."

Professor Amy Wax, including by removing her first-year courses, over "comments she made regarding Black student academic performance," ¶ 250, and has arrested and put on probation protesters who disrupted a football game, ¶ 255.[19]

Penn cites examples that it claims demonstrate Penn's commitment to defending "pure political speech," Mem. 31, but omits, however, the context of these allegations. For instance, Penn defends its "decision not to immediately sanction or shut down political protests on campus." Mem. 31. But far from "pure political speech," the event it cites was a three-week takeover of a campus building, aided by faculty and staff, during which Jewish students "expressed to Penn that they do not feel safe" entering the building, and Yakoby and Rubin were denied entrance by the occupants because of their Jewish identities.[20] ¶¶ 206-08. Penn's assertion that "intellectual advancement" depends on the expression of antisemitism on its campus, Mem. 29, confirms that the underlying problem at Penn goes well beyond deliberate indifference, and underscores why court intervention is necessary here—without it, it will continue to permit and foster its antisemitic hostile educational environment under the guise of academic discourse.

## II.   PLAINTIFFS STATE A DIRECT DISCRIMINATION CLAIM UNDER TITLE VI

For plaintiffs' separate Title VI claim—arising from Penn's intentional discrimination through its direct actions and an invidious double standard application of its policies that adversely

---

[19] Contrary to Penn's assertions, Mem. 31, plaintiffs do not "call for Title VI-mandated discipline against individuals who expressed ideas they find disagreeable," or any specific discipline at all. *See infra* Arg. § Section V. What plaintiffs call for is that Penn apply its policies equally and prevent verbal harassment and antisemitic speech and conduct to the same extent as racist or other speech and conduct that Penn has and does readily address, including speech that "materially and substantially interfere[s] with the requirements of appropriate discipline in the operation of the school," *R.L. v. Cent. York Sch. Dist.*, 183 F. Supp. 3d 625, 632 (M.D. Pa. 2016) (citing *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)); *see* Catherine E. Lhamon, *"Dear Colleague" Letter* (Nov. 7, 2023), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-202311-discrimination-harassment-shared-ancestry.pdf ("Harassing conduct can be verbal *or* physical and need not be directed at a particular individual.").

[20] Penn's suggestion that the First Amendment prevents Penn from disciplining students or professors is at best a red herring that ignores decades of decisions by the courts and the Department of Education holding both private and public institutions accountable for failing to stop verbal harassment. *See, e.g.*, *Booker*, 2015 WL 1344661, at *2-4 (hostile educational environment based on racial slurs, race-based comments, and KKK song sufficiently pleaded).

affect plaintiffs and other Jewish students—plaintiffs need only "demonstrate to the court that . . . [the] factual scenario is compatible with discriminatory intent, *i.e.*, that discrimination could be a reason for [defendant's] action," and this "initial burden is not intended to be onerous." *Nardella v. Phila. Gas Works*, 2012 WL 1150127, at *4 (E.D. Pa. Apr. 5, 2012). Penn challenges those double standards by claiming that plaintiffs failed to allege that "similarly situated individuals outside their protected group 'received more favorable treatment.'" Mem. 20. But Penn's "qualms with this element are better resolved through a motion for summary judgment." *Astaraee v. Villanova Univ.*, 509 F. Supp. 3d 265, 271 (E.D. Pa. 2020) ("[I]nquiry into whether the students were in fact similarly situated will be fact-intensive and rely on discovery."); *see also Houston v. Easton Area Sch. Dist.*, 355 F. App'x 651, 654 (3d Cir. 2009) ("[W]hether a factor is relevant for purposes of a similarly situated [discrimination] analysis must be determined by the context.").

Moreover, plaintiffs allege far more than is required—the way Penn responds to reports of antisemitic harassment, like plaintiffs', is *a fortiori* worse than its response to other forms of discrimination or disfavored speech. *E.g.*, ¶¶ 247-64. Plaintiffs' allegations support an inference of discriminatory intent, based on years of Penn's toleration and promotion of antisemitism on campus, which is dramatically at odds with how Penn readily acts to enforce its policies to investigate and address bias-related incidents when the victims are not Jewish or Israeli, and its efforts to intentionally reduce its Jewish enrollment. *E.g.*, ¶¶ 247-64, 265-67. For example, an Orthodox Jewish student was confronted by campus police at his apartment, charged, and prosecuted for telling peers to "Shut up, you water buffalo," "a term commonly used in his native Hebrew to refer to a loud, rowdy person." ¶ 249.

Yet Penn has taken no action against several students who have espoused antisemitism, including a student who was charged by the Philadelphia District Attorney for ripping down and

stealing an Israeli flag from the home of Jewish Penn students while on her way to an October 28 rally, during which she gave a speech referring to the October 7 terrorist attack as "glorious" and recalling "feeling so empowered and happy" when she saw the "joyful and powerful images" of the attack. ¶¶ 190-91, 193, 245, 249, 274. Penn has also swiftly stopped and punished disruptive protest activity—just not when the message promotes hate and terror against Jews. For example, in October 2022, when protesters from an environmental student group ran onto Penn's football field during a game, campus police arrested nineteen students who were sentenced to community service and disciplinary probation, while two were suspended from the marching band. ¶ 255. Penn defended the decision because the protest was not "an appropriate expression of free speech, nor consistent with Penn's open expression guidelines." *Id.* But plaintiffs detail numerous times when Penn failed to uphold these guidelines to address conduct promoting hate and violence against Jews, including when Penn permitted (and aided) students, faculty, and staff to stage a three-week takeover of an academic building, denying entry to Yakoby and Rubin, ¶¶ 204-09, and when, during a student- and faculty-organized walkout, a speaker told Jewish students to "go back to . . . fucking Berlin," and Davis was told, "get out of here kikes" and "you're a dirty little Jew, you deserve to die," while "Open Expression Observers" stood idly by, ¶¶ 172-76.

### III.   PLAINTIFFS ADEQUATELY ALLEGE STATE LAW CLAIMS

#### A.   Plaintiffs Sufficiently Plead Breach of Contract

Plaintiffs allege breach of contract. Because "the relationship between a private educational institution and an enrolled student is contractual in nature"—"comprised of the written guidelines, policies, and procedures [] distributed to the student over the course of their enrollment in the institution"—the "student can bring a cause of action against said institution for breach of contract where the institution ignores or violates portions of the written contract." *Astaraee.*, 509 F. Supp. 3d at 273. As plaintiffs allege, at least seven Penn policies contain obligations giving rise to

plaintiffs' claim. ¶¶ 38-57, 295, 298. Penn cites *Gjeka v. Delaware County Community College*, 2013 WL 2257727, at *13-14 (E.D. Pa. May 23, 2013), Mem. 36—but that case confirms that plaintiffs' claims should not be dismissed. There, the court *upheld* a breach of contract claim against the defendant college based on its harassment policy, and only dismissed a breach of contract claim against the defendant professor because there was no contract between the plaintiff and the professor. Similarly, in *Doe v. Abington Friends School*, 2022 WL 16722322, at *4-5 (E.D. Pa. Nov. 4, 2022), cited Mem. 36, the court found that "[a]lthough the handbook indicates that the school has discretion in determining whether the conduct complained of constitutes bullying or harassment," the policies' mandatory language, such as that the "administration *will initiate a prompt investigation*" was sufficient to state a claim for breach of contract. Here, Penn has breached mandatory obligations in Penn's policies. ¶¶ 295, 298.

### B.    Plaintiffs Sufficiently Plead UTPCPL Claims

To state a claim under the UTPCPL, 73 Pa. Stat. Ann. § 201-1 *et seq.*, "a plaintiff must establish that the defendant engaged in an activity proscribed under the law, that the plaintiff justifiably relied on the defendant's wrongful conduct or representation and suffered harm as a result of that reliance." *Loduca v. WellPet LLC*, 549 F. Supp. 3d 391, 400 (E.D. Pa. 2021) (cleaned up). Plaintiffs need not allege that Penn intended to deceive them, only that Penn's policies are "capable of being interpreted in a misleading way," *id.*, a determination that is "best sorted out through discovery." *Id.* at 401.[21] Plaintiffs allege that Penn disseminated specific, detailed, and clear policies laying out its students' "rights" and "obligations," which it deemed "*essential* to the University's educational mission and its character as a community," ¶¶ 42-43, and that Penn

---

[21] In furtherance of its consumer-protection objective, the statute is to be liberally construed. *See Earl v. NVR, Inc.*, 990 F.3d 310, 312 (3d Cir. 2021).

deceived them by leading them to believe, among other things, that Penn would enforce those policies. ¶¶ 298, 300-12. Penn astonishingly argues that those statements exaggerated and overstated "puffery," on which it was unreasonable for students to have relied. Mem. 38. Penn also argues that because its Code of Student Conduct provides that the "content of student speech or expression is not by itself a basis for disciplinary action," Mem. 39, even though it also prohibits "hate speech" and "racial" slurs, ¶ 298, no reasonable consumer (student) could be deceived into believing that Penn would protect Jewish students from harassment on campus. Mem. 39. But whether a statement is puffery is a question for the "finder of fact," *Commonwealth ex rel. Shapiro v. Golden Gate Nat'l Senior Care LLC*, 648 Pa. 604, 626 (2018), as is whether plaintiffs' reliance was justifiable. *See Levine v. First Am. Title Ins.*, 682 F. Supp. 2d 442, 467 (E.D. Pa. 2010).

In any event, Penn does not and cannot explain why "essential" statements like those in Penn's Code of Student Conduct—giving students the right "to be free from discrimination on the basis of . . . religion[, and] national or ethnic origin," ¶ 42—are puffery, not to be relied on. Penn cannot avoid liability on a motion to dismiss merely by asserting that its policies do not mean what they say.[22] And no reasonable university could legitimately make an argument, as Penn does here, Mem. 39, that students cannot reasonably expect such policies to bar so-called "political speech," where, as plaintiffs allege, such speech "demonize[s]" people based on their religion or national origin, ¶ 60, especially where the university does not protect "political speech" when it demonizes groups other than Jews. Finally, Penn argues plaintiffs have not pled justifiable reliance because they have not claimed how knowledge of Penn's behavior would have changed their conduct.[23]

---

[22] In *Corsale v. Sperian Energy Corp.*, cited by Penn, Mem. 38, the court found that promises were mere "puffery" where plaintiffs alleged only that the defendant claimed an unnamed and ambiguous "competitive" rate. 412 F. Supp. 3d 556, 562-63 (W.D. Pa. 2019).

[23] Penn cites a common law fraud case to argue that plaintiffs should have "ascertained" through "common prudence or diligence" that Penn would not enforce its policies, Mem. 40 (citing *Manning v. Temple Univ.*, 2004 WL 3019230, at *11 (E.D. Pa. Dec. 30, 2004), *aff'd*, 157 F. App'x 509 (3d Cir. 2005)), is far afield. In any event, that is not the

Mem. 40. This argument ignores that they relied on Penn's misrepresentations in deciding to "enroll at Penn, and to pay tuition and fees to Penn, and to continue to maintain enrollment at, and pay tuition and fees to, Penn." ¶¶ 298, 308. No more is required at this stage. *See Levine*, 682 F. Supp. 2d at 467.

## IV.    <u>THE COURT HAS SUBJECT MATTER JURISDICTION</u>

When a defendant challenges the sufficiency of plaintiffs' standing through a Rule 12(b)(1) motion, courts consider only "the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff," and plaintiffs must only "plausibly suggest that [they have] standing." *Schuchardt v. President of the U.S.*, 839 F.3d 336, 343-44 (3d Cir. 2016). If, however, a defendant challenges standing by introducing contradictory jurisdictional allegations that present a dispute of material fact, the court may not dismiss without allowing for a trial on the contested facts. *See id.* at 343. The court may dismiss a claim under Rule 12(b)(1) only if the claim "clearly appears to be immaterial" or is "wholly insubstantial and frivolous," *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991), and "must take care not to reach the merits of a case," *Davis v. Wells Fargo*, 824 F.3d 333, 348 (3d Cir. 2016).

Thus where, as here, Rule 12(b)(1) "jurisdictional issue[s] and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits of an action," a "jurisdictional finding of genuinely disputed facts is inappropriate." *Wells Fargo*, 824 F.3d at 348. Penn's standing arguments are intertwined with the merits because, among other things, Penn challenges injury-in-fact and traceability under Rule 12(b)(1) by arguing that "most of Plaintiffs' allegations describe harassing and antisemitic conduct suffered by other

---

standard for a UTPCPL claim. *See Toy v. Metro. Life Ins.*, 593 Pa. 20, 54 (2007) ("[T]he recipient of an allegedly fraudulent misrepresentation is under no duty to investigate its falsity in order to justifiably rely[.]").

students," "Penn had nothing to do with the newly alleged third-party harassment and Plaintiffs do not even allege they informed Penn about it," and Plaintiffs' subjective fears of future harm "because there are still protests advocating views they find appalling" are not actual and imminent future injuries. Mem. 9-17. But all these arguments directly challenge the elements of plaintiffs' hostile environment claims, including the actionability of the harassment and Penn's knowledge of and control over the harassment. Penn also puts deliberate indifference directly at issue— arguing, for example, that plaintiffs' claims are unripe because Penn is currently (and unsuccessfully) responding to its hostile environment, including by "enforcing its policies with respect to violations that involve antisemitic conduct." Mem. 8. But the adequacy of Penn's response is of course a merits question—and as the complaint alleges and the events of the last few weeks demonstrate, Penn's response to antisemitism has been utterly ineffective—*i.e.*, deliberately indifferent. *See supra* Arg. § 1.C; Yakoby Decl. ¶ 2; Davis Decl. ¶ 5. In any case, Penn "may not short-circuit the usual process, flip the burden of persuasion, and permit itself to submit competing facts to support its argument." *Wells Fargo*, 824 F.3d at 349. Accordingly, Penn's standing motion must be rejected. And where, as here, facts concerning Penn's remedial efforts (or lack thereof) and knowledge of ongoing harassment, are solely within Penn's possession, "jurisdictional discovery is warranted." *Roche v. Aetna Health Inc.*, 2014 WL 1309963, at *6 (D.N.J. Mar. 31), *modified on recons.*, 2014 WL 7179614 (D.N.J. Dec. 17, 2014); *see also Wells Fargo*, 824 F.3d at 347, 349 n.18 (while "Rule 12(b)(1) allows a district court to make findings of fact that contradict the allegations in the complaint, at the very outset of litigation, before any discovery has taken place," "all merits arguments . . . should ordinarily be addressed at the pleading stage by affording the plaintiff the protections provided by Rule 12(b)(6)").

## A.      Plaintiffs and SAA Have Standing

Penn's arguments, that plaintiffs lack standing to pursue injunctive relief, and SAA lacks standing altogether, Mem. 9-18, are meritless. Plaintiffs have standing because they have suffered "an injury-in-fact," "fairly traceable to the defendant's challenged conduct," "that is likely to be redressed by a favorable judicial decision." *Kelly v. RealPage Inc.*, 47 F.4th 202, 211 (3d Cir. 2022) (citations omitted). The standard is "generous" and plaintiffs' "burden is low." *Richard Roe W.M. v. Devereux Found.*, 650 F. Supp. 3d 319, 327 (E.D. Pa. 2023) (citations omitted). Plaintiffs have more than adequately alleged facts—uncontroverted by the self-serving exhibits Penn submits—demonstrating that they face ongoing and future imminent harm, which would be stopped and prevented by the injunction they request.

### 1.      *Plaintiffs Sufficiently Allege Ongoing and Future Injury-in-Fact*

Penn contends that plaintiffs cannot meet the "particularized" element of standing because "most of Plaintiffs' allegations describe harassing and antisemitic conduct suffered by other students." Mem. 9. That is not the law, as "courts have upheld standing for plaintiffs who are not the direct targets of discrimination." *Pocono Mtn. Charter Sch. v. Pocono Mtn. Sch. Dist.*, 908 F. Supp. 2d 597, 615 (M.D. Pa. 2012); *see also Schuchardt*, 839 F.3d at 345 ("[T]he fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance."). Thus, where, as here, the environment created by defendant's policies and practices has been alleged to cause plaintiffs' injuries, *e.g.*, ¶¶ 268-76, plaintiffs sufficiently plead standing, *Roe*, 650 F. Supp. 3d at 328.[24] Penn's argument ignores not

---

[24] Plaintiffs have more than sufficiently alleged their "personal stake"—*i.e.*, their "personal" freedom to attend Penn without fear of antisemitic harassment. Penn's cases in support of its argument otherwise are starkly inapposite. *Raines v. Byrd* involved "no injury to [the plaintiffs] as individuals." 521 U.S. 811, 829 (1997) (finding no legislative standing for members of Congress alleging law passed over their votes was unconstitutional). *Ellison v. American Board of Orthopedic Surgery*, 11 F.4th 200, 207 (3d Cir. 2021), on the other hand, did not analyze "particularized" injury at

only that incidents directed at other Jewish students also adversely affect plaintiffs, but that plaintiffs themselves have been directly targeted with antisemitic harassment.[25]

Penn also challenges plaintiffs' injury-in-fact by asserting that their "personal injuries occurred in the past," again mischaracterizing a small selection of allegations. Mem. 10. The complaint details the *ongoing* harms plaintiff continue to suffer,[26] and as recent events confirm, Penn's antisemitic environment has continued to intensify. *See* Yakoby Decl. ¶¶ 2, 10; Davis Decl. ¶ 6 (describing an on-campus encampment where "individuals in the encampment, including students, committing acts of violence, intimidating and harassing Jewish students and faculty members, and inciting others to do the same"). But even had plaintiffs alleged only past harm, "well-pled claims of past harm coupled with a policy, pattern, or practice that suggests those harms are likely to recur meet the actuality or imminence requirement." *Roe*, 650 F. Supp. 3d at 329. Plaintiffs' allegations make clear that given their ongoing enrollment and Penn's continuing "polic[ies], pattern[s], [and] practice[s]" leading to ineffective responses to rampant antisemitism in violation of its policies designed to protect Jewish and Israeli students, they will remain subject

---

all, finding that a doctor lacked standing to challenge defendant's failure to let him complete a certification exam, where he was not otherwise able to practice medicine.

[25] *E.g.*, ¶¶ 89-91 (SAA Member #1 subjected to antisemitic harassment in classroom, including professor facilitating discussion in which she was told that "Jews exaggerate terrorist attacks just to satisfy their colonial and racist desires"); ¶ 152 (Davis called a "dirty little Jew"); ¶ 168 (Yakoby accosted with "fuck you" for hanging hostage posters); ¶ 176 (Davis called a "dirty little Jew" who "deserve[s] to die"); ¶ 188 ("Jews R Nazis" graffiti affecting SAA Member #2); ¶ 208 (Yakoby and Rubin denied access to academic building during antisemitic takeover).

[26] *E.g.*, ¶ 270 (Yakoby "fears that he has a target on his back" and "has repeatedly told the administration he fears for his physical safety and is forced to miss class because the administration will not address, and protect him from, the anti-Jewish harassment," including being threatened with "die Zionists pig"); ¶ 271 (Davis, who has become a "public target" for demanding equal treatment through this lawsuit, is "terrified . . . for her physical safety and . . . life" and "now attends counseling regularly" after months of being "assaulted, mocked, abused, harassed, intimidated, [] demonized," "falsely labeled a racist, and [] relentlessly bullied . . . as a result of Penn's deliberate indifference"); ¶ 272 (Rubin, who "could not sleep for over two weeks" because of "mobs rampaging campus," "no longer attends certain events and avoids certain parts of campus during certain times"); ¶ 273 (SAA Member #1 has been "severely impacted by the antisemitism she faced in the classroom," which increased her "fear on campus of potential physical or verbal assaults," causing her to "refrain[] from openly expressing her support for Israel"); ¶ 274 (SAA Member #2 struggles to "focus[] in class," and is "constantly taken off guard because the administration does nothing to warn students when and where [the disruptions] will occur").

to Penn's hostile environment.[27] *Roe*, 650 F. Supp. 3d at 329-30 ("[W]hen a plaintiff is harmed because of a continuing practice, it is significantly more likely that the injury will occur again" (cleaned up)).[28] Penn has no basis to suggest otherwise. In fact, just days after Penn made this same argument in its initial motion to dismiss, Dkt. 21, Penn students, staff, and faculty occupied Van Pelt Library and hung posters calling for an "intifada"—*i.e.*, the murder of Jews. ¶ 239. The harassment has only intensified since then. In the past week alone, Penn closed the library, rather than evict an illegal encampment,  Davis Decl. ¶ 7; repeat aggressors who have targeted Jewish students returned to campus, despite being purportedly banned, *id.* ¶ 4; and the incessant chanting to globalize the intifada, can be heard from within buildings and dormitories, *id.* ¶ 6. Penn similarly argues that plaintiffs merely put forth "[s]ubjective apprehensions" of future harms. Mem. 11.[29] But here, plaintiffs remain subject to unlawful antisemitic harassment, intimidation, and threats, in a recurring pattern of activity targeted at them as Jews—their fears have come true time and again. *E.g.*, ¶¶ 208, 213-16, 234, 239, 242-43, 269, 291; Yakoby Decl. ¶¶ 10-11; Davis Decl. ¶¶ 2, 4, 6, 8.

## 2. *Plaintiffs' Ongoing and Future Injuries Are Traceable to Penn*

Penn argues that plaintiffs have not alleged facts tracing their risk of future injury to Penn's deliberate indifference, Mem. 9-16, seeking again to improperly intertwine questions of standing

---

[27] *E.g.*, ¶¶ 65, 97, 107, 184, 199, 204, 206, 209, 236, 238-39, 246, 254, 264 (alleging Penn continuously fails to apply its own policies in a nondiscriminatory manner that causes plaintiffs ongoing harm).

[28] Penn's citations to cases that provide general standards for future injury are inapposite. Mem. 10 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411-14 (2013) (plaintiffs challenging government foreign surveillance statute lacked standing because they were "United States persons" not subject to the statute and were speculating about whether government may target their communications in the future); *McNair v. Synapse Grp.*, 672 F.3d 213, 223-25 (3d Cir. 2012) (individual plaintiffs were no longer customers of defendant and thus "not currently subject to [defendant's] allegedly deceptive techniques" nor likely to be injured by them in the future)).

[29] Penn cites *Wertz v. Ryan,* 2022 WL 118135, at *6 (E.D. Pa. Jan. 12, 2022), but there, unlike here, the plaintiff, who sought an injunction prohibiting the district attorney from "further retaliatory action," did not show past conduct by or future intent to engage in such conduct by the district attorney, or how the district attorney could engage in such future conduct. 2022 WL 118135, at *5-6.

with the merits, *see Wells Fargo*, 824 F.3d at 348. In any event, plaintiffs allege far more than the "low bar" required to allege traceability: a "fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant," which can be "indirect." *Roe*, 650 F. Supp. 3d at 333. Penn argues that plaintiffs do not allege a future injury traceable to Penn's refusal to discipline, Mem. 14, but plaintiffs allege precisely that Penn's failures have resulted, and continues to result in, antisemitic harassment. *E.g.*, ¶¶ 80, 86-94, 117, 136, 138, 140-43, 150, 157, 159, 162, 170, 171, 185, 189-90, 202-08, 213, 216-19, 233, 239-46, 252, 260, 262; Yakoby Decl. ¶¶ 2, 6, 11, 13-14; Davis Decl. ¶¶ 2-5.[30] Moreover, plaintiffs detail how Penn's "policies and practices" put "plaintiffs in danger of ongoing and future harm." *Roe*, 650 F. Supp. 3d at 333; *e.g.*, ¶¶ 58, 62-65, 70, 77-81, 87-91, 94, 98, 114-16, 182; *supra* Arg. § 1.C.

Penn's exhibits are not the type of evidence appropriately considered at this stage, *see Gotha v. United States*, 115 F.3d 176, 179 (3d Cir. 1997), nor can they overcome plaintiffs' well-pled allegations or the latest events—protesters camped out, shouting "Intifada revolution" and physically attacking Jews, Yakoby Decl. ¶ 2, 9-11, 14; Davis Decl. ¶ 6—only confirm that Penn's conduct has injured and will continue to injure plaintiffs. Penn argues that it is "taking serious, University-wide actions to address antisemitism, which is fatal to Plaintiffs' theory of an ongoing violation that justifies an injunction." Mem. 11-13 (Gringer Exs. 3, 4, 15, 16, 27, 30). According to Penn, because it asserts that it is attempting to address *the same issues it also denies exist*, plaintiffs' allegations of future harm are irrelevant. Penn's suggestion—that an institution could avoid liability simply by claiming to be working on the problem—would, if accepted, eviscerate the civil rights statutes. But even on their face, Penn's self-serving statements do not demonstrate

---

[30] By contrast, in *Lutter v. JNESO*, 86 F.4th 111, 128 (3d Cir. 2023), relied by Penn, there was no "fairly traceable causation" between a law harming the plaintiff and various state officials, including the governor, whom she sued, where "she d[id] not identify any action taken by these state officials to enforce that statute."

that it is truly "taking serious" its antisemitism problem. For example, Penn says that some of its individual schools have implemented antisemitism training, Mem. 12, but nowhere does it contend that these programs are mandatory for any, let alone all, students. Gringer Exs. 4, 30.

Penn's citation to its own statements and website provide no assurances to overcome plaintiffs' well-pled allegations that the harassing conduct will continue. For example, Penn asserts that "Penn Police responded to report of a stolen Israeli flag," Mem. 13, and were "able to identify a suspect," Gringer Ex. 12, but ignores the fact that the student remains at Penn free to continue to harass students like plaintiffs, including when she participated in an on-campus demonstration where she chanted "we are with Hamas," ¶¶ 191, 193. No amount of *ipse dixit* statements by Penn can alter the reality that Penn has not taken effective disciplinary action against the offenders who continue to contribute to plaintiffs' injuries, or demonstrate that it has or will successfully remediate the hostile environment through any other means.[31] The events on campus this week confirm that Penn's purported efforts have been woefully ineffective and insufficient and that its antisemitism problem is only growing. Yakoby Decl. ¶¶ 9-11; Davis Decl. ¶¶ 6-8.

Penn, arguing that plaintiffs cannot allege their injuries are traceable to Penn's failure to discipline, contends that "all aspects of disciplinary proceedings are confidential," and thus it cannot tell the Court or plaintiffs whether they have taken any action. Mem. 14. As an initial matter, it does not matter whether Penn might have taken some disciplinary action in secret, as nothing it has done has resulted in any improvement to the hostile environment. *See* Yakoby Decl.

---

[31] Penn cites inapposite cases which, if anything, support plaintiffs that have no bearing on the circumstances at Penn. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (no showing plaintiff was imminently likely to be arrested and choked by police again); *Abadi v. Target Corp.*, 2023 WL 4045373, at *1-2 (3d Cir. June 16, 2023) (no sufficient threat of future injury where pro se plaintiff had stopped shopping at Target and its challenged temporary COVID-mask policy had already been lifted); *Wolfe v. City of Portland*, 566 F. Supp. 3d 1069, 1082-85 (D. Or. 2021) (finding *mootness* "[u]nder the specific facts of this case," where challenged activity decreased in the year following the complaint, protests changed location and were no longer unlawful, alleged bad actor law enforcement stopped being deployed to protests, federal government revoked relevant executive order, and police tactics changed).

¶¶ 11-13; Davis Decl. ¶¶ 2-5. In any event, the kinds of disciplinary "proceedings" Penn relies, like a January 16 statement from its website that merely announces that it has made disciplinary referrals, and a news article that reported that Penn is merely "*investigating*," Mem. 14 n.5; Gringer Ex. 16, are plainly insufficient responses. Penn's say-so is not enough to dismiss plaintiffs' civil rights allegations at this early stage. *See, e.g.*, *Pacheco-Figueroa v. United States*, 2023 WL 6436703, at *4-6 (E.D. Pa. Sept. 29, 2023) (denying Rule 12(b)(1) motion and granting "full discovery" where "jurisdictional discovery" and "merits discovery" are "intertwined" and "case likely will come down to factual issues"). Penn also argues that plaintiffs' injuries have been caused by third parties. Mem. 11, 15. According to Penn, injunctive relief would never be available for hostile educational environment claims because the institution, even where it permitted and fostered the environment, could simply shift the blame to those doing the harassment that the institution is supposed to prevent. That is not the law; under Title VI, institutions are responsible for their deliberate indifference to harassment perpetrated by "third-party" individuals, like students and professors, over whom the institution has control. *Booker*, 2015 WL 1344661, at *2-3; *Roe*, 650 F. Supp. 3d at 333. Nothing in Penn's cited cases, Mem 15, suggests otherwise.[32]

3.    *A Favorable Decision Will Redress Plaintiffs' Injuries*

Penn argues that the injunction does not "connect[]" to plaintiffs' injuries. Mem. 16-17. This argument is inappropriate on a motion to dismiss, as "it need not appear that the plaintiff can obtain the particular relief prayed for in the complaint, as long as the district judge can ascertain from what has been alleged that *some* relief may be granted by the court." *Roe*, 650 F. Supp. 3d at

---

[32] In *Simon v. E. Ky. Welfare Rts. Org.* 426 U.S. 26, 41 (1976), plaintiffs sued Treasury department officials for giving a favorable IRS ruling to hospitals that refused to fully serve indigent people, claiming the government encouraged the hospitals to deny services. The Supreme Court held that the connection between the IRS ruling and plaintiffs' alleged injuries (not receiving proper hospital services) was too attenuated to afford standing. *Id.* at 41-43. *See also Lundy v. Hochberg*, 91 F. App'x 739, 743-44 (3d Cir. 2003) (denying standing on former law partner's claim that firms "unauthorized practice of law" deprived him of clientele).

335. Penn argues that plaintiffs "fail to explain how any measure they demand would impact their claimed future injuries," but as Penn's own authority holds, Mem. 16, prospective injunctive relief is appropriate when it "can . . . remedy the existing harms that flow from the past denial of equal opportunity," *Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34, 49-50 (2d Cir. 2023). And redressability is satisfied when the "risk [alleged by plaintiffs] would be reduced to some extent if [plaintiffs] received the relief they seek." *Massachusetts v. EPA*, 549 U.S. 526 (2007).

Plaintiffs seek an injunction that would directly redress their injuries, as it would require Penn to cease treating Jewish and Israeli students differently, including in enforcing Penn's own policies. The connection between plaintiffs' injuries and Penn's policies and practices is more than enough to show that plaintiffs will benefit from the requested relief.[33] Penn's argument, that plaintiffs only have a "generalized interest" in or seek "psychic satisfaction" through an injunction, Mem. 16-17 (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107-09 (1988)), is off the mark and was recently rejected in *Roe*, where the plaintiff—like plaintiffs here—sought "injunctive relief requiring [defendant], at a minimum, to implement and enforce policies and practices to prevent future incidents of abuse," 650 F. Supp. 3d at 334. The *Roe* defendant, like Penn here, argued that the "relief would not redress plaintiffs' injuries because plaintiffs cannot allege facts connecting their individual experience (and individual risk) as . . . [defendant's] resident[s] to the sprawling injunctive relief they seek." *Id.* at 334-35. *Roe* denied defendant's motion to dismiss on grounds equally applicable here—that defendant's "argument again

---

[33] Penn contends that Yakoby lacks injunctive standing because he dropped a course after a professor made antisemitic remarks. Mem. 16. If anything, that Yakoby was forced to drop a class only reinforces his claims—he was directly deprived of the educational opportunity of a class he enrolled in because his professor called Israel a "psycho-Nazi state." ¶ 137. Comparing Israel to Nazis is antisemitism. ¶¶ 25-27. Plaintiffs' requested relief would remedy Yakoby's loss as result of this antisemitism. In any event, Penn's argument has been rejected by the Third Circuit. *See Freedom from Religion Found. v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469, 481 (3d Cir. 2016) ("[P]rinciples of standing [do not] require [a] plaintiff[ ] to remain in a hostile environment to enforce [his] constitutional rights.").

misunderstands both plaintiffs' burden at this stage of the proceedings and the redressability requirement itself" because "[r]edressability is not a demand for mathematical certainty. . . . Unlike cases where judicial relief would merely offer plaintiffs 'psychic satisfaction' or vindicate their 'generalized interest in deterrence,' the injunction proposed by plaintiffs would change the systemic conditions that place them in danger of abuse." *Id.* at 335.

4.  *SAA May Seek Injunctive Relief*

SAA is a not-for-profit corporation comprised of voluntary members, including Jewish and Israeli Penn students, "formed to defend human and civil rights, including the rights of individuals to equal protection and to be free from antisemitism in higher education, through litigation and other means." ¶ 19. Organizations like SAA can seek relief for their members, as "the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Warth v. Seldin*, 422 U.S. 490, 515 (1975).

Penn argues that associational standing is "improper" in all hostile educational environment cases because the inquiries are "highly individualized" and "plaintiff-specific." Mem. 18. That is not the law. Instead, "so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members entitled to invoke the court's jurisdiction." *Warth*, 422 U.S. at 511. The SAA members are not "indispensable"— this action challenges a widespread practice and seeks injunctive relief; courts regularly find that claims seeking relief based on unlawful patterns and practices do not require the kind of individual participation that bars associational standing. *See, e.g.*, *Pa. Psychiatric Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 284 n.3, 286 (3d Cir. 2002) (finding associational standing for challenges to alleged "systemic policy violations," and recognizing "[i]ndividual participation by

an association's membership may be unnecessary when the relief sought is prospective"); *see also Action All. of Senior Citizens of Greater Phila. v. Snider*, 1994 WL 384990, at *3 (E.D. Pa. July 18, 1994) ("[P]articipation of individual members is rarely necessary when injunctive relief rather than individual damages is sought. This is particularly true where, as alleged here, a broad-based change in procedure rather than individualized injunctive relief is sought.").[34]

### B.      Plaintiffs' Claims Are Ripe Under 12(b)(1)

According to Penn, because it claims that its response is "ongoing," "[n]o ripe controversy" exists, Mem. 6-7, and adjudication of plaintiffs' claims would impose "substantial hardship" on Penn, Mem. 8. This argument, if accepted, would allow an institution to avoid liability indefinitely by asserting that its response is "ongoing."

As an initial matter, the "continued vitality" of the prudential ripeness doctrine, upon which Penn relies, has been placed into serious doubt and should be rejected. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (the doctrine stands "in some tension with our recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging"); *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 539 n.3 (3d Cir. 2017). But even assuming the doctrine's vitality, plaintiffs' claims based on past and continuing civil rights violations are ripe for adjudication. In determining ripeness, courts consider: "Are the parties in a sufficiently adversarial posture to be able to present their positions vigorously; are the facts of the case sufficiently developed to provide the court with enough information on

---

[34] The four cases Penn relies on are plainly distinguishable. Mem. 17-18. In *Barnett v. Johnson City School District*, 2005 WL 8178066, at *5 (N.D.N.Y. Feb. 2, 2005), the court faulted an organization for failing to allege an injury to its own members and only alleging "conjectural or hypothetical injuries" to "unnamed similarly situated black students." In *Blunt v. Lower Merion School District*, 767 F.3d 247, 290 (3d Cir. 2014), the court found that organizational plaintiffs lacked standing because, unlike here, evaluating their "highly individualized" claims required addressing each student's educational needs, such as the "complex history" of their individualized education plans and disability status. Neither *Whitfield v. Notre Dame Middle Sch.*, 412 F. App'x 517 (3d Cir. 2011), nor *L. L.,* 710 F. App'x 545, involves associational standing.

which to decide the matter conclusively; and is a party genuinely aggrieved so as to avoid expenditure of judicial resources on matters which have caused harm to no one." *Jie Fang v. Dir. U.S. I.C.E.*, 935 F.3d 172, 186 (3d Cir. 2019). Here, the answers to all four questions is yes.[35]

In short, contrary to Penn's argument, plaintiffs need not wait to bring their exigent civil rights claims to remedy their injuries until an unspecified time in the future when Penn announces that its purported efforts—such as convening a "Task Force" and "Advisory Group" to "determin[e] what measures to recommend" and "understand how antisemitism is experienced," Mem. 7, have concluded, *see L. Sch. Admission Council*, 791 F. App'x at 319 (finding alleged injury concrete, not speculative, and claims "sufficiently developed" and noting "we know what will happen because it has already happened several times").

Penn's claim that "[h]aving to litigate the adequacy of Penn's response to antisemitism while that response is ongoing would impose substantial 'hardship' on Penn" should also be rejected. Mem. 8.[36] At issue is "the hardship to the parties of *withholding* court consideration," not whether *hearing* the case will cause Penn hardship. *Peachlum v. City of York*, 333 F.3d 429, 434 (3d Cir. 2003). Penn cites no support for the proposition that a court can disregard its "virtually unflagging" obligation "to hear and decide cases" simply because a defendant will be

---

[35] *See Doe v. L. Sch. Admission Council, Inc.*, 791 F. App'x 316, 319 (3d Cir. 2019) (finding claims "sufficiently developed" and "ripe for judicial review" based on pattern of defendant's prior conduct); *TruePosition, Inc. v. LM Ericsson Tel. Co*., 2012 WL 3584626, at *27 (E.D. Pa. Aug. 21, 2012) ("Where . . . the defendant is alleged to have engaged already in conduct that violates a plaintiff's rights, the force of a ripeness challenge is diminished."). Penn's bizarre characterization of plaintiffs' claims as an "abstract disagreement" further confirms its fundamental misunderstanding of—and deliberate indifference to—the reality of antisemitism and its effect on Jewish students on its campus. The ripeness doctrine exists "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect . . . agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Doe v. County of Centre*, 242 F.3d 437, 453 (3d Cir. 2001). That has no application here.

[36] Contrary to Penn's argument, litigating this case would not subject any of its purported investigations or disciplinary measures to "judicial 'second-guessing.'" Mem. 8. In *Davis ex rel. v. Monroe County Bd. of Educ.*, 526 U.S. 629, 633, 648 (1999), which Penn cites, the Court merely confirmed that its decision did not, in effect, require schools to engage in any particular disciplinary action. Plaintiffs here are not asking that Penn take particular disciplinary actions.

inconvenienced by the litigation. *Susan B. Anthony List*, 573 U.S. at 167. Penn should not be allowed to avoid liability for its ongoing antisemitism problem in perpetuity through its own statements and assurances, especially seeing as Penn's responses so far have proven patently insufficient.[37] Indeed, Penn's position that it can hide behind its "ongoing" procedures only highlights that absent court intervention, *plaintiffs* will continue to be harmed by Penn's civil rights violations. *See County of Centre*, 242 F.3d at 453 (discrimination claims ripe where "[w]ithholding judicial consideration causes an immediate and significant hardship on the [plaintiffs], who will be deprived of their right to present their federal statutory and constitutional claims for redress"); *TruePosition,* 2012 WL 3584626, at *27 (claims ripe where it "would be a hardship to withhold relief due to the allegations of antitrust violations and resultant harm already supposedly experienced by [plaintiff]" notwithstanding that part of the plaintiff's claims were contingent on future events). Indeed, since filing the complaint, plaintiffs' experiences with antisemitism at Penn have only gotten worse. *E.g.*, Yakoby Decl. ¶¶ 4-14; Davis Decl. ¶¶ 2-3, 4-8.[38]

## V.   **PENN'S MOTION TO STRIKE SHOULD BE DENIED**

Penn's request to strike plaintiffs' request for injunctive relief should be rejected. "[M]otions to strike are generally disfavored by courts and will be denied unless the allegations

---

[37] Penn throws in a request, devoid of any supporting authority, to "stay the proceedings" *sine die* until Penn's "ongoing responses" to antisemitic incidents have "concluded." Mem. 9. But Penn has already had years to address its antisemitism problem, ¶ 58, and plaintiffs and other Jewish students face ongoing harm for which there is no end in sight, *see supra* Arg. § IV; Yakoby Decl. ¶¶ 2, 4-14; Davis Decl. ¶¶ 2-8. Penn has not even attempted to justify its "extraordinary" request. *Pelzer v. City of Philadelphia*, 2007 WL 1377662, at *2 (E.D. Pa. May 7, 2007).

[38] For instance, Yakoby has been targeted by professor in retaliation, Yakoby Decl. ¶¶ 3-8, and subjected to continued "[d]isruptive protests," which have "become the norm," *Id.* ¶ 2. One major and ongoing disruption is an encampment, which Penn students and faculty have established and maintained for eight days. *Id.* ¶¶ 7, 9-12. The on-campus encampment is "centrally located," and even though it violates several policies, rather than evict and discipline the perpetrators, Penn is engaging them in dialogue. *Id.* ¶¶ 9, 12. Since the encampment was established, Yakoby has been subjected to hateful graffiti, including "ZIOS GET FUCKT" and an Israeli flag in chalk with a red "X" captioned "STOMP ZONE," "RAGE ZONE," and "ZIONISM IS ANTISEMITISM." *Id.* ¶ 10. The occupiers promote terror against Jews, chanting, "Al-Qassam, make us proud, take another soldier down," and waving the flags of the Popular Front for the Liberation of Palestine." *Id.* Because of the encampment, Jewish students have been called "pigs," "kikes," "Nazis," "faggots," and "Hitler's children." *Id.* ¶ 11.

have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues in the case." *Brown v. Am. Airlines, Inc.*, 2024 WL 1143478, at *10 (E.D. Pa. Mar. 15, 2024). Penn cannot show that the relief is "redundant, immaterial, impertinent or scandalous," Fed. R. Civ. P. 12(f), and argues that plaintiffs' requested injunctive relief involves specific disciplinary measures against particular students or faculty. Mem. 34.[39] That is not true. Plaintiffs do not request specific remedial measures, only the relief "necessary and appropriate" to prevent Penn from continuing to discriminate against Jewish students. Complaint at pp. 109-10. Penn cannot explain how enjoining Penn from applying its policies in a discriminatory manner interferes with Penn's "flexibility" in "respon[ding] to on-campus harassment." Mem. 34.

Penn also asks this Court to strike plaintiffs' request "for judicial regulation of Penn's receipt of private donations," claiming that an injunction along these lines would not be connected to the "actual claims at issue here." *Id.* 33-34. Penn should be prevented from accepting foreign funds which further the hostile environment to which plaintiffs are subjected. Such relief has a "reasonable relationship," *id.* at 34, to plaintiffs' claims. Penn's invocation of "foundational principles of academic freedom," *id.*, has nothing to do with enforcing the obligations Penn voluntarily and knowingly assumed under Title VI by accepting funds from the United States.

## CONCLUSION

For all the foregoing reasons, the Court should deny defendant's motion in its entirety.[40]

---

[39] Penn cites inapposite cases in which the relief was unavailable. *Rivera v. Dealer Funding, LLC*, 178 F. Supp. 3d 272, 281 (E.D. Pa. 2016) (striking "demand for damages that is not recoverable as a matter of law"); *Hanover Prest-Paving Co. v. Tile Tech, Inc.*, 2022 WL 1493568, at *5 (M.D. Pa. May 11, 2022) (striking demand for disgorgement because such relief is unavailable for patent infringement claims); *Doe v. Haverford Coll.*, 2023 WL 5017964, at *11 (E.D. Pa. Aug. 7, 2023) ("[S]pecific performance is not the proper remedy for his breach of contract claim.").

[40] Should any portion of Penn's motion be granted, Plaintiffs respectfully request leave to amend the complaint. Leave to amend should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15.

Dated:    May 3, 2024

Respectfully submitted,

KASOWITZ BENSON TORRES LLP

By: */s/ Marc E. Kasowitz*
      Marc E. Kasowitz*
      Daniel R. Benson*
      Mark P. Ressler*
      Andrew L. Schwartz*
      Joshua E. Roberts*
      Jillian R. Roffer*
      New York, New York 10019
      Tel: (212) 506-1700
      mkasowitz@kasowitz.com
      dbenson@kasowitz.com
      mressler@kasowitz.com
      aschwartz@kasowitz.com
      jroberts@kasowitz.com
      jroffer@kasowitz.com

      *Admitted *pro hac vice*

LAW OFFICES OF ERIC A. SHORE, P.C.

      Eric A. Shore (ID: 73807)
      Briana Pearson-Prout (ID: 327007)
      1500 JFK Boulevard
      Suite 1240
      Philadelphia, Pennsylvania 19102
      Tel:  (856) 433-6198
      erics@ericshore.com
      brianap@ericshore.com

      *Attorneys for Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned counsel hereby certifies that on May 3, 2024, a true and correct copy of the foregoing Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss and Strike and all supporting materials were filed electronically through the CM/ECF system, which will send notification of such filing to all counsel of record.

Dated:    May 3, 2024

Respectfully submitted,

<u>*/s/ Marc E. Kasowitz*</u>
Marc E. Kasowitz

42