**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| EYAL YAKOBY, JORDAN DAVIS, NOAH RUBIN, and STUDENTS AGAINST ANTISEMITISM, INC. <br><br>                 Plaintiffs, <br><br>    v. <br><br> THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, <br><br>                 Defendant. | No. 2:23-cv-04789 (MSG) |

<u>**REPLY MEMORANDUM IN SUPPORT OF
PENN'S MOTION TO DISMISS AND MOTION TO STRIKE**</u>

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 3

I.  This Court Lacks Subject-Matter Jurisdiction Over Plaintiffs' Claims ............................ 3

    A.  Plaintiffs' Claims Are Not Ripe ........................................................................ 3

    B.  Plaintiffs Have No Justiciable Claim For Injunctive Relief .................................. 6

    C.  SAA Lacks Standing ....................................................................................... 10

II.  Plaintiffs' Request For Disciplinary Measures And Judicial Regulation Of Private
Donations Should Be Struck .......................................................................................... 12

III.  Plaintiffs Fail To State A Claim .................................................................................. 12

    A.  Plaintiffs Fail To Plead A Plausible Title VI Claim ............................................ 12

        1.  Penn Was Not Deliberately Indifferent As A Matter Of Law ................... 13

        2.  Plaintiffs Have Not Plausibly Alleged That Penn Is Deliberately
Indifferent To Antisemitism ............................................................... 14

        3.  Plaintiffs Fail To Plead Direct Discrimination Or Discriminatory
Animus ............................................................................................ 22

    B.  Plaintiffs Fail To Plead A Breach Of Contract Claim ......................................... 24

    C.  Plaintiffs Fail To Plead A Claim Under The Unfair Trade Practices And
Consumer Protection Law (UTPCPL) .............................................................. 24

CONCLUSION ..................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Action Alliance of Senior Citizens of Greater Philadelphia v. Snider*,
 1994 WL 384990 (E.D. Pa. July 18, 1994)...............................................................................11

*Alexander v. Yale University*,
 631 F.2d 178 (2d Cir. 1980)..................................................................................................6

*Allen v. Wright*,
 468 U.S. 737 (1984)..............................................................................................................9

*American Freedom Defense Initiative v. Southeast Pennsylvania Transportation Authority*,
 92 F. Supp. 3d 314 (E.D. Pa. 2015) ....................................................................................18

*Astaree v. Villanova University*,
 509 F. Supp. 3d 265 (E.D. Pa. 2020) ..................................................................................24

*Bird v. Mastery Charter Schools*,
 2022 WL 1773673 (E.D. Pa. June 1, 2022) ........................................................................21

*Black v. Zaring Homes, Inc.*,
 104 F.3d 822 (6th Cir. 1997) ...............................................................................................22

*Blunt v. Lower Merion School District*,
 767 F.3d 247 (3d Cir. 2014)...........................................................................................17, 22

*Booker v. Bangor Area School District*,
 2015 WL 1344661 (E.D. Pa. Mar. 24, 2015)........................................................................9

*Caver v. City of Trenton*,
 420 F.3d 243 (3d Cir. 2005)................................................................................................21

*City of Los Angeles v. Lyons*,
 461 U.S. 95 (1983)...............................................................................................................7

*Clapper v. Amnesty Int'l USA*,
 568 U.S. 398 (2013)..............................................................................................................6

*Culley v. Cumberland Valley School District*,
 2016 WL 775091 (M.D. Pa. Feb. 29, 2016) .......................................................................23

*David v. Neumann University*,
 187 F. Supp. 3d 554 (E.D. Pa. 2016) ..................................................................................24

*Davis ex rel. LaShonda v. Monroe County Board of Education*,
526 U.S. 629 (1999)............................................................................................2, 12, 13, 14

*De Piero v. Pennsylvania State University*,
2024 WL 128209 (E.D. Pa. Jan. 11, 2024)................................................................23

*Doe v. Bibb County School District*,
126 F. Supp. 3d 1366 (M.D. Ga. 2015), *aff'd*, 688 F. App'x 791 (11th Cir. 2017) .........13, 16

*Doe v. County of Centre*,
242 F.3d 437 (3d Cir. 2001).....................................................................................5

*Doe v. Haverford Coll.*,
2023 WL 5017964 (E.D. Pa. Aug. 7, 2023) ............................................................12

*Doe v. Law School Admission Council, Inc.*,
791 F. App'x 316 (3d Cir. 2019) .............................................................................4

*Doe v. Sacks*,
2024 WL 402945 (S.D.N.Y. Feb. 2, 2024)...............................................................18

*Edwards v. California University of Pennsylvania*,
156 F.3d 488 (3d Cir. 1998).....................................................................................12

*Felber v. Yudof*,
851 F. Supp. 2d 1182 (N.D. Cal. 2011) ...............................................................18, 22

*Fuller v. City of Oakland*,
47 F.3d 1522 (9th Cir. 1995) ...................................................................................20

*Goodwin v. Pennridge School District*,
309 F. Supp. 3d 367 (E.D. Pa. 2018) .......................................................................15

*Guckenberger v. Boston University*,
957 F. Supp. 306 (D. Mass. 1997) ...........................................................................18

*Hanoverian, Inc. v. Pennsylvania Dep't of Environmental Protection*,
2008 WL 906545 (M.D. Pa. Mar. 31, 2008).............................................................23

*Hunt v. Washington State Apple Advertising Commission*,
432 U.S. 333 (1977)...........................................................................................10, 11

*In re Burlington Coat Factory Securities Litigation*,
114 F.3d 1410 (3d Cir. 1997)...................................................................................14

*Ings-Ray v. School District of Philadelphia*,
2003 WL 21250556 (E.D. Pa. Apr. 30, 2003) ..........................................................14

*Jackson v. Katy Indep. School District,*
    951 F. Supp. 1293 (S.D. Tex. 1996) .......................................................................19

*Koumantaros v. City University of New York,*
    2007 WL 840115 (S.D.N.Y. Mar. 19, 2007) ..........................................................22

*L. L. v. Evesham Township Board of Education,*
    710 F. App'x 545 (3d Cir. 2017) .....................................................................11, 21

*Leibovitz v. New York City Transit Authority,*
    252 F.3d 179 (2d Cir. 2001)....................................................................................21

*Loduca v. WellPet LLC,*
    549 F. Supp. 3d 391 (E.D. Pa. 2021) ......................................................................25

*Mandel v. Board of Trustees of California State University,*
    2018 WL 1242067 (N.D. Cal. Mar. 9, 2018)..........................................................16

*Mirabella v. William Penn Charter School,*
    2017 WL 1062460 (E.D. Pa. Mar. 20, 2017), *aff'd,* 752 F. App'x 131 (3d Cir. 2018)............6

*MJG v. School District of Philadelphia,*
    2017 WL 5010033 (E.D. Pa. Nov. 2, 2017), *aff'd sub nom. M.J.G. v. School District of Philadelphia,* 774 F. App'x 736 (3d Cir. 2019) ................................................15

*Pacheco-Figueroa v. United States,*
    2023 WL 6436703 (E.D. Pa. Sept. 29, 2023) ...........................................................9

*Peachlum v. City of York,*
    333 F.3d 429 (3d Cir. 2003)......................................................................................3

*Pennsylvania Psychiatric Society v. Green Spring Health Servs., Inc.,*
    280 F.3d 278 (3d Cir. 2002)....................................................................................11

*Richard Roe W.M. v. Devereux Foundation,*
    650 F. Supp. 3d 319 (E.D. Pa. 2023) ...................................................................6, 8

*Rickenbaker v. Drexel University,*
    2022 WL 970768 (E.D. Pa. Mar. 30, 2022)............................................................24

*Rivera v. Dealer Funding, LLC,*
    178 F. Supp. 3d 272 (E.D. Pa. 2016) ......................................................................12

*Saravanan v. Drexel University,*
    2017 WL 5659821 (E.D. Pa. Nov. 24, 2017) .........................................................22

*Seldon v. Home Loan Service, Inc.,*
    647 F. Supp. 2d 451 (E.D. Pa. 2009) ......................................................................25

*Simon v. Eastern Kentucky Welfare Rights Organization*,
  426 U.S. 26 (1976) ..................................................................................................10

*TruePosition, Inc. v. LM Ericsson Telephone Co.*,
  2012 WL 3584626 (E.D. Pa. Aug. 21, 2012) ..........................................................5

*Texas v. United States*,
  523 U.S. 296 (1998) ..................................................................................................4

*Velez v. QVC, Inc.*,
  227 F. Supp. 2d 384 (E.D. Pa. 2002) .....................................................................22

*Warth v. Seldin*,
  422 U.S. 490 (1975) ................................................................................................11

*Whitfield v. Notre Dame Middle School*,
  412 F. App'x 517 (3d Cir. 2011) ............................................................................11

*Williams v. Lenape Board of Education*,
  2020 WL 2111221 (D.N.J. May 4, 2020) ...............................................................15

*Zeno v. Pine Plains Central Schoo District*,
  702 F.3d 655 (2d Cir. 2012) ..............................................................................14, 15

**Other Authorites**

U.S. Dep't of Educ., Office for Civil Rights, 2003 Dear Colleague Letter on First
  Amendment (July 28, 2003),
  https://www2.ed.gov/about/offices/list/ocr/firstamend.html ..................................17

**INTRODUCTION**

Plaintiffs' opposition concedes (albeit begrudgingly) that Penn has not tolerated antisemitism and has taken steps to address it on campus.  Plaintiffs want Penn to do more, and they repeatedly claim that Penn would in fact do more if other racial or ethnic groups were targeted.  But it is telling that Plaintiffs can cite only two examples of students or faculty being disciplined for saying offensive things targeting racial or ethnic groups:  one, involving Professor Amy Wax where she *was* disciplined for making antisemitic remarks, and the other, more than 30 years old, where the student was ultimately not disciplined and where the "speech code" policy at issue has long since been abandoned.  These two examples not only do not help Plaintiffs' claims, they dismantle them.  The rest of Plaintiffs' theories also fall short.

Recent events prove that Penn is anything but complacent, that it has taken prompt and forceful action, and that Plaintiffs' quick-strike suit is premature.  There is perhaps no better illustration that this suit is unripe than Plaintiffs' claim that harm is ongoing because of the existence of an "encampment" on Penn's campus, where they say antisemitism has been allowed to fester.  By the time Plaintiffs filed their brief, Penn had already requested police assistance (initially refused) to dismantle the encampment, and just a few days after their brief was filed the encampment *was* dismantled and arrests *were made*.  In no way is Penn's ripeness argument just a "trust-me defense," as Plaintiffs contend.

Plaintiffs also cannot overcome the Article III standing guardrails by claiming past harms will reoccur by repeatedly incanting that Penn's ongoing responses are "ineffective."  Penn cannot rid the world of antisemitism, but that is not what the law requires.  Penn's ongoing investigations, disciplinary processes, and initiatives to combat antisemitism preclude any inference that Plaintiffs face a "certainly impending" recurrence of such harms or that *Penn* would be the cause of any future harm Plaintiffs anticipate.  Plaintiffs' proposed solution to the problems pervasive across

college campuses right now—inviting this Court to mandate their policy preferences and elevate their preferred political speech, and who should be subject to discipline—is neither tenable nor advisable.  Most importantly, it is contrary to the law.

Next, Plaintiffs push for an injunction that would force Penn to expel and terminate students and faculty based on Plaintiffs' say-so, but binding precedent forecloses their efforts to conscript this Court into ordering their desired remedial measures.  If nothing else, this overbroad relief must be stricken.

Finally, each of Plaintiffs' claims should be dismissed under Rule 12(b)(6).  Their opposition reads as though the Supreme Court's decision in *Davis ex rel. LaShonda v. Monroe County Board of Education*, 526 U.S. 629 (1999), does not exist.  But it is controlling for their deliberate indifference claims, and it demands that Plaintiffs allege facts showing that Penn's response is "clearly unreasonable in light of the known circumstances."  *Id.* at 648.  Plaintiffs' allegations fall short, so they instead read into Title VI a sweeping (and unprecedented) license to infer deliberate indifference because, despite forceful condemnations and considerable investments in new methods of combatting antisemitism, Penn's actions have not yet led to the outcomes Plaintiffs believe are appropriate.  But *Davis*'s warning that "courts should refrain from second-guessing" "disciplinary decisions," *id.*, precludes this theory.

Likewise, none of the authorities or arguments that Plaintiffs raise in their opposition justifies permitting their state law claims to proceed.  Plaintiffs do not point to a contractual obligation that requires Penn to do anything in response to the allegations they present, and even assuming an obligation existed, they do not explain how Penn breached it.  In support of their deception claims, Plaintiffs argue that in choosing to attend Penn they relied on their belief that Penn would ignore its policies prohibiting discipline based on the content of expression when it

came to the speech they consider antisemitic.  It is not plausible that any reasonable consumer would rely on such a belief in the face of policies that explicitly state that Penn does not censor speech.

## ARGUMENT

### I.     This Court Lacks Subject-Matter Jurisdiction Over Plaintiffs' Claims

#### A.     Plaintiffs' Claims Are Not Ripe

Plaintiffs' claims are premature because they challenge Penn's ongoing response to evolving events and the adequacy of yet-to-be-determined outcomes of Penn's efforts to prevent and punish harassment and new initiatives to fight antisemitism.

Plaintiffs do not seriously challenge that the facts underlying their Amended Complaint are still being developed.  *See* Opp. 37-39.[1]  Indeed, one need look no further than Plaintiffs' opposition and new declarations to see that the facts are not "sufficiently developed to provide the court with enough information on which to decide [Plaintiffs' claims] conclusively." *Peachlum v. City of York*, 333 F.3d 429, 433 (3d Cir. 2003).  On May 3, 2024, Eyal Yakoby and Jordan Davis declared that a "Gaza Solidarity Encampment" has "contributed to a hostile environment on campus."  Davis Decl. ¶¶ 4, 6; Opp. 39 n.38.  They faulted Penn for not "yet" acting to "end the harassment."  Yakoby Decl. ¶ 12.  But while Plaintiffs were making those accusations, Penn was responding.   A week *earlier*, on April 26, 2024, Penn demanded the protesters disband the encampment immediately, and by April 30, 2024, Penn had initiated disciplinary proceedings. *See* Yakoby Decl., Ex. B; Ex. 32.[2]  On May 2, 2024, Penn requested assistance from the Philadelphia

---

[1] "Opp." refers to Plaintiffs' opposition (Dkt. 42) to Penn's motion to dismiss, "Mot." (Dkt. 41).  "Davis Decl." refers to the Declaration of Jordan Davis (Dkt. 42-1) and "Yakoby Decl." refers to the declaration of Eyal Yakoby (Dkt. 42-2).

[2] Unless otherwise noted, "Ex." citations reference exhibits to the May 24, 2024 Declaration of David Gringer filed concurrently.

police to disband the encampment.  Ex. 33.[3]  The Philadelphia police initially declined to intervene but then, on May 10, 2024, Philadelphia and Penn police disbanded and removed the encampment, Exs. 35-36.  Penn sanctioned students involved in the encampment, Ex. 34, and banned non-affiliated participants from Penn's campus, Ex. 38.

As the encampment episode shows, the factual premises underlying Plaintiffs' claims—contingent on Plaintiffs' speculation that Penn's efforts will not address very recent allegations of harassment—will at least change, and very well could collapse, as Penn's ongoing responses and initiatives continue and conclude.  *See Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'").  Universities are facing campus-wide upheaval over evolving university protests, and counter-protests, with both peaceful and harassing elements that have triggered serious concerns about antisemitism, free speech, and safety.  These are unprecedented circumstances, not a repeat of business as usual.  For that reason, *Doe v. Law School Admission Council, Inc.*, 791 F. App'x 316, 319 (3d Cir. 2019) (cited Opp. 38 n.35), does not justify Plaintiffs' argument that they need not wait for ongoing proceedings, initiatives, and responses to conclude.  In that case, the plaintiff challenged rules for disability accommodations for a test she planned to take, arguing she had previously sought the same accommodations under the same rules and had been denied.  There was nothing in the record to suggest the results of a future request would be different, so the court deemed the claim ripe.  Here, no party can say with any certainty what the outcome of Penn's ongoing initiatives and proceedings will be.

---

[3] Plaintiffs claim that Penn's exhibits are "self-serving," Opp. 29, but do not challenge the facts of anything in them, and most of Penn's exhibits are materials incorporated by reference in the Amended Complaint, *see* Dkt. 41-1.  In any event, Plaintiffs submit their own declarations to support their jurisdictional claims.  *See, e.g.*, Davis Decl.

Plaintiffs have not shown in their opposition that they will suffer if judicial consideration is withheld.  Yakoby has graduated.  Declaration of Margaret Kip ¶ 3 (filed concurrently).  In recent weeks, he has praised Penn leadership for (in his words) "correctly recogniz[ing] that the recent encampment protest placed many members of the Penn community 'under threat.'"  Ex. 37.  Rubin is a member of the Student Advisory Group—he is working with Penn in the ongoing initiatives to combat antisemitism (AC ¶ 198).  And after filing this lawsuit, Davis said of Penn: "I've had great experiences with my academics there.  I've had phenomenal professors and I've met amazing people there.  I just hope to see some internal changes."  Ex. 31.  Those changes Davis seeks are in process, with her input part of the deliberation.  This lawsuit does not and cannot bring about those changes any faster.  The cases Plaintiffs cite in arguing hardship (Opp. 39) do not involve challenges to a defendant's ongoing response to recent and evolving events and thus do not help their arguments.  In *Doe v. County of Centre*, 242 F.3d 437 (3d Cir. 2001), the plaintiffs' claims concerning discriminatory restrictions already imposed upon them during an ongoing application process were considered ripe even though their application was still under pending a decision.  *Id.* at 453.  Here, Plaintiffs do not allege Penn's ongoing proceedings, investigations, and initiatives are discriminatory, they instead contend without basis that those efforts will fail to adequately counter antisemitism.  And in *TruePosition, Inc. v. LM Ericsson Tel. Co.*, 2012 WL 3584626, at *26 (E.D. Pa. Aug. 21, 2012), the plaintiff brought numerous claims, only one of which hinged on an ongoing process.  In contrast, each of Plaintiffs' claims is contingent on Penn failing to respond adequately to and sanction recent conduct.

While Plaintiffs argue that they have "exigent civil rights claims" (Opp. 38), their opposition fails to explain how those claims are not contingent on the outcomes of Penn's ongoing work.  And their attempt to bolster the Amended Complaint with new allegations of Penn's

purported ineffective response to an encampment, allegations which became moot days after they filed their opposition, is further proof their claims are unripe.

**B.      Plaintiffs Have No Justiciable Claim For Injunctive Relief**

Plaintiffs' request for an injunction fails for two distinct reasons. First, Yakoby has graduated and cannot be affected by any future events at the University. Second, all Plaintiffs have not met their burden to show that future injury is "certainly impending" because their allegations of past harm do not establish a clear likelihood of recurrence.

As a graduate, Yakoby cannot seek an injunction premised on harm arising from his "ongoing enrollment" (Opp. 30). Nor can he pursue his generalized interest in enforcing his policy preferences on behalf of other students (Yakoby Decl. ¶ 14) when an injunction would bring him no personally meaningful relief. *See Mirabella v. William Penn Charter Sch.*, 2017 WL 1062460, at *4-5 (E.D. Pa. Mar. 20, 2017) (Goldberg, J.) (dismissing injunctive relief claim where graduated student "no longer had a personal interest in the challenged practices and the injunctive relief requested would not provide him with any meaningful relief"), *aff'd*, 752 F. App'x 131 (3d Cir. 2018); *Alexander v. Yale Univ.*, 631 F.2d 178, 184 (2d Cir. 1980) (dismissing graduated students' claim for injunctive relief as "[n]one of these plaintiffs at present suffers from the alleged injury").

Plaintiffs are wrong that their allegations of past harm coupled with their subjective view that Penn's responses to ongoing events will remain "ineffective" (*see* Opp. 29-33) are sufficient to show their past harms are so likely to recur as to be "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). Their opposition tries to cast their claims as challenging "continuing policies, patterns, and practices leading to ineffective responses." Opp. 30 (citing *Richard Roe W.M. v. Devereux Found.*, 650 F. Supp. 3d 319 (E.D. Pa. 2023)) (cleaned up). What is missing are any alleged facts to support the existence of any "policies, patterns, and practices" that are the cause of the alleged antisemitism.

Settled precedent forecloses Plaintiffs' efforts to establish standing based on past harms and general averments that similar harms routinely occur, without a showing that Penn has authorized the injurious activity. *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), is on point. There, Lyons sued the City alleging that police had subjected him to an unlawful chokehold five months prior, that city police routinely use chokeholds unlawfully, and that the plaintiff "justifiably fears" he will be again subject to a chokehold. *Id.* at 98, 105. The Court held that Lyons did not have standing for an injunction prohibiting the use of chokeholds where he made no showing that "all police officers … always choke any citizen with whom they happen to have an encounter" or that "the City ordered or authorized police officers to act in such manner." *Id.* at 106.

Here, Plaintiffs' arguments are analogous to those in *Lyons*. Davis alleges two incidents of harassment in October 2023 and says that those incidents continue to impact her emotional well-being. AC ¶¶ 151, 175-76; Davis Decl. ¶¶ 2-3; *but see Lyons*, 461 U.S. at 107 n.8 ("The emotional consequences of a prior act simply are not a sufficient basis for an injunction[.]"). Rubin alleges he was denied access to a building by protestors in December 2023 and that he "could not sleep for over two weeks" and avoided certain parts of campus because of the protestors. AC ¶¶ 208, 272. And SAA Member #2 alleges he was affected by the vandalization of an off-campus Jewish fraternity house in October 2023 because he lives in a different Jewish fraternity two blocks away, and that he has trouble focusing and feels on-guard. AC ¶¶ 188, 274. These are the past harms and ongoing effects each Plaintiff alleges, which they argue will recur merely because they say other unspecified episodes have occurred and there are (now were) ongoing protests on campus, which neither Davis, Rubin, nor SAA Member #2 claim to have resulted in harm to them. *See* Davis Decl. ¶ 6 (reporting things that her Jewish friends have told her). While these three Plaintiffs remain enrolled at Penn, they have not pointed with any degree of specificity to any Penn policy

that condones the harassment they anticipate.   Thus, they offer only their own, unwarranted speculation that future injury is certain.   Given all the steps that they acknowledge have already occurred (*see* AC ¶¶ 195-99), this claim is meritless.

Unable to meet the standards of controlling precedent, Plaintiffs hitch their standing claims to an exception to Supreme Court precedent in *Lyons* and *Clapper* that courts have applied sparingly and only in the face of systemic and endemic institutional failures to respond to alleged harm.   *See* Opp. 30.   These cases make clear that Plaintiffs have alleged nothing of the sort at Penn. In *Richard Roe W.M. v. Devereux Foundation*, 650 F. Supp. 3d 319 (E.D. Pa. 2023), the opposition's main standing authority, the plaintiffs were minor children with disabilities confined to residential facilities who alleged that staff had physically abused them, that similar abuse occurred for decades, and that the facilities have a systemic environment of abuse caused by deficient hiring, supervisory, and reporting policies.   *Id.* at 326-28.   The plaintiffs were found to have alleged an imminent risk of abuse recurring because they were children *confined* to facilities where they were at the mercy of deficient policies that remained in place.   *Id.* at 326-30.   Notably, there was no evidence the facilities were doing anything to address the problem.   The *Roe* court observed that unlike *Lyons*, the plaintiffs had clearly alleged ongoing official policies were to blame for their injuries, and the court relied on cases involving involuntary confinement to support its holding that there was a sufficient likelihood past harms would recur. *Id.* at 330-31.   That court also distinguished *Clapper* by noting that no third party needed to act for the policies to create an abusive environment.   *Id.* at 332.   The reasoning of *Roe* does not apply to this case, and Plaintiffs cannot rely upon it to lessen their burden to plead a "certainly impending" future injury.

Fundamentally, none of Plaintiffs' authority is on point because none of the cases found a plaintiff to have standing under the circumstances here where Plaintiffs concede that Penn is

responding to incidents as they occur and is investing significant resources into preventing the recurrence of their harm.  *See* AC ¶¶ 195-99; Yakoby Decl., Ex. B; Ex. 37.  The fact that Plaintiffs bring deliberate indifference claims does not, as they suggest, mean they can establish standing simply by alleging students and teachers engaged in challenged conduct.  Opp. 34.  The cases they cite do not help them.  *Roe* did not involve a deliberate indifference claim and in *Booker v. Bangor Area School District*, 2015 WL 1344661 (E.D. Pa. Mar. 24, 2015), standing was not at issue—and in neither case did the defendant respond to and seek to prevent the recurrence of the plaintiff's harm.  Penn is responding in real time to allegations of antisemitism, investigating and initiating sanctions or criminal referrals where appropriate, and proactively working to prevent future incidents.  *See* Mot. 12-13.  Plaintiffs urge the Court to ignore these responses by arguing that the sufficiency of Penn's response is an issue for the merits of their Title VI claim.  Opp. 34.  This argument is unavailing, as the standing question is whether in light of Penn's responses, Plaintiffs plausibly allege a certainly impending injury and have shown a "line of causation between" Penn and the future harm Plaintiffs anticipate.  *Allen v. Wright*, 468 U.S. 737, 757 (1984).  This Court can answer that question without determining whether Penn's actions are a sufficient response under Title VI to the *past* incidents Plaintiffs allege, and without discovery.  *Cf. Pacheco-Figueroa v. United States*, 2023 WL 6436703, at *5 (E.D. Pa. Sept. 29, 2023) (statutory standing under FTCA immunity exceptions turned on government's supervision of contractor, a question intertwined with the merits of plaintiff's personal injury claim).

Indeed, Plaintiffs' latest allegations about an "encampment" of protestors illustrate why their theory that Penn's responses are "ineffective" cannot establish "certainly impending" injury. *See* Opp. 33 ("events on campus this week confirm Penn's purported efforts have been woefully ineffective and insufficient"); Davis Decl. ¶¶ 4, 6.  That encampment is now gone, and the

individuals involved from Penn were placed on administrative leave.  Ex. 34.  So, in this instance, as in all the other episodes Plaintiffs allege, Penn responded to policy violations by condemning the conduct and demanding it stop, Dkt. 42-3, initiating sanctions proceedings, Exs. 32, 34, and involving police where appropriate, Exs. 33, 35.  And as Plaintiffs' allegations show, not all protestors on or near Penn's large urban campus are Penn affiliates who can be subject to Penn's procedures or discipline.  *See* AC ¶¶ 170-71 (distinguishing between "speakers" and "students and faculty" speakers at rally).  So, as is usually true, where Plaintiffs make allegations about conduct or statements without identifying the relevant actors or speakers, or their affiliation with Penn, it cannot be assumed that those are individuals whose behavior Penn could influence.  *See Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 41-42 (1976) (no standing where it is speculative that defendant's conduct influenced the third-parties responsible for the plaintiff's injuries).

While Penn has not done exactly what Plaintiffs have demanded, on the timeline they have demanded, the allegations of past harms lodged by Davis, Rubin, and SAA Member #2 do not entitle Plaintiffs to injunctive relief, particularly where they fail to plead that recurrence of those harms is "certainly impending," and Penn is responding to events with serious action, in real time.

### C.     SAA Lacks Standing

In addition to lacking standing for injunctive relief, Plaintiff SAA lacks associational standing to sue on behalf of its members because its Title VI and contract claims require the individualized participation of the students.  *See Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (an organization suing in place of its members must demonstrate that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit").  Plaintiffs do not dispute that SAA lacks standing to seek damages for breach of

contract.  *See* Opp. 36-37; *see also Warth v. Seldin*, 422 U.S. 490, 515-16 (1975) (an association that "alleges no monetary injury … has no standing to claim damages on [a member's] behalf").

Plaintiffs do argue that their Title VI claims do not require the participation of SAA's individual members because they seek injunctive relief.  But they must demonstrate that *both* the *claims* and the relief they seek do not require the individual participation of SAA's members.  *See Hunt*, 432 U.S. at 343.  And Plaintiffs' Title VI deliberate indifference claims require each plaintiff to show s/he was personally subjected to "severe" and "pervasive" harassment that deprived her or him of "equal access to the school's educational opportunities."  *Whitfield v. Notre Dame Middle Sch.*, 412 F. App'x 517, 521-22 (3d Cir. 2011).  The inquiry into whether the harassment alleged is "severe" and "pervasive" is plaintiff-specific.  *See L. L. v. Evesham Township Bd. of Educ.*, 710 F. App'x 545, 549 (3d Cir. 2017) (allowing one plaintiff's claim to proceed, while granting summary judgment as to others').  Plaintiffs' cases do not suggest that associational standing is appropriate where the factual premise of each plaintiffs' injury differs (as it does here).  For example, the associational plaintiff in *Action Alliance of Senior Citizens of Greater Philadelphia v. Snider* (Opp. 37) brought claims for injunctive relief on behalf of its members, all of whom experienced the identical harm of being improperly denied benefits for a medical program, and its claims therefore did not require the participation of individual members.  *See* 1994 WL 384990, at *3 (E.D. Pa. July 18, 1994).  Similarly, in *Pennsylvania Psychiatric Society v. Green Spring Health Servs., Inc.* (Opp. 36-37), the associational plaintiff had standing because its members experienced the same harms in the same manner.  *See* 280 F.3d 278 (3d Cir. 2002).  Here, though, the SAA's claims require evidence concerning each member's subjective experience at Penn, requiring its members' individual participation in the case.  Indeed, the facts underlying each Plaintiff's claim that harassment denied her or him equal educational opportunities are unique and

cannot be equated.  For instance, SAA Member #1 alleges harassment in a class that no other

Plaintiff took (*see* AC ¶¶ 87-91) and she graduated in spring 2023 (*id.* ¶ 20), before the events on

which other Plaintiffs base their deliberate indifference claims.

## II.   Plaintiffs' Request For Disciplinary Measures And Judicial Regulation Of Private Donations Should Be Struck

In opposing Penn's motion to strike, Plaintiffs try to hide the fact that their request for

disciplinary measures contravenes longstanding Title VI precedent from the Supreme Court

precluding Title VI plaintiffs from making "particular remedial demands," *Davis ex rel. LaShonda*

*v. Monroe County Board of Education*, 526 U.S. 629, 648 (1999), by denying that they request

any specific remedial measures.  *See* Opp. 40.  This is wrong.  Since the Amended Complaint

obviously does request specific remedial measures—including "termination [of] deans,

administrators [and] professors" and "suspension or expulsion[] against students," AC, Prayer for

Relief, (A)(i)-(ii)—Plaintiffs should be deemed to withdraw their request for this relief, or it should

be stricken.  Plaintiffs also cannot use Title VI to enjoin Penn to "declin[e] and return[] donations,"

used to fund certain professors.  *Id.* at (A)(iii).  Academic freedom protects Penn's decisions on

whom it hires and what it lets professors express and teach.  *See Edwards v. California Univ. of*

*Pennsylvania*, 156 F.3d 488, 492 (3d Cir. 1998).  Plaintiffs' demand for disciplinary measures and

regulation of Penn's receipt of donations for academic work are unavailable remedies as a matter

of law.  The Court should strike them.  *See Rivera v. Dealer Funding, LLC*, 178 F. Supp. 3d 272,

281 (E.D. Pa. 2016); *Doe v. Haverford Coll.*, 2023 WL 5017964, at *11 (E.D. Pa. Aug. 7, 2023).

## III.   Plaintiffs Fail To State A Claim

### A.   Plaintiffs Fail To Plead A Plausible Title VI Claim

Plaintiffs' Title VI claim should be dismissed because Penn's response to concerns about

antisemitism on campus has not been, as a matter of law, "clearly unreasonable in light of the

known circumstances." *Davis*, 526 U.S. at 648-49.  Although Plaintiffs try to muddy the waters by alleging unidentified factual disputes, the Supreme Court in *Davis* made clear that courts can decide "on a motion to dismiss" whether a school's response was "'clearly unreasonable' as a matter of law." *Id.* at 649.  The allegations in the Amended Complaint do not overcome *Davis*'s high bar.  Plaintiffs try to disaggregate Penn's multipronged efforts to address antisemitism concerns on campus—including Penn's statements condemning antisemitism (Opp. 14-15), Penn's meetings with Plaintiffs and other Jewish students to listen to and address their concerns (Opp. 16-17), and Penn's comprehensive action plan (Opp. 17-18).  But those facts all provide necessary context (which *Davis* requires be considered, *see Doe v. Bibb Cnty. Sch. Dist.*, 126 F. Supp. 3d 1366, 1379 (M.D. Ga. 2015), *aff'd*, 688 F. App'x 791 (11th Cir. 2017)), and they all rebuff Plaintiffs' arguments of deliberate indifference.  At bottom, Plaintiffs' core argument is that Title VI licenses the Court to second-guess specific disciplinary decisions and to impose on Penn unprecedented obligations to control massive amounts of on-campus speech—including speech by individuals not under Penn's control—that might be unpopular or disagreeable to Plaintiffs.  *Davis* and its progeny foreclose that argument.  *See Davis*, 526 U.S. at 648.

### 1. Penn Was Not Deliberately Indifferent As A Matter Of Law

Plaintiffs concede that Penn has forcefully condemned antisemitic conduct, listened to student concerns, offered supportive resources, enforced policies, launched investigations and disciplinary proceedings, and made long-term commitments to addressing antisemitism, including enacting a comprehensive antisemitism Action Plan.  *See* AC ¶¶ 102-05, 109, 121, 156, 161-62, 165, 187, 195-96, 198, 237-38.  But now, Plaintiffs argue that the Court should ignore the Penn statements that, they admit, "are referred to in the complaint" with "limited quotes," arguing that those statements are not incorporated by reference.  Opp. 9 n.6.  That argument fails.  Courts are allowed to consider exhibits that are cited to and discussed in a plaintiff's complaint, even on a

motion to dismiss.   *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).   As the Third Circuit has explained, the incorporation-by-reference rule seeks to prevent what Plaintiffs ask be allowed here:  A "situation in which a plaintiff is able to maintain a claim … by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement" said something different than the plaintiff's misleading characterization.  *Id.*  In their opposition brief, Plaintiffs resist the only reasonable inference that those allegations allow: Penn is not deliberately indifferent, and its response has never been clearly unreasonable.

### 2. Plaintiffs Have Not Plausibly Alleged That Penn Is Deliberately Indifferent To Antisemitism

Plaintiffs argue that "the essence of plaintiffs' allegations" is that "in the face of months and even years of campus antisemitism, Penn's response has been '[in]effective in preventing … further harassment' … *and therefore* 'clearly unreasonable in light of the known circumstances.'" Opp. 20 (emphasis added).  But under settled precedent, whether a school's response was clearly unreasonable does not turn (as Plaintiffs would have it) on whether the efforts are "unsuccessful" or whether "more work is needed."  Opp. 14.  In *Davis*, the Supreme Court held that schools are not required to "purg[e] their schools of actionable peer harassment," *Davis*, 526 U.S. at 648, to avoid liability.   Thus, courts routinely find that "*actually* eliminating harassment is not a prerequisite to an adequate response."  *See, e.g.*, *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 670 (2d Cir. 2012).  To the contrary, because the "clearly unreasonable" requirement is not a "mere 'reasonableness' standard," 526 U.S. at 648, schools comply with *Davis* where, as here, they invest considerable resources and engage in new and serious efforts to address third-party harassment—an analysis that does not turn on whether the efforts are themselves successful but focuses instead on the reasonableness of the school's response.  *See Ings-Ray v. Sch. Dist. of*

*Philadelphia*, 2003 WL 21250556, at *4 (E.D. Pa. Apr. 30, 2003) (even if "defendants' remedy was not foolproof," the school's "comprehensive and well-orchestrated remedies" "cannot, as a matter of law, constitute clearly unreasonable responses."); *accord MJG v. Sch. Dist. of Philadelphia*, 2017 WL 5010033, at *9 (E.D. Pa. Nov. 2, 2017), *aff'd sub nom. M.J.G. v. Sch. Dist. of Philadelphia*, 774 F. App'x 736 (3d Cir. 2019).

Plaintiffs' reliance on *Goodwin v. Pennridge Sch. Dist.*, 309 F. Supp. 3d 367, 376 (E.D. Pa. 2018), is likewise unavailing: Plaintiffs cannot reasonably argue that Penn has "use[d] th[e] same methods to no avail," *cf. Zeno*, 702 F.3d at 669, when they admit that in just the last few months Penn has condemned antisemitism unequivocally, offered support and resources to affected students, has disciplined students following several incidents, and adopted a comprehensive program that invests considerable resources in the community's safety and security, engagement, and education (AC ¶ 196). That those efforts have not, at a time of extreme volatility, rid its campus of every vestige of antisemitism (or often more aptly, political speech Plaintiff Yakoby finds objectionable), does not mean Penn has violated federal law.

Nor are there issues of fact that preclude dismissal. Plaintiffs cite *Williams v. Lenape Board of Education*, 2020 WL 2111221 (D.N.J. May 4, 2020), extensively for this point. *See, e.g.*, Opp. 13-14. But in *Williams*, the court emphasized that there—unlike here—the school had not "implement[ed] any sort of new racial sensitivity program in response to the incidents of racial abuse it learned of." *Id.* at *17-18. Plaintiffs identify no case where a school has acted proactively, adopted a comprehensive plan, and consistently condemned both individual incidents and the larger scourge of peer harassment and still been held liable (or even potentially liable) under Title VI. Their own allegations defeat any inference that Penn has been indifferent—much less that its responses are so unreasonable as to satisfy *Davis*'s high bar. That is especially true because under

*Davis*, the inquiry turns on all known circumstances—not just those that benefit the Plaintiffs.  *See Doe v. Bibb Cnty. Sch. Dist.*, 126 F. Supp. 3d 1366, 1379 (M.D. Ga. 2015) (applying *Davis* and observing that a fact "cannot be considered in isolation because … a funding recipient's conduct must be evaluated in light of all known circumstances"), *aff'd*, 688 F. App'x 791 (11th Cir. 2017).

Plaintiffs try to distinguish *Mandel v. Board of Trustees of California State University*, 2018 WL 1242067 (N.D. Cal. Mar. 9, 2018), on the grounds that the plaintiffs there had not alleged that "the offending students" had "repeatedly violated the Student Conduct Code."  Opp. 18 n.14.  But here, like in *Mandel*, Plaintiffs do not allege that the same students were behind multiple incidents.  *See Mandel*, 2018 WL 1242067, at *19 ("[T]he Student Plaintiffs do not allege that multiple events sponsored by plaintiffs or Jewish students or community members were impermissibly shut down *by these same protestors* or that these same protestors have repeatedly aimed threats and violent taunts at Jewish students." (emphasis added)).  Rather, most of Plaintiffs' alleged perpetrators are not even purported to be affiliates with Penn at all—they are anonymous or unidentified, and Plaintiffs' efforts to treat all protesters and perpetrators as a single entity finds no support in *Mandel* or elsewhere.

Here too, context refutes that Penn's response has been unreasonable.  "All known circumstances" includes the context of a volatile political situation with impassioned stakeholders on both sides—many of whom follow Penn's rules and who are engaged just in core political speech.  Timing is also an important circumstance: Plaintiffs filed suit well before Penn's normal disciplinary processes could run their course.  Plaintiffs' allegations of delay or inaction—if strategically beneficial to them—are thus unsubstantiated given Penn's preparation of a comprehensive antisemitism plan, and its quick and public condemnation of antisemitic incidents. Finally, Penn's response must be evaluated against the context of what Penn knew—and did not

know.  *See Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 273 (3d Cir. 2014) ("Constructive knowledge is not sufficient; 'only actual knowledge is a predicate to liability'" under Title VI (citation omitted)).  Accepting Plaintiffs' allegations as true, some of the complaints were not reported at all, *see, e.g.*, AC ¶ 154, many of the complaints of antisemitism did not identify the perpetrators, *see, e.g.*, AC ¶ 176 ("As [Davis] moved away from the crowd, three men, whose faces were covered by keffiyehs and who were standing at the outskirts of the rally[.]"), and investigating who may be subject to discipline and then implementing that discipline takes time.

> a)      **Penn's Responses To The Alleged Incidents Were Not Clearly Unreasonable**

Try as they might to run away from the clear thrust of their suit, Plaintiffs' opposition confirms that this case largely amounts to a disagreement about specific disciplinary decisions Penn has made.[4]  The inescapable implication of what Plaintiffs say (first in their Amended Complaint, and even more forcefully in their opposition) is that Penn should discipline anyone whom Plaintiffs say should be disciplined.  Penn's decision not to do that is not deliberate indifference.

Plaintiffs' argument runs into the two basic problems Penn identified in its motion.

*First*, many of the specific incidents of which Plaintiffs complain relate to protected speech, and Title VI cannot (as the Department of Education has observed) "be interpreted in ways that would lead to the suppression of protected speech on public or private campuses."  U.S. Dep't of Educ., Office for Civil Rights, 2003 Dear Colleague Letter on First Amendment (July 28, 2003), https://www2.ed.gov/about/offices/list/ocr/firstamend.html.  Plaintiffs claim that "[a]t issue here is not 'pure political speech' or 'academic freedom.'"  Opp. 21.  But the predicate for much of

---

[4] To be sure, Plaintiffs' allegations are in many instances inaccurate or outright false.  But for purposes of this motion to dismiss, Penn accepts the factual allegations as true.  Those allegations still fail to state a claim.

Plaintiffs' claim proves otherwise: Plaintiffs urge the Court to find that Penn is in violation of Title VI due to its decision not to shut down a literature festival because speakers had, *in the past*, expressed views about Israel that Plaintiffs dislike (*see* AC ¶¶ 98-128); for allowing a Jewish club to screen a documentary called "Israelism" that examines American Jews' attitudes towards Israel (*id.* ¶ 213); for not immediately sanctioning or shutting down expressly political protests (*id.* ¶¶ 206-08); and for refusing to censor, fire, or otherwise discipline students and faculty for expressing a view that Israel has acted improperly during the war in Gaza (including for statements like "Palestinians have the right to defend themselves.  I 'utterly condemn' the occupation and structures of discrimination.  'There is no justification.'" (*id.* ¶ 140)), *see id.* ¶¶ 137-47.  Title VI does not require schools to censor such speech—even when the speech is offensive to some students.  *See, e.g.*, *Doe v. Sacks*, 2024 WL 402945, at *7 (S.D.N.Y. Feb. 2, 2024).  The First Amendment protects even objectively offensive speech, as this Court has found.  *See American Freedom Def. Initiative v. Southeast Pennsylvania Transp. Auth.*, 92 F. Supp. 3d 314, 320, 329 (E.D. Pa. 2015) (Goldberg, J.) (First Amendment protection for an advertisement that read "Islamic Jew–Hatred: It's in the Quran.  Two Thirds of All U.S. Aid Goes to Islamic Countries. Stop the Hate.  End All Aid to Islamic Countries.").

None of Plaintiffs' cases establishes that a school acts with deliberate indifference when, in actively responding to alleged harassment, it also strives to respect the free-speech rights of students and faculty.  And imposing hostile-environment liability based on "unpopular speech" by school officials, *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 316 (D. Mass. 1997), or "expressive conduct" at student protests, *Felber v. Yudof*, 851 F. Supp. 2d 1182, 1188 (N.D. Cal. 2011), imperils free expression.

Perhaps recognizing that their arguments cannot be extricated from these free-speech principles, Plaintiffs pivot to their flawed contention that Penn treats other kinds of speech differently.  *See* Opp. 21-22 & n.19.  But Plaintiffs do not identify a single adequate comparator. They point to Penn's discipline of Professor Amy Wax (*id.* at 21-22) but ignore Penn disciplined her for, among other things, making antisemitic statements (*see* Mot. 21-22; Dkt. 41-30).  Just as inapposite is Penn's discipline of "protesters who disrupted a football game."  Opp. 22.  Plaintiffs provide virtually no context for that incident—including how long it took to discipline those protesters, what they said, and whether any of the protesters in this case similarly disrupted an official university proceeding.  Without those details, Plaintiffs cannot ask the Court to assume that the two circumstances are similarly situated.  And even if, at other times, Penn has determined that it must discipline students for engaging in particular forms of protests—at particular times, in particular places, and in particular manners—those comparisons do not inform whether Title VI requires Penn to do so here.  And of course, Penn *has* done so here.  *See supra* 3-4.

*Second*, the specific allegations Plaintiffs discuss in their opposition brief do not plausibly show that Penn's response was ever unreasonable (much less clearly unreasonable).  To start, Plaintiffs' attempts to diminish the significance of Penn's repeated meetings with Plaintiffs and other Jewish students (Opp. 16) are unavailing:  Those are the exact kinds of facts that courts find as a matter of law "belie[] an inference of deliberate indifference."  *Jackson v. Katy Indep. Sch. Dist.*, 951 F. Supp. 1293, 1303 (S.D. Tex. 1996).  And as to the specific allegations Plaintiffs discuss, none of Plaintiffs' cherry-picked examples support Plaintiffs' argument.  For instance, they claim that after Davis was harassed on Oct. 16, 2023, "she request[ed] help obtaining class accommodations" (Opp. 19-20), but Plaintiffs never alleged that she reported the alleged harassment other than through this lawsuit.  Yakoby and Rubin claim that Penn failed to "use its

emergency notification system to alert its community" where there was a threat made against the Hillel building, but they admit that police "enter[ed] the building" and dealt with the threat (Opp. 20). The other two allegations—SAA Member #1's allegation that she felt victimized by a professor's statement in class, and the allegation that "a horde of more than a hundred rally goers" protested and "den[ied] plaintiffs freedom of movement around campus" (Opp. 20)—do not establish deliberate indifference. Both allegations implicate academic freedom and speech—one about what a professor teaches in class, the other about a political protest—and Penn cannot be obligated to fire a professor or arrest hundreds of protesters under the guise of Title VI.

Plaintiffs also mischaracterize what Penn has argued when they say that "Penn does not dispute that it had actual knowledge of nearly all incidents of harassment alleged in the complaint." Opp. 12. Even if Penn knew generally that antisemitic incidents have occurred on campus—and even if Penn knew of protests where some individuals said something antisemitic—Penn disputes the conclusory assertion that it knew who was responsible sufficient to know whom to investigate or discipline. Plaintiffs again try to pass the buck by claiming that whether Penn knew is a "fact-based inquiry." Opp. 12. But at issue here is that Plaintiffs have not pled that Penn in fact knew who was responsible. As a matter of law, Plaintiffs' allegations cannot plausibly show that Penn's response was clearly unreasonable if it had no reasonable way of identifying who was responsible.

b)    No Plaintiff Alleges Harassment Actionable Under Title VI

Whether the alleged conduct is "sufficiently severe and pervasive" to constitute actionable harassment "is a question of law" that the Court can decide at this stage, based on the pleadings. *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995). Plaintiffs do not dispute that the incidents that they personally experienced are not, on their own, enough to satisfy this high threshold. But they try to get around this by describing this case as "involv[ing] a massive institutional problem." Opp. 13. Plaintiffs' argument that the Court need not focus on the conduct

to which they personally were subjected directly contradicts the Third Circuit's approach in *L. L. v. Evesham Twp. Bd. of Educ.*, 710 F. App'x 545 (3d Cir. 2017).  There, the court found that one student (KLJR) "*who was present* when the 'n-word' was uttered" could establish a hostile environment, but the other two plaintiffs—including KLJR's sister, who was in school at the same time (2007-2012)—could not because "[t]he conduct *to which [they] were each subjected* over the five year period was neither severe nor pervasive."  *Id.* at 549 (emphases added); *see also* Mot. 22.  Likewise, in *Bird v. Mastery Charter Schools* (*see* Mot. 23 n.7), this Court dismissed a hostile environment claim because the plaintiff's claim rested "solely on examples of her supervisors at Mastery discriminating against others," explaining that "[i]mportantly, to sufficiently plead a hostile work environment claim, the discrimination needs to 'detrimentally affect the *plaintiff*.'" 2022 WL 1773673, at *5 (E.D. Pa. June 1, 2022) (Goldberg, J.) (citation omitted).  *See also* Mot. 23 (citing *Caver v. City of Trenton*, 420 F.3d 243, 263 (3d Cir. 2005)).  Courts routinely decline to adopt such a "broad conception" of "environment."  *See, e.g.*, *Leibovitz v. New York City Transit Auth.*, 252 F.3d 179, 189 (2d Cir. 2001) (finding no hostile environment because "much of the alleged harassment did not occur in plaintiff's immediate vicinity" and noting that even if she "could claim to share the same 'environment' … as the women allegedly harassed, [she] failed to demonstrate that their harassment adversely affected … her own employment.").

None of the cases Plaintiffs rely on (Opp. 10-12) is on point because they stand for a different proposition—that incidents that occurred to other people, or outside the plaintiffs' immediate purview, can still inform the analysis of "whether facially neutral conduct … was actually based on [the plaintiff's] race." *Caver*, 420 F.3d at 264.  They do not say that all members of a protected group can sue under Title VI for any racially motivated incident, regardless of whether they personally witnessed the incident or whether the incident was at least in part

motivated by *their* identity.  And while, in other circumstances, a plaintiff may be able to establish

"a nexus between the discrimination directed at him or her, and that directed at others," *Velez v.*

*QVC, Inc.*, 227 F. Supp. 2d 384, 410 (E.D. Pa. 2002), that principle does not apply here—where

Plaintiffs have not plausibly alleged that the specific individuals who allegedly harassed them were

also behind other incidents that affected other members of the Penn community.  At minimum, the

incidents that happened outside of Plaintiffs' immediate orbit—and which had nothing to do with

Plaintiffs personally—are not severe enough as to the Plaintiffs to support their Title VI claim.

*See Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997) (finding that "most of the

comments were not directed at plaintiff … [and that] contributes to our conclusion that the conduct

here was not severe enough to create an objectively hostile environment."); *Felber v. Yudof*, 851

F. Supp. 2d 1182, 1188 (N.D. Cal. 2011) (observing that conduct "that occurred at times and in

places where plaintiffs were not present … may, to the extent plaintiffs were actually aware of it,

have some *extremely marginal* relevance" to a hostile environment claim (emphasis added)).

### 3.  Plaintiffs Fail To Plead Direct Discrimination Or Discriminatory Animus

As Penn explained in its motion (Mot. 19), a *prima facie* claim of direct discrimination

under Title VI requires that a plaintiff allege, among other things, that "he suffered an adverse

action occurring 'under circumstances giving rise to an inference of discrimination.'"  *Saravanan*

*v. Drexel Univ.*, 2017 WL 5659821, at *8 (E.D. Pa. Nov. 24, 2017) (quoting *Blunt*, 767 F.3d at

275); *accord Koumantaros v. City Univ. of New York*, 2007 WL 840115, at *8 (S.D.N.Y. Mar. 19,

2007).  Plaintiffs never address this argument and have not identified a *single* adverse action that

Penn has taken against them.[5]  The direct discrimination claim must be dismissed for that reason alone.  *See, e.g.*, *De Piero v. Pennsylvania State Univ.*, 2024 WL 128209, at *6 (E.D. Pa. Jan. 11, 2024) (dismissing Title VII direct discrimination claim because plaintiff did not allege that he "suffer[ed] an adverse employment action").  Allegations of omissions—without allegations of affirmative actions taken against the plaintiffs—are as a matter of law insufficient to plausibly allege the "adverse action" requisite of a direct discrimination claim.  Mot. 19.

Plaintiffs are also wrong that their allegations support an inference of discriminatory intent—or that this is a fact-bound question under the circumstances.  *See* Opp. 22-24.  Plaintiffs do not dispute that they have alleged nothing to support their conclusory assertion that Penn was motivated by a racially discriminatory animus or motive.  *See* Mot. 20.  They instead argue that the Court can infer discrimination by considering how Penn has treated other groups.  But none of the alleged comparators are even plausibly similarly situated to Plaintiffs:  Plaintiffs' efforts to compare the relative "strength" of public statements has nothing to do with discrimination; allegations of how Penn has hired or fired faculty members are irrelevant comparators to Plaintiffs, all of whom are students; and conclusory allegations that Penn has enforced policies differently when other students or student groups have violated Penn's rules or policies are insufficient without any allegations to establish that the incidents are in fact similarly situated.  *Id.*  In their opposition, Plaintiffs also try to compare their allegations to an incident *in 1993* where an Orthodox Jewish student was, they allege, prosecuted for calling his peers "water buffalo[es]," Opp. 23—but they do not even try to situate the specific instances of misconduct as being similar, and Penn

---

[5] Plaintiffs' failure to address Penn's adverse-action argument independently counsels in favor of dismissal.  "[W]hen a plaintiff files a response to a motion to dismiss but fails to address certain arguments made by the defendant, the court may treat those arguments as conceded."  *Culley v. Cumberland Valley Sch. Dist.*, 2016 WL 775091, at *4 (M.D. Pa. Feb. 29, 2016) (quoting *Hanoverian, Inc. v. Pennsylvania Dep't of Env't Prot.*, 2008 WL 906545, at *16 (M.D. Pa. Mar. 31, 2008).

did not ultimately discipline that student.  Indeed, in the thirty years since, Penn abandoned the "speech code" policy at issue.  As a last gasp, Plaintiffs claim the Court should defer the question. Not so.  The question before the Court is whether Plaintiffs' allegations are enough to state a claim. As a matter of law, they are not.

**B.      Plaintiffs Fail To Plead A Breach Of Contract Claim**

Plaintiffs still fail to identify any provision that "create[s] any sort of affirmative, enforceable duty on the part of the University" that Penn failed to honor.  *David v. Neumann Univ.*, 187 F. Supp. 3d 554, 559-60 (E.D. Pa. 2016).  Plaintiffs rely on *Astaree v. Villanova Univ.*, where the plaintiff, unlike here, adequately pleaded his claim with specific portions of documents that "la[id] out procedures for [] students and provide[d] written guidelines and policies for students to follow."  509 F. Supp. 3d 265, 273 (E.D. Pa. 2020).  Plaintiffs fail to plead such specific promises here.  Instead, the Amended Complaint simply lists provisions of seven different policies, without identifying which policies applied to plaintiffs, which policies required Penn to act under any particular circumstance, what the applicable policies required Penn to do, or how Penn fell short. *See* AC ¶ 298.  Without more, plaintiffs do not adequately plead a breach of contract claim.

**C.      Plaintiffs Fail To Plead A Claim Under The Unfair Trade Practices And Consumer Protection Law (UTPCPL)**

Plaintiffs' opposition (Opp. at 25-26) fails to justify their cursory claims and legal conclusions that Penn engaged in deceptive and misleading conduct (*see* AC ¶ 309).  It is simply not plausible that general statements about "rights" and "obligations" in the Code of Student Conduct (Opp. 25-26), that are followed by "the content of student speech or expression is not [an appropriate] basis for disciplinary action" (AC ¶ 43), could be "likely to deceive a consumer acting reasonably under the circumstances" into believing, *Rickenbaker v. Drexel Univ.*, 2022 WL 970768, at *5 (E.D. Pa. Mar. 30, 2022), that a 28,000-student, urban university with a campus

open to the general public could possibly "ensure" an "environment free of discrimination, abuse, harassment, and intimidation."  AC ¶ 305.  It cannot be (and is not) the case that any school with an anti-discrimination policy is liable for deception if an incident of discrimination occurs.

Plaintiffs also cannot get around the fundamental fact that Penn's policies state clearly and plainly that it does not regulate the content of speech.  *See* AC ¶ 43.  So, they resort to claiming that they reasonably believed Penn would bar the speech they find demonizing because Penn does not protect political speech when it demonizes groups other than Jews (Opp. 26).  This is not true (*see supra* 19, 23) and was certainly not a representation that Penn made, thus not one that Plaintiffs relied upon.  Nor is it believable (nor supported by anything in the Amended Complaint) that before accepting attendance at Penn, Plaintiffs not only read all the policies they claim to have relied upon (including the Faculty Handbook), but also learned about and relied upon Penn's application of its policies in specific instances that had not yet emerged or that occurred 30 years ago.  *See Loduca v. WellPet LLC*, 549 F. Supp. 3d 391, 400 (E.D. Pa. 2021) (stating, on a motion to dismiss, that "a plaintiff is not entitled to a presumption of justifiable reliance"); *Seldon v. Home Loan Servs., Inc.*, 647 F. Supp. 2d 451, 470-71 (E.D. Pa. 2009) (plaintiffs must allege more than "a list of misrepresentations," they must set forth how their reliance changed their conduct).

## CONCLUSION

This lawsuit is premature, Plaintiffs lack standing for their injunctive relief, Plaintiff SAA lacks standing for its claims, and all claims fail on the merits.  The Court should dismiss Plaintiffs' Amended Complaint with prejudice.

Dated:  May 24, 2024

Respectfully submitted,

*/s/ David Gringer*
David Gringer (*pro hac vice*)
Alan Schoenfeld (*pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8864
Facsimile: (212) 230-8888
david.gringer@wilmerhale.com
alan.schoenfeld@wilmerhale.com

Seth P. Waxman (*pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
seth.waxman@wilmerhale.com

Sean V. Burke
Jason Gerard Canavan
Office of General Counsel
University of Pennsylvania
FMC Tower at Cira Centre South
2929 Walnut Street, Suite 400
Philadelphia, PA 19104-5099
Telephone: (215) 746-5200
Facsimile: (215) 746-5222

*Attorneys for Defendant the Trustees of the
University of Pennsylvania*