# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ALLY LANDAU, HJSB, HJSC, and | : | |
| JEWS AT HAVERFORD | : | |
| | : | **CIVIL ACTION** |
| v. | : | **No. 24-2044** |
| | : | |
| THE CORPORATION OF | : | |
| HAVERFORD COLLEGE | : | |

**McHUGH, J.**                                                              **January 6, 2025**

**MEMORANDUM**

The filing that commenced this action set forth a panoply of complaints, as did an amended version, spread across 430 paragraphs. But a litany of complaints related in a general way to the same subject – in this instance the serious problem of antisemitism – is not the same thing as a legally cognizable complaint pled in accordance with the Federal Rules of Civil Procedure. To survive, a complaint must plausibly set forth facts sufficient to support a recognized cause of action. Applying that standard here, Plaintiffs' complaint falls well short of the mark. I will therefore grant Defendant Haverford's motion to dismiss, albeit with leave to amend.

**I.      Standard of Review**

Haverford moves for dismissal under Rule 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim. Within the Third Circuit, motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009), and motions to dismiss under Rule 12(b)(1) are governed by a similar standard set forth in *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007). In both instances, the Court must accept as true all material allegations laid out in the complaint and construe those facts in favor of the nonmoving party. *See*

*Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Storino v. Borough of Point Pleasant Beach*, 322 F.3d 293, 296 (3d Cir. 2003).

## II.    Overview

Following Hamas' attack on Israel in October 2023, the Israel-Palestine conflict has been at the center of public discourse.  This debate is especially evocative on college campuses, and Haverford College is no exception.

Plaintiffs Jews at Haverford, Alumni Ally Landau, and two anonymous students[1] (collectively "Plaintiffs") allege that over the past year, Haverford College ("Haverford" or "the College") has become a bastion of antisemitism that is tolerated and at times perpetuated by the College.  Am. Compl., ¶¶ 18-21, ECF 14.  Plaintiffs contend that they have been personally affected by the eruption of disorder on campus.  *Id.* ¶¶ 45-50.  Specifically, they state that they have lost friends, faced harassment, been forced to change their routines, and missed out on seminal Haverford experiences because of escalated antisemitism.  *Id.*  They assert that antisemitism at Haverford has fostered a hostile educational environment in violation of Title VI, and that Haverford has breached certain contractual obligations by failing to deal with campus unrest.  *Id.* ¶¶ 404-423.

At this stage, a court would typically review the relevant facts.   I cannot cogently do so here due to the sprawling and disorganized character of Plaintiffs' Amended Complaint, which appears to detail every frustration and disagreement of Jewish students and faculty that has occurred at Haverford over the last year.  It spills pages of ink on lengthy frolics about events on other college campuses and about ideological debates.  Rather than isolating instances of

---

[1] The two anonymous students, HJSB and HJSC, are permitted to proceed under pseudonym in public-facing filings for the duration of this litigation.  *See* ECF 29.

harassment and logically relating them to the elements of a hostile environment claim, Plaintiffs set forth a running list of grievances that reads more as an opinion editorial than it does a legal complaint.

Some of the instances alleged are concerning, and if pled properly, could perhaps support a cognizable legal claim under Title VI. Yet, the Complaint is diluted by instances that no reasonable person could construe as intentional discrimination. For example, Plaintiffs contend that Haverford did not announce the month of May as "American Jewish History Month," and instead only celebrated "Asian American/Pacific Islander Month." Am. Compl. ¶ 333. Or, Plaintiffs complain that some graduating students at the Spring 2024 commencement donned attire that signified their support for Palestinians – a classic example of protected First Amendment expression. *Id.* ¶¶ 340-344. Elsewhere, Plaintiffs include comments made by a professor who does not even attend Haverford. *Id.* ¶ 189. As a result of Plaintiffs' scattered pleading, any serious allegations of actionable discrimination are buried as needles within a haystack of distraction.

Plaintiffs also dedicate a full eight pages of their Complaint to their effort to link Judaism to Zionism, while simultaneously insisting that they are not asking the Court to resolve any religious issues. *Id.* ¶¶ 56-103. Plaintiffs' equivocation is disingenuous, but likely strategic, seeking to blur the line between Zionism as a political philosophy and Zionism as a component of Jewish identity, and in the process implicitly sweep any and all criticism of Israel into the basket of antisemitism. [2] As a threshold matter, as I have done previously,[3] I reject Plaintiffs' embedded

---

[2] Haverford's briefing also suffers from a lack of nuance in failing to distinguish different types of Zionism or anti-Zionism, because in current usage "Zionism" can hold many different meanings. This serves Defendant's strategic purpose of deeming Zionism strictly a political philosophy, implicitly denying it can, depending on context, constitute an element of Jewish identity.

[3] *Tannous v. Cabrini Univ.,* 697 F.Supp.3d 350, 367, n. 10 (E.D. Pa. 2023) (upholding termination of professor by university concerned by tone and content of social media posts about Israel).

proposition that any anti-Israel speech is intrinsically antisemitic, because reasonable people acting in good faith can challenge decisions of the Israeli government without harboring antisemitic views.

Although Plaintiffs present pockets of compelling facts, the burden is on Plaintiffs to articulate how particular facts support the elements of a legal claim, not to send the Court on a scavenger hunt. As cogently observed by Judge Boudin of the First Circuit, it is not the Court's role, "especially in a counseled civil case, to create arguments for someone who has not made them or to assemble them from assorted hints and references scattered throughout the brief." *Yeomalakis v. F.D.I.C.,* 562 F.3d 56, 61 (1st Cir. 2009).

## III.   Discussion

### A.   Standing

As a threshold issue, Plaintiffs narrowly show sufficient Article III standing. To establish standing, a plaintiff must have "1) suffered an injury in fact, 2) that is fairly traceable to the challenged conduct of the defendant, and 3) that is likely to be redressed by a favorable decision." *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560-61 (1992).

Plaintiffs assert that both current and former individual student Plaintiffs have standing to seek damages. Opp'n to Mot. to Dismiss, at 21-22, ECF 23 ("Mem. in Opp'n"). The record is thin as to the specific injuries incurred by the individual Plaintiffs and whether those injuries are of the sort that could be financially compensated, the sole relief available.[4] The Amended Complaint, however, generally sets forth several instances that, if experienced by these individual

---

[4] Only compensatory damages would be available in this case, as emotional distress and punitive damages are not available under Title VI or in contract law. *See Barnes v. Gorman,* 536 U.S. 181, 187-188 (2002) (as to punitive damages); *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 221-222 (2022) (as to damages for emotional distress).

Plaintiffs, would reasonably demonstrate injury in fact. The individual Plaintiffs also plainly allege that they were "injured" by the College's deliberate indifference to antisemitic harassment on campus. Am. Compl. ¶¶ 46-48, 416-417, 422; *see also Ballentine*, 486 F.3d at 810 (citing *Lujan*, 504 U.S. at 561) ("general factual allegations of injury may suffice."). I therefore find that the individual student Plaintiffs have standing to seek damages. *See also Kestenbaum v. President & Fellows of Harvard Coll.,* No. 24-10092, 2024 WL 3658793, *4 (D. Mass. Aug. 6, 2024) (finding that a graduated student had standing to seek monetary relief for a Title VI hostile environment harassment claim based on antisemitism).

Jews at Haverford also has standing to pursue injunctive relief at this juncture. An association has standing to sue on its members' behalf when (1) at least one of its members would have standing to sue individually, (2) the interests it seeks to protect are "germane to the organization's purpose," and (3) the claims and types of relief requested do not require individual participation of the members. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342-343 (1977). Plaintiffs aver that "Jews at Haverford" is an "unincorporated association consisting of Jewish students and faculty at Haverford College, as well as Haverford alumni and parents of students and alumni, who are Jewish and share a commitment to the existence of Israel as a Jewish state." Am. Compl. ¶ 45. Although Plaintiffs provide no additional detail on the association, or its membership, structure, or functions, despite several hundred pages of briefing, at this stage I am bound to accept Plaintiffs' factual representations.[5]

---

[5] The Court cautions Plaintiffs that should information arise in subsequent discovery that casts doubt on the existence of Jews at Haverford as an active membership association, this Court may sua sponte revoke its finding of Article III standing.

Jews at Haverford nominally satisfies each of the three criteria for associational standing. First, at least one member of Jews at Haverford would have standing to sue in their own right, assuming that at least one person in the association experienced antisemitic harassment and notified the College.  Second, as a group allegedly comprised of Jewish Haverford community members dedicated to the existence of Israel, holding the College accountable for the spread of antisemitism where it intersects with anti-Zionism is surely "germane to the organization's purpose." *Hunt*, 432 U.S. at 343.  Finally, because Jews at Haverford seeks only injunctive relief, the association could litigate most claims without the participation of individual members, supporting the grant of associational standing.  *See Pa. Psychiatric Soc. v. Green Spring Health Servs., Inc.,* 280 F.3d 278, 284 (3d Cir. 2002) (suits for injunctive relief often require less individual involvement than would a suit for monetary relief, making injunctive relief actions better suited for associational standing).

 I will therefore deny Defendant's Motion to Dismiss under 12(b)(1).

**B.  Title VI Hostile Environment**

Plaintiffs claim that Haverford created a hostile environment in violation of Title VI by failing to act, or at times choosing not to act, in the face of widespread antisemitism on campus. Am. Compl. ¶¶ 17-19.  Although Title VI broadly protects students on federally funded college campuses from antisemitic discrimination, Plaintiffs fail to plead all required elements of the hostile environment claim they seek to articulate.  Accordingly, I will dismiss their Title VI claim with leave to amend.

*1.  Title VI Applies to Antisemitic Harassment*

On its face, Title VI does not address discrimination on the basis of religion.  But there is ample precedent classifying antisemitic harassment and discrimination as tantamount to racial

6

discrimination.  *See, e.g. Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617-18 (1987) (finding that "the Court of Appeals erred in holding that Jews cannot state a § 1982 claim against other white defendants"); *T.E. v. Pine Bush Central School Dist.,* 58 F.Supp.3d 332, 354-355 (S.D.N.Y. 2014) (holding that "regardless of whether they assert their claims on 'national origin' or 'race,' Plaintiffs are within their rights to assert a claim under Title VI based on anti-Semitic discrimination.").  The Department of Education's Office of Civil Rights has also advised that Judaism is akin to race in specific instances where attacks are levied on "shared ancestry or ethnic characteristics."  U.S. Dep't of Educ., OCR Dear Colleague Letter: Shared Ancestry or Ethnic Characteristics (Nov. 7, 2023).  I conclude therefore that Title VI applies.  How to apply it is a far more complex question.

As noted above, Plaintiffs posit that Zionism is "a central tenant of Judaism" under the purview of Title VI, whereas Haverford proposes that Zionism is merely a political belief unprotected by Title VI.  Am. Compl. ¶ 57; Mot. to Dismiss, at 11, ECF 17.[6]  For purposes of legal analysis, resort to such generalities is not useful, because the many meanings of "Zionism" make its relationship to Judaism extremely complex,[7] made all the more complicated by strong emotions incited by strife in the region, and by the broad diversity of opinion within the Jewish population itself.[8]  Deciphering when criticism of Israel or promotion of the Palestinian cause veers into

---

[6] Page numbers refer to ECF pagination.

[7] Some of those complexities, for example, are captured by a general summary created by The Anti-Defamation League.  (Sep. 1, 2016), www.adl.org/resources/backgrounder/zionism.

[8] I accept that a commitment to the existence of a Jewish state – though notably not a *carte blanche* endorsement of any activity of the State –  is a piece of ethnic identity for many (though not all) Jewish people.

antisemitism is necessarily a fact specific endeavor, and on that score Plaintiffs' complaint is insufficiently pled.

        2. *Plaintiffs do not plead facts supporting aggregation of their claims, and as a result, fail to plausibly establish the existence of a hostile environment*

Courts in this Circuit recognize the "hostile environment" theory of Title VI[9] suits for intentional discrimination. *See Saxe v. State Coll. Area Sch. Dist.,* 240 F.3d 200, 206 n. 5 (3d Cir. 2001).[10]   A plaintiff raising a hostile environment claim must show that 1) they experienced harassment that was "so severe, pervasive, and objectively offensive" that it deprived the victim of access to an educational activity or benefit, and 2) that the school was "deliberately indifferent" to known acts of harassment.[11]  *Davis, as Next Friend of LaShonda D. v. Monroe County Bd. of Educ.*, 526 U.S. 629, 633 (1999).

To determine whether a hostile environment exists, courts consider whether the alleged conduct was sufficiently severe or pervasive.  *See Castleberry v. STI Grp*., 863 F.3d 259, 264 (3d Cir. 2017) (conduct need only be severe *or* pervasive, not necessarily both); *see also Yael Canaan v. Carnegie Mellon Univ.,* No. 23-2107, 2024 WL 5145899, at *11 (W.D. Pa. Dec. 17, 2024).  One particularly offensive instance may be sufficiently severe.  On the other hand, multiple less egregious instances over time might evince sufficiently pervasive harassment.  Mere name calling or one-off instances of moderate bullying will not suffice, nor will simple disagreement with

---

[9] Title VI of the Civil Rights Act provides, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

[10] District courts in this Circuit analyzing Title VI hostile environment claims frequently cite *Whitfield v. Notre Dame Middle Sch*., 412 Fed. Appx. 517 (3d Cir. 2011), even though it is nonprecedential.

[11] This assumes that the Plaintiff has already made a showing that they are a member of a protected class under Title VI and that they were qualified for the relevant educational opportunities.

educators' management decisions.  *Davis,* 426 U.S. at 651-652.  In determining whether a hostile environment exists, courts should consider the totality of the circumstances.  *Castleberry,* 863 F.3d at 264.

A typical hostile environment claim considers the totality of a single individual's circumstances, such as the frequency of the harassing conduct, its severity, and whether it was physically threatening or humiliating, or instead an offensive utterance.  *See Saxe,* 240 F.3d at 205.  Here, however, Plaintiffs attempt to aggregate the experiences of many Jewish people at Haverford to paint the picture of a hostile environment endured collectively by all Plaintiffs.  In fact, Plaintiffs specifically represent that it is the "environment, rather than any individual acts of harassment" that create a right of action.  Mem. in Opp'n, at 36.

Courts are split as to whether multiple Plaintiffs may aggregate individual instances of harassment to establish a hostile environment.  Absent Third Circuit precedent on this question, both parties cite the Sixth Circuit opinion in *Berryman v. SuperValu Holdings, Inc*., 669 F.3d 714 (6th Cir. 2012).  In *Berryman,* a group of African American employees sued their employer under Title VII for a hostile work environment based on multiple employees' allegations about multiple different race-based incidents.  *Id.* at 716.  The Sixth Circuit applied a totality of the circumstances test, much like the test in the Title VI context,[12] and concluded that courts may aggregate claims from multiple plaintiffs to determine whether a hostile environment exists, even where those claims were not directed at or experienced by the same plaintiff.  *Id.* at 718.

---

[12] Hostile environment claims originated in Title VII workplace harassment context.  *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986); *Harris v. Forklift Systems, Inc.,* 510 U.S. 17 (1993) (for something to constitute harassment under a "hostile environment" theory, it must both 1) be viewed as harassment by the victim and 2) be objectively severe or pervasive enough that a reasonable person would agree that it is harassment).  Title VI hostile environment claims often reference and incorporate caselaw from Title VII.

But *Berryman* further held that aggregation is *only* permitted where a plaintiff shows that they were personally aware of the specific instances of harassment alleged by other employees. *Id.* at 719. The Sixth Circuit reasoned that courts may not infer collective knowledge where plaintiffs operate in a large space with multiple buildings. *Id.* ("In a physically large and partitioned workplace like the separated warehouses in this case, it is inappropriate for us to infer that Plaintiffs perceived events they did not discuss in their depositions."). While a plaintiff does not need to be the target of or a witness to a specific instance of harassment for that instance to be considered in evaluating the presence of severe or pervasive harassment, a plaintiff does need to "marshal basic evidence" to show that they knew about it. *Id.*

Yet in seeking aggregation here, Plaintiffs do not provide any facts that could support a finding that each plaintiff was aware of the other acts of harassment alleged.[13] Plaintiffs simply aver that "Haverford is a small and intimate campus, of approximately 1400 students in all years. The events described in the FAC were known virtually universally, and certainly among the Jewish students at whom they were directed." Mem. in Opp'n, at 35. Such conclusory assertions of collective knowledge are insufficient to show individual knowledge on behalf of each Plaintiff.

To take one example, it is unclear who witnessed a professor's alleged comments that he would not write recommendation letters for any student seeking to study Judaism or study in Israel. Am. Compl. ¶ 303. Further, it is unclear who the student that initially heard the statement then told, which of the named Plaintiffs knew of that incident, and when each Plaintiff was made aware, if ever. There is no allegation, for example, that Jews at Haverford organizationally had any

---

[13] Due to the anonymous nature of much of the pleadings, apart from Ally Landau's alleged instances, Plaintiffs do not specify what each plaintiff experienced or witnessed, nor what each respective plaintiff knew about other alleged instances.

channel for sharing such information.  The entire complaint suffers from similar deficiencies as to the spread of information about instances that purportedly created a hostile environment.

Absent clear factual pleadings as to who knew what and when they knew it, Plaintiffs cannot show that each Plaintiff was aware of each instance of harassment alleged, and as such may not aggregate their claims to demonstrate the presence of a hostile environment.  Without aggregation, the vast majority of Plaintiffs' claims in isolation are not sufficiently severe or pervasive to constitute a hostile environment under Title VI.

### 3. Plaintiffs do not show that Haverford was aware of each episode of harassment, but responded with indifference

Even if one or more of Plaintiffs' allegations was sufficiently severe or pervasive to constitute actionable harassment, Plaintiffs still fail to plead facts that would allow the Court to evaluate whether Haverford both knew about the harassment and acted with deliberate indifference – a critical element of a hostile environment claim.  Specifically, Plaintiffs do not set forth clearly, for each instance in the Amended Complaint, who complained to whom, if so, about what, and when.[14]

Harassment perpetrated by a student or teacher is only actionable where the school's action or lack thereof constitutes "deliberate indifference."  *Davis*, 526 U.S at 642.  A school may not be held liable for harassment based on a respondeat superior theory.  *See Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 285 (1998).  Instead, a school can only be liable for harassment where its indifference effectively "caused" the discrimination.  *Davis*, 526 U.S at 642.  Logically, therefore,

---

[14] The Amended Complaint broadly states that there are "several students who have explicitly brought complaints of this antisemitic behavior," and that there was a "large volume of complaints from Jewish students, parents, and alumni."  Am. Compl. ¶¶ 316, 310.  These sweeping statements do not indicate which instances were complained about, whether the person who heeded the complaint had authority to act, and whether any complaint procedure was properly followed.

a central element in pleading deliberate indifference for a Title VI claim is that administrators knew about the incidents that allegedly comprise the hostile environment, because a school's conduct can only be evaluated in light of *known* circumstances. *Blunt v. Lower Merion Sch. Dist.,* 767 F.3d 247, 273 (3d Cir. 2014) (citing *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 666 (2d Cir. 2012)); *see also StandWithUs Ctr. for Legal Justice v. Mass. Inst. of Tech.*, No. 24-10577, 2024 WL 3596916 (D. Mass. July 30, 2024) (holding that a university's unsuccessful efforts to contain escalating-on campus protests were insufficient to show deliberate indifference, based on what they knew at the time).

Additionally, a school can only act with deliberate indifference where the administrators with notice have authority to act. In other words, the administrator must be in a position to exercise "substantial control over both the harasser and the context in which the known harassment occurs." *See Davis,* 526 U.S. at 645 ("Only then can the [school] be said to 'expose' its students to harassment or 'cause' them to undergo it.").

Of the 430 paragraphs in the Complaint, only twice do Plaintiffs plead that someone put administrators on notice of allegedly discriminatory conduct, and in neither case would Haverford's response meet the legal standard for deliberate indifference. In the first instance, Plaintiffs objected to a public statement by Dean McKnight, which, according to Plaintiffs, "compared the butchery of Jews in Israel by a known terrorist group committed to eradicating the Jewish State and slaughtering all the Jews within it to a 'hurricane' or other natural disaster." Am. Compl. ¶ 118. Plaintiffs state that "a Jewish student leader complained," presumably to Dean McKnight himself, though the Complaint does not specify, who then responded, "I got emails from all different individuals; I can't make everyone happy." *Id.* Assuming that the Dean failed to meet the moment in how he responded to the butchery of Hamas, students' disappointment with an

administrator's choice of words, even deeply felt disappointment, cannot be deemed deliberate indifference.  For the Supreme Court has made clear school administrators are accorded wide latitude in matters of campus governance.  *See, e.g., Davis,* 526 U.S. at 648 ("[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators.").

Second, Plaintiffs aver that posters advertising a Shabbat dinner and a discussion of Jewish identity were torn down, Am. Compl. ¶ 160, an incident easily construed as antisemitic.  The allegations regarding this incident provide the *most* detail as to whether anyone complained to administrators, yet still fall short of what proper pleading would demand.

The Plaintiffs aver that "a Jewish leader and several Jewish students complained to the Haverford administration and asked that this be investigated." *Id.* ¶ 161.  Once again, however, the Amended Complaint omits any information as to when students complained, whether the request to investigate was formal or informal, or which administrator received the complaint(s).  Ironically, while Plaintiffs contend that "no member of the Haverford Administration publicly acknowledged the intentional destruction of the posters," *id.,* the *very next* paragraph of the Amended Complaint contradicts that, averring that that President Raymond issued a statement, saying that if there had been a "targeted removal" of any materials based on their promotion of Jewish activities, that would be "a clear case of antisemitism." *Id.* ¶ 162.

Plaintiffs then assert that an alleged perpetrator later identified himself, referencing a tweet that a Haverford student posted on his pseudonymous, personal Twitter account, which reads "I be tearing down Chabad posters and eating them like f*ckin fruit rollups." *Id.* ¶ 163.  Plaintiffs repeatedly state that the student was never punished, and even won a student-selected award at graduation. *Id.* ¶¶ 7, 164, 349-356.  Importantly, however, Plaintiffs do not plead that the alleged perpetrator was identified at any point to administrators, or that any administrator was made aware

of his tweet.  Title VI does not incorporate a common law negligence standard of "should have known."  It requires that Haverford had actual knowledge of antisemitic conduct which it then ignored.  Taking insinuation out of the equation, on the record as it stands, Plaintiffs have pleaded that there was a reprehensible incident followed by public condemnation from the College President, allegations that fall well short of pleading deliberate indifference.

For all remaining incidents in the Amended Complaint, the Court is left to wonder whether a complaint was lodged, and if so, whether the complaint was made to someone with authority to remedy the situation.  For example, Plaintiffs include a series of tweets made by Haverford Professor Guangtian Ha, one of which reads "[t]he state of Israel must be dismantled and the society de-Nazified.  Arms embargo, sanction, boycott, attack Zionism on all fronts.  Zionism is Nazism, it is fascism.  Zionists are racists."  Am. Compl. ¶ 182.  Yet, nowhere do Plaintiffs assert any facts to show that anyone with remedial authority at Haverford was ever made aware of the tweets.  Elsewhere, Plaintiffs allege that anonymous posters reading "from the river to the sea" were hung around campus.  Am. Compl. ¶ 147.  But Plaintiffs do not state for how long the posters remained up, whether any administrators saw the posters, or whether anyone complained to administrators about the posters.  In both instances, the dearth of information as to whether and when administrators with remedial authority were put on notice of alleged harassment makes it impossible to discern whether Haverford acted with deliberate indifference – a fundamental element of a hostile environment claim.

Ultimately, Plaintiffs repeatedly fail to show that they endured severe or pervasive harassment, either through their own experiences or through their awareness of others' experiences, that the College had notice of the alleged harassment, and that its response or lack of

response can be considered deliberate indifference.  Because Plaintiffs do not plead the elements of a Title VI hostile environment discrimination claim, dismissal is warranted.

### C.  Contract Claims

Plaintiffs also raise several breach of contract claims grounded in assorted College policies. To state a claim for breach of contract, a plaintiff must "set forth facts regarding (1) the existence of a contract, including its essential terms; (2) a breach of duty imposed by the contract; and (3) resultant damages." *Doe v. Haverford Coll.*, 656 F.Supp.3d 540, 545 (E.D. Pa. 2023) (citing *McShea v. City of Philadelphia*, 995 A.2d 334, 340 (Pa. 2010)).  Under Pennsylvania law, relationships between private colleges and their students are contractual in nature.  *Kimberg v. Univ. of Scranton*, No. 06-1209, 2007 WL 405971, at *3 (M.D. Pa. Feb. 2, 2007) (citing *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. Ct. 1999)).  "Written guidelines, policies, and procedures" distributed to students over the course of enrollment may constitute the terms of such contracts.  *Id.*

A plaintiff suing a private college for breach of contract must assert allegations that "relate to a specific and identifiable promise that the school failed to honor."  *David v. Neumann Univ.*, 187 F.Supp.3d 554, 558 (E.D. Pa. 2016); *see also Miller v. Thomas Jefferson Univ. Hosp.*, 908 F.Supp.2d 639, 655 (E.D. Pa. 2012) (a plaintiff must "point to *specific* undertakings in the [contract] that were not provided.") (emphasis added).  When interpreting university policies as contracts, each provision must be read in the context of the larger policy – a plaintiff may not cherry-pick helpful language and disregard the rest.  *Murphy v. Duquesne Univ. Of The Holy Ghost*, 777 A.2d 418, 432 (Pa. 2001) ("the parties' contractual intent cannot be gleaned by ignoring all but one sentence in the Contract, and then reading that sentence out of context.").  Finally, a plaintiff may not enforce a policy to which they are merely a third party, such as a promise from

the college to some other student, absent a specific intention to grant third party enforcement authority. *Guy v. Liederbach,* 459 A.2d 744, 751 (1983).

### 1.  Social Media Policy

Looking first to the social media policy, Plaintiffs fail to identify a specific undertaking that is relevant to any of the facts alleged.  Plaintiffs quote several lines from the Policy that appears to govern any social media use on campus, and then broadly allege that these instructions are "systematically violated on a recurring basis by students who have attacked Jewish students at Haverford who support Israel or who attend religious services. . .".  Am. Compl. ¶¶ 144-145.  But Plaintiffs omit language just a few lines above the quoted text that the Policy applies *only* to "faculty, staff, and students who administer or contribute to *official Haverford College-related social media channels*."  Mot. to Dismiss, Ex. 4, at 2 (emphasis added).  A contractual term must be read in its context.  *Murphy*, 777 A.2d at 432.  Such sleight of hand erodes not just the plausibility of the claims advanced but also Plaintiffs' credibility.  Because none of Plaintiffs' allegations involving social media involve official Haverford-related social media channels, this policy is irrelevant, and no breach of contract exists.

### 2.  Poster Policy

Plaintiffs' breach of contract claim as to the Haverford Poster Policy similarly fails to articulate a specific actionable promise between Haverford and Plaintiffs.  The Poster Policy in relevant part provides that "[t]he posters and other small notices must contain the name of the sponsor(s).  An e-mail address where the sponsor can be reached should also appear on the notice."  Am. Compl. ¶ 146.  Plaintiffs then include a photo of an anonymous poster reading "from the river to the sea Palestine will be free," accurately pleading that the anonymous poster fails to include contact information in violation of the Policy.  Am. Compl. ¶ 147.  But Plaintiffs point to no

undertaking by Haverford as to enforcement of the Poster Policy. Rather, the remedy that the policy explicitly provides is one of self-help: "any member of the community may take down any posting that is in violation of this policy." *See* Mot. to Dismiss, Ex. 5, ¶ 4(d). An offended student could instantly remove it. As a contractual matter, the Poster Policy is more in the nature of an agreement between Haverford and those who seek to hang posters, setting forth the conditions under which posters may be displayed, not a promise to those who might see them. Plaintiffs dedicate eight paragraphs to exploring the import of the phrase on the poster, ranging from analogies to confederate flags to White House statements in response to October 7th. But the offensiveness of the phrase to students of Jewish heritage has no bearing on the legal question of whether the policy creates an enforceable contract, and I am compelled to conclude that it does not.

### 3. *Scope of Expressive Freedom*

Plaintiffs' breach of contract claims based upon the "scope of expressive freedom" also lack specificity, for Plaintiffs do not articulate which specific language or policy is at issue, nor which conduct is at issue. Am. Compl. ¶ 419. Plaintiffs include three block quotes, each from a different Haverford policy, that provide in general terms that students have a right to protest and express their views, subject to an obligation to respect the dignity of others. Am. Compl. ¶¶ 122-124. A generalized assurance is not the same as a specific contractual promise. Plaintiffs do not articulate any specific instances that demonstrate a clear violation of any of the three excerpts which seemingly make up Plaintiffs' "scope of expressive freedom" claim. On the one hand, Plaintiffs plead no instances where they attempted to protest and were denied the opportunity. On the other hand, that Haverford allowed protests counter to Plaintiffs' interests to proceed on campus only shows that the College was abiding by its own policies on expressive freedom. Thus,

absent more specific pleading as to a precise policy provision at issue and one or more specific instances that demonstrate a violation, Plaintiffs' claim fails.

### 4. Non-discrimination Statement

Finally, Plaintiffs allege that Haverford breached its "Non-discrimination statement." Plaintiffs include the following excerpt:

> Haverford College is committed to providing an employment and educational environment free from all forms of unlawful discrimination because of race, color, sex/gender (including pregnancy, childbirth, related conditions, and lactation), religion, age, national origin, ancestry, citizenship, disability, status as a medical marijuana cardholder, genetic information, gender identity or expression, sexual orientation, current or past membership or service in the U.S. Armed Forces or a state military unit, or any other characteristic protected by law.

Am. Compl. ¶ 121. Beyond broadly referencing the other 278 pages of their Amended Complaint and its exhibits, Plaintiffs do not articulate in which specific instances they believe Haverford violated this policy. A college non-discrimination policy *can* constitute a contractual obligation where a plaintiff pleads specific facts surrounding the policy and its alleged violation. For example, in *Kestenbaum*, a case in which a Jewish graduate student sued Harvard University for alleged antisemitic harassment, the Court held that plaintiff Kestenbaum's breach of contract claim predicated on Harvard's nondiscrimination policy survived a motion to dismiss. *Kestenbaum,* 2024 WL 3658793, at *8. But Kestenbaum's pleadings were far more specific as to how the precise policy at issue was allegedly breached. For example, he cited to the provisions in Harvard's policy that establish complaint procedures regarding instances of discrimination. *Id.* Kestenbaum then articulated two distinct instances where he properly launched a complaint and where Harvard allegedly failed to follow their own procedures, laying out the precise flaw in Harvard's behavior for each complaint. *Id.* Thus, Kestenbaum's "cognizable breach of contract theory" was that

"Harvard failed to follow the complaint-handling procedures that the Policies prescribe," not that Haverford broadly violated its non-discrimination policy. *Id.*

Here, in stark contrast, Plaintiffs summarily refer to their multiple allegations of discrimination and deem that sufficient to establish a breach of the antidiscrimination policy. This hardly suffices to plead breach of contract.

It is also worth noting that an element of a claim for breach of contract is the requirement that "a plaintiff must set forth facts regarding. . .resultant damages." *McShea*, 995 A.2d at 340. Not a single paragraph in the entire Amended Complaint references any injury stemming directly from Haverford's alleged breaches of contract. Thus, Plaintiffs' pleading deficiency is two-fold.

Because none of Plaintiffs' breach of contract claims meet the requisite pleading standard, they will be dismissed.

## IV.    Conclusion

For the reasons set forth above, the motion to dismiss will be granted on 12(b)(6) grounds. The Court does not doubt that reactions to events in Israel and Palestine have created many uncomfortable moments for Jewish students at Haverford, as on other campuses.  But that does not by itself create a violation of federal law.  Plaintiffs seek to advance a specific legal theory under Title VI, and that comes with the obligation to comply with federal pleading standards. Plaintiffs have already availed themselves of the opportunity to amend as of right in response to Haverford's first motion to dismiss.  This dismissal will be without prejudice, but if counsel chooses to file a second amended complaint, he would be well advised to file a tailored pleading that directly and specifically addresses the elements of the claims he advances, to the extent that he can do so in compliance with the obligations imposed by Federal Rule of Civil Procedure 11.

 /s/ Gerald Austin McHugh
United States District Judge